Michael Nelson
9450 SW Gemini Dr
PMB 90924
Beaverton, Oregon 97008-7105
P: 702.932.3434
Email: oklahomaremote@gmail.com
PRO-SE / PRO-PER

### UNITED STATES DISTRICT COURT
### DISTRICT OF KANSAS

CHAD M. KOEHN and United Capital Management of Kansas, Inc.

           Plaintiffs,

v.

Michael Nelson

           Defendant

PRO-Se

**DOCKET NO.:**
**5:22-CV-04008-JWB-GEB**

**CIVIL ACTION**

**Memorandum & MOTION**
**of Concerning use of**
**HATE SPEECH**
**In Originating State Petition**

**MOTION for Referral to BAR**
**Association for DISBARMENT**

**& Prayer for Relief**

### UNITED STATES DISTRICT COURT DISTRICT OF KANSAS

### Memorandum & MOTION Concerning - HATE SPEECH in Originating Petition

Now Here Comes defendant Michael Nelson, defendant in the above captioned matter, having lawfully removed a State Court Petition, erroneously filed in State Court, to the US Federal Court for the US District of Kansas and so does herein submit this Memorandum and Motion for Referral to the Bar Association, Pro Se,

The Defendant so herein present this Memorandum, Motion and Requests for Prayer of Relief without limitation.  The Plaintiff's jointly and severally were equally both aware of the background of the defendant and were both equally aware of the defendant's close "spanish" ties, including without limitation home in the Kingdom de Espana, commonly referred to as Spain, thus indicating strong spanish ties and background of the defendant.

It is well settled fact that the use of the terms "bean" and "beaner" are derogatory terms used to describe persons of hispanic, spanish, latin, mexican decent, association, affiliation, and as such attacking the race, creed, color, etc. of another human being in legal pleadings does not simply indicate a protected class as defined under the Civil Rights legislation in the United States, but **it screams at <u>improper</u> use of the legal system for the means to demean, attack, ridicule, INTIMIDATE and generally cause hatred and contempt towards the person of another.**

It is well settled fact the attorneys for the plaintiffs and **the plaintiffs themselves jointly and severally received confidential protected information, from JANE DOE, co conspirator to the Plaintiffs, as to the location of the defendant**, and with knowledge of the defendants intended travel to the Republic of Catalonia, in the Kingdom de Espana, (Spain), where the defendant's family maintains a home, and minor children are located.  Children whom the Plaintiff's and their co conspirators have directly attacked through words, statements and memes.  The use of "bean" to refer to the defendant may in fact be another slur in calling the defendant "patufet" (Catalan), small and feeble minded, insignificant person.  The SLUR was and is taken as extreme vulgarity and directed at multiple attacks of protected classes, in race, creed, color, ethnic origin, family, **<u>it is done so maliciously with intent *to intimidate*</u>**,

harass, defame, annoy, discriminate against, and <u>generally violate civil rights,</u> the use is a ***violation of the Cannon of Ethics governing the conduct of attorneys.***  Name calling and use of **SLURS of HATE find no place in the administration of substantial justice**.  The use by the attorneys and by extension the continued hate spewed forth by the Plaintiff's provides by way of proof in the positive beyond the prima facie evidence of a continuation of racial bigotry by the plaintiff's and their organizations, all of which is actionable, both in the United States Civil and Criminal courts and around the world in each of the civil court systems where the hate speech was directed to achieve its purpose of  INTIMIDATION, defamation, harassment, annoy, discriminate against, threaten, intimidate and generally obstruct the rule of laws and the administration of substantial justice.

1.)  The fact two purportedly licensed attorneys did draft, proof-read, and carefully file with mens rea of the guilty mind a State Petition in a District County Court, of Saline County of the US State of Kansas, the originating "Petition" in this case, now removed for cause to this US Federal District Court.

2.) These two licensed attorneys having owed a duty to the Courts, the Judicial Process, the Justice System, their Oaths of their profession and duties to all, including their client, and the populous at large, did so maliciously with malice of forethought cause a racial epithet and known racial slur to be written, proof-read and purposefully submitted to a public record in a legal proceeding.

3.) Not for the purposes of explanation of an action, nor for the purposes to describe a wrong criminal, civil or a simple tort, but these attorneys taking instruction from their Racist, BIGOTED clients did purposefully, willfully and knowingly directly refer to the person of the defendant by a word of hatred and bigotry within the publicly filed State Petition.

4.) Given the date when the petition was filed, the obvious notice written in the petition of knowledge of a good and legal mailing address for the Defendant and the ability to have the defendant, so served avoiding unnecessary delay in the proceedings; the TWO presumed bar licensed attorneys, whom list bar numbers and purport to operate on behalf of a LARGE multi-attorney firm with ample resources to prevent accidental racism to be filed in public documents, did purposefully:

    a.) Lay in wait preparing with co-conspirators to litigate the matter via "surprise", once their plan to entrap unlawfully the defendant through the use of fraudulent inducements to other courts

    b.) Did conspire to unlawfully detain the defendant and have the defendant <u>served with improper service</u> as they attempted unjustly and not in the interests of Substantial Justice to secure a default judgment against the person of the defendant, as both a means to quiet the defendant, through racially motivated intimidation, ridicule, contempt all in attempts to cause the defendant further bodily injury and extreme bodily harm perhaps even contemplation of death to defendant, and using the same as a means to "out" one or more "WHISTLEBLOWERS" claimed inside the Plaintiff's organizations, as admitted to by the plaintiffs

    c.) The use of the racially motivated word of HATE, was and is done as further means to intimidate, defame, and generally attack the defendant for no permissible legal purpose.  The Attorneys and their clients the plaintiffs:  United Capital Management of Kansas Inc. and CHAD MITCHELL KOEHN remove all doubt as to their bigotry.

