# Exhibit

# "C"

# To Follow . . .

Your Partner in the Profession | March 2018 • Vol. 87 • No. 3

# THE JOURNAL

## OF THE KANSAS BAR ASSOCIATION



**Lawyers' Electronic Advertising:
Websites, Blogs, LinkedIn, etc.**
J. Nick Badgerow
P 40

**The KLS Low Income Tax Clinic in KCK**
William Schmidt
P 34



**Success** is making it to the game on time...and getting paid while you're there.

**PAYMENT RECEIVED**
Client: Joe Smith
Amount: $1,152.00



## Have the best of both worlds

LawPay was developed to simplify the way attorneys get paid, allowing you to run a more efficient practice and spend more time doing what you love. Our proven solution adheres to ABA rules for professional conduct and IOLTA guidelines. Because of this, LawPay is recommended by 47 of the 50 state bars and trusted by more than 45,000 lawyers.

lawpay.com/ksbar  |  888-281-8915

**LawPay**®
AN AFFINIPAY SOLUTION

**+**

**KANSAS BAR ASSOCIATION** 1882

### The experts in legal payments

LawPay is a registered ISO of Merrick Bank, South Jordan, UT



**40 |** Lawyers' Electronic Advertising:
WEBSITES, BLOGS, LINKEDIN, ETC.
J. Nick Badgerow

**34 |** The KLS Low Income Tax Clinic in KCK
William Schmidt

*Cover design by Ryan Purcell*

**6 |** KBA Elections
About Your Candidates in Contested Races

**17 |** Math and the Law Series:
The Calculation of Child Support in Kansas
……………………………………………*Charles F. Harris*

**25 |** OPINION
CASA: Key in Saving Kansas Foster Kids
……………………………………*Honorable Kevin Mark Smith*

## Regular Features

**11 |** KBA President
Who Wants to be A Politician……. *Gregory P. Goheen*

**13 |** KBF President
Annual Meeting: Don't Let It Go
…………………………………… *Hon. Evelyn Z. Wilson*

**15 |** YLS President
The Importance of Mentorship ……….. *Clayton Kerbs*

**19 |** Law Practice Management Tips & Tricks
Better to Lawyer Up in Cases of Ethics Complaints
…………………………………… *Larry N. Zimmerman*

**21 |** Law Students' Corner
………………………… *Washburn Law School 1L Section AB*

**22 |** Substance and Style
Legal Writing Lingo………………… *Tonya Kowalski*

**24 |** Winter/Spring 2018 CLE Schedule

**32 |** Diversity Corner
Military Training Serves One Well in Law School
…………………………………………… *Brandon Curl*

**52 |** Members in the News

**54 |** Obituaries

**55 |** Appellate Decisions

**59 |** Appellate Practice Reminders
A Picture is Worth a Thousand Words:
Recent Amendments to Supreme Court Rule 3.07
…………………………………… *Douglas T. Shima*

**60 |** Classified Advertisements

# THE JOURNAL

# OF THE KANSAS BAR ASSOCIATION

## 2017-18
### Journal Board of Editors

Emily Grant, chair, emily.grant@washburn.edu
Sarah G. Briley, sbriley@morrislaing.com
Hon. David E. Bruns, brunsd@kscourts.org
Richard L. Budden, rbudden@sjblaw.com
Boyd A. Byers, bbyers@foulston.com
Jennifer Cocking, jcocking@capfed.com
Connie S. Hamilton, jimandconniehamilton@gmail.com
Michael T. Jilka, mjilka@jilkalaw.com
Lisa R. Jones, ljones@fgcu.edu
Hon. Janice Miller Karlin, judge_karlin@ksb.uscourts.gov
Casey R. Law, claw@bwisecounsel.com
Hon. Robert E. Nugent, judge_nugent@ksb.uscourts.gov
Professor John C. Peck, jpeck@ku.edu
Rachael K. Pirner, rkpirner@twgfirm.com
Richard D. Ralls, rallslaw@turnkeymail.com
Karen Renwick, krenwick@wbsvlaw.com
Terri Savely, savelyt@kscourts.org
Teresa M. Schreffler, tschreffler@gmail.com
Richard H. Seaton Sr., seatonlaw@sbcglobal.net
Sarah B. Shattuck, bootes@ucom.net
Richard D. Smith, rich.smith@ks.gov
Marty M. Snyder, marty.snyder@ag.ks.gov
Patti Van Slyke, journal editor and staff liaison, pvanslyke@ksbar.org
Catherine A. Walter, cwalter@topeka.org
Meg Wickham, dir. of communications and member svcs., mwickham@ksbar.org
Issaku Yamaashi, iyamaashi@foulston.com
Natalie Yoza, yoza@kscourts.org

The **Journal Board of Editors** is responsible for the selection and editing of all substantive legal articles that appear in The Journal of the Kansas Bar Association. The board reviews all article submissions during its quarterly meetings (January, April, July, and October). If an attorney would like to submit an article for consideration, please send a draft or outline to Patti Van Slyke, Journal Editor at editor@ksbar.org.

Ryan Purcell, graphic designer, rpurcell@ksbar.org

The **Journal of the Kansas Bar Association** (ISSN 0022-8486) is published monthly with combined issues for July/August and November/December for a total of 10 issues a year. Periodical Postage Rates paid at Topeka, Kan., and at additional mailing offices. The Journal of the Kansas Bar Association is published by the Kansas Bar Association, 1200 SW Harrison St., Topeka, KS 66612-1806; Phone: (785) 234-5696; Fax: (785) 234-3813. Member subscription is $25 a year, which is included in annual dues. Nonmember subscription rate is $45 a year.

The Kansas Bar Association and the members of the Board of Editors assume no responsibility for any opinion or statement of fact in the substantive legal articles published in The Journal of the Kansas Bar Association. Copyright © 2017 Kansas Bar Association, Topeka, Kan.

For *display advertising information,* contact:
Bill Spilman at (877) 878-3260 toll-free, (309) 483-6467 or email bill@innovativemediasolutions.com

For *classified advertising information* contact Patti Van Slyke at (785) 234-5696 or email editor@ksbar.org.

Publication of advertisements is not to be deemed an endorsement of any product or service advertised unless otherwise indicated.

POSTMASTER: Send address changes to The Journal of the Kansas Bar Association, 1200 SW Harrison St., Topeka, KS 66612-1806.

## Let your VOICE be Heard!

### 2017-18
### KBA Officers & Board of Governors

**President**
Gregory P. Goheen, ggoheen@mvplaw.com

**President-elect**
Bruce W. Kent, bruce.w.kent@gmail.com

**Vice President**
Mira Mdivani, mmdivani@uslegalimmigration.com

**Secretary-Treasurer**
Charles E. Branson, cbranson@douglas-county.com

**Immediate Past President**
Steve N. Six, six@stuevesiegel.com

**Young Lawyers Section President**
Clayton Kerbs, ckerbs@kerbslaw.com

**District 1**
Toby J. Crouse, tcrouse@foulston.com
Christi L. Bright, christi@thebrightfamilylawcenter.com
Diana Toman, tomand@compassminerals.com

**District 2**
Sarah E. Warner, sarah.warner@trqlaw.com
Hon. Sally D. Pokorny, spokorny@douglas-county.com

**District 3**
Angela M. Meyer, Angela-meyer@att.net

**District 4**
Brian L. Williams, bwilliams.lawoffice@gmail.com

**District 5**
Cheryl L. Whelan, cheryl.whelan@ag.ks.gov
Vincent Cox, vcox@cavlem.com

**District 6**
Tish S. Morrical, tish.morrical@hamptonlaw.com

**District 7**
Gary L. Ayers, gayers@foulston.com
Sylvia B. Penner, spenner@fleeson.com
Hon. Jeffrey E. Goering, jgoering@dc18.org

**District 8**
Gaye B. Tibbets, tibbets@hitefanning.com

**District 9**
Aaron L. Kite, aaron@rbr3.com

**District 10**
Gregory A. Schwartz, greg@splaw.legal

**District 11**
Mark Dupree, Mark.lawdupree@gmail.com

**District 12**
Bruce A. Ney, bruce.ney@att.com
Nancy Gonzalez, nancy.gonzalez@ssa.gov
Alexander P. Aguilera, alex@sbhlaw.com

**At-Large Governor**
Eunice Peters, peterse28@gmail.com

**KDJA Representative**
Hon. Michael F. Powers, mpowers@8thjd.com

**KBA Delegate to ABA**
Rachael K. Pirner, rkpirner@twgfirm.com
Hon. Christel E. Marquardt, christel.marquardt@yahoo.com

**ABA State Delegate**
Linda S. Parks, parks@hitefanning.com

**ABA YLD Delegate**
Joslyn Kusiak, jkusiak@kellykusiaklaw.com

**Executive Director**
Jordan Yochim, jeyochim@ksbar.org

## OUR MISSION

The **Kansas Bar Association** is dedicated to advancing the professionalism and legal skills of lawyers, providing services to its members, serving the community through advocacy of public policy issues, encouraging public understanding of the law, and promoting the effective administration of our system of justice.



*Save the Date*

**ANNUAL MEETING 2018**
*Thurs. & Fri. June 14 & 15*

**DoubleTree Overland Park**

# KBA Elections
## Introducing the Candidates in Contested Races

### Secretary/Treasurer



**Nancy Morales Gonzalez** is a lifelong Kansan and has been a Kansas lawyer for 16 years. She has served on the Kansas Bar Association Board of Governors for the past 9 years. She received her undergraduate degree from the University of Kansas, and her Juris Doctorate from the University of Missouri-Kansas City, where she was the managing editor of a national law journal, among other awards and endeavors. Nancy began her legal career as a judicial law clerk at the U.S. District Court for the Western District of Missouri, before joining a national law firm. In a year's sabbatical from the firm, she served as a judicial law clerk at U.S. Court of Appeals for the Eighth Circuit. Nancy transitioned from the firm in 2008 to enter into government service. She presently is a senior attorney representing the federal government in national litigation. In addition to her legal practice, Nancy holds leadership positions in many civic and professional organizations. She aspires to serve the lawyers of Kansas as the Secretary-Treasurer of the Kansas Bar Association. ∎



**Cheryl Whelan:** Since 2012, I have had the pleasure of serving as the District Three Governor on the Kansas Bar Association (KBA) Board of Governors (BOG). For the last year, I also served on the BOG Executive Committee. With this experience, I am very aware of the challenges facing the KBA on a variety of issues including membership and finances. The KBA must address these challenges in order to remain a relevant and vibrant organization. With my second term on the BOG soon ending, I am running for the KBA Secretary-Treasurer so that I may utilize my experience and knowledge of the KBA to continue working on these issues.

For over 25 years I have been very involved with the KBA at the committee and section level. I am a long-term member of the Government Law Section, and a past president as well as a past secretary-treasurer of the section. I currently serve on the Board of Publishers, the Golf Tournament Planning Committee, the Law Related Education Committee, the Media-Bar Committee and the Nominating Committee. In the past, I served on the Commission on Professionalism, the Annual Meeting Analysis Task Force and the Annual Meeting Planning Committee for the 2014 Annual Meeting.

I also am involved in other professional and civic organizations including the Topeka Bar Association, the Women Attorneys Association of Topeka, the Kansas Women Attorneys Association and Sertoma. I am a past board member of the American Red Cross of the Capital Area.

Currently, I am an Assistant Attorney General and the Director of Open Government Training and Compliance in the Office of Kansas Attorney General Derek Schmidt. Additionally, I am a Judge Advocate in the Army Reserve, and was awarded the Bronze Star for a combat deployment in Iraq. After 21 years of service, I am retiring from the Army Reserve this spring. I previously served as the General Counsel for the Kansas State Department of Education and have many years of experience as an attorney with various governmental agencies including the United States Army, the State Fire Marshal's Office, the Shawnee County District Attorney's Office, and the Kansas Court of Appeals.

I earned both my Juris Doctor and Masters of Public Administration from the University of Kansas. My undergraduate degrees in political science and communication studies are from Washburn University. ∎

## KBA Delegate to the ABA House of Delegates



**Natalie Haag:** Kansas is the best place in the country to practice law. The lawyers in our state are great advocates for their clients, for fair and impartial courts and for integrity in the legal community. I hope to represent this great group of lawyers as the KBA Delegate to the ABA House.

My 32 years of legal experience includes civil and criminal litigation, administrative law and corporate law, and I've practiced in law firms, at the State of Kansas and in both public and private corporations. Over the last 21 years, I've worked as General Counsel and Chief of Staff to Governor Graves, Director of Governmental Affairs for Security Benefit Corporation and General Counsel for Capitol Federal® Savings Bank. In these positions, I've worked extensively with legislative bodies, which has allowed me to develop and hone my lobbying skills. As your delegate, I would enjoy putting these skills to work by advocating for your positions at the ABA.

Practicing law in Arkansas City, Wichita and Topeka, I've met attorneys from across the state in a wide variety of practices. While serving on the KBA Board of Governors, as the President of the KBA, and on various KBA committees, including the Legislative Committee (former chair), 2020 Diversity Committee, and CLE Committee, I've had the opportunity to travel all over Kansas and learn about the issues that matter to our entire legal community. During my terms as KBA President-Elect and President, I also represented our state at ABA meetings, where I gained a deeper understanding of the value this organization brings to our profession. My prior experience with the ABA, combined with my knowledge of what's important to Kansas lawyers, will help me to give valuable input to the ABA House on the policies that govern the practice of law.

As your ABA delegate, I would be happy to have the opportunity to continue and expand my service to the bar. I have demonstrated my long-term commitment to our legal community through committee and board service as a member of the KBA, Topeka Bar Association, Women Attorneys Association of Topeka and Kansas Women Attorneys Association. This commitment is also reflected in my service as the Second Congressional District Representative on the Supreme Court Nominating Commission, which has allowed me to work with dedicated lawyers from across the state to select qualified candidates for our judiciary. In addition, I have the pleasure of serving my alma mater as a member of the Washburn University School of Law Business and Transactional Law Center Board of Advisors. It has been a great honor to be recognized for my professional service with the 2008 Kansas Bar Association Outstanding Service Award, 2013 Topeka Bar Association Newton Vickers Professionalism Award and the 2016 Washburn University School of Law Alumni Fellow.

My position as General Counsel of Capitol Federal® Savings Bank, while busy, allows me the flexibility to commit to studying the issues and attending the ABA and KBA meetings required to fulfill the obligations of this position. It would be my pleasure to represent the great lawyers of Kansas and advocate for your positions at the ABA. I request your vote for the position of KBA Delegate to the ABA House. ∎



## KBA Delegate to the ABA House of Delegates (cont'd from previous page)



**Eric Rosenblad:** I have been a practicing member of the Kansas Bar since 1982 and have directed the Southeast Kansas Legal Services program since 1984. Let me share my thoughts about this election.

The work of the Kansas Bar Association and the American Bar Association has never been more important. We strive to preserve the rule of law, to maintain fair and impartial Courts, to provide vital public education on legal issues, to improve the law and resist improvident reactionary proposals, and to constantly improve our member's ability to provide high quality, effective service to our clients. As a member of the KBA Board of Governors I have appreciated the opportunity to work on these issues.

As a Fellow and Trustee of the Kansas Bar Foundation I have been impressed by the important work our members support. The Foundation provides crucial financial support to law related charities to meet critical needs. The educational projects supported by the Foundation improve understanding and respect for the law. I am pleased to be a part of supporting this work.

Kansas lawyers understand that the privilege of practicing law comes with some duties. Our training and experience has given us valuable leadership skills that are needed in our local communities. Like many of you, I have regularly volunteered my time to many civic, charitable and religious organizations, serving on boards, giving advice and counsel, and sometimes rolled up my sleeves for a good cause.

This is my vision for our profession and the values I would hold as your representative to the ABA House of Delegates. If you share this vision, I will welcome your support. ∎



**Christi Bright:** I am a graduate of the University of Kansas School of Law and have been representing clients in various areas of the law throughout the states of Kansas and Missouri for over 20 years. I am grateful to have built, alongside my husband, a very successful and prominent family law practice in Overland Park Kansas. Throughout my practice, I have dedicated a great amount of my time and efforts in serving on numerous boards, commissions, committees and task forces within the state and local bar associations. In addition to serving as one of the District 1 Board of Governors, I am also the President Elect for KBA's Family Law Section and am past co-chair of the Diversity committee. I also serve as the Board liaison to the KBF Board of Trustee's. Locally, I serve on the family law bench bar committee for the Johnson County Bar Association where we recently modified and updated local guidelines that are used and referenced all over the state by Judges and practitioners alike. We also prepare and present continuing legal education to other practitioners on relevant and current issues that are facing our profession. In addition to my service to my local and state bar associations, I also serve the ABA as a presidential appointment on the Commission for Youth at Risk. I serve in so many professional capacities because I believe that our bar is only as strong as the service that we individually provide back to it.



Throughout my career, I have clerked for the Honorable W. Stephen Nixon, a Circuit Court Judge in Jackson County Missouri and given several lectures throughout Kansas and Missouri, including for continuing legal education credits, on the topics of probate, employment and housing discrimination and diversity. When I am not working, I am a passionate tennis player with a growing ambition for golf. I most enjoy spending time outdoors with my family. Most people have heard me say that I am tropical and love most things outdoors, including gardening, but this Kansas weather sends me into a light depression every winter. On weekends, I can be found serving in my church as a children's church teacher or working at one of the local outreach centers helping meet the needs of the homeless or disadvantaged. I dreamed of being at attorney when I was 8 but I never could have imagined that God would take that dream and fulfill so many others through the life that I am so richly blessed to live! I can't help but wake up each day and be thankful and ask how can I help someone else be better today! ∎

# The 2017 Desktop Reference on the Economics of Law Practice in Kansas



During the spring of 2017, The Kansas Bar Association surveyed the legal community on the economics of law practice considering similar studies undertaken in 2012, 2005 and 1997. The objectives of all studies were to derive and report the following:

- Demographics of practicing attorneys, including views on economic sentiment
- Attorney 2016 taxable income arrayed by practice class, gender, field of law, office location, full- vs. part-time status, years in practice and firm size
- Associate, legal assistant, and secretary 2017 annual compensation by years of experience (tenure) and office location
- Prevailing average 2017 hourly billing rates for attorneys arrayed by a variety of indicators, and for legal assistants by years of experience, firm size and office location
- Attorney time allocated to billable and non-billable professional activities in 2017
- Fixed expense and gross revenues per attorney and overhead rates associated with maintaining a private law practice by office location and firm size in 2016, and
- Contemporary law office client and matter management, technology embracing and marketing practices

This information has been organized here to help attorneys plan and manage their professional lives. They can compare themselves and their firms against benchmarks/ norms established from aggregating survey data. These benchmarks consider these variables: office location, firm size, practice class, area of legal concentration/ primary field of law and years in practice. Attention is also given to analysis of gender-specific factors influencing income gaps. Time series information is also provided to denote trend, given available data.

## Spiral bound & color printed only $65 for KBA members

### For more information or to order, visit: www.ksbar.org/bookstore or call the KBA at 785-861-8815



## Workers Compensation Administrative Law Judge

The Director of Workers Compensation for the State of Kansas is accepting applications for a Workers Compensation Administrative Law Judge position in Lenexa. The selected judge will hear and decide litigated workers compensation claims. Travel may be required. The successful applicant will be appointed to a four (4) year term with a annual salary of approximately $104,582.30 per year. Pursuant to K.S.A. 44-551 (d), in order to be certified by the Director for consideration by the Nominating Committee, applicants are required to be an attorney regularly admitted to practice law in the State of Kansas, have at least five (5) years experience as an attorney and must have at least one year of experience practicing law in the area of workers compensation. To apply, please send your resume with a cover letter and the Kansas Tax Clearance Certificate addressed to:

Larry G. Karns, Director,
Division of Workers Compensation,
401 SW Topeka Blvd., Suite 2, Topeka, KS 66603-3105.

To be considered, application must be received by **April 6, 2018**.

This is an unclassified regular full-time position which is benefits eligible.

### Kansas Tax Clearance Certificate Required:

Each applicant applying for a State of Kansas job vacancy must obtain a valid Kansas Certificate of Tax Clearance by accessing the Kansas Department of Revenue's website at http://www.ksrevenue.org/taxclearance.html. A Tax Clearance is a comprehensive tax account review to determine and ensure that an individual's account is compliant with all primary Kansas Tax Laws. A Tax Clearance expires every 90 days. Applicants are responsible for submitting a valid certificate with all other application materials to the hiring agency. This is in accordance with Executive Order 2004-03. If you need assistance with the Tax Clearance, please contact (785) 296-3199.

### Reasonable Accommodation:

Individuals with disabilities are encouraged to contact the agency recruiter if reasonable accommodations are needed for any part of the application or hiring process.

Kansas Department of Labor is an Equal Opportunity Employer

# Who wants to be a politician?

## by Greg Goheen



The involvement of lawyers did not end with the creation of the United States. Thomas Jefferson believed that the greatest chance for success of the new republic was for well-trained lawyers to be at the core of government. Among his numerous endeavors, Jefferson worked to create a law school at the College of William and Mary which included training on legislative sessions, in addition to the more traditional legal education. That effort ensured graduates would be equipped to use their legal training to promote good government. For



The law and politics are inextricably linked. Lawyers have had a marked impact on the development and history of our government since the birth of our nation. This is somewhat surprising, as during the early period of colonization, there existed a general dislike for the legal profession, and there even existed statutes in some colonies prohibiting the practice of law. Yet, thirty of the fifty-six individuals who signed the Declaration of Independence were lawyers or judges. Like many lawyers today, these individuals took time away from their law practices to provide public service, though at a much higher level than most of us do today. The viewpoints and contributions of these early American lawyers shaped the Revolution as a fight to ensure the Rule of Law as a fundamental part of our governance. John Adams even suggests that the American Revolution can trace its origin to a colonial Boston courtroom in February 24, 1761, where a challenge was made by writ of assistance—essentially a search warrant—in a case known as Paxton's Case. The fundamental system of allocating rights and responsibilities between our government and the citizens it serves, and providing for the protection of those rights through the legal system, can be traced to those early American lawyers who participated in the drafting and development of the fundamental documents and proceedings that formed our nation.



and local governments. At the same time, our governing bodies and leaders have displayed a marked decrease in civility and respect which are desperately needed to maintain the Rule of Law that has guided our nation and protected our individual rights and liberties.

To stem this tide, lawyers need to re-engage at all levels of government. Lawyers come from diverse backgrounds with differing political views, but every lawyer understands and respects the need for courtesy and tolerance in sharing and debating those diverse views. Lawyers are well-equipped with skills needed for good governance. As is our nation in general, lawyers are governed by the Rule of Law and are dedicated to that principal. No profession is better suited to manage the process of government, whether as elected officials or citizen watchdogs. Lawyers are bound by a strict code of ethics demanding integrity and engendering respect. Lawyers are trained to advocate and communicate so they can develop consensus. They are also trained to be fair, deliberative and decisive. These same characteristics are requisite for good governance.

