# EXHIBIT

## "A"

# To Follow . . .

**Defense Attorneys filing in opposition to revoking bail, together with known minutes and orders**

**IN THE DISTRICT IN AND FOR WASHINGTON COUNTY**
**STATE OF OKLAHOMA**

DISTRICT COURT WASHINGTON CO. OK
JILL L. SPITZER COURT CLERK

OCT 1 1 2022

BY _____ DEPUTY

**THE STATE OF OKLAHOMA,**

**Plaintiff,**

vs.

**Case No. CF-2021-304**

**MICHAEL ERIC NELSON,**
**Defendant.**

## OBJECTION TO STATE'S MOTION TO INCREASE BOND

Comes now Michael Eric Nelson, by and through undersigned counsel and

objects to the state's requested bond increase and offers the Court the following:

### Relevant Procedural Background

1. Michael Nelson stands accused of one felony (count 1) and one misdemeanor

   (count 3)[1]. In count one it is alleged that Mr. Nelson violated the *Oklahoma*

   *Computer Crimes Act,* 21 O.S. § 1958, a felony. In the Second Amended

   Information filed April 7, 2022 the state alleges that Mr. Nelson "on or between

   the 24th day of February, 2019 and the 1st day of October, 2021, did unlawfully

   communicate by email, a computer system, for the purpose of using such access

   for Stalking in violation of Oklahoma Statute Title 21 0.S. § 1173."

2. In count three Mr. Nelson is charged with *Unlawful Use of Computer System*,

   21 O.S. § 1953 (8), a misdemeanor. In count 3 the state alleged that Mr. Nelson

   "on or about the 20th day of October, 2021, by willfully using a computer,

---

[1] Count 2 was dismissed by the state on August 5, 2022, see August 5, 2022 court minute.

1

computer system, or computer network to annoy, abuse, threaten or harass another person by sending an email to Cynthia Blanchard."

3. This case is set on the Jury Sounding Docket for December 16, 2022 at 2:00 pm.

4. On September 22, 2022 the state filed the "*State's Motion To Increase Bond and Set Hearing*". In the State's motion the state alleges that Mr. Nelson violated the conditions of his release by contacting **Mark Ritter**, **Craig Piercy** and "*an attorney known to an associate of Cynthia and Anthem Blanchard indicating that he intends to subpoena an employee of HeraSoft in Bartlesville, Oklahoma.*"

## The Basis for the Objection

## Mr. Nelson Did Not Violate the Conditions of His Bond

The written court minute filed in this case on January 11, 2022 list the bond conditions as "no contact w/alleged victim, ankle monitor, surrender passport, not reside in Washington Co." (See attached   Exhibit A, January 11, 2022 *Court Minute*) On March 7, 2022 the bond conditions were modified, "State and defendant agree defendant can return and reside in Rhode Island, ankle monitor can be removed by agreement. Defendant can return to Oklahoma to consult with Attorney and for court appearances. Continued no contact with victims." (See attached Exhibit B, *March 7, 2022 Court Minute*)

In the state's motion to increase Mr. Nelson's bond the state **claims** that the condition of bond was "…that the defendant have no contact with the victims or **the victim's businesses including 505 Silas St. Bartlesville, OK 74033**" The state's claims regarding the conditions of Mr. Nelson's bond are not reflected in the

2

court minute, the court's minute only prohibits Mr. Nelson from contacting the alleged victims.

### Mr. Nelson Contacted the Individuals the State
### Complains of for Legitimate Litigation Purposes

On the first page of the state's motion the state complains that "**He [Mr. Nelson] states that he is going to subpoena Mr. Ritter…**" and that "**On or about September 6, 2022 the defendant call Craig Piercy, a shareholder and associate of Cynthia and Anthem Blanchard…**".

Mr. Nelson took the action the state complains of during the course of litigation while defending himself, *pro se*, in a pending federal lawsuit. The lawsuit was filed against him by a board member of the company controlled by Cynthia Blanchard, that lawsuit is currently pending in the United States District Court of Kansas.

The lawsuit is captioned *United Capital Management of Kansas, Inc. and Chad M. Koehn vs. Michael E. Nelson*, 22-4008-JWB-GEB. The plaintiff in that lawsuit Mr. Koehn disclosed in a public SEC disclosure that he is a member of the board of directors of **Anthem Holding Company**.

> **Chad Koehn, President of United Capital Management is a member of the Board of Directors of Anthem Holdings Company**. In his position as a member of the Board of Directors he is compensated by Receiving shares of stock and/or warrants to obtain shares in the company. Mr. Koehn has an incentive to recommend Anthem Holdings Company. This is a conflict of interest, and consequently the investment advice provided by Mr. Koehn is biased.
>
> Mr. Koehn will only recommend that a client invest a portion of client's portfolio in Anthem Holdings Company if believes that it is in client's best

interest. (Under no circumstances will Mr. Koehn and/or United Capital Management exercise any investment discretion with respect to whether to invest a client in Anthem Holdings Company.)

(See June 2021 SEC Disclosure https://static.fmgsuite.com/media/ documents/6c9c702c-f1da-437b-a466-cceab07e50d8.pdf)

Chad Koehn the plaintiff in the federal lawsuit, is a member of the board of directors of Anthem Holdings Company, and that company is controlled by the complaining witness and her husband[2]. Mr. Nelson owns a significant portion of Anthem Holdings Company[3]. (In the preliminary hearing of this matter Cynthia Blanchard testified that Mr. Nelson was a shareholder in the company her and her husband controlled[4].) So the relationships are clear, Chad Koehn a board member is suing Eric Nelson a shareholder and the state's complaining witness Cynthia Blanchard is the president of the company.

In defending the lawsuit in federal district court, Michael Nelson subpoenaed two witnesses Mark Ritter and Craig Piercy[5].

Mr. Nelson has a constitutional right to participate in the defense of the lawsuit filed against him by an associate of the state's complaining witness.

The right to offer the testimony of witnesses, and to compel their attendance, if8 necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the

---

[2] (See March 29, 2022 Preliminary Hearing transcript in this matter page 38 lines 2- 5)

[3] (See attached as Exhibit C- Anthem Holdings Company stock certificate issued to Mr. Nelson for 509,419 shares of common stock of Anthem Holdings Company, a Texas Corporation).

[4] (See March 29, 2022 Preliminary Hearing transcript in this matter page 38 line 5)

[5] (See Attached Exhibit D Notice of Subpoena for Mark Ritter and Exhibit E Notice of Subpoena for Mark Ritter filed in the United States District Court for Kansas)

prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19 (1967)

On page three of the state's motion the state complains that "**Finally, on September 15th 2022 the defendant, using the email address oklahomaremote@gmail.com, sent an email to an attorney known to an associate of Cynthia and Anthem Blanchard indicating that he intends to subpoena an employee of HeraSoft in Bartlesville, Oklahoma. In the email, the defendant indicates that he will have a special counsel take the deposition of Gil Gilliam in Bartlesville, Oklahoma at the local courthouse for a six to seven hour a deposition.**"

Mr. Nelson has been ordered by United States Magistrate Judge Gwynn's Birzer to communicate with attorney Christopher Kellogg, counsel for Chad Koehn, using the email "oklahomaremote@gmail.com" concerning the pending litigation in the *United Capital Management of Kansas, Inc. and Chad M. Koehn vs. Michael E. Nelson*, 22-4008-JWB-GEB. (See Attached Exhibit F, April 27, 2022 Order issued by Magistrate Birzer Document 67)

The lawsuit that Mr. Nelson is defending involves the state's complaining witness Cynthia Blanchard and Gil Gilliam. Mrs. Blanchard and Gil Gilliam are listed as potential witnesses in Chad Koehn's initial disclosures in that lawsuit. (See Attached Exhibit G, Plaintiff's Initial Disclosures, page 3 numbers 6 and 8)

The state also complains that during a conversation with Mr. Piercy that "**The defendant told Mr. Piercy that the Blanchard's were con-artists who operated Ponzi schemes, that**

**they used their companies to hide money and steal money from investors. He mentioned specific companies such as Anthem Vault and HeraSoft."**

Mr. Nelson has good reason to believe that the Blanchard's are running a Ponzi scheme. The dispute between Mr. Nelson and the Blanchards began while he was employed by one of their many companies over a crypto currency named "Herc", Mr. Nelson received an email from a fellow share holder who informed him that a group of investors had purchased three million dollars of the crypto currency and wanted to know where the money was.

