# EXHIBIT

## "B"

# To Follow . . .

**Transcript of 12 October 2022 hearing in Oklahoma**

```
 1        IN THE DISTRICT COURT IN AND FOR WASHINGTON COUNTY
                        STATE OF OKLAHOMA
 2

 3   STATE OF OKLAHOMA            )
                                  )
 4   v.                           )      Case No. CF-2021-304
                                  )
 5   MICHAEL ERIC NELSON          )

 6

 7

 8

 9   --------------------------------------------------------

10              MOTION TO INCREASE BOND HEARING

11   --------------------------------------------------------

12

13

14

15

16

17

18

19

20       On the 12th day of October, 2022, the following

21   proceedings came on to be heard in the above-entitled

22   cause before the Honorable Linda S. Thomas, District

23   Judge presiding, in the City of Bartlesville, County of

24   Washington, State of Oklahoma:

25             Proceedings reported by machine shorthand.
```

1                    A P P E A R A N C E S:

2    FOR THE STATE OF OKLAHOMA:

3        MS. ZOE GULLETT
         OFFICE OF THE DISTRICT ATTORNEY
4        420 South Johnstone, Room 222
         Bartlesville, Oklahoma 74003

5

6    FOR THE DEFENDANT:

7        MR. KEVIN D. ADAMS
         ATTORNEY AT LAW
8        36 E Cameron Street, Suite 16
         Tulsa, Oklahoma 74103

