# EXHIBIT

# "C"

# To Follow . . .

## INTERLOCUTORY APPEAL

Transcript of  TRANSCRIPT of Hearing 12 October 2022, Oklahoma Criminal Court

```
 1        IN THE DISTRICT COURT IN AND FOR WASHINGTON COUNTY
                          STATE OF OKLAHOMA
 2

 3   STATE OF OKLAHOMA              )
                                   )
 4   v.                            )      Case No. CF-2021-304
                                   )
 5   MICHAEL ERIC NELSON           )

 6

 7

 8

 9   -------------------------------------------------------

10              MOTION TO INCREASE BOND HEARING

11   -------------------------------------------------------

12

13

14

15

16

17

18

19

20        On the 12th day of October, 2022, the following

21   proceedings came on to be heard in the above-entitled

22   cause before the Honorable Linda S. Thomas, District

23   Judge presiding, in the City of Bartlesville, County of

24   Washington, State of Oklahoma:

25             Proceedings reported by machine shorthand.
```

1              A P P E A R A N C E S:

2    FOR THE STATE OF OKLAHOMA:

3         MS. ZOE GULLETT
          OFFICE OF THE DISTRICT ATTORNEY
4         420 South Johnstone, Room 222
          Bartlesville, Oklahoma 74003
5

6    FOR THE DEFENDANT:

7         MR. KEVIN D. ADAMS
          ATTORNEY AT LAW
8         36 E Cameron Street, Suite 16
          Tulsa, Oklahoma 74103
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       I N D E X

2    MOTION TO INCREASE BOND HEARING

3    October 12, 2022                          Page

4    Proceedings.................................    5

5    Reporter's Certificate.....................   38

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        EXHIBIT INDEX
State's Exhibits                      Offered   Admitted
     1      Affidavit of Craig Piercy    16        16
     2      Affidavit of Howard Gilliam  16        16
     3      Audio CD audio               16        16
```

PROCEEDINGS

1

2      THE COURT:  We are now on the record in

3  Washington County District Court, Case Number

4  CF-2021-304.  State of Oklahoma versus Michael Eric

5  Nelson.  Present with Mr. Nelson is Mr. Kevin Adams, and

6  present for the State of Oklahoma is Zoe Gullett.  This

7  matter comes on for hearing today on the State's motion

8  to increase the bond and set a hearing.  And then I have

9  also received the Defense objection to the State's

10  motion to increase the bond.

11      Mr. Adams, I noticed it was filed yesterday.  I

12  will tell you that I had an opportunity to read the

13  objection itself, but the number of attachments that you

14  had to it, I did not have time to read those.  They are

15  quite voluminous and would have taken me a lot longer

16  from when I got it this morning to today, to right now.

17      So, Ms. Gullett, it's your motion.  You may

18  proceed.

19      MS. GULLETT:  Thank you, Judge.  So, Your

20  Honor, we somewhat had a slight impromptu hearing on

21  this motion a bit on 9-23 whenever we -- when I first

22  filed this motion and asked for this hearing to be set.

23  So the Court has heard a bit about what the State's

24  motion was about, but I will reiterate some the reasons

25  -- or the reasons why the State filed this motion.

1      As the State's motion indicates, this has to do
2  with about three different contacts that Mr. Nelson has
3  had.  One is with a Mr. Ritter, one is with a Craig
4  Piercy, and one is with a -- kind of a secondhand
5  contact with a Mr. Gil Gilliam.  So at this time the
6  State would direct the Court's attention, first of all,
7  to the docket sheet in this case, to specifically
8  January 11th of '22, where myself, Judge Sigler, and
9  Mark Kane, who at the time was representing the
10 Defendant, as well as the Defendant, who was in custody
11 at the time, where this motion -- or this matter came on
12 for a bond reduction hearing where the State of Oklahoma
13 had filed a motion to increase the Defendant's bond to
14 -- it was actually his bond had been increased to a
15 hundred thousand and the Defendant had asked for a bond
16 reduction.  Mr. Kane and myself, as well as the
17 Defendant, had come to an agreement that the bond would
18 be amended to $50,000, which was my understanding at the
19 time that that was how much the Defendant's family could
20 make, allowing the Defendant to bond out, not remain in
21 jail, with the conditions specifically listed in the
22 court minute of no contact with the alleged victims or
23 businesses.  The Defendant is to surrender his passport.
24 Defendant must have an ankle monitor.  Defendant is not
25 to reside in Washington County.  Defendant must also

serve -- was also served with a PO, and he was order

back in front of Your Honor later on in January for a

status docket.