5.) Many American's of Mexican and Spanish descent can vividly describe the moment they heard the epithet "beaner" and being called a "bean". <u>As a child or a young adult, it stung.</u> To them, it said: **"You're not American, and you never will be."** Yet, it is well settled US Federal Law, since July 9th of 1868, when the States ratified the 14th Amendment, providing for EQUAL PROTECTION of the Laws among all Citizens! A detailed analysis of the 14th amendment and its protections can be made upon the request of this honorable Federal Court; as equally can the rights afforded all Americans including those native born American Citizens under the Civil rights acts, of which there are many, unfortunately necessary to protect the minority from the abuse of the majority, especially herein the "WHITES" of Saline County Kansas, and the township of Salina, who obviously have received little or no education as to the negativity of using words of HATE. It was Miss Cora Williams who raised funding to start the NAACP tutoring and counseling programs back in 1997, as the DOMESTIC TERRORIST ORGANIZATION the Klu Klux Klan, prepared to march in Salina. HOW TERRIBLY saddened the Court should be that this world has lost Miss Cora Williams as she left this world in the year of the Lord Jesus Christ 2020, after a long fight to END HATE in all its forms. Miss Cora with her large heart and warm spirit working diligently for the people of Salina and of Saline County Kansas obviously has missed reaching the souls, hearts and minds of even those supposed "educated" persons who administer the law in Salina and Saline County. KANSAS does not need to revisit its "BLOODY" past with HATE. Words of division and decisiveness find NO PLACE in the American Judicial System.

a.) Kansas as a State, was in fact first discovered by **Spanish** {EMPHASIS ADDED} explorer Francisco Vasquez de Coronado [A **SPANIARD**], who named many of the animals found in this newly discovered lands in the year of the Christian Lord, 1541.  If the counsel and the plaintiff's had referred to the person of the defendant by calling him an "armadillo", it would not have been as offensive a term, as with many of the words in the English language and the colloquialisms in these the United States of America, are derived from the explorers of yesteryear, the name of the small armed rodent "armadillo" actually means "little armored one", though even the use of this epitet could have unreasoned effects on the persons of others, ESPECIALLY in legal proceedings, yet it is not a settled term of HATE, as the use of the word "bean" or "beaner", is the equivalent of calling a black skinned man the "N" word.  Though here the Plaintiffs themselves often use the "N" word with "red" and directly attack those native born Americans, colloquially referred to by white men as "indians".  ***There can be no excuse for the use of the term of RACISM and BIGOTRY by the attorneys on behalf of their alleged BIGOTED and RACIST clients who have removed all doubt as to their racism given the other statements and comments of the Plaintiff's including many other racial eptitets of extreme HATE.***

"Last spring, Google searches for the term spiked when a Latino man revealed that a Starbucks barista in Southern California had written "beaner" on two cups he ordered, as a way of identifying him.

Then, on Jan. 1, The New York Times used "beaner" as an answer in its crossword puzzle. (The clue referred to baseball: "Pitch to the head, informally.") The Times apologized.

Such uses of "beaner" and "bean" are ***particularly troubling at a moment when hate crimes against Latinos have been rising.*** According to the Center for the Study of Hate and Extremism at California State University, San Bernardino, anti-Latino hate crime

increased 176 percent in major U.S. cities in the three weeks after the 2016 presidential election."

6.) **Beaner (BEAN)** is a derogatory slur towards Mexicans, and Latinos  and Spanish [Spaniards] in general.

Booth, William (September 28, 2005). "The Mouth of Mencia". *The Washington Post*. Retrieved April 26, 2010.

Definition of beaner | Dictionary.com". *www.dictionary.com*. Retrieved 2021-12-19.

San Diego's top Latino cop retires". *The San Diego Union-Tribune*. September 1, 2005.

"Pedro deflects the barbs; Racist comments don't faze Sox ace". *The Boston Herald*. September 14, 2000.

7.) Even if the counsel of the Plaintiff's were to claim their specific use of "Bean", was not as it is taken and intended a Racial SLUR against spanish.  The Plaintiff's and counsel can offer no reasonableness for the failure to proof-read the document filed and signed by not one BUT two (2) presumably bar licensed attorneys.  It is further known by the Plaintiff's and their extended organization and co-conspirators including without limitation criminal mastermind JANE DOE, that the defendant suffers from a lifetime of stuttering.  "Bean, is a person who **stuttered**. Unlike some other famous actors, Rowan Atkinson's stutter..."  The Defendant has is known to CHAD MITCHELL KOEHN's alleged co conspirators JANE and JOHN DOE, who may be identified under seal due to a frivolous protective order preventing service of process to them and a malicious and frivolous prosecution JANE DOE has instituted against the person of the defendant, know first hand of the Defendant's extreme "stuttering" difficulties and lifelong suffering from stutters. Indicating that even in any attempts by the counsel for the plaintiffs to erroneously explain away their use of "BEAN" as the titling and description of the defendant in the legal proceedings, in the

commencement hereof through the erroneously filed State petition which is now herein removed to this US Federal District Court, a person who suffers from "stuttering" is also defined in a protected class. There can be no mistake the attorneys and their clients certainly remove all reasonable doubts as to their collective joint and several BIGOTRY against others, especially those in minority and protected classes. THERE IS NO EXCUSE FOR NAME CALLING AND RACIALLY MOTIVATED HATE IN LEGAL PROCEEDINGS, IT COLLECTIVELY DENIES SUBSTANTIAL JUSTICE. Allowing presumed bar licensed attorneys to get away with the use of word of HATE in the initiating petition and allow these attorneys to continue in the practice of law does a disservice to ALL LAWYERS, EVERYWHERE!

8.) There can be no logical reasoning nor word which the term "Bean", is a "typo", or reason for its titling and description as made therein the originating petition. The term "BEAN" used in the pleading of the state petition, so removed, was and is done PURPOSEFULLY, with willingness, knowingly, with MALICE of Forethought to sew seeds of HATRED, Contempt, Ridicule and certain INTIMIDATION.