Not every politician is, or should be, a lawyer. Nor would every lawyer necessarily be a good politician. However, as our society has seemed to fracture and become more divisive, we, as lawyers and stewards of the legal system upon which our nation is founded, need to step forward and renew our commitment to serve our communities. Our city councils, local boards and commissions, county governments, legislatures and executive offices can all benefit from a greater representation and involvement of those trained in and dedicated to the Rule of Law. As lawyers, we have an obligation and duty to defend our laws and our way of government. Our system benefits from having elected officials who are also lawyers; we must encourage every member of our Bar to dedicate at least some portion of their professional career to civic service so that our system of government can continue to thrive and prosper for generations to come. ∎

decades after the founding of our country, lawyers dominated the elected officials leading our nation. From John Adams to Barack Obama, 25 lawyers have served as President of the United States. Two more (Harry Truman and Theodore Roosevelt) went to law school but did not complete their degrees. However, as is the overall trend in elected office, the number of Presidents with law degrees has declined in the past 70 years. In fact, since Harry Truman took the oath of office on January 20, 1945, only four of thirteen Presidents have had law degrees compared with twenty-two of the first thirty-two Presidents who served.

Similar trends are found for other elected officials. In the mid-19th century, lawyers comprised 80 percent of members of Congress. By the 1960s that percentage fell to less than 60 percent ,and today, lawyers constitute less than 40 percent of Congressional members. This decline is mirrored in state



**About the Author**



**Gregory P. Goheen** is a shareholder at McAnany, Van Cleave & Phillips, P.A., where he has practiced since graduating from Southern Methodist University's Dedman School of Law in 1993. He received his bachelor's degree in 1990 from the University of Kansas. Greg is past President of the Kansas Association of School Attorneys and Fellow and past Trustee of the Kansas Bar Foundation.

# Annual Meeting—Don't Let It Go

## by Hon. Evelyn Z. Wilson

W hile I have the mic . . .

I need to tell you about something I think is really important.

Annual Meeting.

The big one. The one ALL the lawyers go to.

As I write this article, it's still fading away. . . not quite gone, but on life support.

It's hard for me to describe the value of Annual Meeting. When I first became a lawyer, everyone went. It was like church. You didn't really think about whether you would go. You didn't really wonder what the CLEs would be about. (In fact, most attorneys at that time still resented the requirement for CLE hours, as if that requirement somehow put into question their wherewithal and ambition to learn about the law on their own.) It was Annual Meeting! You just went. And did stuff. And went home.

But that STUFF was foundation-building. I was intimidated and awed by the speakers, and the power, and influence, and the energy of people who could, and did, change our state, our culture, our expectations of what we might accomplish.

There were hundreds of lawyers, and spouses. There was more to do than you could possibly do. But there was always next year. The accommodations and the food were excellent, luxurious even. From the Broadmoor and Vail to Crown Center. We were pampered and serious. Being a lawyer was serious business.

I'm afraid I'm seeing a profession adrift. Good people, certainly. But without what holds us all together we live more and more in lots of ever-shrinking enclaves.

Small just can't muster up the energy a cohesive whole – with all its parts – can create.

Of course we didn't all think alike. No more than we do now. Now, though, we seem a lot more scattered out. Dissipated.

Lawyer strong. Just that . . . Lawyer. Strong.

Catch it. Nurture it. Pass it on.

Demand it. Recognize it.

Clear your calendars for it.

Or it might fade away altogether. And we'll be working just another job.

I owe too many lawyers too much to let that happen without standing before you with my fist in the air. ■

### About the Author



**Hon. Evelyn Z. Wilson** is Chief Judge of Kansas' Third Judicial District (Shawnee County). Before taking the bench in 2004, she practiced law for 19 years—seven years in northwest Kansas and 12 years in Topeka. Judge Wilson graduated from Bethany College and Washburn Law School.

# CALLING ALL VENDORS, SPONSORS AND ADVERTISERS!!



**Vendors, sponsors and advertisers are integral influencers in making the Kansas Bar Association partnerships possible.**

We offer many options to showcase your products, services and people while featuring competitive price points through the following:

- Annual Meeting
- Continuing Legal Education Programs
- Golf Tournament
- Journal (10 issues per year)
- Public Service Outreach
  - Law Wise (newsletter resource for teachers and students in elementary school through high school)
  - High School Mock Trial Tournament
  - Constitution Day Projects
- Trivia Night
- Vendor Marketplace
- Web Marketing

Let's discuss how the KBA can align your law firm or company goals and objectives with our events and participants.



**Contact**
Deana Mead
KBA Associate Executive Director
(785) 861-8839 | dmead@ksbar.org

# The Importance of Mentorship

by Clayton Kerbs



In January, I lost a friend and mentor. Ken Strobel practiced law for over fifty years in Dodge City. Ken was a kind man and a very skilled attorney. I was fortunate enough to have known him for many years, and for the last couple of years, he office-shared in our building.

As it has been said, we never know what we have until it's gone. Or in the case of a mentor, until that person is gone. I know I will miss discussing cases with Ken and waiting through the long, dramatic pause he would hold prior to giving his opinion on a matter.

With those in the Baby Boomer generation having already retired or soon to be retired, the time is now for young lawyers to seek out a mentor if he or she does not already have one (or several). Urban legends and misinformation may cause Baby Boomers to be uncomfortable communicating with Millennials. But there are undeniable benefits to the mentor and the mentee that make mentorship a must for attorneys in the latter part of their career.

To prospective mentors, we Millennials (born 1977-1992) need your experience and wisdom in managing our practice and assessing cases or potential cases. A Millennial may come out of law school ready to conquer the world and bring justice to those in need. We may be overambitious in our assessment of a prospective client's case. A more experienced attorney will analyze the facts differently, through the lens of past failures and triumphs, and may pass on a case that a younger attorney might foolishly take.

A 2010 article in the Harvard Business Review entitled "Mentoring Millennials," explored the psyche of a Millennial and what Millennials are searching for in the workplace. The author noted Millennials want to "make new friends, learn new skills, and connect to a larger purpose." Is that any different from more experienced attorneys? Maybe some senior partners are not thrilled to be thrust into a new relationship with a younger attorney, but I believe a good number of attorneys in the twilight of their careers have a sense of duty to the profession, to leave it better than they found it, to give back to a profession that has been very good to them and their families.

The "Mentoring Millennials" article also suggests different mentoring methods that can be tried. The first is reverse mentoring, which involves the mentor giving assignments to the mentee or having the mentee assist with a task. One positive of this arrangement is it will give the mentee a peek into the mentor's daily tasks. The second type of mentorship is group mentoring. This would be similar to what large law firms already do when younger attorneys are mentored by a more experienced attorney, most likely in a particular practice area.

Group mentoring raises the issue of how to mentor a young attorney who decides to hang out a shingle. The young lawyer could first look in a specific geographical area and practice area(s) for a mentor. Another option would be to participate in the Solo & Small Firm section of the Kansas Bar Association, one of the more active sections in the KBA.

Hopefully attorneys of all experience level will see the value of participating in a mentor/mentee relationship. Start today—before it is too late! ∎

### About the Author



**Clayton Kerbs** currently practices in his hometown of Dodge City with his father, Glenn. Clayton's practice consists of domestic and municipal law cases. He attended Creighton University and Washburn University School of Law. Prior to practicing law, Clayton worked for U.S. Senator Jerry Moran. Clayton is married to Leah; they have two sons, Porter and Chandler.

ckerbs@kerbslaw.com



# KBA LIBRARY

## KBA eBooks

**Don't leave the office without it!**

All KBA Handbooks are now available
as eBooks through **Casemaker!**

Visit **https://go.ksbar.org/CasemakerLibra**
for more information.

# Math and the Law:
## A 2018 Journal Series

## The Calculation of Child Support in Kansas

### by Charles F. Harris

Nowhere in Kansas law has math had a greater impact on the citizens of Kansas than in the calculation of child support. Since 1987, the system of child support adopted in Kansas has been applied thousands of times in cases involving children.

Prior to 1987, child support in Kansas had been available because it was first required in the Statutes of the Territory in 1855.[1] However, there was no statutory or court rule system for the calculation of child support. The award of child support in Kansas was a crazy quilt of different systems. Each was dependent on the whims of different judges presiding in the different judicial districts. In Sedgwick County, the court adopted a percentage of net income schedule based upon the number of children.[2] Other courts used a gross income base. None of the systems used to calculate child support had any economic basis tied to the actual needs of the child.

In 1985, the United States Office of Child Support Enforcement issued the Federal Mandate for Child Support.[3] It was a federal recognition of the patchwork method of calculation and collection of child support that existed at that time. It applied to all of the states and required that each adopt a system for calculation of child support that had uniform and mandatory requirements; was economically based upon the needs of children within the state; was subject to verification for compliance with the specific system; and was subject to periodic reviews and updates. In addition, the mandate called



for a system of enforcement and collection of child support. The mandate required all states to have their system in place by October 1, 1987.

Pursuant to the federal mandate, the Kansas Legislature deferred to the Kansas Supreme Court to establish the compliant system.[4] In turn, the Supreme Court created the Kansas Commission on Child Support to assist in the process.[5] The commission consisted of family law attorneys, judges with family law experience; academics with family law experience; payors and payees of child support; and a representative of SRS/DCF. In addition, the committee was authorized to employ an economist to assist the panel.

The committee produced the first Kansas Child Support Guidelines (KSGL) which were adopted by the Supreme Court as Administrative Order 59, effective October 1, 1987. As adopted, the KSGL were mandatory on all district courts tasked with setting child support. This complied with the uniformity requirement. If you had fifty couples spread across the state with the same facts, the judges were required get the same result, up to a point. This removed discretion from the judges.

The KSGL utilized a set of six tables of child support amounts which were the product of analytical work performed

by the first economist who worked with the committee, Dr. William Terrell from Wichita State University. He utilized federal spending data for households with children to arrive at the tables. That format has been retained and updated since 1987; it satisfied the economic basis requirement.[6]

The KSGL utilized a child support worksheet to show the calculations used by the court to arrive at the child support amount.[7] The worksheet must be attached to the order.[8] That satisfies the requirement for there to be an ability to verify the calculations for compliance with the KSGL. It also establishes an understandable benchmark for future changes in circumstances which would justify modification of the child support amount, such as change of income, age of children, elimination of daycare, etc.

Child support in Kansas is a combination of child support from the tables, actual health insurance paid for the children, and any daycare costs.[9] The amounts are added together to determine the amount of the child support the couple owes to the child. The KSGL then uses the "income shares approach" which calls for using the relative percentages that the incomes of each of the parents bear to the combined total. The result is that the respective child support amount for each parent is directly affected by the relative percentages of income for each parent. As a result, child support owed by each parent is rarely equal because of a disparity of income for each.

Although up to a point, the amounts determined by the KSGL are not discretionary, there is also a discretionary adjustments section on the worksheet that the court may use to increase or decrease the calculated amount when that modification is found to be in the best interest of the child.[10] Those adjustments create a fairness factor for the court to use. They include long distance parenting time costs; parenting time adjustments; income tax considerations; special needs; agreement past majority and overall financial considerations. They

may be applied on a case-by-case basis but must be supported by a finding by the court in the order as to the amount of the adjustment, and that it is found to be in the best interest of the child.

The KSGL have been updated every four years since first adopted to ensure current spending data is being used. In addition, from time to time, societal changes such as changes in spending patterns on children or different custodial arrangements such as shared residency have justified modifications to the guidelines. Another example is that the highest combined income amount used on the child support tables has increased from $8,600 in 1987 to $15,500 per month in 2017 because of increased availability of federal spending data for higher incomes.[11]

To enforce the child support ordered, child support owed by wage earners is collected by means of an income withholding order similar to a continuing wage garnishment.[12] A system of court trustees has been implemented in most major cities. The trustees pursue collection and modification of child support for a small percentage of the child support collected. A central collection point was established—the Kansas Payment Center—which processes all child support.[13] The support is electronically dispensed to payees by means of a direct deposit or debit card so payments are generally processed within three days of receipt.

The effect of the KSGL has been dramatic. In 2016, the Kansas Payment Center processed $415,000,000 in child support paid in under the system. The KSGL has proven to be an effective yet fluid system for the establishment and collection of child support in Kansas for thirty years. The children of Kansas have greatly benefitted from the system that was adopted to comply with the federal mandate in 1987. ∎

**Endnotes**

1. Statutes of the Territory of Kansas 1855, Chapter 62 § 6.

2. Sedgwick County Child Support Guidelines, 1980, promulgated by Judge James Beasley.

3. 45 C.F.R. § 304.95; 45 C.F.R. § 302.56.

4. K.S.A. 20-165 (Supp. 1986).

5. Kansas Commission on Child Support, later Child Support Advisory Committee to the Kansas Supreme Court.

6. Kansas Supreme Court Administrative Order 59, Appendix III; Kansas Supreme Court Administrative Order 287, Appendix II.

7. A.O. 59, § II, A; A.O. 287, Appendix VII.

8. A.O. 59, § II, D; A.O. 287, § III, A.

9. A.O. 287, § IV, D.

10. A.O. 59, § II, D, 11; A.O. 287, § IV. E.

11. A.O. 59, Appendix III; A.O. 287, Appendix II.

12. K.S.A. 23-3124 (Supp. 2013).

13. K.S.A. 23-3103 (Supp. 2013); K.S.A. 39-7, 135.

**About the Author**



**Charles F. Harris** earned his Juris Doctor from Washburn University School of Law after four years of active duty in the Army. He was a partner in the law firm of Kaplan, McMillan and Harris for more than 30 years and is now a solo practitioner. An active member of the KBA, Charles has served on a variety of committees and authored the Child Support Chapter of the KBA's Family Law Handbook. He has been a member of the Child Support Guidelines Advisory Committee since 1989 and a Fellow of the American Academy of Matrimonial Lawyers since 1995. Charles has also authored three books: *Alias Charley Hart*, *Under the Black Flag*; and *Captain Tough, Chief of Scouts*.

# Better to Lawyer Up in Cases of Ethics Complaints

by Larry Zimmerman

**Hiring Counsel in Ethics Complaints**
Figures from the ABA indicate that 7-10% of Kansas lawyers face ethics complaints annually. Few of those result in discipline or diversion, but each complaint represents genuine risk for a lawyer's livelihood and peace of mind. Even trivial, false, or suspiciously motivated complaints can drag on for months, wander off on investigatory tangents, and cause clients and insurers to worry about your odds. Despite the risks inherent in an ethics complaint, lawyers still struggle to decide whether and when to hire defense counsel.

**Purpose of Counsel**

Cautious lawyers lean toward trusting the old proverb, "He who represents himself has a fool for a client." Ethics complaints usually trigger an emotional response—fear, anger, confusion, etc.—and detached, professional help can be vital to responding appropriately. Additionally, the ethics system is often confusing. Megan Zevieh, author of *The Playbook: The California Bar Discipline Practice Guide,* notes, "Basic rules that are applied in other courts do not apply in attorney discipline cases. It's ironic—principles lawyers fight to uphold for their clients don't apply when lawyers are the ones being prosecuted." She adds, "The system is a Wonderland, as in *Alice in Wonderland*. A crazy world where logic is defied." A lawyer in your corner can help demystify the process.

**Concerns about Hiring**

Proponents of the *pro se* approach to complaints often suggest that your lawyer can actually cause problems. For example, the Disciplinary Administrator has counseled in CLEs that a lawyer should obtain counsel, "when the lawyer concludes the complaint has merit." (The implication being that hiring counsel may be an admission that the complaint has some merit.) I have also read an investigator's report which cited the aggressive defense of counsel as somehow relevant to the conduct of the respondent, so awareness of "perception pitfalls" when hiring counsel may be warranted.



> "He who represents himself has a fool for a client."
>
> -- *Proverb*

There is even concern that a vigorous defense aided by counsel could be treated as an aggravating factor in discipline. The theory is that defense could be interpreted as a refusal to acknowledge the wrongful nature of the conduct. (This particular concern is not unique to the issue of hiring counsel, however.) Justice Steagal recently asked in oral arguments, "Mr. Hazlett, can a disciplinary panel use the fact that a respondent defended himself or herself as an aggravating factor?" and then followed with, "I don't understand how that doesn't become a rule that says, 'You can't defend yourself….'"

There are more pragmatic reasons lawyers might hesitate to hire counsel. Money comes immediately to mind as a legal defense in an ethics case can be expensive. Informal queries about hourly rates range from $250 - $425 per hour depending on the level of experience and expertise within the specific practice area of the respondent. Final bills for ethics defense from docketing to dismissal can range from $5,000-10,000. Zevieh warns, "Many lawyers facing bar complaints are solos who do not have the funds to hire counsel. It is totally within reason to estimate that a bar investigation will cost in the neighborhood of $5,000 to defend even if you get the investigation closed without charges being filed."

Megan Zevieh is attempting to answer those financial concerns that might prevent a lawyer from hiring counsel by starting an online help center for self-represented lawyers facing complaints in California. *The Playbook* (statebarplaybook.com) provides detailed written guides through the California ethics system, videos, sample filings and documents, and an online community forum for similarly situated lawyers to support and assist each other. Such online help systems and communities have popped up to answer other under-served legal clientele but this is the only such community currently found serving lawyers who cannot afford counsel or who want

to proceed *pro se* for other reasons. If it works in California, watch for the idea to spread.

## When to Hire

Even those who recommend hiring counsel are often reserved in that recommendation. *The Kansas Appellate Practice Handbook* online at kscourts.org advises, "Once there has been a probable cause determination, it is a good idea to be represented by counsel in disciplinary proceedings." That advice suggests counsel is unnecessary during investigation, *and that advice is suspect.*

The Association of Discipline Defense Counsel (disciplinedefensecounsel.org) warns, "An inquiry or investigation letter from the state bar should not be taken lightly, as it could be a precursor to a public disciplinary proceeding before the state bar court with your law license on the line." Zeviah's Playbook for *pro se* respondents also treats the investigatory period seriously, providing instruction, guides, and forms on handling issues arising in investigation, including explaining, for example, "…how you can be charged with multiple acts of misconduct for what any rational person would view as a single act." The investigatory period is fraught with risks for the uninitiated, and it forms the case file from which a decision to file charges is ultimately made. Careful handling of the case during this period really matters.

## Access to Justice

Financial barriers to obtaining representation in an ethics case are not easily solved. The fear that hiring counsel could be damaging to the case can be. The Association of Discipline Defense Counsel says, "Hiring defense counsel does not make you look culpable in the eyes of the State Bar." If we ensure our disciplinary process commits to that statement, then there will be one less barrier to justice. ∎

## About the Author



**Larry N. Zimmerman** is a partner at Zimmerman & Zimmerman P.A. in Topeka and former adjunct professor, teaching law and technology at Washburn University School of Law. He is one of the founding members of the KBA Law Practice Management Committee.

**kslpm@larryzimmerman.com**



KALAP Foundation
Upholding the Integrity of the Bar

A Campaign to Benefit Lawyers in Need

515 S. Kansas Avenue
Suite 202
Topeka, KS 66603
(785) 368-8275
1-888-342-9080
kalap@kscourts.org

www.kalap.com

# Law Students' Corner
## by Washburn Law School 1L Section AB

NOTE: For this month's Law Students' Corner column, Prof. Tonya Kowalski invited students in her section of Legal Analysis, Research & Writing II to anonymously answer three questions about their 1L experience so far. This small project is the beginning of a larger inquiry into how law students' perceptions evolve during the first year. Some responses have been very lightly edited for clarity.

**A**s a 1L, what has most surprised you about law school? It might be something totally unexpected or something that was just very different than you thought it would be.

Unsurprisingly, students know that grades greatly affect their careers and are concerned about fairness.

• I was surprised that we are largely asked to teach ourselves.

• That [apart from legal writing], the classes are basically made up of one or two grades, for example, a mid-term and final. I thought that there might be more assignments or requirements throughout the semester.

• The curve has surprised me the most. I have never been graded on a curve before, not even in my undergraduate studies. You earned your points individually, and not necessarily against everyone else. An "A" was actually an "A" and not a "C."

• Law school professors so far are way more lenient than I thought they would be. The syllabus might say one thing, but execution of the syllabus is different. For example, if you're late to "x" number of classes, you can't sit for the final, and students will be late to that number and then some, and still sit for the final.

• I expected that I would not be able to have a personal life outside of school. While I was absolutely incorrect, I have found that there is a great deal of difficulty in keeping both personal life and school in balance.

**After your first semester, has anything about your law studies so far changed the way you think about justice (e.g. social justice, access to justice) or the justice system itself?**

Professors often observe that when first year law students confront the malleability of law and narrative for the first time, it can leave them feeling disillusioned, ungrounded, or sometimes empowered:

• Justice can be viewed in so many ways because of all of the various actors in creating "justice" in our legal system. There are plenty of individuals who can game the system and secure "justice" for their client when their client was entirely wrong, but I have also noticed even more individuals who genuinely care about what justice is supposed to mean in our legal system. Justice is also a very biased thing; our legal system is interested in "the greater good" and sometimes that keeps justice from being effective for those who deserve it.

• After learning about the justifications European invaders used to take possession of "undeveloped" Native American land, I was struck by the lack of justice in the government now protecting wildlands. It angers me and makes it clear that full justice is unattainable when sought via a self-serving justice system.

• So far I am more cynical. Justice to me seems not about what the truth is, but who can tell lies better and/or has more money.

**As a law student who is beginning to think about long-term career planning, if you could ask your future employers to remember something about what it was like to be a law student, what would that be?**

Here again, students are acutely aware that the job market is highly competitive, and understandably fear that their strengths and potential may be overlooked in favor of only those few with the highest grades:

• I would like them to remember what they went through their first year just trying to figure things out—to remember the people they met and how different life was.

• How much emphasis did your first employer place on grades earned throughout law school and your G.P.A.?

• When interviewers ask me to explain away my past failures, weaknesses, and underachievements, they should bear in mind that my sincerity is not only limited by truthfulness, but it is also limited by stigma. I am not free to discuss valid factors to the extent they invite prejudice and discrimination. In other words, you don't know what you don't know about my recovery from mental illness. You don't know what you don't know about the labor of stripping away my social conditioning. You don't know what you don't know about . . . me. ∎

# Legal Writing Lingo

## by Tonya Kowalski, Professor, Washburn School of Law

Today's law graduates increasingly have studied legal writing as both a practice and a discipline. Over the past twenty to thirty years, the art of legal analysis and writing has exploded as one of the fastest-growing fields in law. And as we all know, every discipline—even one that prizes concision—must come with some jargon.