In a document[6] explaining "Herc" produced by the Blanchard's (See Attached Exhibit H, "Herc" White Paper) the Blanchard's are listed as CEO and President on page 14 and on page 18 is an individual know as Joby Weeks. Mr. Weeks is listed as a member of the "Advisory Board". Mr. Weeks, was indicted out of United States District Court in New Jersey, in *United States of America v. Matthew Brent Goettsche et al., 18-CR-877-CCC*, for conspiracy to engage in wire fraud in connection with his role in BitClub Network. Mr. Weeks ultimately entered a plea in that case.

In the Department of Justice Press Release[7] concerning the case, federal prosecutors said the following:

> Defendants Goettsche, Balaci, and Weeks have been charged with conspiracy to engage in wire fraud in connection with their roles in BitClub Network. From April 2014 through December 2019, BitClub Network was a fraudulent scheme that solicited money from investors in exchange for shares of purported cryptocurrency mining pools and rewarded investors for recruiting new investors into the scheme. Goettsche, Balaci,

---

[6] https://s3.us-east-2.amazonaws.com/hercmedia/herc_2018_whitepaper.pdf

[7] https://www.justice.gov/usao-nj/bitclub

Weeks, and others conspired together to solicit investment in BitClub Network through fraudulent means, including by providing false and misleading figures that BitClub investors were told were "bitcoin mining earnings" purportedly generated by BitClub Network's bitcoin mining pool.    Goettsche, Balaci, Weeks, and others obtained the equivalent of at least $722 million from BitClub Network investors.

Defendants Goettsche, Balaci, Weeks, and Abel also conspired to sell BitClub Network shares—which were securities—notwithstanding that BitClub Network did not register the shares with the U.S. Securities and Exchange Commission.  Weeks and Abel created videos and traveled around the United States and the world to promote BitClub Network and recruit others to invest.

It is not just that the Blanchard's had a member of the "Advisory Board" that was indicted for the "BitClub Conspiracy", while Mr. Nelson worked for the Blanchard's he personally witnessed Anthem Blanchard recruit for and invest money into BitClub.

The Blanchard's have also started multiple companies in recent years and make astounding claims such as their company is securing the energy grid in California, claim to be in partnership with the country of the Netherlands, claim to be securing all gold imports and exports to the country of the Netherlands.

The issue concerning whether or not the Blanchard's are involved in a "Ponzi Scheme", and whether or not they are being assisted by Chad Koehn the board member of Anthem Holdings Company, are all the issues involved in the federal litigation in Kansas.

What has occurred between these two cases is a board member of Anthem Holdings Company sues Mr. Nelson, lists the Blanchards and their employees as witnesses against Mr. Nelson in a federal civil case and then when Mr. Nelson wants to depose witnesses associated with the Blanchards to defend the federal lawsuit, the

7

Blanchards run to the Washington County District Attorney's office to try and stop Mr. Nelson from defending the federal case. Mr. Nelson has a constitutional right to participate in the federal litigation pending in the United States District Court of Kansas and he has done nothing wrong by doing so.

## CONCLUSION

Therefore, for all the reasons stated above. Counsel request the Court deny the state's request to increase bond.

Respectfully Submitted,

Kevin D. Adams, OBA# 18914
Attorney at Law
36 East Cameron Street, #16
Tulsa, OK 74103
O (918) 582-1313

## CERTIFICATE OF DELIVERY

I hear by certify that a copy of the foregoing instrument was mailed or delivered on October 11, 2022 to the office of the following:

Washington County District Attorney's Office

Kevin  Adams

8

A

# IN THE DISTRICT COURT OF WASHINGTON COUNTY
## STATE OF OKLAHOMA
## COURT MINUTE (DISTRICT COURT ARRAIGNMENT)

DISTRICT COURT WASHINGTON CO OK
JILL L. SPITZER, COURT CLERK

JAN 1 1 2022

DATE: 1-11-22

JUDGE: Sigler          By _Sarah Murphy_ DEPUTY

CASE #: CF-21-304

STATE OF OKLAHOMA vs. Michael Eric Nelson

STATE PRESENT BY: Gullett

✓ Deft is present in person ✓ In custody
___ Without attorney

___ Deft Arrested on Warrant w/$_____ Bond          ✓ With attorney M. Kane

___ Deft failed to appear. Bench warrant/Bond forfeiture authorized in the amount of $_____

✓ Probable Cause Affidavit reviewed by Court          ✓ Court finds probable cause for arrest

___ Deft advised of his/her constitutional rights ____ How & when to apply for Court appt attorney

✓ Deft in receipt of Information/App to Revoke/Motion to Accel ___ Waives/does not waive 20 days

___ Information read ✓ Waives reading ____ Deft acknowledges his/her name and address are
correct.

✓ Deft name or address amended to: 33 Hartford Ave, Wakefield RI

___ Deft enters plea of NOT GUILTY.                ___ Deft enters plea of GUILTY.
___ Court enters plea of NOT GUILTY for deft.      ___ Deft withdraws plea of NOT GUILTY
                                                       and pleads GUILTY.
✓ Bond is set at $ 100,000.00                      ___ Deft enters plea of NO CONTEST and
___ Deft is out on bond                                the Court finds the Deft GUILTY.

✓ Case set for 1-21-22 at 9:00 (am)/pm

With Thomas         for Status

Bond Condition: No contact w/alleged victim ; ankle monitor, surrender passport,
not reside in Washington Co.
___ It is Order, Judgment & Decree of the Court the Defendant be & hereby is sentenced/revoked to:

_____
_____

___ The Defendant is ordered to pay the Court Costs, together with the following:
    ___ $_____ Fine                    ___ $_____ VCA

___ The Defendant is to receive credit for time served at the rate of $25.00 per day or until the amount
of $_____ is paid into case(s): _____

Other Action: Deft asks for bond reduction - Hearing held @ 3:30 pm.

# B

**IN THE DISTRICT COURT OF WASHINGTON COUNTY, STATE OF OKLAHOMA**

State
_____
Plaintiff(s)

Zoe Gullett (33184)
_____
Attorney(s) for Plaintiff(s)

-vs-

Michael Eric Nelson
_____
Defendant(s)

Case No CF-21-304

Perry Newman
_____
Attorney(s) for Defendant(s)

DISTRICT COURT WASHINGTON CO OK
JILL L. SPITZER, COURT CLERK

**COURT MINUTE**

Date: March / 7 /2022      Judge: Sigler

FILED
MAR 0 7 2022

Court Reporter      None                    DEPUTY

State + D agree D can return to reside
in Rhode Island, ankle monitor can be
removed by agreement. D can return
to Oklahoma to consult with Attorney
+ for Court Appearances. Continued
no contact with Victims. D to return
for PH on 3/29/22 @ 9:00 am. A to check
in daily with bondsperson.

Set for further hearing on _____ at _____ .M.

12861

3/7/2022
_____
Judge of the District Judge

C

No. of Certificate
**CS-9**

# Anthem Holdings Company
INCORPORATED UNDER THE LAWS OF THE STATE OF TEXAS

Shares
**509,419**

This is to certify that

# Michael Nelson

is the record holder of FIVE HUNDRED NINE THOUSAND, FOUR HUNDRED NINETEEN (509,419) shares of Common Stock of ANTHEM HOLDINGS COMPANY, a Texas corporation (the "Corporation"), transferred to the shareholder on October 22nd, 2019, transferable only on the books of the Corporation by the holder, in person, or by duly authorized attorney, upon delivery of a properly endorsed stock power. Such shares are issued and shall be held subject to all the provisions of the Certificate of Incorporation, Bylaws of the Corporation and any amendments thereto, and any other governing documents, copies of which are on file at the principal office of the Corporation and made a part hereof.