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

I N D E X

MOTION TO INCREASE BOND HEARING

October 12, 2022                                    Page

Proceedings.................................    5

Reporter's Certificate.....................   38

```
 1                        EXHIBIT INDEX

 2    State's Exhibits                    Offered   Admitted

 3        1      Affidavit of Craig Piercy   16       16

 4        2      Affidavit of Howard Gilliam 16       16

 5        3      Audio CD audio              16       16

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2          THE COURT:  We are now on the record in

3   Washington County District Court, Case Number

4   CF-2021-304.  State of Oklahoma versus Michael Eric

5   Nelson.  Present with Mr. Nelson is Mr. Kevin Adams, and

6   present for the State of Oklahoma is Zoe Gullett.  This

7   matter comes on for hearing today on the State's motion

8   to increase the bond and set a hearing.  And then I have

9   also received the Defense objection to the State's

10  motion to increase the bond.

11          Mr. Adams, I noticed it was filed yesterday.  I

12  will tell you that I had an opportunity to read the

13  objection itself, but the number of attachments that you

14  had to it, I did not have time to read those.  They are

15  quite voluminous and would have taken me a lot longer

16  from when I got it this morning to today, to right now.

17          So, Ms. Gullett, it's your motion.  You may

18  proceed.

19          MS. GULLETT:  Thank you, Judge.  So, Your

20  Honor, we somewhat had a slight impromptu hearing on

21  this motion a bit on 9-23 whenever we -- when I first

22  filed this motion and asked for this hearing to be set.

23  So the Court has heard a bit about what the State's

24  motion was about, but I will reiterate some the reasons

25  -- or the reasons why the State filed this motion.

1        As the State's motion indicates, this has to do

2    with about three different contacts that Mr. Nelson has

3    had.  One is with a Mr. Ritter, one is with a Craig

4    Piercy, and one is with a -- kind of a secondhand

5    contact with a Mr. Gil Gilliam.  So at this time the

6    State would direct the Court's attention, first of all,

7    to the docket sheet in this case, to specifically

8    January 11th of '22, where myself, Judge Sigler, and

9    Mark Kane, who at the time was representing the

10   Defendant, as well as the Defendant, who was in custody

11   at the time, where this motion -- or this matter came on

12   for a bond reduction hearing where the State of Oklahoma

13   had filed a motion to increase the Defendant's bond to

14   -- it was actually his bond had been increased to a

15   hundred thousand and the Defendant had asked for a bond

16   reduction.  Mr. Kane and myself, as well as the

17   Defendant, had come to an agreement that the bond would

18   be amended to $50,000, which was my understanding at the

19   time that that was how much the Defendant's family could

20   make, allowing the Defendant to bond out, not remain in

21   jail, with the conditions specifically listed in the

22   court minute of no contact with the alleged victims or

23   businesses.  The Defendant is to surrender his passport.

24   Defendant must have an ankle monitor.  Defendant is not

25   to reside in Washington County.  Defendant must also

1  serve -- was also served with a PO, and he was order

2  back in front of Your Honor later on in January for a

3  status docket.

4           I understand that the defense counsel has, in

5  his motion, put a copy of the agreed to order that was

6  later filed on March 7th of '22, or court minute, the

7  agreed to court minute where Mr. Newman and myself

8  agreed, because I believe -- so Mr. Newman approached me

9  because Mr. Nelson was living in the Tulsa area and

10 having a very financially difficult time living in

11 another state away from his family in a state where he

12 did not have a job and had no connections, asking --

13 Mr. Newman asked me if I would have an objection to

14 Mr. Nelson returning to Rhode Island to reside.  And

15 after a bit of back and forth between myself and

16 Mr. Newman, we agreed that he could return to reside in

17 Rhode Island, that the ankle monitor could be removed by

18 agreement.  And, again, this is a handwritten court

19 minute so not everything we talked about is necessarily

20 dictated in this court minute.  That there was

21 conversations about him and his bonds person having an

22 app to -- her be able to check in on him every day --

23 it's a GPS app -- so that she would actually know where

24 he was.  It actually works better than an ankle monitor

25 because those don't -- you don't have a constant ID of

1  where he's at.  The Defendant can return to Oklahoma to

2  consult with his attorney and for court appearances.

3  And then there is a very important word here where it

4  says "continued" no contact with the victims.  Defendant

5  to return for preliminary hearing March 29th at 9:00

6  a.m.  Defendant to check in daily with bonds person.

7        So this court minute does not supersede the

8  bond conditions that were put into place in January of

9  2022.  It just say continue no contact with the victims.

10  So we didn't spell out continue no contact with the

11  victims and the victims' businesses, and we didn't say

12  that the condition of no contact with the victims'

13  businesses was lifted.  We just say continue no contact

14  with the victims.  We didn't change any of Judge

15  Sigler's orders.  And Judge Sigler signed that as well.

16  So if he had wanted to change it to say he could have

17  contact with the businesses, then he could have done so.

18  But he did not.  His orders remain the same up until

19  today.

20        So that brings us to what occurred in September

21  of this year.  So on or about September 6th, the

22  Defendant began contacting various people associated

23  with the victims in this case, Anthem and Cynthia

24  Blanchard, and their businesses.  Specifically a

25  business here Bartlesville that is physically located

here in Washington County, which is called HeraSoft.
And he -- and as the State will show he contacted
Mr. Ritter with -- through a voice mail, which I'm going
to ask to play for the Court here in a minute, where he
talks about he is going to subpoena Mr. Ritter and he