I understand that the defense counsel has, in

his motion, put a copy of the agreed to order that was

later filed on March 7th of '22, or court minute, the

agreed to court minute where Mr. Newman and myself

agreed, because I believe -- so Mr. Newman approached me

because Mr. Nelson was living in the Tulsa area and

having a very financially difficult time living in

another state away from his family in a state where he

did not have a job and had no connections, asking --

Mr. Newman asked me if I would have an objection to

Mr. Nelson returning to Rhode Island to reside. And

after a bit of back and forth between myself and

Mr. Newman, we agreed that he could return to reside in

Rhode Island, that the ankle monitor could be removed by

agreement. And, again, this is a handwritten court

minute so not everything we talked about is necessarily

dictated in this court minute. That there was

conversations about him and his bonds person having an

app to -- her be able to check in on him every day --

it's a GPS app -- so that she would actually know where

he was. It actually works better than an ankle monitor

because those don't -- you don't have a constant ID of

where he's at.  The Defendant can return to Oklahoma to consult with his attorney and for court appearances. And then there is a very important word here where it says "continued" no contact with the victims.  Defendant to return for preliminary hearing March 29th at 9:00 a.m.  Defendant to check in daily with bonds person.

So this court minute does not supersede the bond conditions that were put into place in January of 2022.  It just say continue no contact with the victims. So we didn't spell out continue no contact with the victims and the victims' businesses, and we didn't say that the condition of no contact with the victims' businesses was lifted.  We just say continue no contact with the victims.  We didn't change any of Judge Sigler's orders.  And Judge Sigler signed that as well. So if he had wanted to change it to say he could have contact with the businesses, then he could have done so. But he did not.  His orders remain the same up until today.

So that brings us to what occurred in September of this year.  So on or about September 6th, the Defendant began contacting various people associated with the victims in this case, Anthem and Cynthia Blanchard, and their businesses.  Specifically a business here Bartlesville that is physically located

here in Washington County, which is called HeraSoft.
And he -- and as the State will show he contacted
Mr. Ritter with -- through a voice mail, which I'm going
to ask to play for the Court here in a minute, where he
talks about he is going to subpoena Mr. Ritter and he
talks about him being a shareholder in both Anthem
Holdings as well as HeraSoft, again a company that's
physically here.  And talks about having filed 16
subpoenas in other courts up and down the eastern
seaboard.  And then he insinuates that Mr. Ritter's name
continues popping up in all sorts of documents and all
sorts of claims of young women; and then he says
something like he wants to have a conversation man to
man with Mr. Ritter, which sounds intimidating.  Then he
contacts a Mr. Craig Piercy, who has written out an
affidavit.

       And would Your Honor like for me to put State's
exhibit stickers on these?

          THE COURT:  I think so.  That would
probably keep the record clear.

          MS. GULLETT:  So I reached out to
Mr. Craig Piercy and asked him to write out an affidavit
because none of these individuals live in Oklahoma.  So
I requested that Mr. Piercy write out an affidavit of
his interaction with Mr. Nelson.  So this would be

State's Exhibit 1, and this is Mr. Piercy's affidavit of his interaction with Mr. Nelson.

THE COURT: Okay.

MS. GULLETT: So, Your Honor, as you can see in this affidavit, Mr. Nelson reached out to a shareholder of the Blanchards' company and stated things like that the Blanchards are con artists who operate Ponzi schemes, that he specifically stated that Anthem Blanchard is broke, that he's burned through his inheritance, that he's scheming investors out of money, specifically referenced their home in Bartlesville, apparently. Goes on to disparage the victims to a shareholder of their company and a shareholder specifically of the company, again, here in Bartlesville, Oklahoma.

So the issue that we have here, and as you'll hear in the voice mail, is that this case started because Mr. Nelson contacted the City Manager of Bartlesville, Oklahoma, as soon as he found out that the Blanchards were here starting a business and said do you have any idea of who started a business here in Bartlesville, these are horrible, terrible people, the Blanchards, they're Ponzi scheme scam artists, they're terrible people, this is who they are.

So that's what this case is about, is him

following these people around sending messages to
people, such as the manager -- or the City Manager of
Bartlesville, and attempting to disparage the Blanchards
to other people.  And he's doing the exact same thing,
once again, but he is doing it now through a
shareholder, when he has been instructed by the Court to
have no contact with the businesses that have to do with
the Blanchards.  To contact a shareholder of that
business is to have contact with that business.

Then there is Mr. Gil Gilliam, and he also did
an affidavit.  And I apologize.  He -- I'll mark this as
State's Exhibit 1.