9.) It is well settled in fact the obligation of bar licensed attorneys to proof-read their legal work before a filing is made. It is disturbing that not one but TWO (2) presumed bar licensed attorneys would have "proof-read" the short only 4 page petition and not correct a "typo" or other excuse they may proffer for what is obvious and evident purposeful wanton willful and knowingly made with MALICE of Forethought a SLUR made towards the person of the Defendant to cause extreme emotional distress, hatred, ridicule, contempt, INTIMIDATION and gives rise to obvious violations to due process, equal protection under the law, denial of substantial justice and civil rights violations. The actions of the counsel and their

clients are both civil and CRIMINAL in the manner such horrific use of SLUR made against protected classes is herein made in a public legal pleading, filed to the County District Court, in a County which is made up of more than 91+% anglo saxon WHITES, the attorneys claim headquarters in a building with the Plaintiffs in a town which has such extreme levels of hate that the DOMESTIC TERRORIST ORGANIZATION the Grand Wizards of the Klu Klux Klan regularl march through main street in protest of DOCTOR Martin LUTHER King's Nationally recognized holiday.  The facts are the attorneys seek to sew HATE, Contempt, Ridicule and certain INTIMIDATION in their initiating petition.

"It is important to proofread legal documents **to identify and correct any errors that may have crept in**. An incorrect word in a legal document can change the entire meaning of information contained in the document. A small mistake can cause considerable legal issues for both the clients and the lawyers."

10.)    Of even greater concern is the fact the County of Saline, of the US State of Kansas is by far one of the least diverse racially in the United States.  According to statistical information available, from the United States Census, provides the following:  "That white alone is 90.1%",  though other Federal resources show the percentage much higher.

https://www.census.gov/quickfacts/salinecountykansas

11.)    It is obvious and evident the use of "BEAN" is meant to do more than simply cause the defendant emotional distress, and direct hatred, ridicule, INTIMIDATION and contempt towards the person of the defendant.  Given the other facts present including without limitation the intention to litigate via "surprise", purposeful delay in service of process, improper service of process, obvious and evident attempts to secure a default judgment, it was and is the purpose of both the unethical attorneys to cause the racially motivated hate speech to be included in the public legal pleading, and send it uncovered into a minority filled dangerous facility.

**12.)** **"Lawyers who manifest racist attitudes not only prejudice the administration of justice and tarnish a very noble profession,** but such *lawyers also call into question their very competence to practice law."*

13.) "The administration of justice is one of the most important functions of a civil society. The **effectiveness of the judicial system depends on the public's utmost trust in the fairness of those charged with the administration of justice."  Racist epitets find no place in the Courts!**

14.)   Inter-alia "**racist speech by lawyers has been viewed primarily as a violation of ABA Model Rule of Professional Conduct 8.4(d)**. Despite readily characterizing such speech as **"misconduct" under the code of ethics for each state"**

> "Analysis to case examples during or after 1983, the year in which the ABA Model Rules of Professional Conduct were adopted. Since the ABA's adoption of the Model Rules of Professional Conduct, fifty-two States and Territories have adopted the ABA Model Rules of Professional Conduct as their own code of ethics. For purposes of uniformity in discussion, I framed the issues in the language of the ABA Model Rules of Professional Conduct."

15.) "The courts seem to recognize that the professional consequences of racist speech vary **depending on whether the offender is a bar applicant or has already been admitted to the bar [EMPHASIS ADDED]**. After all, it would be _problematic to hold bar applicants to the standards of a professional system to which they have not even been admitted._ For those not yet admitted to a particular bar, state bar admissions committees frequently have held the appropriate sanction to be the denial of bar admission. In re Application of Roger I. Roots, 762 A.2d 1161 (R.I. 2000) (Though denied bar admission for other reasons, the case of Roger Roots also presented a state bar admission committee with an applicant who regularly used racist speech); Hale v. Committee on Character & Fitness for Illinois, 2002 U.S. Dist. LEXIS 4262 (N.D. Ill., Mar. 12, 2002), aff'd. Hale v. Committee on Character and Fitness for the State of Illinois, 335 F.3d 678 (7th Cir. 2003).

Matthew Hale, a self-avowed white supremacist, is often cited as an example of a bar applicant denied admission to the bar due to his past and current racist speech and conduct. Hale v. Committee on Character & Fitness for Illinois, 2002 U.S. Dist. LEXIS 4262 (N.D. Ill., Mar. 12, 2002), aff'd. Hale v. Committee on Character and Fitness for the State of Illinois, 335 F.3d 678 (7th Cir. 2003).

In *Panel File 98-26,*21 for example, a lawyer was disciplined for filing a motion in a criminal case to prevent opposing counsel from bringing an attorney of color to be co-counsel. In re Charges of Unprofessional Conduct Contained in Panel File 98-26, 597 N.W.2d 563 (Minn. 1999).

16.)   EVEN Here, if BOTH attorneys were to "profusely apologize", their intended actions on behalf of an alleged RACIST, White Supremacist client, **have already achieved the determined damage they sought with mens rea of forethought in their guilty minds to have made against the person of the Defendant**, and have already so caused an "uncovered", initiating Petition to be served via improper service, with the **intended consequences to cause the defendant extreme bodily damage** as the defendant was unlawfully held in a facility with 99.2% minority population. The two

presumed bar l**icensed attorneys MUST be PERMANENTLY DISBARRED FROM THE PRACTICE OF LAW,** and the Plaintiff's in this action should be held to account equally in Civil Rights litigation and CRIMINAL PROSECUTION therefore this injustice sewing of HATE.

17.)   **"The administration of justice is one of the most important functions of a civil society.** The *effectiveness of the judicial system depends on the public's utmost trust in the fairness* of those charged with the administration of justice. In the cases that follow, the most common reason courts cited for disciplinary action was to **send a message to the entire bar that r**ace**ist speech cannot be tolerated in a judicial system that prides itself on the equality of justice.**

18.)   To date, racist speech by lawyers has been viewed primarily as a **violation of ABA Model Rule of Professional Conduct 8.4(d)**.  Despite readily characterizing such speech as "misconduct" under the code of ethics for each state.