Knowing some of the basic terms can help practitioners—and not only with talking about writing with their interns or new hires. One reason the legal writing field has developed some basic jargon is to help identify and study different modes of analysis. This process of identifying and naming can help more seasoned practitioners be more mindful and reflective of the processes they are using.

**Acronyms for patterns.** To this day, law students continue to learn IRAC as the basic analytical pattern, at least for law school essay exams. But Issue, Rule, Analysis, Conclusion does not capture the depth practitioners need to persuasively explore difficult issues. To avoid cursory analysis that attempts to apply the main rule directly to the facts, most law students now learn to add an E to IRAC for memos and briefs. The E stands for Explanation and the A becomes application: explain the rule before applying it to the facts. A few more units and letters yield a potential alphabet soup of acronyms for different situations; with T for Thesis, F for Facts, and P for Proof, further iterations include: FIRAC, IREAC, CREAC, TREPAC, and so on.

**Thesis, issue, or conclusion.** In a brief, the lettered and numbered headers that form each unit of analysis may be called a thesis or conclusion. Thinking of the header argument as a thesis can help to instill the sense that it is a proposition that must be proved to the satisfaction of the audience—not merely argued.

**Rules, broad and narrow.** The broad rule tends to be the governing test from a statute or case. Narrow rules are those that have been built on through statutory definitions and judicial interpretations.

**Rule explanation.** To "explain" the rule is to synthesize general principles and then prove any disputed aspects with authority, as described below.

**Synthesis.** The process of gathering and stating well-accepted legal principles from a breadth of authority in order to provide context and foundation for the main rule.

**Proof.** For issues of law, proof involves providing examples, such as case illustrations or legislative history, and counter-analyzing opposing authority. For mixed questions of law and fact, proof usually involves building both supportive and con-trastive fact pattern analogies to the client's case and then applying authoritative reasoning to the facts.

**Case illustration.** Most proofs need descriptive examples of the few most decisive cases both for and against the client's position. These paragraphs have a structure rather like a mini-case brief: rule, fact context, concise holding, and most importantly, judicial reasoning.

**Affirmative and counter-analysis.** Affirmative analysis is the use of authority that tends to align with the client's preferred rule and outcome. Counter-analysis confronts the stronger authorities that oppose them. They are equally important; every offense needs a good defense.

**Application.** Many of us were taught that the "A" in IRAC stands for "analysis." In legal writing, we tend instead to say "application." The reason is that otherwise, students tend to think that the only thing analysis requires is the application of blackletter law to facts. But as practitioners know, analyzing and arguing the rule itself can be just as important, or in the case of a pure question of law—the only thing that is important.

When judges and senior attorneys express dissatisfaction with the quality of lawyers' writing, their main concern is not only errors in grammar, punctuation, citation, and formatting, although those are very distracting to the reader. Even worse is a cursory analysis: one that fails to address contrary authority, makes arguments without examples or analogies, or misses rules and interpretations that provide important context. Naming and identifying these functions can help to build awareness of the legal writer's toolbox.

Further reading:

• For recent graduates: *A Lawyer Writes* by Coughlin et al.
• For all: *The Art of Advocacy* by Messing; *The Winning Brief* by Garner.
∎

### About the Author



**Prof. Tonya Kowalski** teaches Legal Analysis, Research & Writing I and II at Washburn University School of Law and is currently also a member of the Board of Directors of the Association of Legal Writing Directors. She also teaches courses in Tribal Law and Indigenous Peoples' human rights.

**tonya.kowalski@washburn.edu**



# ABA FREE LEGAL ANSWERS

## WHAT IS ABA FREE LEGAL ANSWERS?

**ABA Free Legal Answers allows users to pose legal questions to be answered by volunteer attorneys:**

- Users will need to meet income eligibility guidelines
- Questions must be regarding civil legal matters
- Answers will be provided by volunteer attorneys in the users' respective states
- Links will be provided to lawyer referral and other legal services projects for those not eligible or who need more in-depth legal representation

**ABA Free Legal Answers increases services to low-income populations:**

- Allows users in rural areas to access legal resources from across the state
- Provision of brief advice allows legal services staff attorneys to focus on full representation
- Provision of brief advice can prevent larger legal crises from developing
- OnlineTNjustice.org—the Tennessee model for ABA Free Legal Answers—has, in its few years of service, received over 10,000 legal questions

## CAN I PARTICIPATE AS A PRO BONO ATTORNEY?

Yes, as long as you are licensed in a participating state and in good standing. Scan the QR code below or go to abafreelegalanswers.org and click on "Attorneys Volunteer Here."



**ABA Free Legal Answers increases pro bono opportunities:**

- Convenient pro bono opportunity that attorneys can fit into their schedule
- Attorneys can log in and provide answers 24/7/365
- Reaches volunteer populations with restricted time in which to provide pro bono, such as stay-at-home parents, corporate attorneys, and government attorneys

**The American Bar Association offers:**

- No cost to participating states
- Malpractice insurance for all volunteer attorneys will be provided
- Web hosting will be provided
- A national staff person to maintain the site, manage the queue, and collect and analyze data

## QUESTIONS?

If your state is not already participating and you are interested in learning more, contact Tali Albukerk at 312.988.5704 or abafreelegalanswers@americanbar.org.





abafreelegalanswers.org

© 2016 ABA, All Rights Reserved.

# Winter/Spring CLEs

## Live CLE:

**Brown Bag Ethics: Building that Core Body Strength of Competence**
**April 4, 2018**
Robert L. Gernon Law Center (formerly Kansas Law Center)
1200 SW Harrison St.
Topeka, KS

**Brown Bag Ethics: Communication,**
**Competence & Confidentiality in the Digital Age**
April 18, 2018
Robert L. Gernon Law Center (formerly Kansas Law Center)
1200 SW Harrison St.
Topeka, KS

**2018 Administrative & Government Law CLE**
April 20, 2018
Robert L. Gernon Law Center (formerly Kansas Law Center)
1200 SW Harrison St.
Topeka, KS

**2018 Bankruptcy & Insolvency Law CLE**
April 27, 2018
The Wichita Boathouse
515 S. Wichita Street
Wichita, KS

## Webinars:

**Internet for Lawyers Webinar:**
**8 Mistakes Experienced Contract Drafters Usually Make**
March 21, 2018  (Noon-1:00 PM)

**KBA Webinar: Facebook for Lawyers**
March 22, 2018  (Noon-12:50 PM)

**Internet for Lawyer Webinar:**
**How to Avoid Potential Malpractice Pitfalls in the Cloud**
**and in Everyday Law Office Computing**
March 27, 2018  (Noon-1:00 PM)

**Mesa CLE Webinar:**
**The Truth, The Whole Truth and Nothing But the Truth:**
**The Ethycal Imperative for Honesty in Law Practice**
March 28, 2018 (Noon-1:00 PM)

**KBA Webinar:**
**Formation and Governance of a 501(c) (3) Tax Exempt Organization**
April 4, 2018  (Noon-12:50 PM)

**Internet for Lawyers Webinar:**
**Moving Your Practice Into the Cloud-**
**Benefits, Drawbacks and Ethical Issues**
April 6, 2018  (Noon-1:00 PM)

**Internet for Lawyers Webinar:**
**Me Too: Sexism, Bias, and Sexual Misconduct in the Legal Profession**
April 27, 2018 (Noon-1:00 PM)

# OPINION

# CASA: Key in Saving Kansas Foster Kids

by Hon. Kevin Mark Smith

**NOTE:** Opinions and positions expressed herein are those of the author(s) and not necessarily those of the Kansas Bar Association, the Journal, or its Board of Editors. The material within this publication is presented as information for attorneys to use and consider, in conjunction with other research they deem necessary, in the exercise of their independent judgment. The Board of Editors does not independently research the content of submitted articles approved for publication.

> More money isn't the key to saving Kansas foster kids—you are!
>
> *Hon. K. M. Smith*

I am a Sedgwick County District Court Judge assigned to juvenile court. A few months ago something happened in my courtroom that opened my eyes to an underutilized resource, Court Appointed Special Advocate (CASA) volunteers.[1] A CASA volunteer made me aware of a situation that compromised the safety and well-being of a child in foster care. But for the CASA volunteer, I shudder to think what might have happened to this helpless child. From that point forward I didn't just appoint CASAs on problem cases, but on any case that I believed could use an extra set of eyes to hold everyone, including me, accountable. Regrettably, within a couple weeks of my revelation, CASA of Sedgwick County fell weeks behind in recruiting and training a sufficient number of volunteers to fill my court orders. Any benefit to CASA oversight was diluted by the cold, hard reality that there simply weren't enough volunteers, and that meant many weeks would pass when this lack of additional oversight could lead to bad outcomes. Thus, it became clear to me that appointing CASAs wasn't the key; getting more people in the community engaged in the CASA program was.

K.S.A. 38-2206(a) empowers the court to "appoint a special advocate for the child who shall serve until discharged by the court and whose primary duties shall be to advocate the best interests of the child and assist the child in obtaining a permanent, safe and homelike placement." Moreover, Kansas Supreme Court Rule 110(a)(1) defines the duties and obligations of CASA volunteers:

The primary duties ... are to investigate and become acquainted with the facts, conditions, and circumstances affecting a child 's welfare, to advocate the best interests of the child, and to assist the court in obtaining the most permanent, safe, and homelike placement possible. A CASA volunteer should:

(A) visit the child as often as necessary to monitor the child's safety and observe whether the child's essential needs are being met;

(B) attend court hearings involving the child or, if not excused from attendance by the court, arrange for attendance of a qualified substitute approved by the court;

(C) participate in staffings and, to the extent possible, other meetings about the child's welfare;

(D) participate in the development of a written reintegration plan or modification of an existing plan, or both;

(E) submit a written report to the court before each regularly scheduled court hearing involving the child; and

(F) act on the child's behalf as directed by the program director and the standards promulgated by the judicial administrator..."

CASA volunteers are private citizens, and most counties in Kansas have CASA programs in place.[2] CASA vets them to make sure they are qualified to advocate for children in Child in Need of Care (CINC) cases,[3] the ones where children are removed from their parents' homes and placed in foster care due to abuse or neglect, and trains them to do their jobs properly.[4] Although the Kansas Department of Children and Families (DCF) and its contractors are well intentioned in working these cases, the fact is that they have too many cases for the number of caseworkers so things drop through the cracks, which sometimes results in outcomes that cause any concerned citizen to wince, such as foster children dying while in DCF custody[5] or teens running away from their placements[6] and getting involved in sex trafficking.[7]

Governor Sam Brownback recently proposed $16 million in additional spending over two years for DCF to help deal with the foster care system's shortfalls. One and a half million dollars of these funds will go toward hiring 20 case workers for the entire state;[8] it's unclear whether any of these funds will go toward hiring additional caseworkers for reintegration, adoption, or independent living case plans. Indeed, it appears that most if not all of the proposed increases are directed toward locating runaways.[9] Hence, although this is a good start, it's hard to see how this will fix the problems endemic in the foster care system, particularly those resulting from staffing issues.

### Kansas isn't as bad as you think it is.

To be clear, when I say "problems endemic in the foster care system," I'm not saying Kansas is an outlier. The fact is that by many measurements Kansas is doing better than other states, if not most. "The US Department of Health and Human Services reports that during the federal government's 2015 fiscal year, about 4,600 children in foster care were listed as runaways, or 1.1 percent of the nearly 428,000 total."[10] When the same percentage is applied to Kansas's foster population of 7,192, we would expect about 79 runaways; as of November 2017, Kansas had 77.[11] The national average length of foster care is approximately 19 months;[12] in Kansas it's 19.5 months, which is slightly longer than the national average.[13] Kansas kinship or relative placement, something most states consider to be in the child's best interests, is also not out of the norm with approximately 33 percent of Kansas foster kids placed with relatives,[14] which is also slightly higher than the national average of 32 percent.[15]

Regardless of where Kansas falls on the "we care for foster kids" scale, I am not a DCF apologist. When data says that most runaways are teenage girls,[16] and teenage girls face an increased risk of being victims of sex trafficking,[17] as long as there's one potential victim on the run it's unacceptable. Thus, I decided to do something about these sad statistics in my court, and after I share with you how frustratingly tedious the CINC process is, and how much CASAs impact outcomes for the better, you'll know how you can help solve these problems instead of just complain about them.

### Case lengths are bad, but cutting the cases off too early is much worse.

Case length for these kids is always an issue. As a judge, I have a magic wand, my gavel. I can lose my patience with a case, find that DCF or its contractor failed to exercise reasonable efforts to rehabilitate the family[18] or finalize an adoption,[19] and directly place a child with his or her parents, or with the adoption resource. Case closed, or at least it's a few months from closing. But there's a problem. This isn't viable in most cases. Thanks to moms who delivered their babies high on drugs or drank alcohol and used drugs during their pregnancies, as well as kids witnessing traumatic events while in their parents' custody, many face a lifetime of physical and mental healthcare expenses that often run into the thousands of dollars per year. The typical family that adopts through the foster care system isn't rolling in dough. Such families need state and federal resources that are only available while the children are in DCF custody. Removing the child from DCF custody for direct placement cuts off many of these resources. Thus, case lengths from a few months to several years are endemic in the foster care system regardless of what state the case is filed in.[20] My experience is that cases that stretch on past the average or median case lengths are usually subject to errors that are atypical, such as delays in transferring the case file from the reintegration team to the adoption team, case workers forgetting to contact counselors to obtain reports before hearings, or case workers failing to prepare reports before hearings or trials. On a case by case basis, therefore, the goal is to ensure that all parties do their jobs so tasks aren't left undone and court orders ignored. Moreover, especially as it

**Exhibit 5: Length of Stay for Children Exciting Foster Care FY 2006 and FY 2015**

| Length of Stay | 2006 | 2015 |
|---|---|---|
| <1 Month | 15% | 11% |
| 1-11 Months | 35% | 35% |
| 12-23 Months | 23% | 28% |
| 24-35 Months | 11% | 14% |
| 3-4 Years | 9% | 9% |
| 5+ Years | 7% | 4% |

relates to runaways, steps must be taken to ensure that children know that people care about them.

It's debatable whether additional DCF funding will have much of an impact on the above issues. Indeed, the funding for more caseworkers is already available; the issue is finding caseworkers willing to deal with the issues endemic in foster care cases.[21] Sedgwick County's contractor that works CINC cases is Saint Francis Community Services (SFCS), which offers its social workers competitive salaries and is always searching for new caseworkers to fill its open positions. At any given time, SFCS operates at two-thirds to three-quarters of its ideal personnel level, meaning its caseworkers are working 25 to 33 percent more cases than ideal.[22] Consequently, most of these caseworkers, all of whom hold Bachelors or Masters degrees, work from 50 to 60 hours per week; many burn out, which leads to high turnover that further exasperates the caseworker shortage. It's a never-ending cycle that doesn't bode well for foster children stuck in the system. Again, I'm not a DCF apologist, but such strains on the system require something else besides more money, something that's already unquestionably improves case outcomes.

## A CINC case is looooong, no matter how well you work it.

To fully appreciate what children go through in the CINC process and why we must consider doing something else besides throwing more money at the problem, you must consider the amount of time they spend in foster care regardless of how smoothly their cases progress.

First, a complaint is filed. A common reporter is an ex-spouse or concerned neighbor. Others are mandatory reporters such as teachers who hear kids say disturbing things, doctors and nurses who repair broken limbs or stitch up cuts, or relatives who are compelled to stand up for the children even if the incident that led to the injury was not abuse. Ninety-six percent of the reports are either unsubstantiated or the parents are offered family preservation services instead of DCF placing the kids in police protective custody,[23] the latter leading the District or County Attorney to file a CINC petition. So, of the four percent of cases that result in filings, the process drags on.

The temporary custody (TC) hearing must happen within 72 business hours of removal from the parental home.[24] All the State must show is probable cause that the:

1)  Child is dangerous to self or to others;

2)  child is not likely to be available within the jurisdiction of the court for future proceedings;

3)  health or welfare of the child may be endangered without further care;

4)  child has been subjected to human trafficking or ag-



gravated human trafficking, as defined by K.S.A. 2017 Supp. 21-5426, and amendments thereto, or commercial sexual exploitation of a child, as defined by K.S.A. 2017 Supp. 21-6422, and amendments thereto; or

5)  child committed an act which, if committed by an adult, would constitute a violation of K.S.A. 2017 Supp. 21-6419, and amendments thereto.[25]

Because the burden is so low, most parents waive TC. Let's assume our sample case's parents do the same.

Next is adjudication and disposition,[26] which occurs about six weeks after TC, but no more than 60 days.[27] The burden to adjudicate is probable cause to believe that the child is a child in need of care.[28] The evidence presented is that which is claimed to be true in the initial petition, and as long as the evidence supports one of 11 different classifications of a "child in need of care," the court must adjudicate the child or children as "in need of care" then proceed to disposition.[29] Hence, as with the TC, most parents waive adjudication. Again, to save time let's assume our sample case's parents waive adjudication. At disposition the court orders DCF or its contractor to prepare a permanency plan,[30] orders the parents to comply with its directives, and sets the case for a permanency hearing.

The permanency hearing occurs (at least in my court) about 60 days after adjudication and disposition. The court must make permanency findings within 12 months of removal of the child from home, and every 12 months thereafter until the case closes.[31] 60 days is not much time, so few parents have competed all tasks necessary for reintegration. Thus, although the court will make permanency findings, it's likely that the case will be set over at least 90 days for review. Time for some math: three days + six weeks + eight weeks + two weeks = 16 weeks and three days. By now, the child or children have been in foster care for at least four months. The best-case scenario is that the parents have done everything they've been ordered to do and are transitioning to overnight parenting time with the children. More likely than not, they're still testing positive

every now and then to drug tests, have missed therapy sessions or drug treatment classes due to transportation problems, and don't have sufficient resources to move to a house more suited to raising kids. Let's assume all these issues are present in our sample case.

The review is continued 120 days to give parents time to get their stuff together. Best case, they do and the court approves the reintegration plan. Under this case, the family will be re-united 8-12 months after DCF removed the children from the parental home. Worst case, the parents are still high on meth at every hearing, are in jail or prison, or some other factor compels a good judge to find that reintegration isn't viable. The case is set for termination of parental rights 60 days out. Assuming the best-case scenario time wise and considering the child's best interests,[32] the parents relinquish at that hearing and the case goal changes to adoption.

Once the case plan changes to adoption a whole new set of problems and delays crops up. First, DCF must find an adoption placement. If the placement is a relative from another state, Kansas DCF must request that state's DCF equivalent to approve placement under the Interstate Compact for the Placement of Children (ICPC).[33] For our sample case, let's assume we need approval under ICPC. It takes about three months to receive approval for placement, then another six months for approval for adoption, and throw in another 90 days for administrative hiccups.

Added up, our quickest adoption scenario stretches to 24 months. Nationally, foster children wait 31.2 months for adoption.[34] Kansas's average adoption case length is 36 months.[35]

### The solution to DCF's woes was in front of us all along!

No matter how favorably Kansas's numbers compare to national statistics, children stuck in this process are victims. Imagine being away from relatives or parents from one to three years. Courts must consider "child time" when deciding whether to terminate parental rights, and to a child, one to three years might as well be eternity.[36] Thus, courts should embrace anything that improves outcomes and shortens case lengths.

CASAs walk alongside the kids and monitor the progress of CINC cases from beginning to end. They let all parties know when something isn't progressing as expected, and they file reports with the court to let the judge know about their observations. They advocate for just one child or family of children at a time until that case closes, and only spend from 5-10 hours per month on the case, which includes appearing in court periodically. Although a CASA's duties may seem small in comparison to the others' in a case, especially the caseworker's, consider the impact CASAs have on case outcomes.

• The latest missing runaway count in Kansas is 77.[37] In Sedgwick County, just four CASA kids ran away in the past five years, and all were found.[38]

• Nationally, just 50 percent of foster kids graduate high school.[39] Eighty percent of all Sedgwick County CASA kids, and 85 percent of those who age out of the system graduate.[40] This compares favorably even to USD 259's overall graduation rate of 73 percent![41]

• When determining recidivism rates for former foster kids, DCF only counts those who return to foster care within 12 months. Even that very limited data indicates that 8.5% are pulled into the foster care system again.[42] If I had to guess the overall rate as I've seen it in my courtroom, I'd say the lifetime number is closer to 20 percent. CASA kids? Just two percent.[43]

Unfortunately, none of the newspaper or TV news reports share this encouraging information with the public, just the depressing stories involving runaways or untimely deaths. Thus, I contacted Ashley Thorn, Executive Director of CASA of Sedgwick County, in September 2017 and proposed we present the CINC process to civic, political, and religious organizations, tell them about CASA, and challenge their members to volunteer. The premise was that there's little chance of Kansas cutting down the time kids in crisis spend in foster care via more money or regulations—government's outcomes may be as good as they're gonna get!—so we need citizens to get involved in the only way that has proved to have a substantial and immediate impact on case outcomes.

### When people hear about CASA, they volunteer!

The response to our presentation has been overwhelming. Ms. Thorn told me recently that since we began our tag-team presentations, all Sedgwick County CASA training classes have been full. Several churches and civic organizations have asked us to present to them, too. If our recent experience is an indication, I suspect that when we graduate to the larger groups of civic-minded citizens we will have a backlog of CASA volunteers ready to help improve the lives of troubled kids. But our work is far from complete. Until we have enough CASA volunteers for all four Sedgwick County juvenile court judges to appoint CASAs on every case, we will not see these excellent outcomes overall in Sedgwick County, no matter how much money Topeka throws at DCF.

Do you think $16 million in additional funds over two years will yield the same positive return as CASAs already do? CASA is a resource free to Kansas taxpayers that's guaranteed to dramatically improve case outcomes in all CINC cases. A CASA volunteer immediately helps a child or entire family of children, and if you bring your church, business or civic organization friends with you, you will exponentially impact the lives of hundreds of foster kids.

If you belong to a church or organization filled with people who care for the welfare of Kansas kids, please contact me at ksmith@dc18.org. Ashley and I will be honored to present our program to your organization. ∎

## About the Author



**Hon. Kevin Mark Smith** is a judge in the 18th Judicial District, Sedgwick County, where he currently serves in juvenile court. Judge Smith practiced law in Kansas for more than 16 years before Gov. Brownback appointed him to the bench in Dec. 2015. He graduated cum laude in 1999 from Regent University School of Law where he served as Issue Planning Editor of Law Review.



### Endnotes

1. *See* https://casaofsedgwickcounty.org for information on CASA of Sedgwick County and what it does to advocate for children.

2. *See* http://www.kscourts.org/programs/CASAtable.pdf, for all counties that offer CASA programs, as well as contact information.

3. *See* K.S.A. 38-2201 *et seq.* (2016).

4. Kan. S. Ct. Rule 110(b).

5. Tim Potter, *Mother says her toddler's death in foster care was neglect. The state disagrees.*, Wichita Eagle, December 18, 2017, https://go.ksbar.org/2t1BiY2.