550 Club Drive, #445 Montgomery, Texas 77316



**Cynthia Blanchard**

Co Founder & President

**Anthem Hayek Blanchard**

Chief Executive Officer

# D

## UNITED STATES FEDERAL DISTRICT COURT - DISTRICT OF KANSAS

| | |
|---|---|
| **United Capital Management of Kansas, Inc**. | **DOCKET NO.:** **5:22-CV-04008-JWB-GEB** |
| **& CHAD M. KOEHN** | **CIVIL ACTION** **NOTICE of Intent to** |
| Plaintiffs, counter-Defendants v. | **Issue Subpoena to:** |
| Michael Nelson | **MARK JOSEPH RITTER** |
| defendant; Counter-Plaintiff | **Country Club Heights** |
| *pro se* | **2035 E IRON AVE STE 107R** |
| | **SALINA, KS, 67401** |
| | **[Jury Trial Demanded]** |

Counter-Plaintiff / Defendant ("Nelson"), makes "LIMITED APPEARANCE" to file

**NOTICE OF INTENT TO ISSUE SUBPOENA as Stated attached herewith** so states to

counter-defendants, plaintiffs etAl. As Chad Koehn, United Capital Management of Kansas Inc.

("UCMK") & lawyers collectively ("KOEHN") and to the COURT:

### NOTICE OF INTENT TO ISSUE SUBPOENA

Please take notice that Mister Nelson, intends to issue the Subpoena attached herewith to **NOTICE**

**of Intent to Issue Subpoena to: MARK JOSEPH RITTER; Country Club Heights 2035 E**

**IRON AVE STE 107R SALINA, KS, 67401; please see attached herewith subpoena.** Pursuant

to Federal Rules of Civil Procedure Rule 45(d)(1) and (2)(A) subpoena is to produce electronically

stored information as stated, does not require appearance nor costs or burdens.

Pursuant to Federal Rules of Civil Procedure Rule 45(a)(4); NOTICE is herein so tendered,

TAKE NOTICE, upon the expiration of 7 (seven) days, from the date of service of this notice, with

entry upon the docket of this matter above herein referenced. Mister Nelson will apply to the clerk of

this court for issuance of the attached herewith subpoena directed to **MARK JOSEPH RITTER**

Who is not a party at present and whose address is **Country Club Heights 2035 E IRON AVE STE 107R SALINA, KS, 67401; please see attached herewith subpoena** To produce documents and electronically stored information as stated on subpoena. Any objection not timely made shall be deemed a waiver of all future objections not so stated and well pleaded to the Court.

A document filed pro se is "to be liberally construed," *Estelle, 429 U.S.* "pro se ... however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers," ibid. Cf. Fed. Rule Civ. Proc. 8(f) ("All pleadings shall be so **construed as to do substantial justice"**). "filings generously and with the leniency due pro se litigants", *see Erickson v. Pardus, U.S. 127 S.Ct. L.Ed.2d (2007); Andrews v. Heaton, 483 F.3d (10th Cir.2007).*

Respectfully Submitted, this 17th day of September 2022.

Michael Nelson - Pro Se

Michael Nelson
9450 SW Gemini Dr PMB 90924
Beaverton, Oregon 97008-7105
P: 702.932.3434 Email: oklahomaremote @ gmail.com

**Certificate of Service as to:**

**NOTICE of Intent to Issue Subpoena to: MARK JOSEPH RITTER; Country Club Heights 2035 E IRON AVE STE 107R SALINA, KS, 67401; please see attached herewith subpoena**

The undersigned hereby certifies that, on this same date, filed the **above Notice of INTENT TO ISSUE SUBPOENA Attached herewith** with the Clerk of the Court via electronic-mail: **KSD_Clerks_Topeka** <KSD_Clerks_Topeka@ksd.uscourts.gov> which will send notice of its filing electronically to the attorneys of record, for the opposing parties as per the local rules and FRCP, and as to all future filings and pleadings of whatever nature are necessary in this above herein captured matter, per Local Rule 77.1;

Respectfully Submitted, this 17th day of September 2022.



Michael Nelson - Pro Se

Michael Nelson
9450 SW Gemini Dr PMB 90924
Beaverton, Oregon 97008-7105
P: 702.932.3434 Email: oklahomaremote @ gmail.com

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

KANSAS           ▼

unitedcaptialmanagementofkansas inc & chad koehn

|  |  |
|---|---|
| *Plaintiff* | ) |
| v. | ) Civil Action No. 5:22-CV-04008-JWB-GEB |
| michael nelson | ) |
|  | ) |
| *Defendant* | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

MARK JOSEPH RITTER

To:
Country Club Heights ... 2035 E IRON AVE STE 107R, SALINA, KS, 67401

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:All communications with UCMK, Chad M. Koehn, Anthem Blanchard relating to Anthem Holdings Company or Hera Software Development Inc. with all account statements, subscriptions, shareholder communications.

| Place: Via email or eletronic file transfer Apeearance not required at this time | Date and Time: |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

*CLERK OF COURT*

OR

_____      _____
*Signature of Clerk or Deputy Clerk*            *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 5:22-CV-04008-JWB-GEB

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Case 5:22-cv-04008-JWB-TJJ  Document 337-2  Filed 12/30/22  Page 22 of 61

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

### (c) Place of Compliance.

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises at the premises to be inspected.

### (d) Protecting a Person Subject to a Subpoena; Enforcement.

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

### (e) Duties in Responding to a Subpoena.

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

### (g) Contempt.

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).



## UNITED STATES FEDERAL DISTRICT COURT - DISTRICT OF KANSAS

| | |
|---|---|
| **United Capital Management of Kansas, Inc**. <br><br>**& CHAD M. KOEHN** <br><br>Plaintiffs, counter-Defendants <br>v. <br>Michael Nelson <br><br>  defendant; Counter-Plaintiff <br>*pro se* | **DOCKET NO.:** <br>**5:22-CV-04008-JWB-GEB** <br>**CIVIL ACTION** <br>**NOTICE of Intent to** <br>**Issue Subpoena to:** <br><br>**CRAIG ALLEN PIERCY** <br>**1308 SHORELINE DR W, SALINA, KS,** <br>**67401 or** <br>**300 S 9th St, Salina, KS, United States,** <br>**Kansas or** <br>**PIERCYCRAIG@GMAIL.com** <br><br>**[Jury Trial Demanded]** |

    Counter-Plaintiff / Defendant ("Nelson"), makes "LIMITED APPEARANCE" to file

**NOTICE OF INTENT TO ISSUE SUBPOENA as Stated attached herewith** so states to

counter-defendants, plaintiffs etAl. As Chad Koehn, United Capital Management of Kansas Inc.

("UCMK") & lawyers collectively ("KOEHN") and to the COURT:

    **NOTICE OF INTENT TO ISSUE SUBPOENA**

Please take notice that Mister Nelson, intends to issue the Subpoena attached herewith to **NOTICE**

**of Intent to Issue Subpoena to: CRAIG ALLEN PIERCY 1308 SHORELINE DR W, SALINA,**

**KS, 67401 or 300 S 9th St, Salina, KS, United States, Kansas, PIERCYCRAIG@GMAIL.com;**

**please see attached herewith subpoena.** Pursuant to Federal Rules of Civil Procedure Rule 45(d)(1)

and (2)(A) subpoena is to produce electronically stored information as stated, does not require

appearance nor costs or burdens.

    Pursuant to Federal Rules of Civil Procedure Rule 45(a)(4); NOTICE is herein so tendered,

TAKE NOTICE, upon the expiration of 7 (seven) days, from the date of service of this notice, with

entry upon the docket of this matter above herein referenced. Mister Nelson will apply to the clerk of this court for issuance of the attached herewith subpoena directed to **CRAIG ALLEN PIERCY** Who is not a party at present and whose address is **1308 SHORELINE DR W, SALINA, KS, 67401 or 300 S 9th St, Salina, KS, United States, Kansas, PIERCYCRAIG@GMAIL.com please see attached herewith subpoena** To produce documents and electronically stored information as stated on subpoena. Any objection not timely made shall be deemed a waiver of all future objections not so stated and well pleaded to the Court.

A document filed pro se is "to be liberally construed," *Estelle, 429 U.S.* "pro se ... however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers," ibid. Cf. Fed. Rule Civ. Proc. 8(f) ("All pleadings shall be so **construed as to do substantial justice**"). "filings generously and with the leniency due pro se litigants", *see Erickson v. Pardus, U.S. 127 S.Ct. L.Ed.2d (2007); Andrews v. Heaton, 483 F.3d (10th Cir.2007).*

Respectfully Submitted, this 17th day of September 2022.