talks about him being a shareholder in both Anthem
Holdings as well as HeraSoft, again a company that's
physically here.  And talks about having filed 16
subpoenas in other courts up and down the eastern
seaboard.  And then he insinuates that Mr. Ritter's name
continues popping up in all sorts of documents and all
sorts of claims of young women; and then he says
something like he wants to have a conversation man to
man with Mr. Ritter, which sounds intimidating.  Then he
contacts a Mr. Craig Piercy, who has written out an
affidavit.

          And would Your Honor like for me to put State's
exhibit stickers on these?

                    THE COURT:  I think so.  That would
probably keep the record clear.

                    MS. GULLETT:  So I reached out to
Mr. Craig Piercy and asked him to write out an affidavit
because none of these individuals live in Oklahoma.  So
I requested that Mr. Piercy write out an affidavit of
his interaction with Mr. Nelson.  So this would be

1   State's Exhibit 1, and this is Mr. Piercy's affidavit of

2   his interaction with Mr. Nelson.

3                    THE COURT:  Okay.

4                    MS. GULLETT:  So, Your Honor, as you can

5   see in this affidavit, Mr. Nelson reached out to a

6   shareholder of the Blanchards' company and stated things

7   like that the Blanchards are con artists who operate

8   Ponzi schemes, that he specifically stated that Anthem

9   Blanchard is broke, that he's burned through his

10  inheritance, that he's scheming investors out of money,

11  specifically referenced their home in Bartlesville,

12  apparently.  Goes on to disparage the victims to a

13  shareholder of their company and a shareholder

14  specifically of the company, again, here in

15  Bartlesville, Oklahoma.

16                   So the issue that we have here, and as you'll

17  hear in the voice mail, is that this case started

18  because Mr. Nelson contacted the City Manager of

19  Bartlesville, Oklahoma, as soon as he found out that the

20  Blanchards were here starting a business and said do you

21  have any idea of who started a business here in

22  Bartlesville, these are horrible, terrible people, the

23  Blanchards, they're Ponzi scheme scam artists, they're

24  terrible people, this is who they are.

25                   So that's what this case is about, is him

1   following these people around sending messages to

2   people, such as the manager -- or the City Manager of

3   Bartlesville, and attempting to disparage the Blanchards

4   to other people.  And he's doing the exact same thing,

5   once again, but he is doing it now through a

6   shareholder, when he has been instructed by the Court to

7   have no contact with the businesses that have to do with

8   the Blanchards.  To contact a shareholder of that

9   business is to have contact with that business.

10         Then there is Mr. Gil Gilliam, and he also did

11   an affidavit.  And I apologize.  He -- I'll mark this as

12   State's Exhibit 1.

13         When I spoke to Mr. Gilliam, he informed me

14   that he would be doing this affidavit and putting the

15   original in the mail.  And at this present time, I do

16   not have the original, but he emailed me a copy of the

17   original that he is supposed to have put in the mail.

18   So I do have this copy, and once I get the original, I

19   can substitute it.

20         THE COURT:  Okay.

21         MS. GULLETT:  So Mr. Gilliam and I spoke

22   over the phone; and the important parts of this

23   affidavit is that, first of all, Mr. Gilliam is employed

24   with HeraSoft, which is located, again, here in

25   Bartlesville, Oklahoma.  And he has been an employee

1  with HeraSoft since March 1st of 2021.  He has worked

2  for HeraSoft during -- at no time during the same time

3  as Mr. Nelson.

4         So my understanding, from reading the

5  Defendant's motion, is that the argument that is going

6  to be made is that the Defendant is currently wrapped up

7  defending himself pro se in a civil lawsuit in a Federal

8  case in Kansas with an individual named Chad Koehn.  And

9  it seems like the theme in the motion is that because

10  the Defendant has a Federal case pending and he's

11  representing himself pro se, that he should be able to

12  contact individuals associated with the HeraSoft

13  company, maybe the HeraSoft company itself, and it

14  appears almost as if he thinks he should be able to

15  contact the victims because they have been listed as

16  possible witnesses in that civil lawsuit.  The State's

17  argument is that even though they're listed as possible

18  witnesses in a civil lawsuit in Kansas, does not trump

19  the orders of a District Judge in Oklahoma.  You cannot

20  violate the bond conditions in Oklahoma just because you

21  have a civil lawsuit pending in Kansas.  That is a legal

22  rodeo you have to figure out on your own if you're going

23  to represent yourself pro se in Kansas.

24         So while there might be witnesses listed, you

25  still can't violate your bond condition to contact them.

1    And, at this time, to threaten to contact Gil Gilliam,

2    and as I wrote in my motion, take a -- will have special

3    counsel take the deposition of him in Bartlesville,

4    where Mr. Nelson is not supposed to be except for court

5    appearances or to have met with his original attorney,

6    who was Mark Kane, now none of his most recent attorneys

7    reside in Bartlesville or have offices in Bartlesville,

8    and has -- and at the local courthouse for a six to

9    seven hour deposition, was the indication in that email.

10           So none of that would be appropriate.  He's not

11   supposed to be in Bartlesville, and having contact with

12   Mr. Gilliam is an extension of having contact with the

13   business because he is employed solely by HeraSoft.  So

14   that is a concern for the State.

15           So what this appears to be is reaching out to

16   the shareholders, reaching out and saying these

17   disparaging things, reaching out to an attorney

18   representing someone in this civil case and threatening

19   to depose for six or seven hours an employee of the

20   business here in Bartlesville, and by extension,

21   expecting to be able to depose the victims in this case.

22   Sounds like threatening the victims in the State of