When I spoke to Mr. Gilliam, he informed me
that he would be doing this affidavit and putting the
original in the mail.  And at this present time, I do
not have the original, but he emailed me a copy of the
original that he is supposed to have put in the mail.
So I do have this copy, and once I get the original, I
can substitute it.

THE COURT:  Okay.

MS. GULLETT:  So Mr. Gilliam and I spoke
over the phone; and the important parts of this
affidavit is that, first of all, Mr. Gilliam is employed
with HeraSoft, which is located, again, here in
Bartlesville, Oklahoma.  And he has been an employee

with HeraSoft since March 1st of 2021. He has worked for HeraSoft during -- at no time during the same time as Mr. Nelson.

So my understanding, from reading the Defendant's motion, is that the argument that is going to be made is that the Defendant is currently wrapped up defending himself pro se in a civil lawsuit in a Federal case in Kansas with an individual named Chad Koehn. And it seems like the theme in the motion is that because the Defendant has a Federal case pending and he's representing himself pro se, that he should be able to contact individuals associated with the HeraSoft company, maybe the HeraSoft company itself, and it appears almost as if he thinks he should be able to contact the victims because they have been listed as possible witnesses in that civil lawsuit. The State's argument is that even though they're listed as possible witnesses in a civil lawsuit in Kansas, does not trump the orders of a District Judge in Oklahoma. You cannot violate the bond conditions in Oklahoma just because you have a civil lawsuit pending in Kansas. That is a legal rodeo you have to figure out on your own if you're going to represent yourself pro se in Kansas.

So while there might be witnesses listed, you still can't violate your bond condition to contact them.

And, at this time, to threaten to contact Gil Gilliam, and as I wrote in my motion, take a -- will have special counsel take the deposition of him in Bartlesville, where Mr. Nelson is not supposed to be except for court appearances or to have met with his original attorney, who was Mark Kane, now none of his most recent attorneys reside in Bartlesville or have offices in Bartlesville, and has -- and at the local courthouse for a six to seven hour deposition, was the indication in that email.

So none of that would be appropriate. He's not supposed to be in Bartlesville, and having contact with Mr. Gilliam is an extension of having contact with the business because he is employed solely by HeraSoft. So that is a concern for the State.

So what this appears to be is reaching out to the shareholders, reaching out and saying these disparaging things, reaching out to an attorney representing someone in this civil case and threatening to depose for six or seven hours an employee of the business here in Bartlesville, and by extension, expecting to be able to depose the victims in this case. Sounds like threatening the victims in the State of Oklahoma's case. It sounds like it's an intimidation tactic.

And so at this time, the State would ask to

play the voice mail that the Defendant left for
Mr. Ritter so that you can hear some of the language
Mr. Nelson used when talking to Mr. Ritter about the
victims in this case so you can understand some of the
things he is saying, as well, about the victims.

THE COURT:  Mr. Adams.

MR. ADAMS:  Judge, I don't have an
objection to that.  I don't have an objection.  I think
it's admissible under Title 12-2103B2, because of the
bail hearing.  I just would ask that all of these --
these affidavits and the voice mail be introduced into
the record and made exhibits.

THE COURT:  Yes, Ms. Gullett, you may.

(Exhibit Number 1 audio CD published in
open court)

MS. GULLETT:  So, Your Honor, as you can
hear in that voice mail, he references Anthem Holdings
and HeraSoft a couple of times.  He is talking to
Mr. Ritter, who is, again, a shareholder in the HeraSoft
and Anthem Holdings company.  And he says a lot of stuff
in there, like I have filed subpoenas in 16 other
courts, I'm going to subpoena you one way or another, a
lot of things are going to come out.  Specifically talks
about names keep coming up, coming out having to do with
young women.  All of that is very threatening.  So that

has to do -- he's using all these threatening terms
while also referencing my victim's company and the name
Anthem, which is one of my victim's names.  It's Anthem
Blanchard.  And Anthem Holdings is one of his companies.
It appears like the Defendant is once again attempting
to call, harass, and use this information that he thinks
he has in an attempt to intimidate people around the
victims, associated with their business, or having
something to do with the victims, just like he did with
the City of Bartlesville, just like what we're here on.
As soon as the victims got here, as soon as they opened
HeraSoft, he called the City of Bartlesville -- or
emailed the City of Bartlesville and started his, you
know, beginnings of a tirade with the City of
Bartlesville sending them emails and telling them what
terrible, awful people the Blanchards were.

          So at this time the State of Oklahoma would
request that you increase his bond since he can't follow
through with his bond conditions.  We ask that you
increase his bond to $150,000.  The State had requested
a hundred thousand.  We came to an agreement with
Mr. Kane for $50,000 because of the situation that
Mr. Kane told us that he was in.  We attempted to be
very amenable to allow him to go back to Rhode Island,
to not have an ankle monitor, and this is the behavior

that is in response.