19.)   Once admitted to the bar, lawyers are subject to many more forms of discipline, including private or public reprimands, temporary suspensions, and permanent disbarments. **Courts have held that the use of racist speech by lawyers violates ABA Model Rule 8.4(d), or its equivalent in the individual state's code of attorney ethics, because the racist speech was prejudicial to the administration of justice.** *The very accusation of racism among officers of the court casts doubt in the minds of the public* **and** *damages the perception of the legal profession* as one based on integrity and fairness.   **USE OF HATE in an originating petition is intolerable!**

*Disciplinary Counsel v. Frost, 909 N.E.2d 1271, 1278 (Ohio 2009) ("False statements impugning the integrity of members of the judiciary and judicial system [by accusing them of racism] erode public confidence" (citing Disciplinary Counsel v. Gardner, 99 Ohio St. 3d 416, 2003-Ohio-4048, 793 N.E.2d 425, at ¶ 30)).*

The Deputy Attorney Generals for the US State of New Jersey, Attorney General's Office or the New Jersey Attorney General themselves; analysis of the severity of Racism and its negative consequences to the Administration of Justice is on point here, especially in the facts of the matter where the counsel for the Plaintiff's and the Plaintiff's themselves laid in wait to litigate via surprise as they conspired with others and did so knowingly cause the uncovered petition to be sent into the US State of New Jersey for the purposes to cause racial divide, in a facility they KNEW contained more than 95% minorities.

## Racism in the Legal Profession: A Racist Lawyer is an Incompetent Lawyer

**By: Jana DiCosmo**

*Jana R. DiCosmo, Esq. dedicates this article to her family for their support and encouragement throughout this and many other endeavors. She also expresses special thanks to Professors Serena Williams and Patrick Johnston of Widener University Delaware Law School, and to Jessica Miller, Esq., for their insightful feedback on this article. Ms. DiCosmo is a graduate of Stockton University and Widener University Delaware Law School. **She is a Deputy Attorney General for the Employment Counseling and Labor section of the Office of the New Jersey Attorney General.** Disclaimer: The opinions expressed herein are those of the author and are not necessarily the opinions of the Office of the New Jersey Attorney General or its officials.*

"One of the major ethical issues with drafting legal documents is that any materials drafted by non-lawyers, including paralegals, **must be reviewed and approved by a lawyer before being distributed beyond the confines of the law firm**." AND  "There are ethical implications as well, which shall subject the lawyer to disciplinary action."

> 20.)      "Under the ABA Model Rules of Professional Conduct 5.1, 5.2 and 5.3, the attorney is responsible for supervising personnel who report to him/her, including more junior attorneys and associates, law clerks, paralegals, law librarians, file room staff and secretaries, to name but a few, as well as anyone outside the law firm who is working on a client matter or who may have access to confidential client information. Moreover, a paralegal or legal assistant who goes beyond the definition of what duties are allowed and what the role is intended to be risks a charge of the unauthorized practice of law. (See the NALA Code of Ethics and Professional Responsibility, Canon 1, Canon 2, Canon 3 and Canon 5, the NFPA Model Code of Ethics and Professional Responsibility and Guidelines

for Enforcement, 1.7 and especially 1.8, and the Indiana Paralegal Association Code of Ethics and Professional Responsibility and Rules for Enforcement, Canon 8 and especially Canon 9). "
https://scholarworks.iupui.edu/bitstream/handle/1805/3735/Part%20V%20Ethics%20-%20Hook.pdf;jsessionid=8B908E2DD3827A8A3ACBB53A0F23DC2B?sequence=1

21.)     Embodied in Rules 5.1, 5.2 and 5.3 of the American Bar Association Rules of Professional Conduct and adopted, in whole or in part, in each state. • Rule 5.1 Responsibilities Of Partners, Managers, And Supervisory Lawyers • Rule 5.2 Responsibilities Of A Subordinate Lawyer • Rule 5.3 Responsibilities Regarding Nonlawyer Assistance With respect to a nonlawyer employed or retained by or associated with a lawyer: (a) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer; (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if: (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action. For our purposes, Rule 5.3 is the most important, because (b) clearly states that the lawyer has a duty to make "reasonable efforts" to make sure that the paralegal's "conduct is compatible with the professional obligations of the lawyer." Thus, paralegals should be familiar with all of the provisions of the Code of Professional Conduct in the particular state where he or she is working. Comment [2] Nonlawyers Within the Firm further describes this responsibility for employees within the law firm: [2] Lawyers generally employ assistants in their practice, including secretaries, investigators, law student interns, and paraprofessionals. Such assistants, whether employees or independent contractors, act for the lawyer in rendition of the lawyer's professional services. A lawyer must give such assistants appropriate instruction and supervision concerning the ethical aspects of their employment, particularly regarding the obligation not to disclose information relating to representation of the client, and should be responsible for their work product. The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline. The ABA Model Rules of Professional Conduct were recently amended as part of the Ethics 20/20 project. A subtle but important change is reflected in Rule 5.3, with the change of

MEMORANDUM & MOTION CONCERNING HATE SPEECH IN ORIGINATING PETITION - 14

the title from Nonlawyer Assistants to Nonlawyer Assistance, clarifying that the ethical duties of the lawyer extend to any third-party vendors, consultants, contractors, cloud computing services or otherwise outsourced processes that are part of the representation. Thus, the lawyer cannot contract away his or her ethical duties by using outsiders. Comment [3] Nonlawyers Outside the Firm provides additional insight into the lawyer's responsibilities and cites a number of other Rules that are related: [3] A lawyer may use nonlawyers outside the firm to assist the lawyer in rendering legal services to the client. Examples include the retention of an investigative or paraprofessional service, hiring a document management company to create and maintain a database for complex litigation, sending client documents to a third party for printing or scanning, and using an Internet-based service to store client information. When using such services outside the firm, a lawyer must make reasonable efforts to ensure that the services are provided in a manner that is compatible with the lawyer's professional obligations. The extent of this obligation will depend upon the circumstances, including the education, experience and reputation of the nonlawyer; the nature of the services involved; the terms of any arrangements concerning the protection of client information; and the legal and ethical environments of the jurisdictions in which the services will be performed, particularly with regard to confidentiality. See also Rules 1.1 (competence), 1.2 (allocation of authority), 1.4 (communication with client), 1.6 (confidentiality), 5.4(a) (professional independence of the lawyer), and 5.5(a) (unauthorized practice of law). When retaining or directing a nonlawyer outside the firm, a lawyer should communicate directions appropriate under the circumstances to give reasonable assurance that the nonlawyer's conduct is compatible with the professional obligations of the lawyer.