6. Hunter Woodall & Jonathan Shoreman, *Number of missing Kansas foster kids doubled over two years*, Wichita Eagle, October 14, 2017, https://go.ksbar.org/2CmmqY6.

7. J. Schafer, *Sex Trafficking: Big Business And Big Problem In Kansas*, KMUW, April 6, 2016, https://go.ksbar.org/2BRdMj2.

8. Jonathan Shoreman, *Brownback wants funds to help search for dozens of missing foster children*, Wichita Eagle, January 8, 2018, https://go.ksbar.org/2HMKJ0H.

9. *Id.*

10. Michael Reagan with Michael R. Shannon, Missing Foster Children and the Kansas Bureaucracy, newsmax.com, November 4, 2017, https://go.ksbar.org/2EXovHq.

11. https://go.ksbar.org/2GO7UWT.

12. http://www.childrensrights.org/newsroom/fact-sheets/foster-care/.

13. https://go.ksbar.org/2Cmt14B.

14. https://go.ksbar.org/2GO7UWT.

15. Most recent national data is as of September 30, 2016. https://go.ksbar.org/2HNJzSL

16. Studies put the percentage of runaways who are female at up to 75%. https://go.ksbar.org/2BRO8dS.

17. *See generally*, Gwen Clancy, Runaways and Human Trafficking: The Reality, and How You Can Help, National Runaway Safeline, https://go.ksbar.org/2EUtRHx.

18. K.S.A. 38-2269(b)(7).

19. "If the court determines that reasonable efforts or progress have not been made toward finding an adoptive placement with a fit and willing relative, the court may rescind its prior orders of custody for adoption placement and make other orders regarding custody and adoption that are appropriate under the circumstances." *In re NAC*, 316 P. 3d 771, 778 (Kan. Ct. App. 2013) (citing K.S.A. 38-2264(h)).

20. Chart and data are from https://go.ksbar.org/2Clih6t.

21. *See generally*, Meghan Revard, *High Caseworker Turnover Negatively Affecting Children in Foster Care*, Kansas Adoption Services, December 16, 2017, https://go.ksbar.org/2EUqaSb.

22. Data provided by Saint Francis Community Services.

23. *See Kansas Child Welfare Factsheet*, November 2016, https://go.ksbar.org/2EUSzU2.

24. K.S.A. 38-2243(b).

25. K.S.A. 38-2243(f).

26. K.S.A. 38-2251 & 38-2253.

27. K.S.A. 38-2251(c).

28. *Id.* § (b). See also K.S.A. 38-2202(d) for *eleven* different categories of "child in need of care."

29. *Id.*

30. K.S.A. 38-2257 & 38-2263.

31. K.S.A. 38-2264(e).

32. This doesn't factor in the delays associated with a court terminating parental rights and the ensuing appeal by the parent, which will add another 4 months to the process. *See* K.S.A. 38-2273.

33. *See* K.S.A. 38-1201 et seq.

34. *See* The AFCARS Report, U.S. Dept. of Health and Human Services, October 20, 2017, https://go.ksbar.org/2HNJzSL.

35. *See* https://go.ksbar.org/2FwTKKw.

36. *In re DT*, 30 Kan. App. 2d 1172, 1175 (2002).

37. Jonathan Shorman, *Kansas will step up efforts to find scores of missing foster children*, Wichita Eagle, November 22, 2017, https://go.ksbar.org/2oxfGOz.

38. Data provided by CASA of Sedgwick County.

39. *See Health Care Issues for Children and Adolescents in Foster Care and Kinship Care*, Pediatrics, October 2015, VOLUME 136 / ISSUE 4, https://go.ksbar.org/2Cmujwt.

40. Data provided by CASA of Sedgwick County. It's important to note that some courts in Kansas terminate CASA representation upon termination of parental rights so CASAs' impact on high school graduation rates after kids age out may not be as pronounced.

41. *See* https://www.usd259.org/domain/954.

42. *See* https://go.ksbar.org/2GL7Vek. The Wichita region is just 4.7%.

43. Data provided by CASA of Sedgwick County.

## STUDENT AND EMPLOYEE DISMISSAL AND DISCIPLINARY CASES



## CLIFFORD A. COHEN
### Attorney at Law

Public and Private School Cases
Public Employee Due Process Claims
Federal and State Court
**35 Years of Experience**

## COLANTUONO BJERG GUINN LLC
(Of Counsel)
7015 College Blvd. #375
Overland Park, Kansas 66211
(913) 345-2555 Fax (913) 345-2557
email: cac@ksmolaw.com
Licensed in Kansas, Missouri and Colorado

*Ward Law Offices, LLC welcomes
Tony A. Potter, Of Counsel to the firm.*



WARD LAW OFFICES LLC
KANSAS FAMILY LAW

T. LYNN WARD • TONY A. POTTER • LAURA E. POSCHEN

345 RIVERVIEW, SUITE 120 | WICHITA, KS 67203
316.260.3120 | WARDLEGAL.COM




# The Journal of the KBA is looking for YOU if:

- You have an idea for a substantive article for The Journal and are ready to pursue it;

- You enjoy writing and research and would like to take on a topic already identified by the Board of Editors as an issue of interest to our members and readers;

- You know of a lawyer in your practice or community who is an unsung hero or has an unusual or fascinating avocation and would like to see their story in print;

- You are interested in writing a shorter, feature article on an area of practice or issue of concern to your colleagues;

Please contact *The Journal* editor at **editor@ksbar.org** or visit with any member of the Board of Editors (see list on Page 4 of The Journal of the KBA.)

# ETHICS for GOOD XIX

*Ethics CLE meets humor, for good!*

Sponsored by
**KANSAS BAR FOUNDATION**

Pending approval for 2.0 CLE credit hours, including 2 E&P credit hours in Kansas & Missouri

## Where Does the Money Go?

Our designated charities for 2018 are:
- CASA (Johnson/Wyandotte Counties)
- Safehome and Hope House (domestic violence programs)
- Metropolitan Organization to Counter Sexual Assault (MOCSA)
- Kansas Bar Foundation
- Midwest Foster Care and Adoption Association
- In addition, we will fund Ethics for Good Scholarships to each of the KU, Washburn and UMKC Law Schools and the Johnson County Community College paralegal program.

## How Do We Sign Up for this Amazing, Funny and Informative Program?

For a mere $90, you get both the ethics and the good, the entire Ethics for Good – **now in its 19th year!**

To register for this program, complete the form below or **register online** at:

www.ksbar.org/event/EthicsforGoodXIX-KC

www.ksbar.org/event/EthicsforGoodXIX-OP

## Who Are these Intrepid Presenters?

Stan Davis, *Ethics for Good Elder Statesman*
Jim Griffin, *Scharnhorst Ast Kennard Griffin, P.C.*
Mark Hinderks, *Stinson Leonard Street L.L.P.*
Todd LaSala, *Stinson Leonard Street L.L.P.*
Hon. Steve Leben, *Kansas Court of Appeals*
Jacy Hurst Moneymaker, *Kutak Rock LLP*
Todd Ruskamp, *Shook, Hardy & Bacon L.L.P.*
Hon. Melissa Standridge, *Kansas Court of Appeals*

**Wednesday, June 27, 2018, 2:30 – 4:10 p.m.**
The Nelson-Atkins Museum of Art, Atkins Auditorium
4525 Oak St.
Kansas City, Mo.

Parking: $8 museum non-member parking fee; carpooling encouraged

**Friday, June 29, 2018, 2:30 – 4:10 p.m.***
Polsky Theatre, JCCC Carlsen Center
12345 College Blvd. (College & Quivira)
Overland Park, Kan.
*Reception afterward sponsored by the JCCC Foundation*

## Questions?

Contact Deana Mead, KBA Associate Executive Director, at dmead@ksbar.org or at (785) 861-8839.

---

Please mark the date you will be attending: ❏ June 27    ❏ June 29

Name _____

Address _____

City _____ ST _____ Zip _____

E-mail _____ Sup. Ct. # _____

Bill to:   ❏ MasterCard   ❏ Visa   ❏ AmEx   ❏ Discover

Account Number _____ CVC _____

Exp. Date _____ Signature _____

# ETHICS FOR GOOD XIX
## $90

❏ Check Enclosed
    Payable to:
    Kansas Bar Foundation
    1200 SW Harrison St.
    Topeka, KS  66612-1806

# Military Training Serves One Well in Law School

## by Brandon Curl



What did I get myself into? That was the thought running through my mind when I stepped off a bus at Fort Leonard Wood, Missouri, to begin the U. S. Army's Basic Combat Training. After the completion of basic training and a rigorous five-month Advanced Individual Training, I finally received orders to Fort Riley, Kansas. Just shy of four years as a Human Intelligence Collector and a nine-month deployment later, the time had come to part ways with the Army and decide what to do next. That was when I made the decision to take the LSAT and apply to law school.

The transition from the military and into law school went much smoothly than anticipated. Many times, you hear of horror stories about veterans trying to use benefits through the U. S. Department of Veterans Affairs. However, after just a phone call and answering some questions, it was simply time to "hurry up and wait" for my certificate of eligibility. Although the overall transition has been easy, the most difficult part of my transition from the military to a student is no longer having a steady income. The military provided me with a steady income and allowed me to go on vacation, afford a golf membership, and many other things. The income also allowed me to live in a much newer apartment instead of an older apartment to help me stay within my budget.

Basic training in general teaches many applicable skills to be successful not only in life but also in law school. First and most importantly, the Army teaches soldiers discipline. The

Army starts to instill discipline in its soldiers from day one by punishing soldiers for every little infraction. Now one may wonder what I mean by punishment. Most punishment in basic training is some type of physical training, such as push-ups. The Army uses physical training not only to punish but also help you, because physical fitness is such an important part of the military. This discipline has allowed me to keep a routine and dedicate plenty of time to studying so I can learn the material needed to be successful in the classroom. Basic training also teaches soldiers how to be confident and believe in themselves. I believe that this confidence has permitted me to stay positive and be successful even when I feel overwhelmed with law school.

The Advanced Individual Training for Human Intelligence Collectors is one of the more difficult and longest trainings in the Army. Human Intelligence Collectors are responsible for collecting intelligence via de-briefings, interrogations, and military source operations; preparing Intelligence Information Reports; and providing analysis to senior leaders of the United States Government. I believe my prior experience writing classified intelligence reports played a large role in receiving an A in my legal writing class. Since these reports are not just distributed within the Department of Defense but also to the entire intelligence community, it is immensely important that attention to detail is used and the reports are accurate. Furthermore, like legal writing, intelligence reports are what I would call plain, boring, and straight to the point. Like judges or attorneys, commanders do not have time to sort through unnecessary information. Commanders use these reports to make decisions regarding operations and battlefield decisions, which can be time sensitive.

It is very important to understand the benefits you have when separating from the military—but even more crucial when going back to school—because it can save you money.

The most significant benefit the United States Department of Veterans Affairs provides for students is the Post-9/11 GI Bill. If eligible, and most veterans are, the GI Bill provides up to full tuition and fees paid directly to your law school on your behalf. Believe it or not, many law schools can be attended by veterans at absolutely no cost—including private schools. The GI Bill also provides students with a monthly housing allowance and up to a $1000 stipend for books and supplies.

My best advice to veterans is to understand that just like the military, law school is a big commitment and just as time consuming. It is never easy to receive an overwhelming amount of information in multiple classes and feel like you do not have time to keep up. The military gives every service member the tools and skills to be successful not only in life but also in law school. Although these skills will help make law school easier, it will still be a challenge. Still, just like basic training, the first semester of law school only gets easier as time goes on because you learn what is expected and are taught how to be successful. ∎

### About the Author



**Brandon Curl** is a 1L at Washburn University School of Law and ranked in the Top 20% of his class. He lives in Kansas City and hopes to pursue a career in litigation.

**brandon.t.curl@gmail.com**



# View your professional listing at
## www.LegalDirectories.com
### *"The Legal Search Engine"*

**Marketing Solutions that boost your online visibility and attract clients**

Link to your website from **LegalDirectories.com**
Professional Profile listings available
Advertise your business

**Legal Directories Publishing Co • PO Box 495069 • Garland, TX 75049-5069 • 800.447.5375**



The view from the offices of the Kansas Legal Services Low Income Tax Clinic in Kansas City, Kansas, is stunning. But the offices are as spartan and utilitarian as one would expect for a not-for-profit serving low-income Kansans who require assistance in disputes over state or federal taxes.

# The KLS Low Income Tax Clinic in KCK

## by William Schmidt

Photos and graphics by Ryan Purcell, KBA Staff.

The **Kansas Legal Services LITC**
The Internal Revenue Service (IRS) has provided relief for low income taxpayers since the year 1999 through their promotion of Low Income Taxpayer Clinics (LITCs). LITCs are available through law schools, legal aid organizations and other non-profit organizations. While there is a history of LITCs within the state of Kansas, the current setup has only been in place for the past couple years.

Kansas Legal Services began its LITC in 2015, and it is working to build awareness throughout the state about that LITC. The clinic at Kansas Legal Services is the only LITC for the state of Kansas listed by the IRS in Publication 4134. As a 2009 graduate of Washburn University School of Law, I began managing cases for the LITC in 2016 and became Clinic Director in 2017, working to publicize the LITC program throughout the state.



William "Bill" Schmidt, Director of the KLS Low Income Tax Clinic in Kansas City, Kansas, explains to members of the KBA staff how the clinic operates and the clientele they generally represent.

LITCs specialize in resolving disputes with the IRS and represent low income taxpayers by providing free services (though clients would be responsible for court costs or filing fees). To be a qualifying low income taxpayer, the individual must have income at 250% or less of the poverty level. To give a general idea, one qualified individual would have about $30,000 or less in annual income, and each additional family member could increase that amount by about $10,000.

The IRS provides the funding for LITCs to represent taxpayers on federal tax cases. LITCs can also represent clients on state tax issues in coordination with federal tax cases. The Kansas Legal Services LITC can represent individuals who only have state tax issues at lower income levels through funding from sources other than the IRS. The Kansas Legal Services LITC is not a tax preparation clinic, but a tax controversy clinic, so individuals who have not filed tax returns for several years need to find a tax preparer equipped to file multiple years of tax returns.

To begin, a client would sign a power of attorney form, IRS Form 2848, to allow for a representative to discuss tax issues with the IRS or gather transcripts on the client's case. Transcripts for the client include a transcript of the tax return (called a tax return transcript, different from a copy of the tax return – which is available for a fee), a transcript of forms submitted to the IRS with regard to the client (wage and income transcript), or a transcript of activity related to the particular tax year (account transcript). The account transcript is the main document with information regarding how much a taxpayer owes the IRS for a particular tax year.

### Collection Alternatives

People who have gone through hard times have a variety of debts. One part of those debts can be the result of not filing tax returns for several years. Too often, people who have not filed their tax returns do not pay attention if there will be any fallout from avoiding tax filing. That fallout can include penalties and interest for not filing a timely tax return and not paying the tax debt on time.

One resulting issue is that the Internal Revenue Service can file a substitute return for an individual who has not filed a tax return. The IRS prepares that substitute return by look-



Roadmap to a Tax Controversy:
Pre-Litigation Administrative Procedures

Based on an IRS infographic found on the wall at the KLS Low Income Tax Clinic in KCA.
(Graphics and photos for this article created or taken by Ryan Purcell, KBA staff.)

ing at past tax returns and also what wages and income were reported to the IRS during that year, then making estimates of income based on that past reporting. It is always better for a person to file a tax return, even if that person will owe the IRS without being able to pay. Getting the tax return filed before the deadline means there will not be a penalty for not filing a timely tax return. It also means the taxpayer is in control of the tax return, not the IRS. The IRS might determine that the individual should have a certain filing status or might not include tax credits that the taxpayer would be entitled to. By filing, the taxpayer can choose a filing status for a better tax rate and other benefits that would likely be overlooked if left to the IRS's discretion.

Some individuals receive IRS letters that are basically considered an audit by correspondence. One issue may be whether that individual qualifies to claim a certain child or children on the tax return. The LITC often works with individuals to provide evidence to the IRS to prove that the qualifications are legitimate. Those qualifications can include proof the children are relatives (birth certificates), resided with the individual for over 6 months during the year (school or medical records), and that the individual paid living expenses for the children (utility and other bills).

Other correspondence audits may include IRS claims that the individual underreported income for a tax year. The IRS received forms, such as W-2 and 1099, reported on a wage and income transcript. If the individual's tax return did not report that income, the IRS sends letters to determine whether the individual should have reported it. If the individual under-reported a large enough amount of income, there will be

a penalty attributed to negligence. While it may be true under-reporting, another issue could be identity theft—where another person's income is incorrectly reported as the client's income.

If a person does not respond to IRS correspondence, the IRS assumes the individual agrees with the IRS assessment and directs the taxpayer's account to its Collections Department. The IRS will follow up with the taxpayer by mailing letters, with one proposal being that the IRS will levy finances from the individual. This may result in a garnishment of wages, bank accounts, or Social Security Income. Another result may be that the IRS files a lien that attaches to the individual's house.

For individuals who have been out of contact with the IRS for long periods of time, the IRS may refer the account to a private debt collection agency. There are three main alternatives available for taxpayers to deal with IRS Collections issues: 1) Currently Not Collectible, 2) Installment Agreements, and 3) Offers in Compromise.

The **Currently Not Collectible (CNC)** status applies to taxpayers with financial hardships. The IRS defines this situation as one where a taxpayer has no assets or income that is subject to levy, or that levy action itself will create the hardship. Basically, these situations result when the taxpayer has more expenses than income, including periods of unemployment.

To evaluate whether a taxpayer qualifies for CNC status, it is necessary to submit a list of assets, income and expenses to the IRS. CNC status is a mixed bag. Collections actions will be put on hold and the debt for specific years could potentially expire. However, the debt will still be there generating interest in the meantime. The IRS may file a Notice of Federal Tax Lien while the account is suspended, leading to other companies sending correspondence offering help for dealing with debts.

**Installment Agreements** may be available for taxpayers with enough income to pay on the tax debt. Installment agreements can be open-ended or can be streamlined to pay off the debt within a specific time period, with the payoff period potentially as long as 6 years (72 months). These monthly payments could be done through direct debits from a bank account, payroll deductions from an employer, by credit card, or by check or money order. The Installment Agreement is set up

with the first payment going toward a registration fee, though low-income taxpayers can pay a reduced setup fee. The taxpayer can specify the amount and the day of the month for the payment. The IRS can also accept a lower amount for 12 months and reevaluate the taxpayer's circumstances after the first year.

An **Offer in Compromise** is a settlement agreement the taxpayer negotiates with the IRS. Individuals who are no longer working due to retirement or poor health may be able to negotiate a better settlement than those who are active, healthy members of the work force. Before the IRS will consider an offer, the taxpayer must be current on filing tax returns and making quarterly payments. The taxpayer will again need to provide asset, income and expense information, but this time will need to include supporting documentation. After the offer is accepted, the taxpayer must continue filing tax returns for the next five years. The IRS will apply any refunds during those five years to the overall liability at the heart of the offer.

## Tax Litigation

One letter the IRS sends when it has determined the amount of tax due is the Notice of Deficiency (NOD). The NOD allows the taxpayer to petition the Tax Court and establishes the two-month deadline the taxpayer has to file the petition. After filing with Tax Court, the case is transferred to IRS Appeals and then on to IRS Counsel. Within each of those departments, the taxpayer has a chance to settle the case.

Tax Court is based out of Washington, D.C., and sends judges to appear at various cities throughout the United States. The Kansas Legal Services LITC files cases in Wichita, Kan. and Kansas City, Mo.; it appears for the calendar call at those dockets to provide free legal advice to unrepresented petitioners.

Another form of tax litigation is a "refund suit." A refund suit can be filed when a taxpayer fully pays off a tax liability and is eligible for a refund that has not been paid by the IRS without filing a lawsuit. Refund suits must be filed in U.S. District Court or Federal Claims Court.

### Susan's* Story

Susan* was audited for tax years 2013 and 2014. One clinic attorney was able to prove that she could claim her son as a dependent. For her daughter, the IRS was not convinced. After petitioning the Tax Court and submitting extensive documents, the IRS agreed her daughter could also be claimed as a dependent in 2014. Her refund for 2014 was sufficient to pay her remaining 2013 tax liability.

### Mary's* Story

The LITC negotiated with the IRS for Mary* regarding her rental expenses, saving her $11,550 from a previous audit. It was necessary to extensively organize Mary's documents for the negotiations.

## Injured and Innocent Spouse Relief

There are also several forms of non-litigation tax relief available to taxpayers. Some areas that are confusing to taxpayers are the similar-sounding "Injured Spouse" and "Innocent Spouse" relief. Both forms of relief are available after a married couple files a joint return. Injured Spouse relief comes into play when one spouse owes a past-due government debt while the other spouse is owed a refund. If the refund goes to pay the other spouse's past-due government debt, it makes the spouse who would have gotten a refund the "injured spouse." The "injured spouse" can file Form 8379 so that the refund comes back to that spouse instead of being applied to the other spouse's debt. This relief can be applied whether the couple is married or divorced.

"Innocent spouse" is an entirely different situation. When a married couple files a joint tax return, their signatures say they agree to be jointly and severally liable for any tax liability listed. Since that joint and several liability means the IRS can come after either spouse for the joint liability, when the couple is no longer united because of a death, divorce or legal separation, the split means there is potential for innocent spouse relief. Innocent spouse relief can shift liability between the spouses, resulting in the reduction or elimination of the liability for the innocent spouse.

Form 8857 asks questions about the innocent spouse's education, whether there was domestic violence and what the innocent spouse understood about the couple's finances and tax returns. A taxpayer can also use IRS Publication 971 to learn more about innocent spouse requests and for assistance in filling out the form.

The IRS attempts to determine the intent of the spouses and how fair their tax treatment would be, so the investigation takes several months. The IRS will try to contact both spouses to get their stories. The IRS then makes a preliminary determination, which has a time period for the spouses to protest the determination. Following that period, the IRS will issue a final determination on the relief available for the petitioning spouse.

### Maria's* Story

Maria* was liable for joint returns she signed at her husband's direction. She was a stay-at-home mom, and her husband operated a small business doing car repairs. She had nothing to do with his business, and he controlled all of the finances. Every year, he would have her sign the joint tax returns but she did not understand how the taxes were calculated or the extent of her liability. Maria does not read, write, speak or understand the English language. She is a legal immigrant from El Salvador.

Maria did not discover her tax liability until she was cleaning out her husband's closet after he died. She had her friend explain the IRS notices that she found, and for the first time



William Schmidt explains the infographs on his wall that describe some of the scenarios under which a tax dispute may travel through the state and federal systems.

learned about the huge tax liabilities generated by her deceased husband's business.