Michael Nelson - Pro Se

Michael Nelson
9450 SW Gemini Dr PMB 90924
Beaverton, Oregon 97008-7105
P: 702.932.3434 Email: oklahomaremote @ gmail.com

2

**Certificate of Service as to:**

**NOTICE of Intent to Issue Subpoena to: CRAIG ALLEN PIERCY 1308 SHORELINE DR W, SALINA, KS, 67401 or 300 S 9th St, Salina, KS, United States, Kansas, PIERCYCRAIG@GMAIL.com ; please see attached herewith subpoena**

The undersigned hereby certifies that, on this same date, filed the **above Notice of INTENT TO ISSUE SUBPOENA Attached herewith** with the Clerk of the Court via electronic-mail: **KSD_Clerks_Topeka** <KSD_Clerks_Topeka@ksd.uscourts.gov> which will send notice of its filing electronically to the attorneys of record, for the opposing parties as per the local rules and FRCP, and as to all future filings and pleadings of whatever nature are necessary in this above herein captured matter, per Local Rule 77.1;

Respectfully Submitted, this 17th day of September 2022.

Michael Nelson - Pro Se

Michael Nelson
9450 SW Gemini Dr PMB 90924
Beaverton, Oregon 97008-7105
P: 702.932.3434 Email: oklahomaremote @ gmail.com

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

| | |
|---|---|
| unitedcaptialmanagementofkansas inc & chad koehn <br><br> *Plaintiff* <br> v. <br> michael nelson <br><br> *Defendant* | )<br>)<br>)<br>)<br>)<br>)    Civil Action No.   5:22-CV-04008-JWB-GEB |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:   CRAIG ALLEN PIERCY
1308 SHORELINE DR W, SALINA, KS, 67401 or 300 S 9th St, Salina, KS, United States, Kansas

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: All communications with UCMK, Chad M. Koehn relating to Anthem Holdings Company or Hera Software Development Inc. (HeraSoft) with all account statements, subscriptions, shareholder communications.

| Place: Via email or eletronic file transfer Apeearance not required at this time | Date and Time: |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

*CLERK OF COURT*

                OR

_____      _____
*Signature of Clerk or Deputy Clerk*           *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 5:22-CV-04008-JWB-GEB

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____          _____

*Server's signature*

_____

*Printed name and title*

_____

*Server's address*

Additional information regarding attempted service, etc.:

Case 5:22-cv-04008-JWB-TJJ  Document 337-2  Filed 12/30/22  Page 29 of 61

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED CAPITAL<br>MANAGEMENT OF KANSAS, INC.,<br>and CHAD M. KOEHN,<br><br>        Plaintiffs,<br><br>    v.<br><br>MICHAEL E. NELSON,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 22-4008-JWB-GEB |

### ORDER

The Court conducted a Status Conference in this matter. Plaintiffs appeared through Christopher Kellogg and Craig Brand. Defendant Michael Nelson appeared, pro se. After a thorough discussion with the parties and counsel regarding communications between the parties and the course of proceedings in this matter, the Court enters the following orders.

1.    The exchange portal recommended by Defendants for communications and exchange of documents in this matter would be ideal, but the Court finds the expense of such a portal is not consistent with the ideals of Fed. R. Civ. P. 1 regarding the just, speedy, and inexpensive determination of every action.

2.    Communications between the parties shall take place by email. Christopher Kellogg shall act as the point of communication on behalf of Plaintiffs and their counsel, with Mr. Kellogg using the email address ckellogg@kenberk.com and Mr. Nelson using the email address oklahomaremote@gmail.com.

3.   For substantive communications, such as the service of discovery, the parties shall file a Certificate of Service regarding the communication, identifying the email addresses used.

4.   The parties shall not file any additional pleadings until Defendant files his responsive pleading to Plaintiffs' Amended Complaint. Defendant's deadline to file a responsive pleading is **May 17, 2022**. No extensions to this deadline will be granted.

5.   After Defendant files his responsive pleading, the Court will enter an Initial Order Regarding Planning and Scheduling setting out deadlines including a deadline for the parties to conduct their Fed. R. Civ. P. 26(f) conference. Mr. Kellogg and Mr. Nelson shall confer by telephone and the conference may be recorded, if necessary.

6.   Plaintiffs will not file any Motion for Leave to Amend Complaint until after the Court holds the Scheduling Conference where a deadline for any such motion will be set.

IT IS SO ORDERED.

Dated April 27, 2022, at Wichita, Kansas.

s/ Gwynne E. Birzer
GWYNNE E. BIRZER
U.S. Magistrate Judge

# G

KENNEDY BERKLEY
119 West Iron, 7th Floor
P.O. Box 2567
Salina, KS 67402-2567
(785) 825-4674 [Telephone]
(785) 825-5936 [Fax]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **CHAD M. KOEHN, ET AL.** | ) | |
| | **Plaintiffs** | ) |
| vs. | | ) **Case No. 22-CV-04008-JWB-GEB** |
| | | ) |
| **MICHAEL NELSON** | | ) |
| | **Defendant** | ) |
| | | ) |

## PLAINTIFF'S INITIAL DISCLOSURES

Plaintiffs hereby unilaterally submits the following initial disclosures pursuant to Fed.R.Civ.P. 26(a)(1), and states that this submission had to be unilateral given the Defendants failure to comply with the Court's non-disparagement ruling, failure to engage in a cost efficient determination of this action, failure to jointly work on this initial disclosures based on Nelson's non-cooperation, including that Nelson demanded Plaintiffs counsel set aside 18 hours to confer on the 26(a) issues and placing an unreasonable and unconscionable burden of disclosure on the Plaintiff including time, money and interference with ongoing business operations. Plaintiffs' counsel attempted to explain to Mr. Nelson that a planning conference should take about an hour. Counsel gave Mr. Nelson three hours of time yet that still was not enough time to complete the conference because Mr. Nelson insisted on discussing matters outside the purview of the

conference, including disparaging Mr. Koehn and Mr. Brand, as well as arguing the merits of his position to counsel.

**A.   WITNESSES**

1.   Chad Koehn; Mr. Koehn has general knowledge regarding the claims made by Plaintiffs against Defendant;

2.   The following former or current employees of Plaintiffs have knowledge regarding Defendant's actions:

   i.  Ryan Kolzow;

   ii. Kylee Kolzow;

   iii. Erica Jensen;

   iv. Steven Plott;

   v.  Tresa Matney; and

   vi. Other potential current and past employees to be disclosed as discovery proceeds.

3.   Defendant.

4.   Dale Takio. 501 E. Frank Phillips, Suite 102, Bartlesville OK, 74003, Office : 702-966-0626, Knowledge as to the hacks and false IDs established by the Defendant while defaming the Plaintiff.

5.   Michael Moran. 501 E. Frank Phillips, Suite 102, Bartlesville OK, 74003, Office : 702-966-0626, Expertise involving the Defendants use or mis-use

2

of electronic devices in order to hack and falsely establish Ids for mis-use against the Plaintiff.

6. Cynthia Blanchard. 501 E. Frank Phillips, Suite 102, Bartlesville OK, 74003, Office : 702-966-0626, Knowledge as the Defendant's defamatory conduct against the Defendant.

7. Anthem Blanchard. 501 E. Frank Phillips, Suite 102, Bartlesville OK, 74003, Office : 702-966-0626, Knowledge as to the Defendants defamatory conduct against the Defendant.

8. Gil Gilliam. 501 E. Frank Phillips, Suite 102, Bartlesville OK, 74003, Office : 702-966-0626, Knowledge as to the Defendants defamatory conduct and damages caused to the Plaintiff.

9. Josh Gunter, 501 E. Frank Phillips, Suite 102, Bartlesville OK, 74003, Office : 702-966-0626, Knowledge as to the Defendants defamatory conduct and damages caused to the Plaintiff.

10. Logan Golema, 501 E. Frank Phillips, Suite 102, Bartlesville OK, 74003, Office : 702-966-0626.

11. Any and all law enforcement and prosecutors who are either conducting investigations against the Defendant or are working on law enforcement causes of action against the Defendant.