23   Oklahoma's case.  It sounds like it's an intimidation

24   tactic.

25           And so at this time, the State would ask to

1  play the voice mail that the Defendant left for

2  Mr. Ritter so that you can hear some of the language

3  Mr. Nelson used when talking to Mr. Ritter about the

4  victims in this case so you can understand some of the

5  things he is saying, as well, about the victims.

6                    THE COURT:  Mr. Adams.

7                    MR. ADAMS:  Judge, I don't have an

8  objection to that.  I don't have an objection.  I think

9  it's admissible under Title 12-2103B2, because of the

10 bail hearing.  I just would ask that all of these --

11 these affidavits and the voice mail be introduced into

12 the record and made exhibits.

13                    THE COURT:  Yes, Ms. Gullett, you may.

14                    (Exhibit Number 1 audio CD published in

15                    open court)

16                    MS. GULLETT:  So, Your Honor, as you can

17 hear in that voice mail, he references Anthem Holdings

18 and HeraSoft a couple of times.  He is talking to

19 Mr. Ritter, who is, again, a shareholder in the HeraSoft

20 and Anthem Holdings company.  And he says a lot of stuff

21 in there, like I have filed subpoenas in 16 other

22 courts, I'm going to subpoena you one way or another, a

23 lot of things are going to come out.  Specifically talks

24 about names keep coming up, coming out having to do with

25 young women.  All of that is very threatening.  So that

1    has to do -- he's using all these threatening terms

2    while also referencing my victim's company and the name

3    Anthem, which is one of my victim's names.  It's Anthem

4    Blanchard.  And Anthem Holdings is one of his companies.

5    It appears like the Defendant is once again attempting

6    to call, harass, and use this information that he thinks

7    he has in an attempt to intimidate people around the

8    victims, associated with their business, or having

9    something to do with the victims, just like he did with

10   the City of Bartlesville, just like what we're here on.

11   As soon as the victims got here, as soon as they opened

12   HeraSoft, he called the City of Bartlesville -- or

13   emailed the City of Bartlesville and started his, you

14   know, beginnings of a tirade with the City of

15   Bartlesville sending them emails and telling them what

16   terrible, awful people the Blanchards were.

17           So at this time the State of Oklahoma would

18   request that you increase his bond since he can't follow

19   through with his bond conditions.  We ask that you

20   increase his bond to $150,000.  The State had requested

21   a hundred thousand.  We came to an agreement with

22   Mr. Kane for $50,000 because of the situation that

23   Mr. Kane told us that he was in.  We attempted to be

24   very amenable to allow him to go back to Rhode Island,

25   to not have an ankle monitor, and this is the behavior

1    that is in response.

2           And I don't -- I do not believe that this is

3    the only stuff that has occurred.  There are emails out

4    there that are from various pseudonyms and things like

5    that.  If I could prove that those were from Mr. Nelson,

6    I would happily have attached those as well.  I am not

7    able to exactly pinpoint that those are exactly from

8    him, but we're pretty darn sure they are.  So at this

9    time it appears that Mr. Nelson has gone right back to

10   the behavior that he did whenever this case was filed.

11          Thank you, Judge.

12               THE COURT:  Mr. Adams.  And before you

13   begin, Mr. Adams, I don't know that I addressed your

14   request that the State's Exhibit 1, 2 -- and then we'll

15   count the audio recording as 3 -- be admitted into the

16   record, but I'm assuming the State has no objection to

17   that.

18               MS. GULLETT:  I would move to admit those,

19   Judge.  I apologize.

20               THE COURT:  So as a matter of

21   housekeeping, we will admit those three exhibits.

22               MR. ADAMS:  Specifically, Judge, and

23   neither one of us addressed this in our motions, but I

24   just want to cite for the record what the statute is

25   that controls the request to increase certain

1   (inaudible).

2           THE COURT:  You're going to have to speak

3   up.  When you look down, it's very difficult for her to

4   hear you.

5           MR. ADAMS:  It's Title 22, Section 1109,

6   is the statute from the Oklahoma statutes that require

7   that the State is requesting better security, and that

8   specifically references the petition of Humphrey, which

9   is 601 P.2d 103, just so I'm making a reference in the

10  record.

11          A witness -- a lawyer has an opportunity to

12  interview the witnesses, to talk to the witnesses.

13  That's in our OUJI's.  I'm sure the Court instructs that

14  regularly during jury trials, that, hey, a lawyer has an

15  opportunity to interview the witnesses.  And just so

16  that it's clear, and I put it in the motion, I just want

17  to be clear, Chad Koehn, who is a member of the board of

18  directors of Anthem Holding, okay, which is actually a

19  Texas corporation, but they have HeraSoft here, which is

20  a company that Mr. Nelson has interest in -- and I

21  attached the stock certificate -- sued Mr. Nelson in

22  Kansas.  Mr. Nelson removed it to Federal court because

23  he is a resident of Rhode Island.  The Judge in that

24  case directed -- and the case is -- I mean, it's like

25  270 filings in there.  I mean, they're just pounding him

with motions.  There is a time where the Court said stop
filing motions until he's had an opportunity to answer,
you know.  So he's trying to do what he can to defend
himself in the case, which he doesn't have the money to
hire it otherwise, so that's what he's doing.  But this
is a board of directors of the company that the
Blanchards are in control of.  They listed the
Blanchards as witnesses.  And, now, he's never contacted
them, never said that he could, and the subpoenas --
that we actually had the subpoenas issued, but I
attached a notice of subpoenas filed in court because it
had the file stamp across the top of it that didn't come
through very good, because that's the file stamp that
you get in Federal court.

        Through the Court's process, he issued these