And I don't -- I do not believe that this is the only stuff that has occurred. There are emails out there that are from various pseudonyms and things like that. If I could prove that those were from Mr. Nelson, I would happily have attached those as well. I am not able to exactly pinpoint that those are exactly from him, but we're pretty darn sure they are. So at this time it appears that Mr. Nelson has gone right back to the behavior that he did whenever this case was filed.

Thank you, Judge.

THE COURT: Mr. Adams. And before you begin, Mr. Adams, I don't know that I addressed your request that the State's Exhibit 1, 2 -- and then we'll count the audio recording as 3 -- be admitted into the record, but I'm assuming the State has no objection to that.

MS. GULLETT: I would move to admit those, Judge. I apologize.

THE COURT: So as a matter of housekeeping, we will admit those three exhibits.

MR. ADAMS: Specifically, Judge, and neither one of us addressed this in our motions, but I just want to cite for the record what the statute is that controls the request to increase certain

(inaudible).

THE COURT:  You're going to have to speak up.  When you look down, it's very difficult for her to hear you.

MR. ADAMS:  It's Title 22, Section 1109, is the statute from the Oklahoma statutes that require that the State is requesting better security, and that specifically references the petition of Humphrey, which is 601 P.2d 103, just so I'm making a reference in the record.

A witness -- a lawyer has an opportunity to interview the witnesses, to talk to the witnesses. That's in our OUJI's.  I'm sure the Court instructs that regularly during jury trials, that, hey, a lawyer has an opportunity to interview the witnesses.  And just so that it's clear, and I put it in the motion, I just want to be clear, Chad Koehn, who is a member of the board of directors of Anthem Holding, okay, which is actually a Texas corporation, but they have HeraSoft here, which is a company that Mr. Nelson has interest in -- and I attached the stock certificate -- sued Mr. Nelson in Kansas.  Mr. Nelson removed it to Federal court because he is a resident of Rhode Island.  The Judge in that case directed -- and the case is -- I mean, it's like 270 filings in there.  I mean, they're just pounding him

with motions. There is a time where the Court said stop filing motions until he's had an opportunity to answer, you know. So he's trying to do what he can to defend himself in the case, which he doesn't have the money to hire it otherwise, so that's what he's doing. But this is a board of directors of the company that the Blanchards are in control of. They listed the Blanchards as witnesses. And, now, he's never contacted them, never said that he could, and the subpoenas -- that we actually had the subpoenas issued, but I attached a notice of subpoenas filed in court because it had the file stamp across the top of it that didn't come through very good, because that's the file stamp that you get in Federal court.

Through the Court's process, he issued these notices of subpoena and made arrangements to have a lawyer take the depositions in Kansas. And I listed in F -- or, no, I'm sorry -- G, their initial disclosures, they list Mr. Gilliam, that she was talking about, as a witness as somebody having knowledge and information about the case. In Federal court when you file a civil case, by rule you've got to give notice to the other side of everybody that you know that would have information and notice of the documents because it speeds up the discovery that way. And I believe

Mr. Gilliam is Number 9, but he listed him as a witness.
This is a guy that has witnesses.  So he emailed per
direction of the judge -- or magistrate, which is found
in Exhibit Number F, okay?  Using that email address
Oklahoma remote, he emailed C. Kellogg, who is one of
the lawyers representing the board member of Anthem
Holding, and said I plan on taking the deposition of
this person.  He's completely following the Court's
orders.  That's what he's doing.  Same issue with Ritter
and Piercy, is he actually -- and I attached those
notices, D and E there, that he issued the notice to
issue the subpoena which is what you do in Federal
court.  You file the notice that you intend to issue the
subpoena.  They have so long to object.  If they don't
object, then the clerk's office issues the actual
subpoenas, which we've got them here.  This is all
within the point of the lawsuit, a board of director of
that company sued him, okay?

        They control the company, okay?  You know, the
other thing is there seems to be somewhat of a
coordination here between what's going on with the
lawsuit and what's going on with the District Attorney's
office.  And I say that because of this.  They filed a
request to be able to amend and be allowed to sue
Mr. Nelson's father, who is here in the courtroom,

because he's providing a roof over Mr. Nelson's head.

THE COURT: I'm sorry. When you said "they," who were you referring to?

MR. ADAMS: Okay. The Plaintiffs in Kansas filed a motion to ask the Court to be allowed to amend to sue Mr. Nelson's father. And their theory for saying that he should be a co-defendant of Mr. Nelson is because he's basically providing food and shelter and clothing for his son. That's what they want to be -- that's what they want to be able to add for it. And it's like they're trying to remove any support that Mr. Nelson has.