22.)     Several other ABA Model Rules of Professional Conduct are also important to note in the relationships between the paralegal and the attorney, the paralegal and the law firm and the paralegal and the client. Among these rules are: • Rule 1.1 Competency [including competence with the both the area of the law that is part of the representation and the practice of law, which has been extended to encompass using appropriate technology). • Rule 1.6 Confidentiality (and several more specific rules) • Rule 1.7 Conflicts of Interest (and several more specific rules) • **Rule 3.3 Candor to the Tribunal** • Rule 3.4 Fairness to Opposing Party and Counsel • Attorney-client privilege – as extended to paralegals who are assisting in the representation of the client • Attorney work-product doctrine • Other common privileges include: spouses, clergy-penitent, doctor-patient, participants in settlement negotiations. Other legal doctrines may also apply: trade secret, proprietary information, etc. Various states may have specific rules relating to the roles and responsibilities of nonlawyer personnel, including paralegals. For example, the Indiana Rules of Professional Conduct devote Guidelines 9.1 to 9.10 to the use of non-lawyer assistants (see Indiana Rules of Court, Rules of Professional Conduct, including amendments made through January 1, 2013,

http://www.in.gov/judiciary/discipline/, accessed March 6, 2012): USE OF NON-LAWYER ASSISTANTS Introduction Subject to the provisions in Rule 5.3, all lawyers may use non-lawyer assistants in accordance with the following guidelines. Guideline 9.1. Supervision A non-lawyer assistant shall perform services only under the direct supervision of a lawyer authorized to practice in the State of Indiana and in the employ of the lawyer or the lawyer's employer. Independent non-lawyer assistants, to-wit, those not employed by a specific firm or by specific lawyers are prohibited. A lawyer is responsible for all of the professional actions of a non-lawyer assistant performing services at the lawyer's direction and should take reasonable measures to insure that the non-lawyer assistant's conduct is consistent with the lawyer's obligations under the Rules of Professional Conduct. Guideline 9.2. Permissible Delegation Provided the lawyer maintains responsibility for the work product, a lawyer may delegate to a non-lawyer assistant or paralegal any task normally performed by the lawyer; however, any task prohibited by statute, court rule, administrative rule or regulation, controlling authority, or the Indiana Rules of Professional Conduct may not be assigned to a non-lawyer. Guideline 9.3. Prohibited Delegation A lawyer may not delegate to a non-lawyer assistant: (a) responsibility for establishing an attorney-client relationship; (b) responsibility for establishing the amount of a fee to be charged for a legal service; or (c) responsibility for a legal opinion rendered to a client. Guideline 9.4. Duty to Inform It is the lawyer's responsibility to take reasonable measures to ensure that clients, courts, and other lawyers are aware that a non-lawyer assistant, whose services are utilized by the lawyer in performing legal services, is not licensed to practice law. Guideline 9.5. Identification on Letterhead A lawyer may identify non-lawyer assistants by name and title on the lawyer's letterhead and on business cards identifying the lawyer's firm. Guideline 9.6. Client Confidences It is the responsibility of a lawyer to take reasonable measures to ensure that all client confidences are preserved by non-lawyer assistants. Guideline 9.7. Charge for Services A lawyer may charge for the work performed by non-lawyer assistants. Guideline 9.8. Compensation A lawyer may not split legal fees with a non-lawyer assistant nor pay a non-lawyer assistant for the referral of legal business. A lawyer may compensate a non-lawyer assistant based on the quantity and quality of the non-lawyer assistant's work and the value of that work to a law practice, but the non-lawyer assistant's compensation may not be contingent, by advance agreement, upon the profitability of the lawyer's practice. Guideline 9.9. Continuing Legal Education A lawyer who employs a non-lawyer assistant should facilitate the non-lawyer assistant's participation in appropriate continuing education and pro bono publico activities. Guideline 9.10. Legal Assistant Ethics All lawyers who employ non-lawyer assistants in the State of Indiana shall assure that such non-lawyer assistants conform their conduct to be consistent with the following ethical standards: (a) A non-lawyer assistant may perform any task delegated and supervised by a lawyer so long as the lawyer is responsible to the client, maintains a direct relationship with the client, and assumes full

professional responsibility for the work product. (b) A non-lawyer assistant shall not engage in the unauthorized practice of law. (c) A non-lawyer assistant shall serve the public interest by contributing to the delivery of quality legal services and the improvement of the legal system. (d) A non-lawyer assistant shall achieve and maintain a high level of competence, as well as a high level of personal and professional integrity and conduct. (e) A non-lawyer assistant's title shall be fully disclosed in all business and professional communications. (f) A non-lawyer assistant shall preserve all confidential information provided by the client or acquired from other sources before, during, and after the course of the professional relationship. (g) A non-lawyer assistant shall avoid conflicts of interest and shall disclose any possible conflict to the employer or client, as well as to the prospective employers or clients. (h) A non-lawyer assistant shall act within the bounds of the law, uncompromisingly for the benefit of the client. (i) A non-lawyer assistant shall do all things incidental, necessary, or expedient for the attainment of the ethics and responsibilities imposed by statute or rule of court. (j) A non-lawyer assistant shall be governed by the Indiana Rules of Professional Conduct. (k) For purposes of this Guideline, a non-lawyer assistant includes but shall not be limited to: paralegals, legal assistants, investigators, law students and paraprofessionals."