The LITC submitted an innocent spouse application, alleging spousal abuse. The application explained that her husband was physically violent early on in their marriage. After 30 years, he mellowed out somewhat, yet was still very controlling of their finances and the wife's home life. The IRS requested proof of domestic violence, but since she never made any police reports or sustained injuries, the LITC was able to obtain letters from those who knew the couple well. They did a good job describing how controlling her husband was while he was alive. They also helped explain why she would have no idea about the tax problems until after his death.

Maria was granted full relief under the Innocent Spouse program for tax liability in excess of $133,000.

## Other Forms of Relief

When a taxpayer owes a past-due government debt, any federal or state tax refund will likely be intercepted to pay on those obligations. Those government debts might be IRS liability, child support obligations, other federal government debts, or state tax liabilities. If a taxpayer can show financial hardship—such as the threat of utility shutoffs or foreclosure—the IRS will bypass the hold on the debt owed to it and allow the taxpayer to receive the refund.

The IRS treats canceled loans as income—a term called "cancellation of debt income." Cancellation of debt income from canceled mortgages, student loans or other debts can mean large income listed on the tax return of a taxpayer. It may be beneficial to amend the tax return to reduce or remove that income, especially for a low-income taxpayer. Form 982 and the Insolvency Worksheet in IRS Publication 4681 must be included with the amended tax return.

The IRS has an Identity Theft department that investigates if a taxpayer has tax issues that were caused by someone stealing their identity information. This may include refund-based identity theft —filing a tax return under someone else's social security number to steal their refund—or income-based identity theft— working under someone else's social security number, resulting in income reported to the IRS that they did not report on their tax return. Income-based identity theft may result in a correspondence audit from the Underreporting Department, as referenced previously. Use Form 14039 to submit a client's affidavit regarding identity theft to the IRS.

To qualify for IRS funding, the LITC must have matching funds. Part of those matching funds include donations and volunteer assistance. When attorneys or law students volunteer for the LITC, the LITC can treat that volunteer time as a set billable hour rate to help the clinic meet its financial goals. The LITC works to teach volunteer attorneys and law students about the tax controversy process so volunteers gain something in return for donating time. We invite you to volunteer and learn about the negotiation process for helping low-income taxpayers.

The Kansas Legal Services Low Income Taxpayer Clinic specializes in resolving disputes with the Internal Revenue Service on IRS and state tax issues. The LITC provides low-income taxpayers free legal advice on federal tax matters, but does not prepare tax returns for clients. The LITC is independent from the Internal Revenue Service, Kansas Department of Revenue, or any other state tax authority. All telephone conversations and client interviews are held confidential. To apply for assistance from the Kansas Legal Services Low Income Taxpayer Clinic, an individual may call 1-800-723-6953 or apply online at www.kansaslegalservices.org ∎

*Names have been changed throughout this article to protect client confidentiality.*

## About the Author



**William Schmidt** completed his Juris Doctorate from Washburn University School of Law in 2009 and his Master of Laws in Taxation from the University of Missouri-Kansas City in 2010. He was the recipient of the 2012 Kansas Bar Association Pro Bono Award. He became the Managing Attorney for the Low Income Taxpayer Clinic for Kansas Legal Services in 2016 and became Clinic Director in 2017. He is a contributing writer for the Procedurally Taxing blog and co-author of Chapter 5 in the upcoming 7th Edition of Effectively Representing Your Client Before the IRS.

**Save the Date**



**KANSAS BAR FOUNDATION**
WWW.KSBAR.ORG/KBF

*The President and*
*Board of Trustees*
*of the*
*Kansas Bar Foundation*
*Cordially invite you to attend its*
*Annual Recognition Dinner*

*Thursday, June 14, 2018*
*DoubleTree by Hilton*
*Seattle Ballroom*

*10100 College Blvd*
*Overland Park, KS*

*Hosted cocktail bar 5:30 p.m.*
*Dinner and cash bar 6:30 p.m.*
*Black Tie Optional*



**Kansas Workers –**
improving life through:
**Commitment**
**Compassion**
**Community**









M.1707 An independent licensee of the Blue Cross Blue Shield Association.



# Lawyers' Electronic Advertising: Websites, Blogs, LinkedIn,

## by J. Nick Badgerow



## I.  Introduction

Just as the rules of professional conduct generally, the rules on lawyer advertising have evolved over time. While advertising of any kind was previously prohibited by practice or by rule, society and the bar have changed, and so have the rules on lawyer advertising. The advent of the internet and the ubiquity of social media are causing a rapid change in society, in the practice of law, and in lawyer ethics, to keep up with the times. And lawyers, never on the forefront of technological development, are struggling to keep up. But of course they must do so within the parameters of what is permitted by the rules of professional responsibility.[1] The purpose of this article is to explore the evolution of lawyer advertising, and the various cases and ethics opinions which strive to keep up with this evolution, applied to various means of social networking to promote business for the lawyer.

## II.  Background—the Regulation of Lawyer Advertising

**A.  Ye Olde Rules – "Lawyers Do Not Advertise."** For centuries, advertising by lawyers was considered unprofessional, and was generally outlawed.

> The hustle of the marketplace will adversely affect the profession's service orientation, and irreparably damage the delicate balance between the lawyer's need to earn and his obligation selflessly to serve. Advertising is also said to erode the client's trust in his attorney: once the client perceives that the lawyer is motivated by profit, his confidence that the attorney is acting out of a commitment to the client's welfare is jeopardized. And advertising is said to tarnish the dignified public image of the profession.[2]

The original self-imposed disapprobation of lawyer advertising originated—like much of American law practice—with the English barrister, who viewed advertising as impolite and a violation of etiquette. While there was no express rule against advertising imposed upon members of the bar, barristers eschewed advertising by themselves, and they disapproved of advertising by others.

> It appears that the ban on advertising originated as a rule of etiquette and not as a rule of ethics. Early lawyers in Great Britain viewed the law as a form of public service, rather than as a means of earning a living, and they looked down on "trade" as unseemly. See H. Drinker, Legal Ethics 5, 210-11 (1953). Eventually, the attitude toward advertising fostered by this view evolved into an aspect of the ethics of the profession. *Id.*, at 211.[3]

Since they viewed the practice of law as a public service, traditional English lawyers in the eighteenth and nineteenth centuries looked down on the "trades" as unseemly and ungentlemanly.[4] Surely, only a tradesman would advertise his wares.[5]

With the formation of the Law Society in England in 1825,[6] this general disapproval was formalized. For example, Rule 1 of the Solicitor's Practice Rules disallowed "touting, advertising, or unfairly attracting business."[7] This concept continued even into the late twentieth century. Indeed, the Law Society's prohibition on lawyer advertising was not relaxed until 1984.[8]

In the United States, the first national statement of general rules of professional conduct was stated in the Canons of Professional Ethics, adopted by the American Bar Association in 1908.[9] Rule 29 of those Canons allows for the use of business cards:

> But solicitation of business by circulars or advertisements, or by personal communications or interviews, not warranted by personal relations, is unprofessional. It is equally unprofessional to procure business by indirection through touters or any kind, whether allied real estate firms or trust companies advertising to secure the drawing of deeds or wills or offering retainers in exchange for executorships or trusteeships to be influenced by the lawyer. Indirect advertisement for business by furnishing or inspiring newspaper comments concerning causes in which the lawyer has been or is engaged, or concerning the manner of their conduct, the magnitude of the interests involved, the importance of the lawyer's positions, and all other like self-laudation, defy the traditions and lower the tone of our high calling, and are intolerable.[10]

The Canons were replaced in 1969 by the Model Code of Professional Responsibility.[11] Under the Code, (which applied to Kansas lawyers from 1969 until the adoption of the Model Rules of Professional Conduct in 1988),[12] lawyer advertising was still strictly limited. For example, Disciplinary Rule 2-101(A) under the Code, entitled "Publicity" mandated:

> (A) A lawyer shall not publicize himself, or his partner, or associate, or any other lawyer affiliated with him or his firm, as a lawyer through newspaper or magazine advertisements, radio or television announcements, display advertisements in the city or telephone directories or other means of commercial publicity, nor shall he authorize or permit others to do so in his behalf.[13]

Then, subsection (B) of this Disciplinary Rule provided a specific list of the information which could be included – most of it biographical and all of it objective, and subsection (C) required a lawyer to petition the Disciplinary Administrator if the lawyer wished to include other or additional information in the lawyer's advertisements.[14] Most states (including Kansas) followed the Model Code until it was replaced.[15]

**B.** **Bates.** In 1977, the United State Supreme Court addressed the issue of lawyer advertising from the standpoint of constitutionality and free speech, within the context of the Model Code's prohibitions. In *Bates v. State Bar of Arizona*,[16] the Court held that a state bar rule prohibiting lawyer newspaper advertising was an unconstitutional infringement of a lawyer's First Amendment rights. While the case represented a landmark, its actual holding was limited, stating only that that state cannot constitutionally prohibit a lawyer from advertising in a newspaper ad the lawyer's willingness to provide "routine" legal services at specified prices.

**C.** **Zauderer.** Thereafter, in 1985, U.S. Supreme Court held in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, that a lawyer could not be prohibited from publishing an ad containing a picture of a Dalkon Shield (an intrauterine contraceptive device), advising that potential clients could still file claims arising from the use of that device, since the statute of limitations had not yet run.[17]

**D.** **Shapero.** Then, in *Shapero v. Kentucky Bar Association* in 1988, the Supreme Court held that a state could not ban direct mail advertising by lawyers, though a ban on direct personal solicitation was still appropriate.[18] Earlier, the Supreme Court had explained this ban on personal solicitation by holding "those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of vexatious conduct" which might arise from person solicitation override a lawyer's interest in communicating with potential clients.[19]

> The State is free to fashion reasonable restrictions with respect to the time, place and manner of solicitation by members of its Bar. *See Bates v. State Bar of Arizona*, 433 U.S. [350] at 384 [(1977)]; *Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S. [748] at 771 [(1976)], and cases cited therein. The State's special interest in regulating members of a profession it licenses, and who serve as officers of its courts, amply justifies the application of narrowly drawn rules to proscribe solicitation that in fact is misleading, overbearing, or involves other features of deception or improper influence.[20]

**E.** **The Test.** This line of cases has led to a four-part test generally applied by the courts in determining whether a state's ban on lawyer advertising is constitutional:

1. The state can prohibit advertising which is false or misleading;

2. Even if advertising is not false or misleading, the state may limit advertising if the state shows a substantial governmental interest, such as preventing the potential ills caused by in-person, direct solicitation;

3. The regulation must directly advance that state interest; and

4. The regulation must be reasonable, and drafted narrowly enough to achieve the desired result.[21]

**F.** **The Model Rules of Professional Conduct - Current Kansas Rule 7.1.** The Model Code was eventually replaced by the Model Rules of Professional Conduct, which have now been adopted in 49 states, plus the Virgin Islands and the District of Columbia—either with or without the Comments which accompany the Model Rules.[22] California alone has not adopted the Model Rules.[23]

In Kansas, attorney conduct is now governed by the Kansas Rules of Professional Conduct (substantially based on the Model Rules). Under the current Kansas Rules, advertising by lawyers is regulated specifically at Rules 7.1 – 7.5. Under Rule 7.1, KRPC, "A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services."[24] This prohibits (a) material misstatements of fact or law, (b) the creation of unjustified expectations for the results of the lawyer's services, and (c) unsubstantiated comparisons with the services of other lawyers:[25]

A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:

(a) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading;

(b) is likely to create an unjustified expectation about results the lawyer can achieve, or states or implies that the lawyer can achieve results by means that violate the rules of professional conduct or other law; or

(c) compares the lawyer's services with other lawyer's services, unless the comparison can be factually substantiated.[26]

It is with this backdrop then, that the modern lawyer's approach to advertising must be measured. Of course, as the entire world has become electronically-oriented, the modern lawyer's efforts at self-promotion have become electronically-based.

This sudden, massive increase in the popularity and visibility of the internet has led many lawyers to rethink their advertising methods. Much like lemmings jumping off a bridge, lawyers are following their advertising counterparts in the business world and discovering the abundant commercial uses of the internet ranging from interactive Web sites to direct e-mail solicitation. Attorney advertising has taken a giant leap into the deep end of the internet pool without taking adequate swimming lessons.[27]

It is the purpose of this article to provide a few of those lessons.

## III. Law Firm Websites

**A.** **Internet Advertising is Advertising. Even as technology advances, the rules of professional conduct still apply with equal force.**[28]

Attorney advertising is clearly permissible, subject to record keeping and attorney identification requirements of KRPC 7.2(a) and (b). In KBA Ethics Opinion No. 89-6, the Committee opined that an attorney placing a yellow pages ad is allowed under U.S. Supreme Court cases, and that the Model Rules only require that such advertising not be false or misleading. KRPC 7.2(a) also specifically authorizes advertising through public media. While not specifically mentioned, advertising over an internet directory performs a similar function to those mentioned, hence does not appear to require a special rule.[[29]]

**B.** **ABA Opinion 10-457.** In the twenty-first century, a law firm *without* a website may find itself left behind, as marketing, advertising and sales (and purchasing) have abandoned the newspaper, radio, and other antique forms of communication for the internet. It is not surprising that the American Bar Association has issued Formal Opinion 10-457 (2010)("Op. 10-457"), addressing law firm websites.[30] Unfortunately, taking the opportunity to focus on the subject, the opinion lays out very few definitive rules[31] instead opting to identify actions which a lawyer "may" or "might" take.

Perhaps obviously, this opinion makes it clear that (a) websites must not contain false or misleading information, (b) law firms should maintain a watch on their websites to maintain the accuracy and currency of statements contained therein, and (c) law firms should make sure that unintentional attorney-client relationships are not formed through interaction on the website.

**C.** **Applicable Rules.** As members of a profession, lawyers should be truthful in their communications with others. Op. 10-457 reviews a number of the applicable rules on this subject in the context of lawyer or law firm websites, and emphasizes that truthfulness should be observed at all times:

As noted above, **Rule 7.1** pertains to lawyer advertising and mandates that "A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services." This prohibits (a) material misstatements of fact or law, (b) the creation of unjustified expectations for the results of the lawyer's services, and (c) unsubstantiated comparisons with the services of other lawyers.[32]

**Rule 8.4(c)** makes it improper for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."[33]

**Rule 4.1** holds it to be improper for a lawyer "knowingly . . . to make a false statement of material fact or law to a third

person," although this rule applies to conduct committed in "the course of representing a client."[34]

**D.    Lawyer Websites.** After reiterating the rules mandating truthful communications on the part of a lawyer, Op. 10-457 then reviews the kinds of information which lawyers place on their websites.

**1.    Information About the Lawyer.** This includes biographical and historical information, as well as client information (if clients give their informed consent). This information is of course appropriate, but it can change and become outdated, so it needs to be reviewed and updated as necessary to keep it accurate.

**2.    Information About the Law.** Under this Opinion, "Lawyers may offer accurate information that does not materially mislead." However, as descriptions of the "law" are applied to factual situations, they can mislead the reader or lead to false expectations about results.

**3.    Interactive Websites.** When a website invites inquiries or contacts, there is a risk that the responder will believe that an attorney-client relationship has been created. Thus, the website should contain a disclaimer that no such relationship is created unless and until all parties are identified, the absence of conflicts of interest is assured, and both the lawyer and the client agree to the representation.

**E.    Guidance for Websites.** Op. 10-457 provides suggestions for avoiding risks associated with a law firm website. These are the recommendations set forth in Op. 10-457:

**1.    Updated.** Information on the website should be updated "on a regular basis."[35]

Lawyers are notorious for publishing their websites and then abruptly forgetting about them. Unfortunately, outdated content can quickly diminish a lawyer's credibility. Do not let an apparent lack of attention to detail or an appearance of being "behind the times" cause you to lose potential clients.[36] I challenge you to set a resolution for your practice to review your content for expired, outdated, or inaccurate information.

**2.    Accurate.** Lawyers should make sure that legal information in the website is "accurate and current."

The relevant comment [1] to this Rule [7.1] states that "[i]t is especially important that statements about a lawyer or the lawyer's services be accurate, since many members of the public lack detailed knowledge of legal matters." Accordingly, we conclude that social media profiles or pages that include statements by the attorney setting forth an attorney's skills, areas of specialization or expertise are subject to Rule 7.1(a) and, therefore, cannot be false or misleading.[37]

**3.    Disclaimers.** The website should contain qualifiers or disclaimers that statements of the law should not create unjus-

tified expectations or mislead the reader, and that no attorney-client relationship is formed by a response, unless and until conflicts are cleared and both the lawyer and the prospective client agree to a relationship.

It is advisable for the lawyer to use carefully worded disclosures and disclaimers to clarify the purposes and value of the information on the Web site and in the lawyer's e-mail responses to questions generated by the Web site. However, the use of disclaimers will not necessarily preclude the formation of a lawyer-client relationship and its attendant ethical responsibilities, in particular circumstances.[38]

**4.    Not Legal Advice.** If legal information is provided, the website should include a statement that the information is "general in nature" and that the information should not be construed "as a substitute for personal legal advice."

Should lawyers answer specific legal questions posed in "chat rooms" or "news groups"? Probably not because of both the inability to screen for a potential conflict with an existing client (in violation of ER 1.7) and the possibility of disclosing confidential information (in violation of ER 1.6). In Formal Opinions 87-23 and 92-10, which pertain to lawyers giving legal seminars to lay people, one of the guidelines suggested by this Committee was that lawyers should not answer specific legal questions from the audience. Ethically, it would follow that lawyers should not answer specific legal questions from lay people through the Internet unless the question presented is of a general nature and the advice given is not fact-specific.[39]

**5.    Not Forming A Relationship.** Ironically, a substantial purpose of the website is to distinguish the law firm from all the others, and then to form an attorney-client relationship with the reader. However, if the website invites contact by the reader, the law firm should take care not to create the appearance or expectation that a relationship has been formed by the initial contact. The website disclaimer should be directed to avoiding a misunderstanding by the website visitor, and to clarify that (1) no client-lawyer relationship has been created; (2) the visitor's information will not be kept confidential; (3) no legal advice has been given; or (4) the lawyer will not be prevented from representing an adverse party.

Depending upon the ethics rules in the jurisdiction(s) where the communication takes place, use of appropriate disclaimers in a lawyer's or a law firm's social media profile or in connection with specific posts may help avoid inadvertently creating attorney-client relationships, so long as the lawyer's or law firm's online conduct is consistent with the disclaimer. In that respect, South Carolina Ethics Opinion 12-03[40] concluded that "[a]ttempting to disclaim (through buried language) an at-

torney-client relationship in advance of providing specific legal advice in a specific matter, and using similarly buried language to advise against reliance on the advice is patently unfair and misleading to laypersons."[41]

The risks of a relationship being formed is that the client could expect the law firm to take action on his or her behalf, *and* the relationship could create conflicts of interest for the law firm. In addition to the disclaimer, MRPC Rule 1.18[42] helps to mitigate risks in creating an attorney-client relationship upon initial discussions between a lawyer and a potential client, on certain conditions. Attorneys should review that rule.

Rule 1.18 provides in pertinent part as follows:

**1.18 Client-Lawyer Relationship: Duties to Prospective Client**

(a) A person who consults with a lawyer about the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.

(b) Even when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal that information, except as Rule 1.9 would permit with respect to information of a former client. . .

Comment [2] to Rule 1.18 imposes a limitation on this general rule of confidentiality:

In contrast, a consultation does not occur if a person provides information to a lawyer in response to advertising that merely describes the lawyer's education, experience, areas of practice, and contact information, or provides legal information of general interest. Such a person who communicates information unilaterally to a lawyer, without any reasonable expectation that the lawyer is willing to discuss the possibility of forming a client-lawyer relationship, is not a "prospective client" within the meaning of paragraph (a).

6. **Maintain Confidentiality.** Additionally, it should go without saying that the website should not disclose client confidential information without the consent of the client. Lawyers have been understandably disciplined for violating this advice in their social media advertising.[43]

[I]f the attorney maintains a website without any express limitations on forming an attorney-client relation, or disclaimers explaining that information provided or received by would-be clients will not be held confidential, the analysis changes. The absence of express disclaimers suggests that the attorney may have implicitly 'agreed to consider' forming a relation. Under these circumstances, duties of confidentiality may arise. Accordingly, the use of appropriate disclaimers with a website

may be essential to prevent unsolicited email from being treated as confidential.[44]

## IV. Lawyer Blogs

### A. Law Blog = Blawg.

A blog (a blend of the term web log) is a type of website or part of a website. Blogs are usually maintained by an individual with regular entries of commentary, descriptions of events, or other material such as graphics or video. Entries are commonly displayed in reverse-chronological order. Blog can also be used as a verb, meaning to maintain or add content to a blog. Most blogs are interactive, allowing visitors to leave comments and even message each other via widgets on the blogs, and it is this interactivity that distinguishes them from other static websites.[45]

A blog maintained by a lawyer or law firm is known as a "blawg," thus combining the term "blog" (already an amalgamated term) with the word "law." That there are many law firm blogs is evidenced by the fact that there are sites which help to synthesize, summarize and even prioritize only the best of such law blogs. For example, the ABA maintains a site which rates in the top 100 blawgs.[46]

**B. Rules.** The same care must be taken with a law firm or lawyer's blog as with their websites, to ensure compliance with the Kansas Rules of Professional Conduct. In addition to Rule 7.1, prohibiting false or misleading communications in lawyer advertising, some of the other Rules which should be considered include:

**Rule 1.6 – Client Confidentiality.** Of course, no client confidential information should be posted on a blog. Even generalized summaries of "situations" which can be traced back to a specific client representation should be avoided.

**Rule 3.6 – Trial Publicity.** Lawyers should not use blogs or other social media to post information about forthcoming or ongoing trials. Any lawyer involved in a litigation matter "shall not make an extrajudicial statement" through public means which the lawyer knows or should know "will have a substantial likelihood of materially prejudicing an adjudicative proceeding."[47]

**Rule 4.1 and 8.4(b) – Misrepresentation.** Blogs and other electronic posts and communications must avoid "a false statement of material fact or law to a third person," and must of course not involve "dishonesty, fraud, deceit or misrepresentation."

**Rule 4.4 – Respect for Others.** A lawyer's social media communications should not utilize "means which have no substantial purpose other than to embarrass, delay or burden a third person."

**Rule 7.2 – Identification.** Any internet based communica-

tions, including blogs, must identify the lawyer responsible by name and office address. Additionally, being "advertising," all copies and versions must be maintained for one year.

**Rule 7.3 – Not Solicit.** A lawyer shall not use a blog or other "real time electronic contact" to "solicit professional employment from a prospective client when a significant motive for the lawyers doing so is the lawyer's pecuniary gain" (unless the person contacted is a lawyer or "has a close personal, or prior professional relationship with the lawyer"). Interactive blogs which invite or allow comments and interchange should avoid creating, or creating the appearance of creating, an attorney-client relationship between the lawyer and other posters.