12. Governmental entities that the Defendant has claimed to be working with in the form of a valid whistle blower action against the Plaintiff.

13. Any witnesses identified by Defendant in his initial disclosures.

3

14. Any and all further witnesses learned of by and through the taking of discovery in this matter.

15. Plaintiffs reserve the right to amend these disclosures.

## B. EXHIBITS

1. Any and all documents and communications pertaining to any and all defamation and tortious interference by Defendant;

2. Any and all documents pertaining to Defendant's criminal cases which may be relevant to Plaintiffs' causes of action;

3. Plaintiffs' client records, to the extent relevant to demonstrate Defendant's actions;

4. Defendant's criminal records and records of orders against him; and

5. Documents listed by Defendant.

6. Plaintiffs reserve the right to amend this Exhibit List.

## C. DAMAGES

Plaintiffs claim damages in excess of $75,000.00 for defamation by the Defendant. Plaintiffs also claim damages in excess of $75,000.000 against the Defendant for tortious interference with a business relationship, including but not limited to treble damages, costs and reasonable attorney fees. Plaintiffs further seek an injunction against the Defendant from committing further tortious acts.

4

**D.** **INSURANCE AGREEMENT**

Not applicable to the Plaintiff.

RESPECTFULLY SUBMITTED,

   /s/ Larry G. Michel
Larry G. Michel   #014067
Chris J. Kellogg   #21651
KENNEDY BERKLEY
119 West Iron Avenue, 7th Floor
P.O. Box 2567
Salina, KS 67402-2567
(785) 825-4674
lmichel@kenberk.com
ckellogg@kenberk.com
ATTORNEYS FOR PLAINTIFFS

5





## Blockchain Powered
## Supply Chain Protocol

Whitepaper V5

# Table of Contents

| | |
|---|---|
| Executive Summary | 3 |
| The Problem | 4 |
| The Hercules Solution | 5 |
| The Hercules Blockchain | 7 |
| The Hercules DApp | 8 |
| Decentralized Storage and Data Management | 9 |
| The Herc Token | 10 |
| HIPR Verification Process | 11 |
| Herc Token Metrics | 13 |
| The Hercules Team | 14 |

# EXECUTIVE SUMMARY

## What is Hercules?

Hercules, a Special Economic Zone Company (SEZC) is a software development company that provides supply chain management software that utilizes public blockchains. The Hercules platform is decentralized and powered by HERC tokens which are required to record and validate the supply chain data. Hercules software is fully open source.

## Hercules Simplified

Users on the Hercules platform can create a custom supply chain by defining the items to be tracked and the information to be recorded about each item as it passes through the supply chain. In addition to text-based data, photos and video files can also be stored. The Hercules mobile application then allows authorized users to record and track the user-configured data for each item in the supply chain. The data is encrypted and stored securely and immutably on third-party decentralized storage platforms incorporated into Hercules.

To further secure the information, cryptographic hashes of the data are created, stored and indexed utilizing the Factom protocol. The indexing works in a manner similar to library indexing cards, but instead of being stored in a filing cabinet, the indexing information is written to the Factom blockchain, where it is subsequently anchored by the Bitcoin blockchain. These indexing entries cannot be altered in any way, are completely transparent, and publicly viewable. However, the underlying data remains completely private, viewable only by authorized users through our 2nd layer identity solution Edge Secure (edgesecure.co).

In addition to intra-company supply chain management, Hercules is even more powerful when utilized for more complex supply chains with multiple entities contributing data. Since Hercules is blockchain-based, the supply chain data is a common, shared ledger accessible by all the participants. Therefore, instead of each party in the supply chain maintaining its own records, which creates inconsistencies in traditional supply chain management environments, the Hercules protocol enables all participants in any given supply chain to share data transparently which helps reduce many of the problems plaguing complex supply chains today.

## HIPR - PoHW

To validate the information and to ensure the integrity of data in the system, we created the Hercules validating protocol called Human Initiated Performance Reporting (HIPR pronounced hyp-er) which validates transactions through proof of human work (PoHW). For every supply chain data entry a smart contract running on the Ethereum network compares the information to previous entries to ensure nothing has changed, and that information is being recorded in both instances about the same item. Comparison of any two data sets can also be initiated by users about any item on demand. If the data entries do not match, the user knows that the supply chain has been compromised or an item has been altered. Furthermore, once data is entered into the system, it can be checked on a regular basis to ensure that the data has not been altered.

## The Utility of HERC

HERC tokens are ERC777 tokens that act as "software keys" to access and unlock the information on the Hercules protocol. By staking 1,000 HERCs in their wallet, the user can create a Hercules supply chain. HERC tokens are also required to record data to the supply chain and to review the indexing information stored by the platform, at the cost of ~$.001 per kB of indexing information or $.000032 per Hercules entry, and to pay the third-party decentralized storage platform fees. Finally, HERC tokens are also used to incentivize participation in the HIPR validation process.

# THE PROBLEM

Supply chain management presents many challenges, which arise from the method by which companies input, store, and validate data about their supply chain in their management software.

The problem is significant. It is difficult to find specific data on the amount of supply chain losses in most industries, but the following information on the global food industry provides perspective on the magnitude of the problem.

*[The British Standards Institute has said in a report that losses caused by global supply chain disruptions totaled $56 billion in 2015, reported The Loadstar. Extreme weather, terrorist threats, crime and the European migrant crisis hit the global supply chain in 2015, BSI said. About $22.6 billion was lost globally due to cargo crime, the report said."
(Source: https://www.businessinsurance.com/article/20160325/NEWS09/160329854/global-supply-chain-disruption-cost-56-billion-in-2015-report)]*

Additionally, as per a recent article in Forbes:

*Shared Data Enables Collaboration. Problem solving requires access to reliable information as a basis for generating ideas and making decisions. But it can be difficult to get partners on the same page as far as where that data should come from, how much to share, and how to manage it. 47% of B2B company leaders in a recent Forrester survey indicated that the biggest thing preventing them from creating actionable insights from their data was data quality; managing data from multiple sources was a challenge for 43% of those surveyed."
(Source: https://www.forbes.com/sites/larrymyler/2017/09/11/data-sharing-can-be-a-catalyst-for-b2b-innovation/)*

As evidence of the importance placed on supply chain issues, a June 2017 report from Gartner, Inc., and S&P 500 research and advisory company, indicates that companies will have spent $13 billion by the end of 2017 just on supply chain management software, and they estimate annual sales to exceed $19 billion by 2021. The report references the rapid shift to digitalization as a main factor in the increase in demand for such software as such "technology [is] more attractive to small and midsize businesses and organizations in emerging markets, therefore expanding the addressable market and increasing overall spending."

What are some of the main causes of supply chain problems that lead groups to spend so much money on trying to fix it? Well, the 2016 BCI Supply Chain Resilience Report, which was produced in association with Zurich Insurance Group (with 526 respondents in 64 countries participating) revealed that "66% do not have full visibility of supply chains, 70% experienced at least 1 supply chain disruption, 41% of disruptions occur at Tier 1, and 40% do not analyze the source of disruption." They listed the three top causes of supply chain disruption as:

- unplanned IT and telecommunications outage.
- loss of talent or skill.
- cyber attack and data breach.

All three deficiencies endure as a systemic shortcoming of today's centralized information technology systems. Information does not get flawlessly shared between the different participants because of human error (a result of turnover in the talent pool), lack of data interconnectivity (from IT problems and data breaches), and lack of transparency (a result of all three). Information continues to "fall through the cracks" causing great cost to all involved.

# THE HERCULES SOLUTION

## The Inspiration

The Hercules technology was inspired by a company owned by the HERC Executive team, the company is developing a gold-backed crypto token called (AGLD). After collaborative efforts between both entities, AGLD happens to be the first client of the Hercules blockchain protocol which helps prove and validate the gold content, purity, existence, and location of the gold bars backing each AGLD token along the supply chain. Hercules SEZC, was incorporated in November, 2017 and is headquartered in Grand Cayman. Although gold validation is the first use case for Hercules, this blockchain data management software technology can and will be used for many other use cases such as other precious metals, retail verticals, B2B enterprises, petro chemicals, automotive and food industries, just to name a few.