notices of subpoena and made arrangements to have a
lawyer take the depositions in Kansas.  And I listed in
F -- or, no, I'm sorry -- G, their initial disclosures,
they list Mr. Gilliam, that she was talking about, as a
witness as somebody having knowledge and information
about the case.  In Federal court when you file a civil
case, by rule you've got to give notice to the other
side of everybody that you know that would have
information and notice of the documents because it
speeds up the discovery that way.  And I believe

Mr. Gilliam is Number 9, but he listed him as a witness.
This is a guy that has witnesses.  So he emailed per
direction of the judge -- or magistrate, which is found
in Exhibit Number F, okay?  Using that email address
Oklahoma remote, he emailed C. Kellogg, who is one of
the lawyers representing the board member of Anthem
Holding, and said I plan on taking the deposition of
this person.  He's completely following the Court's
orders.  That's what he's doing.  Same issue with Ritter
and Piercy, is he actually -- and I attached those
notices, D and E there, that he issued the notice to
issue the subpoena which is what you do in Federal
court.  You file the notice that you intend to issue the
subpoena.  They have so long to object.  If they don't
object, then the clerk's office issues the actual
subpoenas, which we've got them here.  This is all
within the point of the lawsuit, a board of director of
that company sued him, okay?

          They control the company, okay?  You know, the
other thing is there seems to be somewhat of a
coordination here between what's going on with the
lawsuit and what's going on with the District Attorney's
office.  And I say that because of this.  They filed a
request to be able to amend and be allowed to sue
Mr. Nelson's father, who is here in the courtroom,

1   because he's providing a roof over Mr. Nelson's head.

2           THE COURT:  I'm sorry.  When you said

3   "they," who were you referring to?

4           MR. ADAMS:  Okay.  The Plaintiffs in

5   Kansas filed a motion to ask the Court to be allowed to

6   amend to sue Mr. Nelson's father.  And their theory for

7   saying that he should be a co-defendant of Mr. Nelson is

8   because he's basically providing food and shelter and

9   clothing for his son.  That's what they want to be --

10  that's what they want to be able to add for it.  And

11  it's like they're trying to remove any support that

12  Mr. Nelson has.

13          THE COURT:  How is that relevant to --

14          MR. ADAMS:  Well, because now the State's

15  doing the same thing.  They're asking to put an ankle

16  monitor on him which would remove any support that he

17  has.  And so I'm saying it happens here and then it

18  happens over here.  And I can't tell you that it's

19  coordinated, but it seems like it's a coincidence.  Now

20  the State's saying, hey, let's put an ankle monitor on

21  the guy.  You know, like they say they want him -- first

22  the conditions was, oh, well, he can't leave the State

23  of Oklahoma because he's got the ankle monitor, but he

24  can't reside in Bartlesville.  You can't have

25  restrictions -- geographic restrictions like that, like

1   an entire county, you know.  He doesn't drive.  So

2   anywhere -- you know, to live outside of Bartlesville

3   and have to get to court and everything, is difficult.

4   I don't think they even have Ubers that can take you

5   around, but maybe they do.  I don't know.

6           THE COURT:  Well, I'm struggling with how

7   that has anything to do with the motion to increase his

8   bond.

9           MR. ADAMS:  Because it seems like they're

10  doing the bidding of the Plaintiffs in the Federal case

11  in Kansas, and this is a coordinated effort between the

12  Anthems and Mr. Koehn, who is one of their board of

13  directors of their company, to cause him as much grief

14  as possible.  And he has a right -- he's not doing

15  anything with their businesses.  He is defending the

16  lawsuit that was filed against him, and he's following

17  the directions of the Federal Magistrate in how he's

18  going about doing it.  I mean, it would certainly be

19  preferable if he had a lawyer, but he is a lot less

20  likely to be able to come up with money to have a lawyer

21  if he has to post another $10,000 in bond.  And if he

22  has to provide his own place to live because he's no

23  longer allowed to live with his parents and it just

24  exasperates the whole problem.

25          And so we don't believe that he has violated

the terms of his probation.  He's not doing anything

specifically with the business.  He's trying to defend

his lawsuit, maybe inartfully so.  And we don't think he

violated the conditions of the bond to begin with.  We

don't think they've met the requirements of Title 22,

Section 11 or of Humphreys.

          And if I could have just one minute, let me

inquire.

          Judge, the only other point is that there has

-- the lawyer -- one of the lawyers representing them

has -- I'm told by Mr. Nelson has actually tried to get

him to contact the Blanchards, which he has refused to

do so --

          THE COURT:  I'm sorry.  You said one of

the lawyers representing --

          MR. ADAMS:  One of the lawyers

representing the Plaintiffs in Kansas actually suggested

that contact the Blanchards, and he has declined to do

so.  He has stayed completely away from them.  And the

reason he is supposed to contact the witnesses before

issuing the subpoenas is because they're telling him

that he's got to do background to show the relevance of

why he's trying to subpoena a particular person in the

Federal case.

          So we would ask the Court to deny the State's

1   request.

2                    THE COURT:  Ms. Gullett, your response.

3                    MS. GULLETT:  Thank you, Judge.  I'd like

4   to respond to some of that, seeing as how I have now

5   been apparently accused of collusion.  I think the word

6   would be "prosecutorial misconduct."  And I would like

7   to set the record straight.  I have never had any --

8   well, I take that back.  Mr. Koehn did call me back in

9   December of '21, when we were attempting to figure out

10  where Mr. Nelson was when there was a warrant active for

11  him.  And then we found out he was being held on a

12  warrant on our bond in New Jersey, and he was picked up