THE COURT: How is that relevant to --

MR. ADAMS: Well, because now the State's doing the same thing. They're asking to put an ankle monitor on him which would remove any support that he has. And so I'm saying it happens here and then it happens over here. And I can't tell you that it's coordinated, but it seems like it's a coincidence. Now the State's saying, hey, let's put an ankle monitor on the guy. You know, like they say they want him -- first the conditions was, oh, well, he can't leave the State of Oklahoma because he's got the ankle monitor, but he can't reside in Bartlesville. You can't have restrictions -- geographic restrictions like that, like

an entire county, you know.  He doesn't drive.  So

anywhere -- you know, to live outside of Bartlesville

and have to get to court and everything, is difficult.

I don't think they even have Ubers that can take you

around, but maybe they do.  I don't know.

THE COURT:  Well, I'm struggling with how

that has anything to do with the motion to increase his

bond.

MR. ADAMS:  Because it seems like they're

doing the bidding of the Plaintiffs in the Federal case

in Kansas, and this is a coordinated effort between the

Anthems and Mr. Koehn, who is one of their board of

directors of their company, to cause him as much grief

as possible.  And he has a right -- he's not doing

anything with their businesses.  He is defending the

lawsuit that was filed against him, and he's following

the directions of the Federal Magistrate in how he's

going about doing it.  I mean, it would certainly be

preferable if he had a lawyer, but he is a lot less

likely to be able to come up with money to have a lawyer

if he has to post another $10,000 in bond.  And if he

has to provide his own place to live because he's no

longer allowed to live with his parents and it just

exasperates the whole problem.

And so we don't believe that he has violated

the terms of his probation.  He's not doing anything
specifically with the business.  He's trying to defend
his lawsuit, maybe inartfully so.  And we don't think he
violated the conditions of the bond to begin with.  We
don't think they've met the requirements of Title 22,
Section 11 or of Humphreys.

     And if I could have just one minute, let me
inquire.

     Judge, the only other point is that there has
-- the lawyer -- one of the lawyers representing them
has -- I'm told by Mr. Nelson has actually tried to get
him to contact the Blanchards, which he has refused to
do so --

     THE COURT:  I'm sorry.  You said one of
the lawyers representing --

     MR. ADAMS:  One of the lawyers
representing the Plaintiffs in Kansas actually suggested
that contact the Blanchards, and he has declined to do
so.  He has stayed completely away from them.  And the
reason he is supposed to contact the witnesses before
issuing the subpoenas is because they're telling him
that he's got to do background to show the relevance of
why he's trying to subpoena a particular person in the
Federal case.

     So we would ask the Court to deny the State's

1  request.

2          THE COURT:  Ms. Gullett, your response.

3          MS. GULLETT:  Thank you, Judge.  I'd like

4  to respond to some of that, seeing as how I have now

5  been apparently accused of collusion.  I think the word

6  would be "prosecutorial misconduct."  And I would like

7  to set the record straight.  I have never had any --

8  well, I take that back.  Mr. Koehn did call me back in

9  December of '21, when we were attempting to figure out

10  where Mr. Nelson was when there was a warrant active for

11  him.  And then we found out he was being held on a

12  warrant on our bond in New Jersey, and he was picked up

13  attempting to get on an airplane for Spain.  However,

14  after that, I have not spoken to Mr. Koehn at all.  In

15  fact, I find him kind of a jerk, so I don't particularly

16  like Mr. Koehn.  So I'm taking a bit of offense to the

17  fact that it is the belief the State of Oklahoma is

18  being used to put Mr. Nelson back in jail for some silly

19  civil lawsuit that is happening in a Federal court in

20  Kansas.

21          My issue is with Mr. Nelson and his behavior

22  towards the shareholders of the HeraSoft Company,

23  specifically Mr. Ritter and Mr. Piercy.  And as far as

24  his contact of them, they are not listed on this witness

25  list that was given to Mr. Nelson as possible witnesses,

my understanding, in the Federal lawsuit.

Also, as far as the filings go in the Federal lawsuit, from my victims, Cynthia and Anthem Blanchard, my understanding is that out of those 270 filings, because they're aware of those filings because they keep referencing Cynthia and Anthem Blanchard, that there have been over 180, I believe, filed by the Defendant on his own pro se motions; and that there's something like 2,000 pages filed by him. So I don't believe that he's having any difficulty in responding or filing on his own. He writes a pretty significant amount of things on his own, albeit, they don't make a whole lot of sense, but they are definitely written by him.