23.)   **Lawyers should avoid hostile, demeaning, or humiliating words in written and oral communications with adversaries.** (§ 4(b).) [EMPHASIS ADDED]

24.)   **Formal Opinion 493 July 15, 2020 Model Rule 8.4(g): Purpose, Scope, and Application** This opinion offers guidance on the purpose, scope, and application of Model Rule 8.4(g). **The Rule prohibits a lawyer from engaging in conduct related to the practice of law that the lawyer knows or reasonably should know is harassment or discrimination on the basis of various categories, including race [EMPHASIS ADDED]**, sex, religion, **national origin [EMPAHSIS ADDED]**, and sexual orientation. Whether conduct violates the Rule must be assessed using a standard of objective reasonableness, and only conduct that is found harmful will be grounds for discipline.  This opinion is based on the ABA Model Rules of Professional Conduct as amended by the ABA House of Delegates through

August 2019. The laws, court rules, regulations, rules of professional conduct, and opinions promulgated in individual jurisdictions are controlling

25.)    It is well settled that Lawyers should NEVER insult, harass, threaten, **intimidate** and certainly NEVER use racially insensitive SLURS in legal pleadings. Neither written submissions nor oral presentations should disparage the integrity, intelligence, morals, ethics, or personal behavior of an adversary unless such matters are directly relevant under the controlling substantive law. (§ 3(b).)  AS HEREIN the use of the titling of the word of division, HATE, and certain INTIMIDATION finds no legal permissible purpose for its use.

26.)    Rule 8.4(g) covers conduct related to the practice of law that occurs outside the representation of a client or beyond the confines of a courtroom. In addition, it is not restricted to conduct that is severe or pervasive, a standard utilized in the employment context. However, and as this opinion explains, conduct that violates paragraph (g) will often be intentional and typically targeted at a particular individual or group of individuals, such as directing a racist or sexist epithet towards others or engaging in unwelcome, nonconsensual physical conduct of a sexual nature. The Rule does not prevent a lawyer from freely expressing opinions and ideas on matters of public concern, nor does it limit a lawyer's speech or conduct in settings unrelated to the practice of law. The fact that others may personally disagree with or be offended by a lawyer's expression does not establish a violation. The Model Rules are rules of reason, and whether conduct violates Rule 8.4(g) must necessarily be judged, in context, from an objectively reasonable perspective. Besides being advocates and counselors, lawyers also serve a broader public role. Lawyers "should further the public's understanding of and confidence in the rule of law and the justice system because legal institutions in a constitutional democracy depend on popular

participation and support to maintain their authority."  MODEL RULES OF PROF'L CONDUCT Scope [14] (2019)

27.)   **Discriminatory and harassing conduct, when engaged in by lawyers in connection with the practice of law, engenders skepticism and distrust of those charged with ensuring justice** and fairness. **Enforcement of Rule 8.4(g) is therefore critical to maintaining the public's confidence in the impartiality of the legal system** and its trust in the legal profession as a whole.  *As explained in this opinion, events in the legal profession and in the broader community influenced the development of Rule 8.4(g) and demonstrated the necessity for its adoption. The police-involved killing of George Floyd and the unprecedented social awareness generated by it and other similar tragedies have brought the subject of racial justice to the forefront, further underscoring the importance of Rule 8.4(g) and this opinion.*

In August 2016, the ABA House of Delegates adopted Model Rule 8.4(g).  *See Annual Meeting 2016: ABA Amends Model Rules to Add Anti-Discrimination, Anti-Harassment Provision (Aug. 8, 2016), https://www.americanbar.org/groups/professional_responsibility/committees_commissions/ethicsandprofessionalresponsibility/  (summarizing events at the House of Delegates meeting). The provision was adopted by voice vote, with no one speaking in opposition. See Stephen Gillers, A Rule to Forbid Bias and Harassment in Law Practice: A Guide for State Courts Considering Model Rule 8.4(g), 30 GEO. J. LEGAL ETHICS 195, 197 (2017)*

28.)   The Rule prohibits a lawyer from "**engag[ing] in conduct that the lawyer knows or reasonably should know is harassment or discrimination on the <u>basis of race</u>, sex, <u>religion</u>, <u>national origin, ethnicity</u>, disability, age, sexual orientation, gender identity, marital status or socioeconomic status in conduct related to the practice of law.**"  MODEL RULES R. 8.4(g).

Adoption of paragraph (g) followed years of study and debate within the ABA. This opinion offers guidance on the Rule's purpose, scope, and application. The conduct addressed by Rule 8.4(g) harms the legal system and the administration of justice. As one court emphasized in sanctioning a male lawyer for disparagingly referring to his female adversary as "babe" and making other derogatory, sexual comments during a deposition, [The lawyer's] behavior . . . was a crass attempt to gain an unfair advantage through the use of demeaning language, a blatant example of "sexual [deposition] tactics." . . . "These actions . . . have no place in our system of justice and when attorneys engage in such actions they do not merely reflect on their own lack of professionalism but they disgrace the entire legal profession and the system of justice that provides a stage for such oppressive actors." Mullaney v. Aude, 730 A.2d 759, 767 (Md. Ct. Spec. App. 1999) (quoting trial judge in the case); see also Principe v. Assay Partners, 586 N.Y.S.2d 182, 185 (Sup. Ct. 1992) ("[D]iscriminatory conduct on the part of an attorney is inherently and palpably adverse to the goals of justice and the legal profession. . . . 'The continued existence of a free and democratic society depends upon recognition of the concept that justice is based upon the rule of law grounded in respect for the dignity of the individual. . . . Law so grounded makes justice possible, for only through such law does the dignity of the individual attain respect and protection. . . .' While the conduct here falls under the heading of sexist, the same principle applies to any professional discriminatory conduct involving any of the variations to which human beings are subject, whether it be religion, sexual orientation, physical condition, race, nationality or any other difference.") (quoting Preamble to the Code of Professional Responsibility)); Cruz-Aponte v. Caribbean Petroleum Corp., 123 F. Supp. 3d 276, 280 (D.P.R. 2015) ("When an attorney engages in discriminatory behavior, it reflects not only on the attorney's lack of professionalism, but also tarnishes the image of the entire legal profession and disgraces our system of justice."); In re Thomsen, 837 N.E.2d 1011, 1012 (Ind. 2005) ("Interjecting race into proceedings where it is not relevant is offensive, unprofessional and tarnishes the image of the profession as a whole."); In re Charges of Unprofessional Conduct, 597 N.W.2d 563, 568 (Minn. 1999) (maintaining that "it is especially troubling" when a lawyer engages in "race-based misconduct" and, if not addressed, "undermines confidence in our system of justice"). On June 4, 2020, the Washington Supreme Court issued an open letter regarding the issues raised by the George Floyd situation, forcefully embracing the cause of racial justice: "We call on every member of our legal community to reflect on this moment and ask ourselves how we may work together to eradicate racism. . . . We go by the title of "Justice" and we reaffirm our deepest level of commitment to achieving justice by ending racism. We urge you to join us in these efforts. This is our moral imperative." Supreme Court of Washington, Open Letter to the Judiciary and the Legal Community (June 4, 2020), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf

29.)   MODEL RULES R. 8.4(d) cmt. [3] (1998). In particular, the Comment stated: **A lawyer who, in the course of representing a client, knowingly manifests by words or conduct, bias or prejudice based upon <u>race</u>, sex, religion, <u>national origin</u>, disability, age, sexual orientation or socioeconomic status, violates paragraph (d)** *when such actions are prejudicial to the administration of justice*. AS THEY ARE HERE.