**Rules 5.1 & 5.3 – Responsibility of Partner and Firm for Lawyer and Non-lawyer Employees.** Under Rule 5.1, a partner or other person with managerial responsibility within a law firm has a responsibility to "make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the rules of professional conduct." Under Rule 5.3, the same responsibility extends to the law firm's responsibilities for non-lawyer staff. Thus, law firms need to make sure that its lawyers and non-lawyer employees are aware of these rules and the requirements pertaining to blogs and other social media, and comply with them.

## V. Facebook, Twitter, E-Mail, and Other Social Media Contacts

Under Rule 7.3(b), "A lawyer shall not solicit professional employment by . . . real-time electronic contact even when not otherwise prohibited by paragraph (a), if: (1) the target of the solicitation has made known to the lawyer a desire not to be solicited by the lawyer; or (2) the solicitation involves coercion, duress or harassment." Whether a solicitation by Facebook, Twitter, e-mail or other electronic means is prohibited under this rule depends on the ease with which the prospective client can ignore the solicitation. Thus, solicitation via a real-time chat room would be prohibited,[48] while other electronic solicitations like tweets,[49] pop-up chats on a firm website,[50] e-mails,[51] and requests that potential client "like" attorney on Facebook[52] can generally be ignored by the recipient, and so are permitted.

## VI. LinkedIn

### A. What is LinkedIn?

There are a number of social media sites on the Internet which provide interaction and client development through exposure and mutual communication. One such site – and probably the largest -- is LinkedIn,[53] a site where one may register and provide a personal biography, including a photograph, list educational and employment background, honors and awards, as well as links to published articles, blogs and websites.

Additionally, a LinkedIn member may give a summary self-description (such as "trial lawyer and ethics counselor") and list the primary areas of focus for one's legal practice.

The key benefit to a site like LinkedIn is the ability then to "connect" with anyone else who is also a member and who agrees to accept you as a connection. Those members (more than half a billion)[54] are located all over the world and work in all kinds of businesses and professions.

> LinkedIn operates the world's largest professional network on the Internet with more than 500 million members in over 200 countries and territories. . . . Professionals are signing up to join LinkedIn at a rate of more than two new members per second. . . . There are more than 40 million students and recent college graduates on LinkedIn. They are LinkedIn's fastest-growing demographic.[55]

One of the functions of LinkedIn is to permit "recommendations," a narrative written by another member about the endorsee's abilities. These could be accolades from clients or observations by opposing counsel.

Another of the functions of LinkedIn is the "endorsement," which allows a member to "endorse" another member – with or without personal knowledge – in numerous areas of expertise fitting somewhere within the general definition of the member's profession. The endorsee receives a message, advising of the endorsement. If added to the profile by the endorsee, the endorsement then appears on the member's page, under the heading "Skills & Expertise," with a photo link for each person who has endorsed the member for each area. In addition, after accepting an endorsement (by clicking "Add to Profile"), the endorsee is given the opportunity to endorse other members, as their profile photos appear, one after another, with a suggested area of expertise.

### B. LinkedIn: What are the Risk Areas and Relevant Rules?

**False Specialization?** Under Rule 7.4(a), MRPC,[56] a lawyer "may communicate the fact that the lawyer does or does not practice in particular fields of law." However, under subsection (d) of the same rule, "[a] lawyer shall not state or imply that the lawyer is certified as a specialist in a particular field of law, unless" the lawyer is actually certified by an organization approved by the state bar or the ABA. The Kansas Bar Association does not approve any certifying organizations, so one is limited to those certifying organizations approved by the ABA.[57] Thus, care should be taken in presenting accurate information under the personal biographical area of the member's page.

**Higher Standard of Care?** Another area of risk could arise in the malpractice area. By claiming to be an expert or specialist, a professional may be held to a higher standard of care than a non-specialist.[58]

**Client Confidences?**
If a client were to give a narrative recommendation about a lawyer, that narrative might include client confidential information protected from public disclosure under Rule 1.6, MRPC. While it is the client's information to share, it could also include work product or legal advice.

**False Advertising?** Because an endorsing member may have no personal or direct knowledge of the endorsee's true expertise, there is a risk that a member may be endorsed as having expertise in an area where s/he does not even practice. If a member is "endorsed" by someone else as having expertise, is that a "communication" by the lawyer? Rule 7.1(a), MRPC, prohibits a lawyer from making a "false or misleading" communication about the lawyer or his/her services, such as "a material misrepresentation of fact or law."



Further, Rule 7.1(c) prohibits advertising which "is likely to create an unjustified expectation about results the lawyer can achieve."

A South Carolina Ethics Advisory Opinion states that a lawyer is responsible for any recommendations, endorsements, or ratings given to that lawyer on a third-party website, such as LinkedIn.[59] That opinion holds that, by participating in the web listing, the lawyer member is responsible the content of that listing. Therefore, it further holds:

> Information on business advertising and networking websites are both communications and advertisements; therefore, they are governed by Rules 7.1 and 7.2. While mere participation in these websites is not unethical, all content in a claimed listing must conform to the detailed requirements of Rule 7.2(b)-(i) and must not be false, misleading, deceptive, or unfair.[60]

**Paying for Advertising?** Rule 7.2(c) prohibits a lawyer from "giving anything of value to a person for recommending the lawyer's services." Thus, while members may endorse each other, there should be no agreement to exchange endorsements, implying a quid pro quo.

**C. LinkedIn: What Can You Do About It?**

The key point is that each LinkedIn member controls his/her own profile. Given the risks outlined above, some commentators suggest turning off the option which adds endorsements to one's LinkedIn profile.[61] Assuming one does not wish to go that far, care should be taken, in at least the following particulars.

**Watch Your Profile.** In creating and updating your personal profile, make sure you do not claim specialization or certification other than as permitted by Rule 7.4(a).

**Watch Your Recommendations.** When a member gives a narrative recommendation, the endorsee should review it

closely and add it to his/her profile only if it is accurate and not misleading, and it does not contain privileged, work product, or client confidential information. In addition, the recommendation should not create false and unjustified expectations as to the results of the lawyer's future work.

**Watch Your Endorsements.** When a contact member endorses another member, the endorsee should review it, and make sure that it covers an area in which the endorsee actually practices and can claim some ability. A member should periodically review the endorsements in his/her profile, and delete any which do not accurately portray the lawyer's abilities and practice areas.[62] A New York ethics opinion holds that lawyers have the ethical duty to monitor and control unjustified endorsements, stating that "there is a duty to review social networking sites and confirm their accuracy periodically, at reasonable intervals."[63]

## VII. Avvo and Other Referral Sources

### A. What is Avvo?

Avvo is a website referral source, claiming records of "nearly every licensed lawyer in the U.S. right at your fingertips, the moment you need help." Avvo asserts that its site contains "detailed profiles, reviews, and the Avvo Rating" for 97 percent of the lawyers in the United States.[64] Avvo then provides an on-call service for immediate legal advice, for a small fee:

> Avvo Advisor is the simplest, most affordable way to get legal advice. A 15 minute call with a top-reviewed Avvo attorney for just $39.[65]

However, in order to find a lawyer to answer questions posed by potential clients who contact the website, Avvo must contract with lawyers. To this end, Avvo claims that "Avvo delivers $8 billion in revenue to lawyers annually,"[66] and that "650,000 contacts are made between potential clients and attorneys on Avvo each month."[67]

Lawyers who contract with Avvo agree that Avvo will refer potential clients to the lawyer, if clients choose the lawyer's service and the lawyer does the work, then Avvo collects from the client, and pays the lawyer through its website, taking its share of the fee before remitting it to the lawyer.[68] The referral fee taken by Avvo (called a "marketing fee") is based on the fees charged by participating lawyers, and not tied to the reasonable cost of actual marketing. Further, lawyers do not get charged unless and until the lawyer gets paid.

### B. Is Avvo Legal?

Recent ethics opinions hold that Avvo is unethical under the MRPC. For example, a New Jersey opinion addresses the Avvo and similar forms of business, and finds it to be inappropriate.[69]

Rule 5.4, KRPC, provides that "[a] lawyer or law firm shall not share legal fees with a nonlawyer." The New Jersey Opinion finds that the Avvo scheme actually constitutes improper



fee splitting between the lawyer-member and a non-lawyer (Avvo):

> The Committees find that the "marketing fee" that lawyers pay Avvo after providing legal services to clients is not for the "reasonable cost of advertising" but, instead, is an impermissible referral fee. The fee "bears no relationship to advertising." ACPE Opinion 481 (May 1981); Joint ACPE Opinion 716 / UPL Opinion 45 (June 2009). Rather, it is a fee that varies with the cost of the legal service provided by the lawyer, and is paid only after the lawyer has completed rendering legal services to a client who was referred to the lawyer by Avvo.[70]

**Rule 7.3(d)** (the Rule prohibiting in-person, live, real-time electronic solicitation), does permit a lawyer to participate in prepaid or group legal service plans, under certain circumstances:

> (d) Notwithstanding the prohibitions in paragraph (a), a lawyer may participate with a prepaid or group legal service plan operated by an organization not owned or directed by the lawyer which uses in-person or telephone contact to solicit memberships or subscriptions for the plan from persons who are not known to need legal services in a particular matter covered by the plan.

However, the Avvo mechanism (though called a "marketing fee") is really only charged to and collected from the attorney upon the performance of work by the lawyer and payment by the client:

> The Avvo plans do not meet the definition for legal service plans; they are pay-for-service plans. There are no "members or beneficiaries" to whom legal services are "furnished" and "paid for" through a legal service plan.[71]

Rule 7.2(c), KRPC, provides:

(c) A lawyer shall not give anything of value to a person for recommending the lawyer's services, except that a lawyer may pay the reasonable cost of advertisements or communications permitted by this rule and may pay the usual charges of a not-for-profit lawyer referral service or other legal service organization.

The New Jersey Opinion concludes that the Avvo system violates this Rule.

When the lawyers pay a fee to the company based on the retention of the lawyer by the client or the establishment of an attorney-client relationship, the answer to the inquiry is simple: the company operates an impermissible referral service.[72]

Similarly, a North Carolina ethics opinion[73] holds that Avvo's approach is not consistent with these Rules. This opinion focusses on the variable nature of the marketing fee. The arrangement violates the general ban on sharing fees with non-lawyers or at least violates the ban on paying for a referral:

A lawyer cannot do indirectly what would be prohibited if done directly. . . Allowing the service to indirectly take a portion of the attorney's fee by disguising it in two separate transactions does not negate the fact that the service is claiming a certain portion of the fee earned by the lawyer as its 'per service marketing fee.' . . . In essence, the service's charges amount to a contingency advertising fee arrangement rather than a cost that can be assessed for reasonableness by looking at market rate or comparable services.

Similar opinions have been issued by the state bar associations in Pennsylvania,[74] Ohio,[75] and New York,[76] all based on the same rules and arguments. No opinion has been issued on the subject in Kansas, though no opinion has been found from other states which comes to a contrary conclusion. The Pennsylvania Opinion holds:

A lawyer who participates in a Flat Fee Limited Scope Legal Services referral program such as that described in this Opinion, in which the program operator collects "marketing fees" from that lawyer that vary based upon the legal fees collected by the lawyer, violates RPC 5.4(a)'s prohibition against sharing legal fees with a non-lawyer. In addition, under the procedures of the FFLS program described in this Opinion, the advance fees paid by the client remain in the possession of the non-lawyer program operator until the operator concludes that the requested legal services have been performed, at which time the operator deposits the funds into the lawyer's operating account. Consequently, a lawyer who participates in such a program violates RPC 1.15(i), which requires advance fees to be deposited in the lawyer's Trust Account.[77]

And the Ohio Opinion states:

This business model presents multiple, potential ethical issues for lawyers. These include fee-splitting with nonlawyers, advertising and marketing, a lawyer's responsibility for the actions of nonlawyer assistants, interference with the lawyer's professional judgment, and facilitating the unauthorized practice of law. As similar online services that match lawyers and clients exist, the Board will evaluate this type of referral service generally to determine if a lawyer's participation would comply with the Rules of Professional Conduct.[78]

On the other hand, the New Jersey Opinion finds that LegalZoom[79] and Rocket Lawyer[80] (similar referral sites) would not violate these Rules (upon registration as legal service plans), because those sites do not charge shared fees disguised as marketing fees:

LegalZoom and RocketLawyer offer what appear to be legal service plans through a different business model. Participating lawyers do not pay referral fees to those companies.[81]

In North Carolina, LegalZoom was charged with federal antitrust violations arising from its business model of providing legal services through member lawyers. That case was settled, with no change in LegalZoom's method of doing business.[82] RocketLawyer charges clients for legal advice, and lawyers provide the advice without getting paid – with a chance at signing up the client for compensation in the future.[83]

## VIII. Conclusion

The rules on lawyer advertising have not changed much since the middle of the Twentieth Century, while lawyers' methods of advertising have evolved quickly and significantly in the Twenty-first Century, particularly on the Internet. As stated by the DC Bar Association:

Social media sites, postings or activities that mention, promote or highlight a lawyer or a law firm are subject to and must comply with the Rules. Attorneys who choose to use social media must adhere to the Rules in the same way that they would if using more traditional forms of communication.[84]

The key is for lawyers (and disciplinary authorities) to keep abreast of changes in technology, while keeping in mind the long-standing and overriding rules against misleading and improper advertising and solicitation. ∎

## About the Author



**J. Nick Badgerow** is a trial-lawyer partner with Spencer Fane LLP in Overland Park, Kansas. For thirty years, he has served as Chairman of the Johnson County Bar Ethics and Grievance Committee. He is Chairman of the KBA Ethics Advisory Opinion Committee; member of the Kansas Judicial Council; Chairman of the Council's Civil Code Advisory Committee; Chairman of the Kansas Ethics 2000 Commission and Ethics 2020 Commission; and he was a member of the Supreme Court-KBA Joint Commission on Professionalism. He is the Editor and a co-author of the KBA's Ethics Handbook, Third Edition (2015). For sixteen years, Nick was a member of the Kansas State Board of Discipline for Attorneys.

### Endnotes

1. Comment [8] to Rule 1.1 (Competence) in the Kansas Rules of Professional Conduct requires that: "To maintain the requisite knowledge and skill, a lawyer should keep abreast of changes in the law and its practice, including the benefits and risks associated with relevant technology. . ." The Kansas Rules of Professional Conduct ("KRPC") appear at Rule 226, Rules of the Kansas Supreme Court, available online at https://go.ksbar.org/KsSupremeCtRules.

2. *Bates v. State Bar of Arizona*, 433 U.S. 350, 368 (1977).

3. *Id.* at 371.

4. *See* H. Drinker, *Legal Ethics 5*, 30 Ind. L.J. 210-11 (1953), available online at https://go.ksbar.org/2oFGVFD.

5. G. Warvelle, Essays in Legal Ethics, 27 (2d ed. 1920), cited in M. Catherine Harris, Solicitors' Right to Advertise: A Historical and Comparative Analysis , Ga. J. Int'l & Comp. Law 317 (1985), available online at https://go.ksbar.org/2FGaajN (hereinafter "Harris").

6. https://go.ksbar.org/2FbhYw5.

7. *Official Papers: The Law Society-Solicitor's Practice Rules*, 1936, 182 L. TIMES 200 (1936), quoted in Harris, *supra*, at fn. 5.

8. Council Statement: Individual Advertising by Solicitors, 81 L. Soc'y Gazette 1802 (1984).

9. ABA, *Final Report of the Committee on the Code of Professional Conduct*, American Bar Association (1908), available online at https://go.ksbar.org/2sZ1fak.

10. *Id.*, at Rule 29.

11. Formerly, Rule 225, Rules of the Kansas Supreme Court (now superseded)("Model Code").

12. KRPC. See note 1, *supra*.

13. Model Code, *supra*, Rule 2-101(A).

14. *Id.*, at Rule 2-101(B) and (C).

15. http://libguides.law.gsu.edu/c.php?g=253396&p=1689859.

16. 433 U.S. 350 (1977).

17. 471 U.S. 626 (1985). *See* A.B.A. Center for Professional Responsibility, Annotated Model Rules of Professional Conduct, at 590, et seq. (8th ed. 2015), for a discussion of both *Bates* and *Zauderer*.

18. 486 U.S. 466 (1988).

19. *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 462 (1978).

20. *In re Primus*, 436 U.S. 412, 438 (1978).

21. *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, 447 U.S. 557 (1980). *See also*, American Bar Association Commission on Advertising, *Lawyer Advertising at the Crossroads: Professional Policy Considerations*, at 2 (1995).

22. https://go.ksbar.org/2HaIdRy.

23. http://lawguides.scu.edu/c.php?g=5684&p=24950.

24. Rule 7.1, KRPC.

25. Rule 7.1(a), (b) and (c), KRPC. See also Kansas Ethics Opinion 98-12. ("The general rule is that legal advertising must not mislead the public"). See also, Kansas Ethics Opinion 99-7 ("Lawyers cannot make false or misleading statements about the lawyer or the lawyer's services. A lawyer's statements about what results might be achieved by the [Firm] or its personnel or lawyers is a form of advertising and becomes false or misleading for purposes of Rule 7.1 if the statement contains material misrepresentations of fact or law or omits a fact necessary to make the statement not materially misleading. Further, statements that create 'an unjustified expectation about the results a lawyer might achieve' also violate 7.1").

26. Rule 7.1, KRPC.

27. Jordan Rappaport, *Attorney Advertising on the Internet*, available online at https://go.ksbar.org/2FcavNi.

28. Of course, the Rules of Professional Responsibility apply to a lawyer's social media presence and advertising. California Ethics Op. 2012-186, available online at https://go.ksbar.org/2oFOdJv.

29. Kansas Ethics Opinion 06-02 (2006).

30. ABA Formal Opinion 10-457 ("Op. 457"), available online at https://go.ksbar.org/2oDfpbQ.

31. While Op. 10-457 uses the word "may" 43 times, "might" 11 times, and "should" some 20 times, the word "must" is only used 7 times.

32. *See* Kansas Ethics Opinion 98-12. ("The general rule is that legal advertising must not mislead the public.") See also, Kansas Op. 99-7, quoted in footnote 25, *supra*.

33. *See* Kansas Op. 94-15 (fraudulent and misleading communications violate Rule 8.4(c)).

34. *See* Kansas Op. 06-03 (discussing Rule 4.1 in analysis of law firm's letterhead).

35. Citing, Missouri Bar Inf. Advisory Op. 20060005 (2006) (firm must remove lawyer's biographical information within reasonable time after lawyer leaves firm), available online at https://go.ksbar.org/2HVfUXM.

36. Cari Twichell, Keep Your Website Copy Up-to-Date (Jan. 13, 2016), available online at https://go.ksbar.org/2Fc5VP6.

37. D.C. Bar Ethics Opinion 370 (November 2016), available online at https://go.ksbar.org/2F2pwy5.

38. Vermont Bar Ethics Advisory Opinion 2000-04 (2000), available online at https://go.ksbar.org/2CODi5p.

39. Ariz. Bar Ethics Op. 97-04 (April 1997), available online at https://go.ksbar.org/2FbkiDj.

40. South Carolina Ethics Op. 12-03 (2012), available online at https://go.ksbar.org/2owxl8W.

41. Christina Harvey, *10 Tips for Avoiding Ethical Lapses When Using Social Media*, ABA Business Law Today, available online at https://go.ksbar.org/2sZ2ZQU.

42. KRPC, Rule 1.17.

43. *In re Skinner*, 740 S.E.2d 171 (Ga. 2013); *In re Disciplinary Proceedings Against Peshek*, 798 N.W.2d 879 (Wis. 2011).



Kansas Bar Association
LEGISLATIVE
Bill Tracking

View our official stance on current and past legislation

Visit **www.ksbar.org/bill_tracking**

44. Arizona Bar Ethics Op. 02-04 (September 2002), available online at https://go.ksbar.org/2t5dWk8.

45. http://en.wikipedia.org/wiki/Blog.

46. http://www.abajournal.com/blawg100/.

47. *See, Comprehensive Health of Planned Parenthood v. Kline*, 287 Kan. 372, 197 P.2d 370 (2008).

48. Fla. Ethics Op. A-00-1 (2000), available online at https://go.ksbar.org/2FFe3pg ; Utah Ethics Op. 97-10 (1997), available online at https://go.ksbar.org/2ou8W3W

49. N.Y. State Ethics Op. 1009 (2014), available online at https://go.ksbar.org/2oJ9Mcq.

50. N.C. Ethics Op. 2011-8 (2011), available online at https://go.ksbar.org/2oy7gGn.

51. Ohio Sup. Ct. Ethics Op. 2013-2 (2013), available online at https://go.ksbar.org/2oAatFx.

52. Pa. Ethics Op. 2014-300 (2013), available online at https://go.ksbar.org/2Fa1nJ1.

53. www.linkedin.com

54. http://fortune.com/2017/04/24/linkedin-users/.

55. https://about.linkedin.com/ .

56. Model Rules of Professional Conduct, Rule 226, Kansas Supreme Court Rules.

57. A current list of approved certifying organizations may be found on the ABA's website at https://go.ksbar.org/2HRTNBm.

58. *See Foster ex rel. Foster v. Klaumann*, 296 Kan. 295, 294 P.3d 223 (2013)(physician); *Duffey Law Office S.C. v. Tank Transport Inc.*, 194 Wis. 2d 674 (Ct. App. 1995)(attorney).

59. South Carolina Ethics Advisory Opinion 09-10 (2009) https://go.ksbar.org/2oAb2PF

60. *Id.*

61. *See, e.g.*, Dana S. Ciolino, *Should I Display "Endorsements" for "Skills and Expertise" on My LinkedIn Profile Page?*, Louisiana Legal Ethics (September 30, 2013), available online at http://lalegalethics.org/dont-display-linkedin-endorsements/.

62. https://www.linkedin.com/help/linkedin/answer/66.

63. NY County Lawyers Association Professional Ethics Committee Formal Opinion 748 (2016), found online at https://go.ksbar.org/2F37P5l.

64. https://www.avvo.com/about_avvo.

65. *Id.*

66. https://www.avvo.com/for-lawyers.

67. *Id.*

68. https://advisor.avvo.com/providers/welcome.

69. New Jersey Advisory Committee on Professional Ethics Joint Opinion 732; New Jersey Committee on Attorney Advertising Joint Opinion 44; New Jersey Committee on the Unauthorized Practice of Law Joint Opinion 54 (June 21, 2017), found online at https://go.ksbar.org/2t20kGh (hereafter "New Jersey Opinion."

70. *Id.* at page 5.

71. *Id.* at page 3.

72. *Id.* at page 5.