The Hercules platform leverages its blockchain technology by offering a supply chain management solution that provides:

1. Flexibility, by enabling users to define the items to be tracked and the data elements to be entered for each item.
2. User-definable permissioned-level sharing of data both inside an organization and with partner enterprises in the supply chain.
3. Fully decentralized solution with no single point of failure.
4. Secure and immutable data storage.
5. Data validation on an ongoing basis and on-demand.

## Flexibility

Through the Hercules protocol, users can define the items to be tracked in a given supply chain, as well as the type of information that will be tracked for each item. The information can include data elements (e.g. serial number, weight, etc.), as well as photographs and video files. While the Hercules software currently only supports certain data types, it is fully open source and can be customized and adapted to fit the needs of a particular supply chain. Once a supply chain has been created and defined, the Hercules platform can be used to gather the user-defined information at any desired stage in the supply chain, from raw components to finished retail goods.

## Configurable Data Entry and Sharing

The supply chain creator defines who has access to their Hercules supply chain data. Specific users can be authorized to record information relating to items in the supply chain and/or to access the data. Access can be given to users within an enterprise and to any other participants in the supply chain. The Hercules blockchain infrastructure allows all of users in a supply chain to share a single, common set of data, which significantly reduces the myriad of problems that result from different parties in the same supply chain - maintaining separate - and often conflicting records regarding the items in the supply chain. Integrating the Hercules supply chain management tool as an internal control shifts the traditional channel arrangements from loosely linked groups of independent businesses to a coordinated initiative - which increases market impact and reduces risk.

## Decentralization

Unlike legacy supply chain management solutions, there is no central store of data in the Hercules platform. Instead, all of the information created and tracked through the Hercules platform is stored on third-party decentralized storage platforms such as STORJ and IPFS.

Since the core Hercules software runs on the Ethereum network, the participants in a multi-party supply chain do not have to rely on a single participant to operate the Hercules platform. Because both the data storage and the core processor are decentralized, there are no single points of failure in the Hercules ecosystem.

## Secure and Immutable Data Storage

The decentralized data storage solutions that Hercules leverages (IPFS and STORJ) adds an additional layer of security on the supply chain data. Whenever data is written to the platform, a time-stamped hash of the data is stored in a Factom data chain, where it is ultimately anchored into the Bitcoin blockchain for even greater data integrity enabling "provable immutability." Therefore, data can be hashed at any time, and that hash can be compared to the time-stamped hash of the data stored by the Hercules platform. If the two hashes are not the same, then it is not the same data.

## Validation

Once data is recorded on the Hercules platform, anyone with the permissions can access this information for validation at anytime. The Hercules validation process utilizes the assetValidation.sol  smart contract running on the Ethereum blockchain to compare two data sets relating to an item recorded at different stages in the supply chain to confirm that the data is the same, and confirming it's the same asset. Moreover, through the HIPR system, supply chain creators can crowdsource ongoing validation of their supply chain data, to proactively flag inconsistent data.

# The Hercules Blockchain

## Why Blockchain?

Due to Blockchain's immutability and distributed data integrity - it places a digital fingerprint on data, therefore, any attempt to change data would become apparent and be immediately known to the rest of the distributed network.

A multi-layered Blockchain solution enables the technology that allows for immediate approval through third-party audits the moment a transaction occurs. Through IPFS, STORJ, and Factom, the Hercules platform allows digital layers of defined trusted information to be shared among specific parties in an open community that shares and supports the Hercules ecosystem by staking and utilizing the HERC token.

Unlike centralized traditional systems of data recording (handwritten or computer-generated tables), Hercules will allow for the uploading of pertinent documents to decentralized storage solutions along the supply chain. This will allow specific items attached to a data set to be monitored along the supply chain immutably.

## How Hercules works



**(Figure 1): An illustration of the utilization of Hercules platform**

The Hercules platform is a decentralized application, built on the Ethereum blockchain. Its core components include:
1. The Hercules mobile application, which allows users to define and track items through user-config urable supply chains.
2. Ethereum smart contracts that manage and validate user-entered data.
3. Third-party blockchain platforms that provide storage solutions through which user-entered data is stored securely and immutably.
4. The HERC token, an ERC777 token, which is required to access the platform.

## The Hercules Decentralized Application

The Hercules decentralized application is the user interface for the multi-layered HERC blockchain protocol platform. It will be available for both Android and iOS devices in the respective app stores and in the form of a web3 decentralized application. It is a DApp utilising the HERC protocol that interacts with the core Hercules smart contracts, as well as, the various third-party decentralized storage solutions incorporated into the Hercules solution.

In addition to the flexibility the user gets from creating a custom supply chain with predefined tracking items and information, the application can be customized as necessary to meet the requirements of a given supply chain. Users can do this development themselves, or, can evoke the Hercules software development team to build a supply chain for them.

The supply chain creator also determines who can record data to the supply chain. Once a user is authorized, they are able to use the Hercules application to enter text and numerical data about items in the supply chain, as well as, photographs and videos of items, if those elements have been specified for the supply chain in question.

Participants in the supply chain can also use the Hercules application to view information about items as they pass through the supply chain and to validate the data. In order to protect proprietary information, the ability to view specific information elements can be limited to authorized users only through the encrypted identity environment provided by Edge Secure.

## Hercules Core Smart Contracts

The core of the Hercules platform is composed of Ethereum smart contract sets that manage the process of tracking items through a supply chain. When a Hercules user initially defines a new supply chain, the Hercules application configures, creates, and deploys a unique set of the smart contracts for that particular supply chain.

**The core smart contracts consist of the following:**

**assetTracking.sol** This smart contract creates a structure for the items to be tracked in the supply chain and manages the identification of each unique instance of an item in the supply chain.

**assetMeasure.sol** This smart contract manages the interface between the Ethereum network and the third-party storage solutions - utilized by the Hercules platform. The HERC token is the medium of exchange between multiple different protocols within the Hercules platform. The assetMeasure contract weighs the data cost for uploading and retrieving information in the value chain. As well as, handling the movement of HERCs that the supply chain manager needs to register a new value chain and the amount for the digital viewer.

**assetValidation.sol** This smart contract provides the ability to verify items in the supply chain. It compares the data recorded about an item at different stages in the supply chain process to ensure that the data is the same, confirming the identity of the item and that it has not been altered. Authorized users can initiate the verification process for an item at any point during the item's passage through the supply chain. The asset-Validation contract is also utilized by HIPR, the Hercules solution component that provides ongoing verification of items in the supply chain.

## Decentralized Storage and Data Management

While Hercules uses the Ethereum protocol to create the framework for managing and recording data about supply chain items, the data itself is not stored on the Ethereum blockchain. Rather, depending on the file-type, the data is written to one of the third-party decentralized data storage platforms integrated into the Hercules platform. Currently, IPFS is used for text-based data elements, while photo and video files are stored in STORJ.

Hercules can also be easily configured to work with other solutions. The data is encrypted before being written and is further protected by being stored on a distributed basis.

The Hercules software (apart from the Ethereum core contracts) is entirely "client-side," i.e. there is no central server to, and from, which the Hercules application writes and reads data. Instead, the application writes organizing data to IPFS, allowing coordination among various users. Therefore, IPFS plays a significant role in the Hercules platform that helps make its unique architecture possible.



**(Figure 2): An illustration of Data Storage on the Hercules Platform**

## The HERC Token

The HERC utility token is the engine that powers the Hercules platform. HERC tokens are required to create a supply chain and to write or read data to and from the supply chain. They can be thought of as "software keys" to access and unlock information.

In order to create a supply chain on the Hercules platform, the Hercules user is required to obtain and "stake" 1,000 HERCs. Thereafter, data can be recorded or viewed at a cost of ~$.001 per kB of data or $.000032 per entry as each Hercules hash into Factom is 32 bytes, plus, in the case of recording, the costs of the third-party storage provider and Factom. The user pays the total amount in a single HERC payment, as calculated by the Hercules platform. Moreover, the exchange contract converts the appropriate amount of the paid HERC to the protocol token utilized by the storage solution, e.g. STORJ coins for STORJ or Factoids for Factom (there is currently no cost for using IPFS as intended in the Hercules platform), and automates the process of paying the third-party protocol. The remainder of the HERC, i.e. the payment for the Hercules ~$.001/kB read/write charge is burned. No portion of the payment is received by Hercules as revenue.