13  attempting to get on an airplane for Spain.  However,

14  after that, I have not spoken to Mr. Koehn at all.  In

15  fact, I find him kind of a jerk, so I don't particularly

16  like Mr. Koehn.  So I'm taking a bit of offense to the

17  fact that it is the belief the State of Oklahoma is

18  being used to put Mr. Nelson back in jail for some silly

19  civil lawsuit that is happening in a Federal court in

20  Kansas.

21        My issue is with Mr. Nelson and his behavior

22  towards the shareholders of the HeraSoft Company,

23  specifically Mr. Ritter and Mr. Piercy.  And as far as

24  his contact of them, they are not listed on this witness

25  list that was given to Mr. Nelson as possible witnesses,

1   my understanding, in the Federal lawsuit.

2          Also, as far as the filings go in the Federal

3   lawsuit, from my victims, Cynthia and Anthem Blanchard,

4   my understanding is that out of those 270 filings,

5   because they're aware of those filings because they keep

6   referencing Cynthia and Anthem Blanchard, that there

7   have been over 180, I believe, filed by the Defendant on

8   his own pro se motions; and that there's something like

9   2,000 pages filed by him.  So I don't believe that he's

10  having any difficulty in responding or filing on his

11  own.  He writes a pretty significant amount of things on

12  his own, albeit, they don't make a whole lot of sense,

13  but they are definitely written by him.

14          So, Your Honor, we're getting in the weeds, I

15  believe, on the Federal lawsuit in Kansas.  This all

16  goes back to I'm sorry if you have spent a lot of your

17  money paying for three attorneys in the State of

18  Oklahoma bonding out in the State of Oklahoma, and you

19  can't -- or no one will take your case in Kansas --

20  because that's the other rumor I've heard.  But just

21  because you don't have anyone to represent you in

22  Kansas, doesn't mean you get to violate a Judge's order

23  in the State of Oklahoma and contact people associated

24  with the business of HeraSoft in Bartlesville, Oklahoma.

25  That does not change Judge Sigler's order.

1        So at this time the State of Oklahoma is asking

2   that you increase the Defendant's bond because he has

3   violated his bond condition.  I'm not asking for an

4   ankle monitor, Judge.  I'm asking that you increase his

5   bond amount, and that if he has to post bond, he posts

6   bond; and that we keep all the other conditions still

7   intact.  If he wants to go back to Rhode Island, he goes

8   back to Rhode Island.  That's fine with me.  I would ask

9   that we reiterate that he cannot have any contact with

10  victims or their businesses.  That includes -- I guess

11  we have to spell it out -- shareholders and disparaging

12  the company to people, like the shareholders, which is

13  calling them and saying that Anthem and Cynthia are

14  involved in a Ponzi scheme.  Because if he really has

15  concern, he can call, like, the SEC or whoever.

16  Apparently there's something about the Department of

17  Justice investigated someone on the advisory board of

18  one of their companies at one point.  Call them.  Let

19  them know.  If you really think that, call them.

20        Thank you, Judge.

21             THE COURT:  One last shot, Mr. Adams.

22             MR. ADAMS:  Judge, it's sounds like the

23  State's just asking to increase the bond.  That's a

24  punitive action.  It's just basically going to cost him

25  more money, okay?  We object to it.  I will just tell

1    you from any standpoint, no, I don't want my clients

2    discussing anything that can be used in a criminal case

3    with anybody, okay?  But I don't see how this Court can

4    order him not to be able to depose people and

5    participate in the litigation in a Federal District

6    court in Kansas.

7           And then the last issue is, is, no, Mr. Piercy

8    and Mr. Ritter were not listed on the initial

9    disclosures by the Plaintiffs in the Federal lawsuit.

10   But in the Federal lawsuit, you're not required --

11   you're not restricted to just deposing people that the

12   Plaintiffs tell you about.  You can depose anybody that

13   has any relevant information which is why he had to do

14   the background to be able to testify to the Court to

15   issue the subpoenas in the first place.

16          And so these two cases are interconnected, and

17   he has to be -- and he's got a constitutional right to

18   participate in the system.  And he's got to be allowed

19   to participate in the system there.  And I would love

20   for him to get a lawyer up there anyway, because it

21   would make things a lot easier for me.

22               THE COURT:  I'm not really concerned about

23   the lawsuit that's going on in the state of Kansas

24   except, Mr. Adams, I do agree with you that he does have

25   a right to defend himself in a lawsuit that had been

1  filed against him.  However, he has chosen to represent

2  himself in that case, and it's pretty common knowledge

3  that a litigant who chooses to represent themselves in a

4  case does so at their own peril.  He's still held to the

5  same standard that a lawyer would be held to even though

6  he's a pro se litigant.

7          The conversation that I heard, the voice mail

8  that I heard, goes way beyond contacting someone to let

9  them know that they're going to get a subpoena or went

10 way beyond what was, in my opinion, allowed under the

11 bond condition in this case.  And while I understand

12 that he has a right to represent himself, he's got this

13 lawsuit, it's just unfortunate that he's been charged

14 with a crime here that has as his bond condition some

15 limits on his contact with the people that he believes

16 may be necessary for him to contact.

17          Taking your theory, Mr. Adams, that he should

18 have the right to contact the witnesses without this

19 Court considering it to be a bond violation, if you take

20 that just one step further then it would also be he

21 could contact the alleged victims in this case and still

22 not violate his bond condition as long as it's part of

23 the case in Kansas.  Well, I just don't believe that to

24 be true.  A criminal case is superior to the civil case.

25 The conditions -- the bond conditions in the criminal

1  case are in place for a reason and remain effective