So, Your Honor, we're getting in the weeds, I believe, on the Federal lawsuit in Kansas. This all goes back to I'm sorry if you have spent a lot of your money paying for three attorneys in the State of Oklahoma bonding out in the State of Oklahoma, and you can't -- or no one will take your case in Kansas -- because that's the other rumor I've heard. But just because you don't have anyone to represent you in Kansas, doesn't mean you get to violate a Judge's order in the State of Oklahoma and contact people associated with the business of HeraSoft in Bartlesville, Oklahoma. That does not change Judge Sigler's order.

So at this time the State of Oklahoma is asking that you increase the Defendant's bond because he has violated his bond condition. I'm not asking for an ankle monitor, Judge. I'm asking that you increase his bond amount, and that if he has to post bond, he posts bond; and that we keep all the other conditions still intact. If he wants to go back to Rhode Island, he goes back to Rhode Island. That's fine with me. I would ask that we reiterate that he cannot have any contact with victims or their businesses. That includes -- I guess we have to spell it out -- shareholders and disparaging the company to people, like the shareholders, which is calling them and saying that Anthem and Cynthia are involved in a Ponzi scheme. Because if he really has concern, he can call, like, the SEC or whoever. Apparently there's something about the Department of Justice investigated someone on the advisory board of one of their companies at one point. Call them. Let them know. If you really think that, call them.

Thank you, Judge.

THE COURT: One last shot, Mr. Adams.

MR. ADAMS: Judge, it's sounds like the State's just asking to increase the bond. That's a punitive action. It's just basically going to cost him more money, okay? We object to it. I will just tell

you from any standpoint, no, I don't want my clients discussing anything that can be used in a criminal case with anybody, okay? But I don't see how this Court can order him not to be able to depose people and participate in the litigation in a Federal District court in Kansas.

And then the last issue is, is, no, Mr. Piercy and Mr. Ritter were not listed on the initial disclosures by the Plaintiffs in the Federal lawsuit. But in the Federal lawsuit, you're not required -- you're not restricted to just deposing people that the Plaintiffs tell you about. You can depose anybody that has any relevant information which is why he had to do the background to be able to testify to the Court to issue the subpoenas in the first place.

And so these two cases are interconnected, and he has to be -- and he's got a constitutional right to participate in the system. And he's got to be allowed to participate in the system there. And I would love for him to get a lawyer up there anyway, because it would make things a lot easier for me.

THE COURT: I'm not really concerned about the lawsuit that's going on in the state of Kansas except, Mr. Adams, I do agree with you that he does have a right to defend himself in a lawsuit that had been

filed against him.  However, he has chosen to represent himself in that case, and it's pretty common knowledge that a litigant who chooses to represent themselves in a case does so at their own peril.  He's still held to the same standard that a lawyer would be held to even though he's a pro se litigant.

The conversation that I heard, the voice mail that I heard, goes way beyond contacting someone to let them know that they're going to get a subpoena or went way beyond what was, in my opinion, allowed under the bond condition in this case.  And while I understand that he has a right to represent himself, he's got this lawsuit, it's just unfortunate that he's been charged with a crime here that has as his bond condition some limits on his contact with the people that he believes may be necessary for him to contact.

Taking your theory, Mr. Adams, that he should have the right to contact the witnesses without this Court considering it to be a bond violation, if you take that just one step further then it would also be he could contact the alleged victims in this case and still not violate his bond condition as long as it's part of the case in Kansas.  Well, I just don't believe that to be true.  A criminal case is superior to the civil case. The conditions -- the bond conditions in the criminal

case are in place for a reason and remain effective throughout this criminal case and until and unless they're changed.

Now, I think it's clear, by looking at the court minute from January of 2022, that the Defendant was to have no contact with the alleged victims, the Blanchards, or their businesses. Well, if you take it literally, that business is a stone and brick building and maybe some paper and some computers. And I don't think that's what the Court meant at all. So it's clear to me that his contact with those people has gone way beyond just the necessity of contacting them for the purpose -- Mr. Ritter, Mr. Koehn, and Mr. Piercy, way beyond what's necessary just to effectuate the process of his civil lawsuit in Kansas.

The other issue is he had a $100,000 bond. The State agreed to reduce it with some conditions due to some apparently monetary constraints. I don't know. But that certainly freed up several thousand dollars for him to get an attorney to represent him in the case in Kansas.

It is clear to me that Mr. Nelson has violated his bond condition of no contact with the victims and their businesses. And just because that minute order, which was filed in, I believe, March -- the one,

Mr. Adams, that you attached.

MR. ADAMS:  Judge, that would be B,
Exhibit B, because A was the January 11th order.  B is
the March order.