30.) Rule 8.4(g) provides: It is professional misconduct for a lawyer to . . . engage in conduct that the lawyer knows or reasonably should know is harassment or discrimination on the basis of race, sex, religion, national origin, ethnicity, disability, age, sexual orientation, gender identity, marital status or socioeconomic status in conduct related to the practice of law. This paragraph does not limit the ability of a lawyer to accept, decline or withdraw from a representation in accordance with Rule 1.16. This paragraph does not preclude legitimate advice or advocacy consistent with these Rules. It is obvious these RACIST attorneys and their alleged RACIST Clients: CHAD M. KOEHN and United Capital Management of Kansas, Inc. are free to associate with who they wish but when initiating the frivolous, baseless, state petition they should be admonished and PERMANENTLY DISBARRED for using HATE in the initiating petition. Though the Klu Klux Klan is considered a Domestic TERRORIST Organization, the Plaintiffs and their unethical attorneys are free to associate with whom they wish under the freedom of assembly provisions of the First Amendment to the US Constitution, HOWEVER, these attorneys should be FOREVER more PREVENTED from bringing their HATE into the administration of justice as they have now done so here.

31.) Harassment is a term of common meaning and usage under the Model Rules. See, e.g., MODEL RULES R. 3.5(c)(3) & 7.3(c)(2) (both discussed in the text). See also MODEL RULES Preamble [5] ("A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others.").

It refers to conduct that is aggressively invasive, pressuring, or intimidating. See, e.g., NEW OXFORD AMERICAN DICTIONARY 790 (3d ed. 2010) (defining "harassment" as "aggressive pressure or intimidation"); MERRIAM-WEBSTER DICTIONARY (defining

"harass" as meaning "to annoy persistently"; "to create an unpleasant or hostile situation for, especially by uninvited and unwelcome verbal or physical conduct"), https://www.merriam-webster.com/dictionary/harass (last visited June 23, 2020)

32.)    Rule 8.4(g) addresses harassment in relation to the practice of law that **targets others on the basis of their membership in one or more of the identified categories.** Consistent with the guiding principle that the Model Rules are rules of reason and "should be interpreted with reference to the purposes of legal representation and of the law itself," the term "harassment" in Rule 8.4(g) must be construed and applied in a reasonable manner. See MODEL RULES Scope [14].

33.)    Model Rule 7.3(c)(2) also prohibits "harassment." It forbids "solicitation that involves coercion, duress or harassment." MODEL RULES R. 7.3(c)(2) (emphasis added).   As with other uses of "harassment" in the Model Rules, a rational reading of the term includes badgering or invasive behavior, **as well as conduct that is demeaning or derogatory. [EMPHASIS ADDED]**

34.)    Similarly, Model Rule 4.4(a) subjects lawyers to discipline for using ***"means that have no substantial purpose other than to embarrass, delay, or burden a third person."*** MODEL RULES R. 4.4(a). While it does not expressly use the word "harassment," the conduct prohibited is clearly of the same sort that comes within that word's definition.   Writing a SLUR to describe and even in this case "TITLE" the Defendant in the originating state petition certainly qualifies as serving no substantial purpose other than to embarrass, annoy, INTIMIDATE and has certainly now caused "delay" and unnecessary burdens to the defendant and embarrassment to the Court.

35.) Discrimination **"includes harmful verbal or physical conduct that manifests bias or prejudice towards others."** MODEL RULES R. 8.4(g), cmt. [3] (emphasis added). In addition, "[t]he substantive law of antidiscrimination and anti-harassment statutes and case law" may serve as a guide in applying paragraph (g). *Bias or prejudice can be exhibited in any number of ways, some overlapping with conduct that also constitutes harassment.* **Use of a racist or sexist epithet with the intent to disparage an individual or group of individuals demonstrates bias or prejudice.**

WHEREAS here we certainly have a case where TWO (2) presumably and self proclaimed members of a bar association **did proof-read as they are REQUIRED** and submit a petition they knew would be a public document to a County Court and **_certainly should have expected that petition to be removed for good cause to a Federal Court_**. These two (2) attorneys conspired both with each other and their bigoted client who has in the past made a number of racist rants and statements including racism and Federal HATE Crimes against the person and family of the defendant along with their co conspirators, JANE DOE. The Plaintiffs are known by virtue of the means by which they made their improper service of process to the defendant did purposefully and **willfully against the law receive confidential information as to the location of the defendant**, and the Plaintiffs did conspire with BOTH their counsel and the co-conspirators of the Plaintiff's collectively and severally to **lay in wait and litigate through surprise seeking to secure a default judgment against the defendant predicated on fraud against the Court. Thus FRAUD against substantial justice.** The use of the SLUR as made to both describe the defendant in a negative light and to embarrass, harass, intimidate, stalk and generally violate the CIVIL Rights of the defendant did willfully knowingly with malice of forethought list the SLUR on the front page of the petition.