73. North Carolina Ethics Opinion 16-06 (2016), available online at https://go.ksbar.org/2oFxS7A.

74. Pennsylvania Bar Formal Ethics Opinion 2016-200 (2016), available online at https://go.ksbar.org/2Fftnv7 ("Pennsylvania Opinion").

75. Ohio Board of Professional Conduct Opinion 2016-3 (June 21, 2016), available online at https://go.ksbar.org/2F2uRp8 ("Ohio Opinion").

76. New York State Bar Association Ethics Opinion 1132 (August 8, 2017), available online at http://www.nysba.org/EthicsOpinion1132/.

77. Pennsylvania Opinion, *supra*.

78. Ohio Opinion, *supra*.

79. https://www.legalzoom.com. "LegalZoom.com, Inc. is an online legal technology company that helps its customers create an array of legal documents without having to necessarily hire a lawyer. Available documents include wills and living trusts, business formation documents, copyright registrations and trademark applications. The company also offers attorney referrals and registered agent services." https://en.wikipedia.org/wiki/LegalZoom.

80. https://www.rocketlawyer.com. "At Rocket Lawyer, we want to change things by making legal services affordable, simple and available to more people than ever before. Every day we spend our time and resources making it easier for people to get the legal help they need, so they can focus on what's really important—taking care of their families and building strong businesses. . . . We combine free legal documents and free legal information with access to affordable representation by licensed attorneys." https://www.rocketlawyer.com/about-us.rl.

81. New Jersey Opinion, page 5.

82. *LegalZoom Settles $14M Antitrust Dispute With NC Bar* (Oct. 23, 2015), available online at https://go.ksbar.org/2t3lK5L.

83. "Rocket Lawyer offers a legal services plan for businesses for $49.95/month which includes access to a lawyer for legal questions. Lawyers who participate in Rocket Lawyer's 'free legal Q&A' aren't paid – but they gain a shot at paying work – at 40 percent discount off their hourly rate, or 10 percent discount off their flat fee rate per Rocket Lawyer's terms of service – if the client eventually retains them." *How Ethical Prohibitions on Fee Splitting Allows RocketLawyer and Gust Launch To Resell and Profit Off of Lawyers' Free Legal Services* (April 26, 2015), available online at https://go.ksbar.org/2F5sVfe.

84. D.C. Bar Ethics Op. 370 (2016), found online at https://go.ksbar.org/2F2pwy5.

# Members in the News

## New Positions

**Richard Acosta** and **Andrea (Ande) Mc-Murtry** have been elected partners of the Horn Aylward & Bandy, LLC law firm. Richard is a graduate of the Southwestern University School of Law in Los Angeles, and practices in the insurance defense area of the firm, focusing on defending professional negligence claims against doctors, hospitals, nursing homes, and correctional health care providers. Ande is a graduate of the University of Missouri—Kansas City School of Law, and is a member of the firm's construction practice group, focusing on representing owners, contractors, sub-contractors, material suppliers, and others with dispute avoidance or resolution. Ande is also an Adjunct Professor of Law at UMKC.

**Robert S. Baran** has been named Senior Counsel for Mann Conroy, LLC, to head up the firm's commercial bankruptcy and secured transactions practice and to deepen the firm's general corporate practice. He received his J.D. and M.A. from Washington University in St. Louis, and was a Helzberg Leadership Fellow in 2010.

**Phillip Bernhart, Roger Gossard, Michael Hassenplug, Cole Hoffmeister, Gary House** and **Dan Reynolds** have been contracted through Montgomery County to provide representation to low-income individuals.

**Daniel Buller** has been named a partner in the Foulston Siefkin Law Firm. Buller received his J.D. from the University of Kansas School of Law, and he practices in the areas of commercial litigation, natural resources litigation, and cybersecurity in the firm's Kansas City office.

**Mary Christopher**, partner at Topeka's Goodell, Stratton, Edmonds and Palmer has been named to fill a vacancy on the Shawnee Co. District Court (3rd Judicial District) created by the retirement of Judge Frank Yeoman. Christopher, a graduate of Washburn University School of Law, has primarily practiced in the areas of civil litigation, health care and business law.



**Tom Dawson**, city attorney for the city of Leavenworth will step down from his duties but will continue serving as the city's prosecuting attorney for Leavenworth Municipal Court.

**James Dummitt** has been named as the new director of the law firm Gilmore & Bell, P.C. which has offices in Missouri, Kansas, Nebraska, Utah and Illinois. Dummitt received his J.D. from the Pepperdine University School of Law and an LL.M. in Taxation from the New York University School of Law. He joined Gilmore and Bell in 2008.

**Justin Ferrell**, formerly with Brewer Law Firm, L.L.C. in Concordia, has been approved as the city attorney by the Concordia City Commission. Ferrell has also now established the Ferrell Law Firm in town.

**Aaron Good** has been promoted to a member of the Klenda Austerman law firm in Wichita. He has practiced with the firm since 2011 in the areas of litigation, employment law and personal injury.

**Neil Gosch** has joined Wichita's Triplett Woolf Garretson as a member of the firm in January; he's been with the firm since 2014. A graduate of the UMKC School of Law, Neil's practice is focused on general civil litigation and construction law with an emphasis in business and commercial litigation, construction disputes, insurance defense, mechanic's liens, under-

ground utility damage, oil and gas litigation, and municipal law, to name a few.

**Shannon Holmburg** has been promoted to Vice President and Trust Counsel, Personal Trust Services. Holmburg earned her Juris Doctor from The University of Kansas School of Law. Before joining the bank, she was an attorney with Gilliland & Hayes, LLC.

**Casey Jones** and **Sean Walsh** have been promoted to member status in Wichita's Hinkle Law Firm.

**Sam Jones** has been hired by Klenda Austerman in Wichita as an associate.

**Stephen R. McAllister**, distinguished professor of law at the University of Kansas School of Law in January was sworn in as Kansas' U.S. Attorney in a ceremony that took place on the K.U. campus. He will oversee a staff of more than 100, including 50 attorneys in offices in Topeka, Wichita and Kansas City, Kan. He indicated his intent to return to teaching at the completion of his service.

**Ryan Myer** has been named a member at Fleeson, Gooing, Coulson & Kitch.

**Sharon Rye** has been named special counsel to the Foulston Siefkin LLP law firm in the Wichita office. She earned her J.D. from the University of Virginia and is a member of the firm's Commercial & Complex Litigation Team.

**Scott Schillings** and **L. Dale Ward** have joined **Eric Namee** as managing members of the Hinkle Law Firm in Wichita.

**Doug M. Taylor** has been hired as legal counsel to The League of Kansas Municipalities. A graduate of the Washburn School of law, Taylor most recently served as Assistant AG with the Alcoholic Beverage Control.

**Katy Tompkins** has been elected a partner at McDonald Tinker in Wichita.

**David Van Parys** was rehired as senior county counselor in Leavenworth County, where he had previously served as county counselor from 1990-2016.

## New Locations

The **Martin Pringle Law Firm in Wichita** announced its plans to relocate from its longtime location in the Ruffin Building downtown to a new, $23 million development planned in the 600 block of East Douglas, next to Naftzger Park. The new location is projected to be completed sometime in the first quarter of 2019.

## Notables

**P. Kelly Donley** and **Edward Keeley** (McDonald Tinker in Wichita) have been elected by their peers for inclusion in the 23rd edition of The Best Lawyers in America.

**Sarah Fertig** of Lawrence was nominated in January by Attorney General Derek Schmidt to serve as inspector general of the state's Medicaid program, a position that had been left vacant by former Gov. Brownback. Fertig would have to establish the office of inspector general from the ground up.

According to the Wichita Business Journal's The List of Law Firms which ranks law firms by number of Wichita-Area Attorneys, the top 5 were: 1) **Foulston Siefkin LLP** with 65 attorneys and 138 employees; 2) **Hinkle Law Firm LLC** with 41 attorneys and 109 employees; 3) **Martin, Pringle, Oliver, Wallace & Bauer LLP** with 30 attorneys and 77 employees; 4) **Fleeson, Gooing, Coulson & Kitch LLC** with 29 attorneys and 54 employees; and 5) **Triplett Woolf Garretson LLC** with 23 attorneys and 48 employees.

**Steve Hirsch**, city attorney for Oberlin, Kansas, led a "Local Government Officials Workshop" to discuss concepts of open meetings and public records for member of the Oberlin City Council. He explained his role as city attorney and walked the council through such things as providing copies of open records and conflict of interest and the prohibition of "serial meetings" by email or text or phone.

**Laura Johnson McNish** and the Marshall County Commission have come to an agreement on salary and have restored the position of county attorney to full time.

**Richard M. Pugh, Ed Pugh** and **Jake Pugh** were profiled in the Wamego Times as three generations of attorneys in one family, practicing for a combined 72 years—so far—in Wamego. Richard is no longer living and Ed is semi-retired, leaving the bulk of the day-to-day practice in the hands of Washburn Law School graduate Jake. The practice focuses on business, real estate and contracts.

**Kevin E. J. Regan**, founder of The Regan Law Firm, L.L.C. of Kansas City, was selected to be included in the Best Lawyers in America 2018 in the area of Criminal Law. He was also selected as one of the Top 50 Lawyers in Kansas City by the 2018 edition of Super Lawyers.

**Scott Sanders** with McDonald Tinker PA has been selected by his peers for inclusion in the 23rd edition of The Best Lawyers in America in civil litigation. Sanders is the son of Judge Jack and Linda Sanders of ElDorado.

**Bill Townsley** of Fleeson, Gooing, Coulson & Kitch has been named president of the Kansas Association of Defense Counsel for 2018.

**Shannon Wood**, of the Foulston Siefkin law firm, will serve as secretary of the Kansas Association of Defense Counsel.

# Obituaries

**William Merrill Mills III**, 75, of Hutchinson, died February 8, 2018. He was born July 5, 1942, in Topeka, to Margaret (Landon) and William Merrill Mills Jr.

Bill graduated from Topeka High School in 1960, KU in 1964, with a bachelor's degree in history and political science, and received his Juris Doctorate in 1967 from KU. While at KU, Bill was a co-captain and All-American swimmer for the KU swim team. He was also a member of Phi Gamma Delta fraternity. After college, he worked as an attorney for Gilliland and Hayes until 1975, then joined the former Hutchinson National Bank as a trust officer. In 1994, he joined the Trust Company of Kansas, retiring as vice-president and trust officer in 2012.

Bill served on many professional and community boards, including serving as a board member and past president of the Trust Division of the Kansas Bankers Association and Hutchinson Chamber of Commerce Ambassadors Club. He also served as an officer for the Reno County Bar Association, Kansas Bar Association, Living Land Foundation, and Training and Evaluation Center of Hutchinson. In addition, Bill was involved in a number of local, state, and national political campaigns.

On July 10, 1965, he married Alice Cash in Abilene. They shared 52 years of marriage.

Bill is survived by: his wife, Alice of Hutchinson; children, Alyssa Mills of Hutchinson, Hilary Lindsey and husband Troy of Springfield, Missouri, William Mills of Austin, Texas, James Mills and wife Molly of Denver, Colorado; grandchildren, Nathalie, Allabelle, Claire, and Eleanor Lindsey, Finley, Lucy, and Anna James Mills; and sisters, Barbara Mills Byers of St. Paul, Minnesota, and Mary Mills Weil and husband David of Dundee, Oregon.

He was preceded in death by his parents and sister, Margaret Mills Ruckert and her husband, Dennis.

Bill will be remembered for his ever-present sense of humor and love of people. His family and clients valued his judgment and guidance. Bill never missed a summer at their cottage in Alexandria, MN where he enjoyed fishing, fireworks and spending time with his family.

Cremation has taken place. Because of Bill's love for the outdoors and Dillon Nature Center, the family invited friends to gather together for a time of celebrating and remembering Bill's life on Saturday, February 17, 2018, at Dillon Nature Center. In lieu of flowers, memorials may be made to Dillon Nature Center, TECH, or the Kansas Honors Scholars Program, in care of Elliott Mortuary, 1219 N. Main, Hutchinson, KS 67501.



**August V. "Gus" Spallo**, Kansas City, Missouri, was born in Philadelphia, Pennsylvania, on April 12, 1927, and passed peacefully on February 5, 2018. He was a retired attorney who proudly served as the Chief, District Counsel for the United States Army Corps of Engineers, Kansas City District.

He was preceded in death by his father, Joseph Spallo, mother, Susan Spallo, brother, Joseph P. Spallo, and son-in-law Terry G. Pippin.

August graduated from Rockhurst High School, Rockhurst College, and later studied the law to earn his Juris Doctor degree at Kansas City Law School (UMKC).

He left his children, his grandchildren, and his great grandchildren some invaluable gifts -- a curiosity about life, a hunger for knowledge, a passion for the outdoors, a dedication to truth and justice, an example of a life whose riches owe little to money, a sense that anything is possible if you work hard, and a model of what a father, and a man, should be.

His family forever loved this great man. He is survived by his loving and devoted wife of 69 years, Clarine L. Spallo; and their three children and their spouses, Joseph C. Spallo and Mary R. Spallo, August V. Spallo Jr. and Suzanne E. Weber, and Susan M. Pippin; six grandchildren, Michael V. Spallo, Stephen R. Spallo and Christina F. Spallo, Andrew J. Spallo and Kalynn M. Spallo, Terry G. Pippin Jr. and fiancé Kaylina A. Clair, Rachel M. Roberts and Matthew B. Roberts, Joseph C. Spallo, Jr. and Kati A. Spallo; and three great-grandchildren, Andrew J. Spallo Jr., Arlo V. Spallo, and Giuliana M. Roberts.

He was a member of St. Therese Parish. His family is indebted to the professional, personal, and tender care provided him by Brittany, Jill, and Gary at St. Luke's North Hospital.

Visitation with the Mass of Christian Burial were held on Friday, February 9, at St. Therese Catholic Church; condolences may be offered at www.passantinobros.com

*"Under the watchful gaze of moon and sun, a hero's work is never done."*



# APPELLATE DECISIONS

All opinion digests are available on the KBA members-only website at www.ksbar.org. We also send out a weekly newsletter informing KBA members of the latest decisions. If you do not have access to the KBA members-only site, or if your email address or other contact information has changed, please contact member and market services at info@ksbar.org or at (785) 234-5696. For the full text of opinions, access the courts' website at www.kscourts.org

# SUPREME COURT

## ATTORNEY DISCIPLINE

### ORDER OF DISBARMENT
### IN THE MATTER OF JEFFERY B. BITNER
### NO. 25,188—JANUARY 30, 2018

FACTS: In a letter signed January 9, 2018, Jeffery B. Bitner voluntarily surrendered his license to practice law in Kansas. At the time of surrender, a complaint was pending which alleged multiple violations of the Kansas Rules of Professional Conduct.

HELD: The court found that the surrender of Bitner's license should be accepted and Bitner was disbarred.

## CRIMINAL

### CONSTITUTIONAL LAW—CRIMINAL PROCEDURE—SENTENCING—STATUTES
### STATE V. ALBRIGHT
### KINGMAN DISTRICT COURT—AFFIRMED
### NO. 116,408—FEBRUARY 2, 2018

FACTS: Albright was convicted in 1999 of first-degree murder, and a Hard 40 sentence was imposed. In 2002, Albright filed a 60-1507 motion alleging ineffective assistance of counsel. In a new trial ordered by Court of Appeals, jury again convicted Albright of first-degree murder, and a Hard 40 sentence was imposed in 2005. Conviction and sentence affirmed, finding no *Apprendi* violation in sentencing. *State v. Albright*, 283 Kan. 418 (2007). In 2016, Albright filed motion for resentencing, asserting his Hard 40 sentence was unconstitutional under *Alleyne v. United States*, 570 U.S. 99 (2013). District court viewed motion as a collateral attack under K.S.A. 50-1507(b) and denied the motion. Albright appealed, arguing his Hard 40 life sentence is unconstitutional under *Alleyne* because it is the result of judicial fact-finding.

ISSUE: Challenge to the sentence

HELD: Albright was entitled to no relief whether the district court correctly construed the pleading as a collateral attack, or whether it should have been characterized as a motion to correct an illegal sentence. Albright cannot use K.S.A. 22-3504 to challenge the constitutionality of his sentence, and there is no showing of manifest injustice to consider an untimely filed 60-1507 motion. Additionally, *Alleyne* cannot be applied retroactively to cases that were final when *Alleyne* was decided.

STATUTES: K.S.A. 2017 Supp. 22-3504; K.S.A. 22-3504, 60-1507, -1507(b), -1507(f)(2)

### SENTENCING—STATUTES
### STATE V. BRUNE
### JOHNSON DISTRICT COURT—AFFIRMED
### NO. 116,720—FEBRUARY 2, 2018

FACTS: Brune pled guilty to two counts of first-degree felony murder. Consecutive Hard 25 sentences imposed. On appeal Brune claimed the district court erred in refusing to run the sentences concurrent to each other. Brune argued consecutive sentences were overly harsh given his acceptance of responsibility, expression of remorse, willingness to enroll in rehabilitative programs, and negative effects of sentence on his family relationships.

ISSUE: Abuse of discretion in sentencing

HELD: Kansas Sentencing Guidelines Act does not preclude review of sentences classified as off-grid crimes, but under facts of this case the district court did not abuse its discretion by ordering consecutive service of Brune's hard 25 sentences.

STATUTE: K.S.A. 2016 Supp. 22-3601(b)(3)

### CONSTITUTIONAL LAW—CRIMINAL LAW—DEATH PENALTY—JUDGES—JURIES—JURY INSTRUCTIONS—STATUTES
### STATE V. KAHLER
### OSAGE DISTRICT COURT—AFFIRMED
### NO. 106,981—FEBRUARY 9, 2018

FACTS: Kahler convicted in part of capital murder. No dispute that he fatally shot four victims, but defense argued severe depression rendered Kahler incapable of forming the intent and premeditation required for capital murder. On appeal Kahler claimed: (1) prosecutor improperly objected to defense counsel's attempt during closing argument to repeat words on a Life Alert recording made during the killings; (2) six instances of judicial misconduct during trial; (3) district court erred in not instructing jury on expert witness testimony; (4) adoption of mens rea approach in K.S.A. 22-3220 unconstitutionally deprived Kahler of asserting an insanity defense; (5) district court filed to sua sponte instruct jury on felony murder as a lesser included offense; (6) district court denied Kahler a fair trial by prohibiting defense counsel from questioning prospective jurors about their views on the death penalty; (7) cumulative trial errors denied Kahler a fair trial; (8) death sentence imposed upon a severely mentally ill person violates the Eighth Amendment; (9) the two statutory aggravating factors advanced by the State to justify the death penalty were unconstitutional; and (10) insufficient evidence supported jury's finding that the crime was committed in an especially heinous atrocious, or cruel manner.

ISSUES: (1) Prosecutorial error, (2) judicial misconduct, (3) expert witness instruction, (4) constitutionality of Kansas death penalty statute, (5) lesser offense felony murder instruction, (6) limitations on defense *voir dire*, (7) cumulative error during guilt phase, (8) Eighth Amendment categorical challenge to death penalty, (9) constitutionality of aggravating circumstances, (10) sufficiency of the evidence of an aggravating factor

HELD: Prosecutor's objection was within the permissible latitude to object to the defense summation going beyond the admitted evidence. The alleged ill will of the prosecutor in making the objection has no bearing on whether the objection itself was prosecutorial error.

Specific allegations of judicial misconduct examined, finding only one harmless error:

(a) While district court's preliminary admonition against outbursts of opinion was reasonable, better practice to also clarify that panel members would have opportunity to raise personal concerns outside the presence of other venire members.

(b) Merely requesting trial counsel to move faster if possible is not judicial misconduct, but better practice to make such administrative requests out of panel's presence.

(c) District court's editorial comment about the instruction that counsels' statements are not evidence, given right after defense opening statement, was harmless error.

(d) No misconduct in district court judge questioning a witness for clarification, but better practice to follow the procedure in *State v. Boyd*, 222 Kan.155 (1977).

(e) District court's premature sustaining of prosecutor's objection to defense counsel repeating words on Life Alert recording was not judicial misconduct, but it was unassigned trial error which alone did not require reversal.

(f) District court's remarks before sending jurors to deliberate did not discourage jurors from asking any questions.

District court erred in refusing to give the requested instruction on expert witness credibility, but error was harmless.

Kahler's arguments are the same as those considered and rejected in *State v. Bethel*, 275 Kan. 456 (2003), which held the mental disease or defect defense adopted in K.S.A. 22-3220 did not unconstitutionally abrogate Kansas's former insanity defense. Further review of Bethel is not warranted.

Felony murder is not a lesser included offense of capital murder.

Under facts in this case, district court did not prohibit defense counsel from questioning prospective jurors during voir dire about their views on the death penalty.

Cumulative effect of trial errors did not deny Kahler a fair trial, and the identified guilt-phase errors are not the type to impact the same jury's sentencing determination.

Pursuant to *State v. Kleypas*, 305 Kan. 224 (2016), the Kansas death penalty is not categorically disproportionate punishment for offenders who are severely mentally ill at the time they commit their crimes.

Kansas cases have rejected Kahler's challenge to the constitutionality of the two statutory aggravating factors found in his case.

State presented sufficient evidence to establish that the killings were committed in a heinous, atrocious, or cruel manner. Evidence supports the jury's weighing determination of mitigating and aggravating circumstances, and the jury's sentencing verdict.

CONCURRENCE and DISSENT (Biles, J., joined by Stegall, J.): Concurs with majority's decision to confirm Kahler's convictions and sentences, but disagrees with majority's finding of misconduct and error by the district court judge's aside that "I normally don't do this" before giving pattern jury instruction about remarks of counsel. If error, agrees it was harmless. At worst, this should be a simple "teaching moment" to caution judges about banter with juries.

DISSENT (Johnson, J): Addresses each claim individually, generally agreeing with majority's analysis and decisions on all issues but for the following:

Disagrees with majority's suggestion that prosecutor's bad faith or ill will can never play any role in error analysis.

Disagrees with majority's reliance on Bethel to reject Kahler's constitutional challenge to K.S.A. 22-3220. Death penalty was not involved in Bethel, and Kansas Supreme Court is obligated to independently analyze whether the procedure of replacing insanity defense with *mens rea* approach undermines the reliability of jury's determination to impose death penalty.

Agrees the cumulative effect of trial errors in this case do not require reversal of the guilty verdict, but strongly disagrees that guilt-phase errors can be ignored when considering the same jury's penalty-phase decision. Would hold the errors in this case undermined the reliability of a jury's death sentence, which should be vacated and remanded for a new sentencing trial.

Expands his Kleypas dissent to now address Kahler's Eighth Amendment claim. Categorical protection of mentally retarded defendants in *Atkins v. Virginia*, 536 U.S. 304 (2002), is discussed and critically compared to mentally ill defendants under *Kleypas*.