## ERC 777

Aiming to continuously be up to date with the latest blockchain technologies, we have taken the initiative to make the HERC tokens issued as ERC777 tokens, which is the latest Ethereum based standard that aims to resolve the problems of the ERC20. Since 2016, millions of dollars were lost from the Ethereum ecosystem due to the lack of transaction handling mechanisms in the ERC20 standard.

Ethereum lacks the ability to know what functions its contracts implement, ERC777 uses contract interface recognition, which allows anyone to enforce address registry to make sure that it supports a specific function. ERC777 also utilizes mint and burn function, making it easier to be adopted, especially in the supply chain industry.

## HERC Token Use Case Example

For example, consider the use of HERC in connection with recording information about a gold bar in the AGLD supply chain. For the verification of a 1kg bar in the Hercules Platform a verification system has been implemented. First, the variables that define the AGLD supply chain (i.e. the purity, weight, date processed, mint, supplier, location in the vault, bar serial, and bar-id) are uploaded into IPFS at 128 bytes with a zero cost associated. Next, the pictures of the bar are uploaded to Storj's decentralized file system at a live rate of Storj with a cost associated being ~$0.00000002 / kb or an average ~$0.0003516 for all 6 photos at 17,580 kb average. Last, the hashes associated with the location of the Storj and IPFS uploads are encrypted into the HERC - Factom Sidechain for later reference. The Factoids necessary for the Entry Credits will be at a live rate; however, the cost associated with the action of 4 hash files being 128 bytes at ~$0.001/kb is equal to ~$0.000128. All in all, the cost associated with wholly verifying a 1kg bar from origin to destination is ~$0.0004796 and will be managed at a live rate per HERC token price.

Please refer to the end of the whitepaper to see the full case study.

## HIPR Verification Process

Human Initiated Performance report (HIPR), is HERCs unique way of validating transactions - through proof of human work (PoHW). This Consensus model is new and effective and the process goes as follows: when information is being sent to HERC on the blockchain, for example, two receipts are sent to the Hercules platform, "supposedly" two identical receipts, one from the supply chain manager and the other from the item provider, the receipts are not validated until an actual human goes to HIPR, plays the game, earnsa Herc token for playing and verifying. Only then does the smart contract get approved if identical or in the case of invalidity, an error comes up and the contract is not executed. The smart contracts are randomly assigned from the backend, and any player that decides to mine, is capable of doing so, by playing HIPR and approving a transaction. The assetValidation.sol smart contract reads the metric arrays (lists) and does a checksum on both. The assetValidation smart contract will then send the supply chain managers a Performance Report of the asset.

From a technology standpoint, HIPR is the one of the most secure and efficient ways to approve transactions on the blockchain, without wasting energy, time, or physical resources since transactions have to be validated by actual humans and not - bots, machines, or rigs. HIPR serves as a transaction validator as well as a CAPTCHA. The HIPR game is built on Unity3D, with C# and targeting WebGL.

**The PoHW validation via HIPR introduced by Hercules is a further modified and enhanced consensus protocol of the PoW, which utilizes the human intelligence and the blockchain capability to prevent network abuses, spam and service attacks, introducing a breakthrough in the future of secured supply chain records and transactions.**

For more details, please click **here**. If interested in trying HIPR please click **here**.

### HIPR INTERNAL CONTROL
### Encrypted Perfomance Report



**(Figure 3): An illustration of HIPR ongoing validation on the Hercules Platform**

To further elaborate, HIPR utilizes a steganography script to make the Hercules protocol cryptographically secure. Due to the open source nature of the project any Nethereum Unity game created by the Hercules community whereby the human motions of a player's actions create a fun, interactive "I am not a robot/Captcha" could be voted into the internal control protocol. This sophisticated feature protects against bad actors while maintaining the core function of comparing data sets on an ongoing basis. Not wanting the contract running continuously, we impose the HIPR game as a PoHW (Proof of Human Work) style device to make it arbitrarily difficult to run the contract. When the puzzle is solved, the underlying technology triggers the sending of data to the assetValidation.sol contract.

In order to incentivize participation in HIPR, game players are awarded with HERC tokens as a reward. The Hercules team is working with the Edge Security wallet team, which is the same team behind the Airbitz wallet to ensure the maximum security for the Hercules wallets.

# HUMAN INITIATED PERFOMANCE REPORTING DATA FLOW



**(Figure 4): An illustration of HIPR Data Flow on the Hercules Platform**

# HERC Token Metrics



| | |
|---|---:|
| Total tokens to be generated | 234,259,085 |
| Retained tokens | (58,564,771) |
| Shareholder/founder tokens | (35,138,863) |
| Total pre-launch sales as of Oct. 29 @ $0.20 | (12,246,806) |
| | |
| Total available for remaining pre-launch sales and crowdsale* | 128,308,645 |

* This remainder will continue to be sold at $0.20 per token until the anticipated launch of Hercules and the HERC token in late-October through our pre-launch sales. All that remains at launch will be offered in our crowdsale at $0.40 per token for up to 12 months after launch. Any tokens left unsold in the crowdsale twelve months after the beginning of the crowdsale will be destroyed.

# THE HERCULES CORE TEAM

## Executive Team



**ANTHEM BLANCHARD**
Chief Executive Officer

Anthem is the Co-Founder and CEO of Hercules. He also co-founded precious metals/fintech company Anthem Vault, Inc., and also serves as their CEO. He has hands-on fintech experience and comes from precious metals backgrounds. Anthem is the son of the legendary goldbug and precious metals pioneer, James U. Blanchard III, who helped restore Americans' right to own gold and also founded rare coin and bullion company, Blanchard & Company. Anthem served as Director of Strategic Development and Marketing with GoldMoney and helped develop and implement their current business model, overseeing marketing and product development efforts which resulted in an increase of total value held by the company from $1 million in 2002 to $368 million by 2008. Between 2010-2013 Anthem served as an independent director and member of the audit committee, compensation committee, and nominating committee at Pernix Therapeutics Holdings Inc. Anthem holds a Bachelor of Business Administration from Goizueta Business School at Emory University.



**CYNTHIA BLANCHARD**
President

Cynthia is the Co-Founder and President of Hercules. She is also the Co-Founder and President of the precious metals fintech company Anthem Vault, Inc., which has successfully been in business for over seven years. Prior to delving into the fintech and blockchain industry, Cynthia owned and operated Harry Max Music Publishing Company in Nashville, TN. and is an accomplished singer who has contributed background vocals on numerous country albums including by artists Reba McEntire and the late Mindy McCready. Cynthia is also the author of the novel titled Humanville which focuses on helping individuals overcome eating disorders. She helped start the Eating Disorders Coalition of Tennessee (EDCT), and has been a national public speaker on related issues. Cynthia holds Bachelor of Science and Masters in Arts Administration degrees from Oklahoma State University.



**LOGAN GOLEMA**
Chief Technology Officer

At 26, Logan has been heralded as a Blockchain Developer and Educator, FinTech Innovator, and seen as highly skilled in object based coding and distributed networking both in enterprise and private applications. With a lifetime of coding experience Logan finds his place in Blockchain due to his incredibly early adoption of the technology. For years Logan has sought out jobs that pay directly in Bitcoin as well as has invited Bitwage to handle his payroll accounts. Day to day transactions from groceries to car insurance are done in Bitcoin with all personal and professional projects stemming from the perspective of a Digital Pioneer.



**GREY JABESI**
Chief Visual Officer

Grey is responsible for directing and managing the brand visuals of HERC. Prior to joining HERC, Grey worked for various companies in South Africa as a CGI Specialist in the Film and Animation industry. He later started Imojimotion, a studio which provided 3D rendering for Architects; Visual Effects; Motion Graphics, as well as, Web Development services. Growing up in Malawi, Africa in his early years, he encountered real life problems which he later realized could be solved by the Blockchain technology. He has since decided to dedicate and focus his efforts on getting involved in meaningful projects within the Blockchain space.