2  throughout this criminal case and until and unless
3  they're changed.
4          Now, I think it's clear, by looking at the
5  court minute from January of 2022, that the Defendant
6  was to have no contact with the alleged victims, the
7  Blanchards, or their businesses.  Well, if you take it
8  literally, that business is a stone and brick building
9  and maybe some paper and some computers.  And I don't
10 think that's what the Court meant at all.  So it's clear
11 to me that his contact with those people has gone way
12 beyond just the necessity of contacting them for the
13 purpose -- Mr. Ritter, Mr. Koehn, and Mr. Piercy, way
14 beyond what's necessary just to effectuate the process
15 of his civil lawsuit in Kansas.
16         The other issue is he had a $100,000 bond.  The
17 State agreed to reduce it with some conditions due to
18 some apparently monetary constraints.  I don't know.
19 But that certainly freed up several thousand dollars for
20 him to get an attorney to represent him in the case in
21 Kansas.
22         It is clear to me that Mr. Nelson has violated
23 his bond condition of no contact with the victims and
24 their businesses.  And just because that minute order,
25 which was filed in, I believe, March -- the one,

1  Mr. Adams, that you attached.

2            MR. ADAMS:  Judge, that would be B,

3  Exhibit B, because A was the January 11th order.  B is

4  the March order.

5            THE COURT:  March the 7th of 2022, is --

6  no minute order fully reflects what was said in court

7  and what the judge's full order was, but it's clear to

8  me that Judge Sigler did not lift the bond condition

9  that he have no contact with the businesses themselves,

10 even though he specifically -- or at least the minute

11 order specifically referenced the victims.

12           At this time I am going to grant the State's

13 motion to enhance his bond, or increase his bond, but I

14 am going to only increase it to $100,000 rather than

15 $150,000 and would reiterate to Mr. Nelson that while I

16 understand that there's some -- there may be some

17 necessity for him to contact some people that are

18 somewhat related to the businesses here, there is proper

19 communication and there is improper communication.

20 Obviously the improper communication would violate his

21 bond condition.  And I guess what I'm saying is just

22 simply if he had contacted one of those three men and

23 not gone into detail about what's going on in the

24 Blanchards' company or I know your wife has done this

25 and here's all this contact about maybe suggestions of

1  underaged children, none of that has anything to do with

2  that lawsuit nor does it have anything to do with

3  anything other than an attempt to intimidate the

4  Blanchards through people that they're closely connected

5  with in their companies.  Completely inappropriate.

6         So you did mention, Mr. Adams, that you thought

7  they were asking to increase -- or an excuse to put an

8  ankle monitor on him.  I didn't see that anywhere in

9  their order, and then Ms. Gullett reiterated that they

10 are not asking for a ankle monitor.

11        MR. ADAMS:  Okay.  Well, I'm pleased that

12 they are not.

13        THE COURT:  That was originally a bond

14 condition, that he wear an ankle monitor.  They

15 graciously agreed to lift that condition, along with

16 some other things, so long as Mr. Nelson abided by his

17 end of the agreement.  And I don't believe that he has

18 done that, and I believe that he has purposely attempted

19 to intimidate the Blanchards through people in --

20 closely related to their company.

21        I do want to address the -- I guess the best

22 way I can put it -- insinuation that the State of

23 Oklahoma is in collusion with the Plaintiff in the

24 Kansas case, that was a really far stretch.

25        And, Mr. Adams, I'm not exactly sure what you

1    were trying to get the Court to understand or believe

2    with respect to that, but it was just a far stretch and

3    hard for me to imagine that the State of Oklahoma,

4    knowing how busy they are, would have time to collude

5    with the Plaintiffs in that Federal lawsuit to try to

6    have an economic impact on Mr. Nelson.  I think they're

7    just simply trying to protect their -- who they believe

8    to be victims in this case and to prosecutor what they

9    believe to be a crime in this case.

10            So, anything further, Ms. Gullett?

11            MS. GULLETT:  Your Honor, I believe we

12   need to set a date for this case.  I believe we're set

13   for status docket for the jury sounding docket.

14            THE COURT:  Okay.  Anything further from

15   you, Mr. --

16            MR. ADAMS:  I didn't hear what Ms. Gullett

17   said.

18            THE COURT:  I think it's currently set on

19   December the 16th.  Am I correct?

20            MS. GULLETT:  Yes.  As long as that's

21   still our date, yes, Judge.

22            THE COURT:  December 16th is the jury

23   sounding docket for the winter and spring term.  And

24   that's the date that it's set on now.

25            MS. GULLETT:  Is that at 2:00 or at 9:00?

1    We're at 9:00, right?

2                 THE COURT:  It's at 9:00 -- let me make

3    sure.  12-16 at 2:00 p.m.

4                 MR. ADAMS:  Judge, is that supposed to be

5    at 9:00?

6                 THE COURT:  No.  It was previously set at

7    2:00.  That's my jury sounding docket is at 2:00.  My

8    regular felony docket is at 9:00 a.m., and to try to do

9    those two things on the same docket is too hectic.

10                 MR. ADAMS:  And so the record is clear --

11   one is Misty -- Mr. Nelson's bond person wanted me to

12   ask if they could just write the bond down at the court

13   clerk's office, the additional bond or -- basically, I

14   think what she's asking is does he have to go into

15   custody and get bonded out at the jail or can we just

16   write the bond at the court clerk's office?

17                 THE COURT:  We're going to follow the

18   proper procedure.  He's got to go to the jail and go

19   through the proper procedure.

20                 MR. ADAMS:  And the other question I have

21   is -- that I just want to be clear on, so there's no

22   misunderstanding, is if he were to make bond, can he

23   appear virtually, since he lives in Rhode Island, or