THE COURT:  March the 7th of 2022, is --
no minute order fully reflects what was said in court
and what the judge's full order was, but it's clear to
me that Judge Sigler did not lift the bond condition
that he have no contact with the businesses themselves,
even though he specifically -- or at least the minute
order specifically referenced the victims.

At this time I am going to grant the State's
motion to enhance his bond, or increase his bond, but I
am going to only increase it to $100,000 rather than
$150,000 and would reiterate to Mr. Nelson that while I
understand that there's some -- there may be some
necessity for him to contact some people that are
somewhat related to the businesses here, there is proper
communication and there is improper communication.
Obviously the improper communication would violate his
bond condition.  And I guess what I'm saying is just
simply if he had contacted one of those three men and
not gone into detail about what's going on in the
Blanchards' company or I know your wife has done this
and here's all this contact about maybe suggestions of

underaged children, none of that has anything to do with
that lawsuit nor does it have anything to do with
anything other than an attempt to intimidate the
Blanchards through people that they're closely connected
with in their companies. Completely inappropriate.

So you did mention, Mr. Adams, that you thought
they were asking to increase -- or an excuse to put an
ankle monitor on him. I didn't see that anywhere in
their order, and then Ms. Gullett reiterated that they
are not asking for a ankle monitor.

MR. ADAMS: Okay. Well, I'm pleased that
they are not.

THE COURT: That was originally a bond
condition, that he wear an ankle monitor. They
graciously agreed to lift that condition, along with
some other things, so long as Mr. Nelson abided by his
end of the agreement. And I don't believe that he has
done that, and I believe that he has purposely attempted
to intimidate the Blanchards through people in --
closely related to their company.

I do want to address the -- I guess the best
way I can put it -- insinuation that the State of
Oklahoma is in collusion with the Plaintiff in the
Kansas case, that was a really far stretch.

And, Mr. Adams, I'm not exactly sure what you

were trying to get the Court to understand or believe
with respect to that, but it was just a far stretch and
hard for me to imagine that the State of Oklahoma,
knowing how busy they are, would have time to collude
with the Plaintiffs in that Federal lawsuit to try to
have an economic impact on Mr. Nelson.  I think they're
just simply trying to protect their -- who they believe
to be victims in this case and to prosecutor what they
believe to be a crime in this case.

So, anything further, Ms. Gullett?

MS. GULLETT:  Your Honor, I believe we
need to set a date for this case.  I believe we're set
for status docket for the jury sounding docket.

THE COURT:  Okay.  Anything further from
you, Mr. --

MR. ADAMS:  I didn't hear what Ms. Gullett
said.

THE COURT:  I think it's currently set on
December the 16th.  Am I correct?

MS. GULLETT:  Yes.  As long as that's
still our date, yes, Judge.

THE COURT:  December 16th is the jury
sounding docket for the winter and spring term.  And
that's the date that it's set on now.

MS. GULLETT:  Is that at 2:00 or at 9:00?

We're at 9:00, right?

            THE COURT:  It's at 9:00 -- let me make sure.  12-16 at 2:00 p.m.

            MR. ADAMS:  Judge, is that supposed to be at 9:00?

            THE COURT:  No.  It was previously set at 2:00.  That's my jury sounding docket is at 2:00.  My regular felony docket is at 9:00 a.m., and to try to do those two things on the same docket is too hectic.

            MR. ADAMS:  And so the record is clear -- one is Misty -- Mr. Nelson's bond person wanted me to ask if they could just write the bond down at the court clerk's office, the additional bond or -- basically, I think what she's asking is does he have to go into custody and get bonded out at the jail or can we just write the bond at the court clerk's office?

            THE COURT:  We're going to follow the proper procedure.  He's got to go to the jail and go through the proper procedure.

            MR. ADAMS:  And the other question I have is -- that I just want to be clear on, so there's no misunderstanding, is if he were to make bond, can he appear virtually, since he lives in Rhode Island, or does the State want him to return to Washington County?

            MS. GULLETT:  I have no objection on that

1  day that he return -- or that he do virtual because it

2  will be just us setting dates.

3            THE COURT:  So what we're going to do,

4  Mr. Adams, and I know that we do it different in this

5  small county than you do in Tulsa County where you

6  primarily practice, but on December the 16th at 2:00,

7  it's basically a setting where we actually set at that

8  time whomever wants a jury trial, says they want a jury

9  trial, and we set it on the next docket -- or the -- we

10  set it on the first day of the first of the jury term in

11  January.  So there is no reason for Mr. Nelson to

12  personally appear on that day because it's basically a

13  date to get a date.

14            MR. ADAMS:  It's something that I can show

15  up and he can appear virtually?