**"Use of a racist or sexist epithet with the intent to disparage an individual or group of individuals demonstrates bias or prejudice." [EMPHASIS ADDED]**

WHEREAS here we have the use of a racially bias, extreme remark not just to describe the defendant, but to directly attack his family, children, and certainly gives rise to being of similar if not identical HATRED and CONTEMPT as calling a "black man" the "N" word: specifically N*g**r!   Why should hispanics, latins, mexicans and spanish in general should have to stand for words of hate and racial divide anymore than an African American should have to withstand or the uses by the Plaintiff of "red" N*g**r, to describe native born americans (what white men call "indians' ' colloquially) Or person with Jewish blood or religion, must tolerate, in hatred by anti-semetic persons?  **The Spanish are no less human than any other!**

**THESE LAWYERS MUST BE PERMANENTLY DISBARRED!**  Sending a clear message to all attorneys that use of SLURS in petitions at State or Federal Courts will NOT be tolerated as it is intolerable to sow seeds of HATE in today's America. Absent permanent disbarment and publicity around the same, the general populace will be forever damaged in their belief in a fair and equal judiciary.  Substantial Justice is DENIED the People of these the United States of America, when attorneys to operate within the Courts, and through initial appearances and state petitions through the use of SLURS, attacking defendants with "name calling" subjecting them to ridicule, INTIMIDATION, hatred, contempt, emotional distress, in pleadings before the defendants have an opportunity to be heard in a Court of law.  **The actions of these attorneys as an extension of the alleged bigotry of their clients United Capital Management of Kansas, Inc. and CHAD MITCHELL KOEHN, is**

**obvious** and <u>evident</u> as they purposefully with malice of forethought spew forth their contempt and HATRED of others based on protected classes.

<u>THE PLAINTIFFS MUST BE MADE TO PAY DAMAGES and COSTS</u>, as well as punitive and compensatory damages for the extreme emotional distress and the attacks suffered by the defendant as was the intention and plan of the Plaintiffs, in conspiracy with co conspirators to malicious prosecution of the defendant and entrapment of the defendant through fraudulent inducement, of the unlawful detainment, allowing for the attorneys and Plaintiffs herein to lay in wait and litigate via surprise. The actions of the Plaintiffs by and through their legal counsel laying in wait and **obviously taking no actions to attempt service of process demonstrate clearly with the preponderance of the evidence and beyond a reasonable doubt as to the intention to conspire with others, litigating via surprise and seeking to litigate when the Plaintiffs reasonably believed the defendant would be unable to respond nor defend the frivolous and malicious petition.**

The PRO SE, <u>defendant apologizes to this Honorable Federal Court</u> in advance as the **Pro Se** defendant is <u>without</u> the <u>legal education nor experience,</u> in the proper formatting nor the extensive rules of FRCP (Federal Rules of Civil Procedure), and having just received the "local rules" of the US District of Kansas Federal Court, on 1 Feburary 2022, the day which the Notice of Removal was dutifully filed with the US Federal Court of the District of Kansas. Having only briefly read through the local rules a single time the Defendant does so herein apologize for the length of this Motion, Memorandum and Request for Prayer of relief, the Defendant has managed to ensure the length is less than 30 pages as per Local Rule 7.1(e), if the memory of the PRO SE Defendant is correct as to the language limiting the pages to less than 30.

WHEREFORE IT IS THE PRAYER FOR RELIEF BY THE DEFENDANT:

To be now and forever more protected against such horrific bias, HATE, ridicule, contempt, INTIMIDATION, harassment, annoyance and extreme emotional distress, by this Honorable Federal Court.  WHEREIN here the defendant so respectfully begs and pleads herein for immediate referral of the two attorneys who took it upon themselves to purposefully use SLUR of HATE, in the originating petition to describe and so "TITLE" the name and person of the Defendant, for PERMANENT DISBARMENT by the Bar Association for the State of Kansas and this Honorable Federal Court.   Furthermore, the defendant requests the following specific relief, in addition to referral with recommendation for PERMANENT DISBARMENT of the Attorneys who authored, proofread and signed the originating petition:

1.  For the Appointment of a "Special Master", for all interactions with the Plaintiff's and/or any attorneys they utilize, as the defendant will be unable to communicate with ANY lawyers, yet alone any attorney employed by the firm: KENNEDY BERKLEY YARNEVICH & WILLIAMSON, Chartered who represent the allged BIGOTED Plaintiffs.  AND for all costs, fees and expenses for the NECESSITY of a "Special Master" to be charged against the Plaintiffs in this matter.

2.  For all costs in the preparation and filing of all motions in this matter due directly to the illegal, immoral and unethical actions as described through the use of HATE SPEECH by the Plaintiffs and their counsel.

3. For referral to BOTH State and Federal Law Enforcement for the investigation and PROSECUTION of HATE CRIMES, in BOTH State and FEDERAL Criminal Court.

4. For the censure and ORDER denouncing the horrific conduct of the Plaintiffs and their counsel and condemning the same **that "HATE SPEECH has no place in the American Judicial System".  That through the sowing of seeds of HATE, Substantial Justice is denied the people.  That Faith in a fair and balanced judiciary is essential for the populace to place trust and faith in the administration of the laws and the government. That when attorneys act with HATE, contempt, ridicule, INTIMIDATION and unjust behavior in legal pleadings, yet alone in the initiation of legal proceedings, the litigants are unfairly damaged through delay and additional costs.**

5. For an Order seeking to correct the record and insure that such HATE and evident purposeful willful knowingly wanton disregard for the rights of humans engaged in civil legal proceedings is discouraged now and forever more by any other would be BIGOT attorney or litigants.

6. For all other such relief as is warranted and proper, including without limitation the award of damages both punitive and compensatory, without limitation.

Respectfully Submitted, this 2nd day of February 2022.

The undersigned hereby certifies that, on this same date, I electronically filed the foregoing with the Clerk of the Court via electronic-mail to:  **KSD_Clerks_Topeka**

MEMORANDUM & MOTION CONCERNING HATE SPEECH IN ORIGINATING PETITION - 27

<KSD_Clerks_Topeka@ksd.uscourts.gov> which will and has the duty to send notice of its filing electronically to the attorneys of record, as per the local rules and FRCP.

Respectfully,

Michael Nelson - Pro Se

—————————————————————————————————————————————

Michael Nelson
9450 SW Gemini Dr
PMB 90924
Beaverton, Oregon 97008-7105
P: 702.932.3434
Email:  oklahomaremote@gmail.com