As unassigned error impacting fairness and justice, reasserts his conclusion that the death penalty violates the Kansas Constitution.

STATUTES: K.S.A. 2016 Supp. 21-3439(a)(6), -5402(d), -6617, -6619, -6619(b), 22-3414(3); K.S.A. 2012 Supp. 21-5402; K.S.A. 21-3439(a), 22-3220, -3420(3)

### CRIMINAL PROCEDURE—JURY INSTRUCTIONS— SENTENCING—STATUTES
### STATE V. MCLINN
### DOUGLAS DISTRICT COURT—AFFIRMED IN PART, REVERSED IN PART, REMANDED
### NO. 114,506—JANUARY 26, 2018

FACTS: Jury convicted McLinn of first-degree premeditated murder. At trial she did not deny killing the victim, but argued a mental disease or defect (dissociative identity disorder) prevented her from forming the requisite culpable mental state. Jury then determined the killing was done in an especially heinous, atrocious, or cruel manner. District court imposed hard 50 life sentence with post-release supervision. McLinn appealed alleging: (1) instructional error regarding the intent needed to establish criminal liability; (2) jury should have been sua sponte instructed on second-degree intentional murder; (3) jury should have been allowed to consider the disposition of her case in determining guilt; (4) district court improperly limited defense counsel from telling jury McLinn would not mind a second trial; (5) cumulative error denied McLinn a fair determination of guilt; (6) insufficient evidence supported the jury's finding that the murder was especially heinous, atrocious, or cruel; (7) district court erred in declining jury's request for definition of "heinous," "atrocious," and "cruel;" (8) K.S.A. 2013 21-6624 is unconstitutionally vague; (9) district court erred in refusing to depart from a hard 50 sentence; and (10) error to impose lifetime post-release supervision.

ISSUES: (1) Mental disease or defect instruction, (2) instruction on lesser included offense, (3) instruction to not consider disposition of case, (4) restriction on closing argument, (5) cumulative error in guilt phase, (6) sufficiency of the evidence—finding of an especially heinous, atrocious, or cruel murder, (7) response to jury request for definitions, (8) constitutionality of K.S.A. 2013 Supp. 21-6624, (9) hard 25 sentence request, (10) lifetime postrelease supervision

HELD: District court's mental disease or defect instruction was not clearly erroneous. Statutory definition of "culpable mental state" is not broadened to include premeditation as a culpable mental state. The state must prove premeditation and an intent to kill at the time the murder is committed. Proof of one does not prove the other.

On the facts in this case, an instruction on second-degree intentional murder would have been factually and legally appropriate, but the failure to *sua sponte* give the unrequested instruction was

not clearly erroneous.

Pattern jury instruction, that disposition of the case was not to be considered in arriving at jury's verdict, merely emphasized jury's duty to determine guilt or innocence. It did not detract from instruction that informed jurors of what would happen if they determined McLinn not guilty by reason of mental disease or defect.

District court did not err in restricting defense counsel's remarks during closing argument. Preliminary instruction given prior to opening statements, about the expense and inconvenience of a mistrial if jurors failed to follow rules, was properly issued. To allow a closing argument that McLinn would be fine with a second trial could be interpreted as encouraging jurors to violate their oath to return a verdict based solely on the evidence and to instead consider the consequences of a divided verdict. *State v. Salts,* 288 Kan. 263 (2009), is contrasted.

The finding of a single error defeats McLinn's cumulative error claim.

Under facts of this case, sufficient evidence was presented of an especially heinous, atrocious, or cruel murder. K.S.A. 2013 Supp. 21-6624(f) is interpreted.

No abuse of district court's discretion in declining to further define "heinous," "atrocious," or "cruel" when instructing the jury.

K.S.A. 2013 Supp. 21-6624 is not unconstitutionally vague.

District court did not abuse its discretion in declining to impose a hard 25 sentence.

District court should have imposed lifetime parole. Post-release supervision portion of McLinn's sentence was vacated. Case remanded for resentencing to impose lifetime parole.

CONCURRENCE (Rosen, J.)(joined by Nuss C.J. and Stegall J.): Consistent with prior dissenting opinions on this issue, disagrees with majority's holding that district court erred in not instructing jury on the lesser included offense of second-degree murder.

CONCURRENCE (Stegall, J.): Joins J. Rosen's concurrence, and agrees with J. Johnson's assessment of impact of *State v. Tahah,* 302 Kan. 783 (2015), on the instant case. District court made factual error and abused its discretion by restricting defense counsel's closing argument, but error was harmless.

CONCURRENCE and DISSENT (Johnson, J.)(joined by Biles, J. in the concurrence): Concurs with majority but for its assessment of district court's restrictions on defense counsel's closing argument. Either the initial coercive instruction was wrong, or the preclusion of defense argument was wrong. Either way there was error, even if harmless.

DISSENT (Beier, J.): Jury instruction that addressed McLinn's mental disease or defect should have included a reference to premeditation which is part of the *mens rea* of first-degree murder. Majority's interpretation of K.S.A. 2013 Supp. 21-5202(a) is criticized. On this unique record the error was reversible.

STATUTES: K.S.A. 2013 Supp. 21-5202, -5202(a), -5202(d), -5209, -5402(a)(1), -6620(b)(6), -6623, -6624, -6624(f), -6624(f) (2), -6624(f)(3), -6624(f)(5), -6625, -6625(a)(1)-(8), 22-3414(3); K.S.A. 21-3401(a), 22-3220, -3420, -3504(1); K.S.A. 1992 Supp. 21-3401(a)(1); K.S.A. 21-3401 (Weeks)

# COURT OF APPEALS

## CIVIL

### APPELLATE PROCEDURE—JUDGMENTS
### CITY OF TOPEKA V. RAMOS
### SHAWNEE DISTRICT COURT—AFFIRMED
### NO. 116,825 – FEBRUARY 9, 2018

FACTS: Ramos was ticketed by city police for traffic infractions. Without appearing in court, Ramos pled no contest and paid his ticket and court costs. Ramos apparently had a change of heart, and three months later he filed a motion to withdraw his plea. The motion was denied by a municipal judge, and Ramos appealed to district court. Once the case was in district court the city filed a motion to dismiss, claiming that the district court lacked jurisdiction because the appeal was filed more than 14 days after Ramos paid his fine. The district court granted the city's motion and Ramos appealed.

ISSUES: (1) Timeliness of the notice of appeal; (2) jurisdiction to consider motion to withdraw plea

HELD: Because Ramos never appeared in court, his sentence was effective on the date in September 2015 when he paid his fine online. Ramos did not file his notice of appeal to the district court until January 2016, well outside of the 14 days allowed by statute. Ramos' appeal was untimely and the district court did not err by dismissing the case on timeliness grounds. The ability to appeal the denial of a motion to withdraw plea differs depending on whether the plea was accepted by a municipal court or by a district magistrate judge or district judge. The plain language of K.S.A. 2016 Supp. 22-3609(a) does not allow for an appeal from the denial of a motion to withdraw plea that was entered in municipal court.

STATUTES: K.S.A. 2016 Supp. 22-3602, -3602(a), -3609, -3609(a), -3609(b), -3609a(a); K.S.A. 12-4102, -4103, -4305(a), -4305(c), -4508

## CRIMINAL

### CRIMINAL PROCEDURE—SENTENCING—STATUTES
### STATE V. SOTTA
### SUMNER DISTRICT COURT—AFFIRMED
### NO. 117,187—JANUARY 26, 2018

FACTS: Sotta pled guilty to aggravated assault with a deadly weapon and aggravated burglary. Sentence imposed included registration as a violent offender under the Kansas Offender Registration Act (KORA). Sotta appealed, arguing registration under KORA was error because district court failed to comply with K.S.A. 2016 22-4902(e)(2) by making a finding on the record that Sotta used a deadly weapon when he committed aggravated assault.

ISSUE: KORA Registration—Record Finding of a Deadly Weapon

HELD: Based on Sotta's admissions in response to court inquiries during the plea hearing, district court twice stated the factual basis for Sotta's plea, including that Sotta had put another person in reasonable apprehension of immediate bodily harm with a deadly weapon, and the weapon was a gun. Court's statement at the plea hearing constituted a finding on the record that Sotta had committed aggravated assault with a deadly weapon. Court order to register under KORA is affirmed, although it would have been better had the district court, in addition to the findings made, specifically stated that a deadly weapon had been used.

STATUTE: K.S.A. 2016 Supp. 22-4902(a), -4902(e)(1), -4902(e) (2)



KANSAS BAR ASSOCIATION

LOMAP

Pointing you in the right direction

www.ksbar.org/lomap

Schedule a **Free, 30-minute, initial consultation** on any of the following Law Practice Management Areas with the KBA Law Practice Management Attorney, Sara Rust-Martin.

## Areas We Can Help You with Include:

I. Trust Accounting
II. General Accounting Systems and Procedures
III. Client Relations and Marketing
IV. Computer Software
V. Conflict Checking Systems
VI. Calendaring and Docketing Systems
VII. Personnel Policies and Procedures
VIII. Succession and Continuation Planning
IX. Starting a Law Practice
X. Closing a Law Practice
XI. The Business of Law and Law as a Business
XII. Law Firm Technology
XIII. Social Media and Marketing
XIV. Websites, SEO and Blogging
XV. Setting Up a Virtual Practice
XVI. Cloud Computing and Security
XVII. The Paperless Office

 **CALL**

**Sara Rust-Martin,**
KBA Law Practice Management Attorney

**(785) 234-5696**
**www.ksbar.org/lomap**

*We are here to Point You in the Right Direction by assisting you in accessing the information and resources you need for your practice to thrive.*

# Appellate Practice Reminders
# From the Appellate Court Clerk's Office

**A Picture is Worth a Thousand Words:** *Recent Amendments to Supreme Court Rule 3.07*

Substantial changes have been made to the procedures for submitting exhibits to the Kansas Appellate Courts. The Supreme Court has enacted amendments to Rule 3.07 for exhibits that are not "documents, photographs, or electronically stored information." For all other exhibits, the following procedure must be followed in Rule 3.07:

"(b) Exhibits. A district court may transmit to the clerk of the appellate courts exhibits that are documents, photographs, or electronically stored information. A party wishing to include any other exhibit must prepare a photograph, not larger than 8 ½ by 11 ½ inches, that fairly and accurately depicts the exhibit and serve the photograph on opposing parties. Any objection must be served not later than 14 days after service of the photograph. The photograph and any objection must be submitted to the district court for settlement and approval. As approved, the clerk of the district court must include the photograph in the record on appeal.

"(c) Items of Unusual Bulk or Weight. A party must make advance arrangements with the clerk of the district court for the transportation and cost of transporting all documents, photographs, or electronically stored information of unusual bulk or weight."

The Appellate Court Clerks Office does not want to be in a business akin to a police department's evidence cage or a district court's exhibits locker. Please keep all that evidence in the district court. If you believe it is necessary for an exhibit to be included in the record on appeal, please follow the newly minted Rule 3.07. ∎

For questions about these or
other appellate procedures and practices,
call the Office of the Clerk of the Appellate Courts.
(785) 296-3229, Douglas T. Shima, Clerk.

**The ABA and the KBA have partnered up to save you money!**
**KBA members will receive a 15% discount on most all ABA books!**

**To get your savings code or for more information visit:**
**http://www.ksbar.org/booksforbars**





# Classified Advertisements

## Positions Available

**Advocate – Disability Crime Victims Unit**
Help obtain justice for victims of crime with disabilities. Advocate sought by Disability Rights Center of Kansas to advocate for crime victims with disabilities. 40 hour a week position, yearly pay is approx $32K, but depends on experience. Paralegals encouraged to apply. Great benefits. Employer-paid BCBS health insurance, KPERS retirement, etc. Questions? Need an alternative format? Contact DRC: 1-877-776-1541 for info@drckansas.org. Get the full job description & application at www.drckansas.org/about-us/jobapp

**Appellate attorney** with >275 published opinions available to work on brief counseling, brief writing, oral argument, and oral argument preparation. Contact Steve Obermeier at (913) 205-1584, or steve.obermeier@outlook.com.

**Attorney Position Available.** Arn, Mullins, Unruh, Kuhn & Wilson LLP, established Wichita law firm seeks associate and/or lateral hire. Minimum two (2) years' experience in Civil, Family, Litigation and General Practice. Attractive benefits, including health insurance, 401(k), disability/life insurance. Please forward resume, introductory letter and writing sample(s) to: Kris J. Kuhn (kkuhn@arnmullins.com).

**Attorney/Administrator–Disability Crime Victims Unit** Help obtain justice for victims of crime with disabilities. Licensed attorney sought by Disability Rights Center of Kansas to provide legal services to crime victims with disabilities & to administer the federal grant. Experience administering grant programs a plus. Salary approx. $62,500, but depends on experience. Great benefits. Employer-paid BCBS health insurance, KPERS retirement, etc. Questions? Need an alternative format? Contact DRC: 1-877-776-1541 or info@drckansas.org. Get the full job description & application atwww.drckansas.org/about-us/jobapp

**City of Wichita, Kansas • Assistant City Attorney III** The City of Wichita Department of Law is currently accepting applications for an Assistant City Attorney III. We are seeking a highly qualified attorney with demonstrated experience in public sector employment law and labor relations for public safety agencies. Requirements include a minimum of four years' experience in professional legal work, graduation from an accredited school of law, and admittance to practice before the Supreme Court of the State of Kansas. Apply online at www.wichita.gov

**Kennedy Berkley Yarnevich & Williamson, Chtd.** seeks an attorney with at least five years' experience in domestic and civil litigation practice. Please send introductory letter and resume for consideration to lherbic@kenberk.com.

**McPherson firm seeks an associate attorney.** Our firm is engaged in general practice in a community of approximately 13,000. Salary is negotiable. Must reside in McPherson. Please send introductory letter and resume to: tkarstetter@kklawoffices.com

**Overland Park Law Firm.** Ferree, Bunn, Rundberg & Ridgway seeking attorney experienced in complex Estate Planning and Probate work. Must be licensed in Missouri and Kansas. If interested, please forward introductory letter and resume for consideration to pbunn@fbr2law.com

**Overland Park/Corporate Woods Law Firm.** Jones & McCoy, P.A. seeking experienced associate attorney with 3+ years of civil litigation experience in business, estates and trust, family law, personal injury and other civil matters. Must have Kansas and Missouri licenses. Great opportunity for the right person to learn and grow their practice. Please send cover letter and resume to brant@jones-mccoy.com.

**Part-Time Legal Assistant.** A private law firm in Topeka has an immediate opening for a qualified Legal Assistant processing collections. Experience in general office administration required and legal office experience is preferred. Only applicants meeting specific criteria will be considered; please contact for duties and requirements. Please send resume and cover letter for consideration to the attn. of Alisia at info@probascolaw.com or via fax (785) 233-2384.

**Wanted: Rising star criminal defense trial lawyer** to gain valuable experience with fast-paced, 32-year-young criminal defense firm with a vision for the future. First-chair experience in the trial of 3 or more criminal felony jury cases required. Please email resume and list 3 felony jury trials applicant has first-chaired to verdict including jurisdictions and case numbers to receptionroom@monnat.com | Monnat & Spurrier, Chartered | Wichita, KS

## Attorney Services

**Appeals.** Experienced trial and appellate attorney available for state and federal appellate case referrals. Licensed before state courts of Kansas and Colorado, U.S. Supreme Court, and various circuit courts of appeals including the Tenth Circuit Court of Appeals. Listed, Who's Who in American Law. Work featured in The New York Times and The Washington Post. Author of numerous legal articles and Am. Jur. Trials treatise on constitutional tort law. Trial perspective at the appellate court level. Reasonable rates, fee arrangements. Contact John B. Roesler, Attorney at Law, PO Box 604, Lawrence, Kansas 66044, (303) 929-2244, jroesler@lawyer.com.

**Contract brief writing.** Experienced brief writer is willing to take in appellate proceedings for any civil matter. Attorney has briefed approximately 40 cases before the Kansas Court of Appeals and 15 briefs before the Tenth Circuit, both with excellent results. If you simply don't have the time to help your clients after the final judgment comes down, call or email to learn more. Jennifer Hill, (316) 263-5851 or email jhill@mcdonaldtinker.com.

**Contract brief writing.** Former federal law clerk and Court of Appeals staff attorney available to handle appeals and motions. Attorney has briefed numerous appeals in both the Kansas and federal appellate courts. Contact me if you need a quality brief. Michael Jilka, (785) 218-2999 or email mjilka@jilkalaw.com.

**Estate & trust litigation.** Available to assist you in probate and trust litigation in Kansas, Missouri and other states. www.nicholsjilka.com.

**Florida legal needs.** I'm here to help. Florida Bar board certified appellate lawyer and experienced trial lawyer. Contact tom@twylaw.com or visit www.TomAppeals.com. Also admitted to active practice in Kansas, 10th and 11th Circuit Courts of Appeal, and U.S. Supreme Court.

**QDRO Drafting.** I am a Kansas attorney and former pension plan administrator with years of experience in employee benefit

law. My services are available to draft your QDROs, communicate with the retirement plans, and assist with qualification of your DROs or other retirement plan matters. Let me help you and your client through this technically difficult process. For more information call Curtis G. Barnhill at (785) 856-1628 or email cgb@barnhillatlaw.com.

**Security Expert Witness.** Board Certified Protection Professional and former Senior Police Commander providing forensic consulting to both plaintiff and defense counsel in all areas/venues of security negligence. A comprehensive CV, impeccable reputation and both criminal and civil experience equate to expert litigation support. Michael S. D'Angelo, CPP. Secure Direction Consulting, LLC. www.securedirection.net. (786) 444-1109. expert@securedirection.net

**Veterans services.** Do you want to better serve your veteran clients without going to the trouble of dealing with the VA? I am a VA-accredited attorney with extensive experience applying for various VA benefits, including Improved Pension. I regularly consult with attorneys (and their clients) about the various services attorneys can offer their clients to help qualify veterans and their families for various VA programs. As soon as a client is in position to qualify, I can further assist by handling the entire application to the VA for you. For more information about my various consultation and application services, please contact the Law Office of Scott W. Sexton P.A. at (785) 409-5228.

**Wanted Immediately:** Attorney specializing in Criminal Defense Research & Writing to join fast-paced, 32-year-young criminal defense firm with a vision for the future and a state and federal national practice, including white collar. Telecommuting option available. Please send resume and 3 writing samples to Monnat & Spurrier, Chartered, 200 West Douglas, Suite 830, Wichita, Kansas 67202, email to receptionroom@monnat.com or fax to 316-264-4785.

## Office Space Available

**2 Updated Office Spaces for Lease**—601 N. Mur-Len Rd. Ste. 20, Olathe, KS 66062. **Office 1)** Large window with large ledge; **Office 2)** Storage closet and large picture window. *Coffee bar, waiting area and receptionist/paralegal area. *Fax, Wifi and ground floor parking. Call Chris Fletcher: (913) 390-8555

**Large office space** now available at One Hallbrook Place in Leawood, KS. Two conference rooms, kitchen, high-speed internet, postage services, copier/fax all included. For more information or to schedule a viewing, contact Bryson Cloon at (913) 323-4500

**Leawood Law Office.** Looking for office sharing and/or work sharing arrangement, ideally with estate planning/probate attorney, although any civil practice is welcome. Conference room, phone system, internet, high-speed copier/printer, and lunchroom. Plenty of surface parking. In a great area in south Leawood—bright and modern space on second floor of bank building. Contact Paul Snyder (913) 685-3900 or psnyder@snyderlawfirmllc.com.

**Office for Rent.** 12' x 15' office space for rent at I-435 and Nall Ave., Overland Park, Kansas. Receptionist provided. Internet access and conference rooms are available. Rent $850 per month, with the possibility of trading rent for work on some cases. Possibility for referrals from three other attorneys in the suite. For more information, contact Samantha Arbegast at 913-652-9937 or scr@theronanlawfirm.com

**Professional office space available,** for lease. The available space consists of one to two offices and an administrative staff bay, in a larger office building. No cost use of reception area, conference rooms, and high-speed internet. Located in southwest Topeka. Competitive rent. For more information, call 785-235-5367 or write Law Office, P.O. Box 67689, Topeka, KS 66667.

**Seeking Office Space:** Bilingual Immigration attorney with over 10 years of experience, looking to rent a conference room or office once or twice a month in Garden City, Kansas. No services needed other than a place to meet clients. We have served the immigrant community in Western Kansas for 9 years and have an ample client base. Our office is a great source of referrals for a family or criminal attorney as we only practice immigration. Please reply to: erika.jura-dograham@gmail.com.

**Selling full sets of the Kansas Reports and the Kansas Court of Appeals books.** Also willing to donate them to a charity, government or quasi-government agency. Contact Douglas G. Waters, Jr., (913) 682-7343 or douglasgwaters1@gmail.com



# Introducing the
# KBA SocialLink



## MAKE CONNECTIONS
### at the
## Kansas Bar Association

### Log in today and connect with other members of the KBA!
Whether it be to connect with your KBA Sections or other members,
login and have a look around.

## Download the SocialLink App





*Apple and the Apple logo are trademarks of Apple Inc., registered in the U.S. and other countries.*
*App Store is a service mark of Apple Inc., registered in the U.S. and other countries.*
*Google Play and the Google Play logo are trademarks of Google Inc.*



KANSAS BAR
ASSOCIATION
www.ksbar.org

# Need clients?

## Need increased VISIBILITY?



# Join
### The Kansas Bar Association's

# Lawyer Referral Service

"... [LRS] is a good source for a steady flow of persons seeking assistance with the kinds of cases I handle. The benefits of working with LRS far exceed the costs of enrollment. It is the most effective use of advertising budget I can imagine. "
~ *Joseph Seiwert, Snider & Seiwert LLC, Wichita*



For more information about the KBA Lawyer Referral Service program, visit us online at **www.ksbar.org/LRS** or call 785-234-5696



KANSAS BAR ASSOCIATION
www.ksbar.org

*Your trusted legal source.*



ABA
AMERICAN BAR ASSOCIATION

MEETS ABA STANDARDS FOR LAWYER REFERRAL

THE RIGHT CALL FOR THE RIGHT LAWYER™

# A TRADITION OF SUCCESS



Matthew E. Birch

Scott E. Nutter

Lynn R. Johnson

Victor A. Bergman

David R. Morantz

## SHAMBERG
## JOHNSON
### AND BERGMAN

816-474-0004
www.sjblaw.com

2600 Grand Boulevard,
Suite 550
Kansas City, MO 64108

S
J &
B

## OUR EXPERIENCE PAYS

We have a long history of success inside and outside
the courtroom. For over 40 years, we have maximized
the value of cases referred to our firm and we will
continue to do so into the future. If you have a client
with a serious injury or death, we will welcome a referral
or opportunity to form a co-counsel relationship.

The choice of a lawyer is an important decision and should not be based solely on advertisements.