**PAUL AUBERT**
Senior Vice President & General Counsel

Paul has served as the sole Shareholder and General Counsel of a private law practice since June 2014. Prior to that, Paul served as General Counsel of Pernix Therapeutics Holdings, Inc., a Nasdaq-listed special- ty pharmaceutical company. Before that, he was a Shareholder in the Corporate and Securities practice group at Winstead PC, a national law firm headquartered in Dallas, Texas, from 2007 to 2012. Paul also served as an attorney in the Corporate and Securities practice groups of several national and international law firms prior to joining Winstead in 2004, including at Andrews Kurth LLP, Weil, Gotshal & Manges LLP, and Jones Walker LLP. He holds a Juris Doctor and an M.B.A. from Tulane University in New Orleans, Louisiana and a B.A. in History from Louisiana State University - Baton Rouge.

## ADVISORY BOARD



**MICHAEL TERPIN**
Founder and Chairman of BitAngels

Michael has spent his career innovating in public relations and across technology platforms after exiting multiple startups as a co-founder. As head of Transform Group, he has led PR for leading blockchain projects including Augur, Bancor, Dash, Ethereum, Factom, Golem, Gnosis, Lisk, Qtum, SALT Lending and WAX. Michael also runs CoinAgenda, the leading conference series in Las Vegas connecting mainstream investors with blockchain and cryptocurrency investments



**BILL BARHYDT**
Founder and Chief Executive Officer of Abra

Bill's passion is information technology and how it can be used to improve people's lives. Prior to Abra, he co-founded Boom Financial, where he also serves as Chairman. He gave the first TED talk on Bitcoin in 2012, and serves as an advisor and mentor to Boost.VC, a Bitcoin-focused incubator fund. Bill won the Technology Pioneer Award from the World Economic Forum in 2000 for his work at WebSentric, the first online meeting service that required no software install, and has consulted to federal and international regulators on the impact of digital currencies and decentralized transaction systems. In addition to co-founding and advising multiple start-ups, including m-Via, Sennari, Plaxo and KnowNow, Bill worked for Goldman Sachs, NASA and the CIA.



**STEVEN DAKH**

Founder of Rubix Consulting and Co-Founder and Former CTO of Jaxx Steve's experience in the blockchain software development industry spans half a decade with his development and co-founding of Bitcoin wallet Kryptokit in December 2013, now known as Jaxx wallet. Steve is a founding member of Ethereum, which launched in January 2014. Steve went on to build the Rush Wallet in 2014. Steve joined Crypto Consortium (C4) advisory board in 2014 as well. Steve is a cofounder of non-profit Unsung that distributes leftover food to the hungry in late 2015 and launched in 2016. Steve began development of Smartwallet multi-currency app in mid 2017 with plans to release later in 2018. Steve is also an advisor for Aeternity, PO.ET, Polymath, U.CASH, AnthemGold, and Academy school of Blockchain (all in 2017), and Theta (in 2018).



**JOBY WEEKS**
Chief Marketer for BitClub Mining

As the Prime Minister of Atlantis and Founding Father of Liberland Joby Weeks has found himself in bitcoin since it began as well as has worked in digital currencies since before 2009. Finding himself at the helm of Liberty Dollar his project minted more than $100mm worth of gold rounds. Joby is known to be a defender of personal rights and the protector of peace across nations.



**ANDREW YASCHUK**
Vice President, Product Development for Factom Inc

Andrew has been building software since the late 90's. Andrew has helped build four companies; two have been sold, and the other two are still in operation. He is also a trusted advisor in the healthcare and block-chain community. He has acted as an adviser for Factom, Storj, and HealthNautica. Andrew also supported Bitcoin mining companies, in the early days, with ASIC mining hardware. He is active in his community and has served as a Healthcare Judge for the Dupage County Election Commission.



**DOMINIK ZYNIS WINGS**
Co-founder and Head of Communications at WINGS Foundation

Dominik is the former Head of Communications at Mastercoin (Omni) Foundation. He also serves as an advisor at DomRaider and MedicalChain.



**JEFF RAMSON**
Founder and Chief Executive Officer of PCG Advisory Group

Jeff Ramson is the Chief Executive Officer of PCG Advisory Group which he founded in 2008. He is well regarded as a business entrepreneur and innovator, with a proven track record of more than 25 years' experience on Wall Street, raising capital and providing strategic guidance for emerging public and private companies in various stages of development. Jeff's passion and understanding of transformative technologies and how they affect current and future business trends has informed his whole career. He is known as an innovator in the intelligent use of social media to raise awareness in the investment community and represented the first Reg A+ offering listed on the NYSE. He has been a student of, and an early participant in, the emerging blockchain and cryptocurrency sector for several years. Most recently, he established Proactive Capital Partners, LLC, a private investment firm focused on capital appreciation through investment in next generation technology opportunities. Jeff is a director of EV Blockchain Corp. and an advisor to CG Blockchain.

# BOARD OF DIRECTORS

CYNTHIA BLANCHARD and ANTHEM BLANCHARD - LISTED ABOVE



**PETER BUCKLEY**

Peter Buckley is a financial industry veteran focusing on capital markets, trading and financial technologies. Peter was an early-stage investor and Board Member in BATS Trading. He served as the Head of New Business for Brokertec; Managing Director and Head of N.A. Clearing and Professional Trading Groups at Newedge; and oversaw new business, strategy and investment opportunities at Tower Research LLC. In 2006, Peter founded Tower's London aliate and served as Spire Europe's CEO, expanding their footprint into emerging markets. Peter was selected by the CFTC to participate on the Technology Subcommittee on Automated and High Frequency Trading (TAC) in Washington DC. He is a graduate of Lehigh University and the Lawrenceville School and has consulted for Delta Strategy Group. Most recently, Peter invested in and has been advising Funding University LLC, a P2P student loan project financed by Jeff Bezos' Amazon Ventures.

# AnthemGold (AGLD)

## A CASE STUDY FOR THE HERCULES PLATFORM

AnthemGold is developing the AGLD, a token providing access to the company's gold-backed cryptocurrency. Hercules provides a solution to the AGLD problem of inconsistent and nonimmutable proof of the gold's purity, weight, existence, and location.

## Background of the precious metals industry

The precious metals industry has a standard of transparency and auditing (Proof of Verification) of the underlying assets that must be met for clients to use any vendor. Scientifically proven methods are used at each stage in the chain of custody to ensure that the purity and weight of the precious metals that are used by a gold bullion manufacturer are the same as the purity and weight of the bar when received by the consumer. The information gathered in these tests needs to be readily available to any clients who wish to validate the chain of custody their bar has gone through.

## AGLD

An AGLD is simply a unit of cryptocurrency that will be represented by one gram of pure gold. The grams will be stored in the form of one kilogram gold bars purchased from certified manufacturers and securely shipped to a private vault in Texas (referred to as the "bunker") managed by third party custodian. When received in the bunker, the bars will be tested and documented by a certified bunker custodian before being added to the vault. These bars will be regularly audited while they are being vaulted.

## Hercules improves the AGLD Currency

When a bar is ordered from a manufacturer and/or dealer, information concerning the bar that is being shipped will be entered into and stored by the Hercules software. This information will include the dealer, the manufacturer, the gross weight, the results of a composition assay that validates the fineness of the gold bar, and the bar's serial number.

When a bar is received at the bunker, it will be tested by a sonic gauge that sends a sound frequency through the bar at multiple points and measures the time it takes for the wave to pass through the bar to confirm density. This returns storable readings that can be used to confirm the purity of the bar. Existing identifiers such as manufacturer, dealer (if separate from manufacturer), gross weight, assay (Fineness), and serial number will be taken from the bar for documentation. Lastly, images of the bar from all sides will be cataloged to document the visual state of the bar as it enters the vault. The individual performing the test and documentation will have a unique identifier that is recorded with the bar upon entering the vault. Thus, the Hercules software will store the following information:

- Results of sonic bar tests in 3 locations
- Manufacturer
- Supplier
- Gross Weight
- Assay (Fineness)
- Serial Number on bar
- Certified Individual's Identifier
- 3 Documenting Images
- Spectrometer Readings in a .CSV format

In addition to the information entered when bars are delivered to the vault, a high definition controllable video of the vault will be available in the Hercules Digital Viewer and will cost HERC tokens to view.





**(Figures 5 and 6): An illustration of how AGLD works with HERC**