24   does the State want him to return to Washington County?

25                 MS. GULLETT:  I have no objection on that

1  day that he return -- or that he do virtual because it

2  will be just us setting dates.

3                    THE COURT:  So what we're going to do,

4  Mr. Adams, and I know that we do it different in this

5  small county than you do in Tulsa County where you

6  primarily practice, but on December the 16th at 2:00,

7  it's basically a setting where we actually set at that

8  time whomever wants a jury trial, says they want a jury

9  trial, and we set it on the next docket -- or the -- we

10 set it on the first day of the first of the jury term in

11 January.  So there is no reason for Mr. Nelson to

12 personally appear on that day because it's basically a

13 date to get a date.

14                    MR. ADAMS:  It's something that I can show

15 up and he can appear virtually?

16                    THE COURT:  Yes.

17                    MR. ADAMS:  Do I need to do it on my

18 computer or whatever, like that, I mean?  Or does he

19 call in or what?

20                    THE COURT:  Well, you can handle that

21 however you want to.  I don't care.  It can either be by

22 phone.  It could be by Facetime, if you prefer to do

23 that.  If you want to get him on some kind of Zoom

24 meeting, as long as you have the equipment to do it, so

25 long as you're not relying on the Court to do that.

1          MR. ADAMS:  Okay.

2          THE COURT:  I want to make clear that the

3    bond condition is no contact with the victim.

4        And, Mr. Adams, you can explain this to

5    Mr. Nelson.

6        But no contact with the alleged victim also

7    means no contact with a third party in an effort to get

8    to the victim or an effort to get a message or

9    intimidate the victim.  So, no contact with the victim;

10   no email, no social media, all those things that we

11   lawyers know what no contact means, okay?  No contact

12   with the alleged victim.

13         MR. ADAMS:  Just in -- this might satisfy.

14   You can't do indirectly what you're not allowed to do

15   directly.

16         THE COURT:  Correct.

17         MR. ADAMS:  Okay.  But just so we're clear

18   on the Court's orders, we're not saying that if he gets

19   a lawyer that can do a deposition of a witness and the

20   lawyer asking the witness depositions [sic] that the

21   lawyer believes is related to the lawsuit in Kansas, the

22   Court, and hopefully the State, doesn't have any problem

23   with that?

24         THE COURT:  I don't have a problem with

25   that so long as Mr. Nelson understands that he can have

1    no contact with that victim.  He can't be at that

2    deposition.  And if he wants to listen in and have -- he

3    just can't have any contact with the victim.  But I

4    believe it would be preferable for him to have an

5    attorney there that can do what he believes he should be

6    able to do in the civil case.  And I'm confident that a

7    lawyer would know within which boundaries he or she

8    needs to stay.

9         So no contact with the alleged victim.  No

10   contact with the businesses that the victims are

11   involved in or own, which we understand that that means

12   not their shareholders.  Don't go down and talk to the

13   secretary.  Don't, you know, picket out in front of

14   their business, all those kind of things.  I just want

15   to be clear on that.

16             MR. ADAMS:  Yes.

17             THE COURT:  And then with respect to being

18   in Bartlesville, that was something that you referenced,

19   Ms. Gullett.

20        And while you referenced it, too, Mr. Adams,

21   the bond condition that was set by Judge Sigler was he

22   cannot be in Bartlesville except to come to court and

23   visit with his attorney.

24        Now, Mr. Adams, I understand you have an office

25   in Tulsa.  So he has no restriction as far as coming to

1  visit you in Tulsa.  I guess if you wanted to come to
2  Bartlesville, he could come here to visit you.  But
3  other than that, the other bond conditions set be Judge
4  Sigler remain in full for force and effect.
5          No contact with the alleged victims or their
6  businesses.  He is to surrender his passport.  No longer
7  has the requirement of an ankle monitor.  He cannot
8  reside in Washington County.
9          What about check in with his bondsman every
10 day?
11             MS. GULLETT:  He is still supposed does do
12 that.
13             THE COURT:  And check in with the
14 bondsman.  I think that's in lieu of having an ankle
15 monitor.
16             MS. GULLETT:  Correct.  And that's with
17 Misty.
18             THE COURT:  Did I miss anything?
19             MS. GULLETT:  No, Judge.
20             THE COURT:  Is there anything that we're
21 unclear about?
22             MR. ADAMS:  No, Your Honor.
23             THE COURT:  Anything else for the record,
24 Ms. Gullett?
25             MS. GULLETT:  No, Judge.  Thank you.

1                    THE COURT:  Mr. Adams?

2                    MR. ADAMS:  No.

3                    THE COURT:  That will then conclude the

4    record.

5                    (End of proceedings)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF OKLAHOMA      )

2  COUNTY OF WASHINGTON   )

3     I, Kara L. Rowell, court reporter in and for the

4  District Court of Washington County, State of Oklahoma,

5  do hereby certify that the above and forgoing contains a

6  true and correct transcription of all portions of

7  proceedings and evidence requested in the above-styled

8  and -numbered cause, CF-2021-304, all of which occurred

9  in open court or in chambers and were reported by me on

10  October 12, 2022.

11     I further certify that this reporter's record of the

12  proceedings truly and correctly reflects the exhibits,

13  if any, offered by the respective parties.

14     WITNESS my hand this 3rd day of November, 2022.

15

16                       _____

                          KARA L. ROWELL, CSR

17                        Court Reporter

                          Washington County

18                        District Court

                          420 S. Johnstone Avenue

19                        Bartlesville, Oklahoma 74003

                          CSR #1600

20                        Expiration:  12/31/22

21

22

23

24

25