16            THE COURT:  Yes.

17            MR. ADAMS:  Do I need to do it on my

18  computer or whatever, like that, I mean?  Or does he

19  call in or what?

20            THE COURT:  Well, you can handle that

21  however you want to.  I don't care.  It can either be by

22  phone.  It could be by Facetime, if you prefer to do

23  that.  If you want to get him on some kind of Zoom

24  meeting, as long as you have the equipment to do it, so

25  long as you're not relying on the Court to do that.

1    MR. ADAMS:  Okay.

2    THE COURT:  I want to make clear that the

3    bond condition is no contact with the victim.

4    And, Mr. Adams, you can explain this to

5    Mr. Nelson.

6    But no contact with the alleged victim also

7    means no contact with a third party in an effort to get

8    to the victim or an effort to get a message or

9    intimidate the victim.  So, no contact with the victim;

10   no email, no social media, all those things that we

11   lawyers know what no contact means, okay?  No contact

12   with the alleged victim.

13   MR. ADAMS:  Just in -- this might satisfy.

14   You can't do indirectly what you're not allowed to do

15   directly.

16   THE COURT:  Correct.

17   MR. ADAMS:  Okay.  But just so we're clear

18   on the Court's orders, we're not saying that if he gets

19   a lawyer that can do a deposition of a witness and the

20   lawyer asking the witness depositions [sic] that the

21   lawyer believes is related to the lawsuit in Kansas, the

22   Court, and hopefully the State, doesn't have any problem

23   with that?

24   THE COURT:  I don't have a problem with

25   that so long as Mr. Nelson understands that he can have

no contact with that victim.  He can't be at that
deposition.  And if he wants to listen in and have -- he
just can't have any contact with the victim.  But I
believe it would be preferable for him to have an
attorney there that can do what he believes he should be
able to do in the civil case.  And I'm confident that a
lawyer would know within which boundaries he or she
needs to stay.

So no contact with the alleged victim.  No
contact with the businesses that the victims are
involved in or own, which we understand that that means
not their shareholders.  Don't go down and talk to the
secretary.  Don't, you know, picket out in front of
their business, all those kind of things.  I just want
to be clear on that.

MR. ADAMS:  Yes.

THE COURT:  And then with respect to being
in Bartlesville, that was something that you referenced,
Ms. Gullett.

And while you referenced it, too, Mr. Adams,
the bond condition that was set by Judge Sigler was he
cannot be in Bartlesville except to come to court and
visit with his attorney.

Now, Mr. Adams, I understand you have an office
in Tulsa.  So he has no restriction as far as coming to

visit you in Tulsa. I guess if you wanted to come to Bartlesville, he could come here to visit you. But other than that, the other bond conditions set be Judge Sigler remain in full for force and effect.

No contact with the alleged victims or their businesses. He is to surrender his passport. No longer has the requirement of an ankle monitor. He cannot reside in Washington County.

What about check in with his bondsman every day?

MS. GULLETT: He is still supposed does do that.

THE COURT: And check in with the bondsman. I think that's in lieu of having an ankle monitor.

MS. GULLETT: Correct. And that's with Misty.

THE COURT: Did I miss anything?

MS. GULLETT: No, Judge.

THE COURT: Is there anything that we're unclear about?

MR. ADAMS: No, Your Honor.

THE COURT: Anything else for the record, Ms. Gullett?

MS. GULLETT: No, Judge. Thank you.

1          THE COURT:  Mr. Adams?

2          MR. ADAMS:  No.

3          THE COURT:  That will then conclude the

4   record.

5          (End of proceedings)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF OKLAHOMA          )

2  COUNTY OF WASHINGTON      )

3      I, Kara L. Rowell, court reporter in and for the

4  District Court of Washington County, State of Oklahoma,

5  do hereby certify that the above and forgoing contains a

6  true and correct transcription of all portions of

7  proceedings and evidence requested in the above-styled

8  and -numbered cause, CF-2021-304, all of which occurred

9  in open court or in chambers and were reported by me on

10 October 12, 2022.

11     I further certify that this reporter's record of the

12 proceedings truly and correctly reflects the exhibits,

13 if any, offered by the respective parties.

14     WITNESS my hand this 3rd day of November, 2022.

15

16                              _____
                                KARA L. ROWELL, CSR
17                              Court Reporter
                                Washington County
18                              District Court
                                420 S. Johnstone Avenue
19                              Bartlesville, Oklahoma 74003
                                CSR #1600
20                              Expiration:  12/31/22

21

22

23

24

25