**UNITED STATES DISTRICT COURT - DISTRICT OF KANSAS**

| | |
|---|---|
| **United Capital Management of Kansas, Inc**. (UCMK) <u>and</u> **CHAD M. KOEHN**<br><br>Plaintiffs, counter-defendants<br>v.<br>Michael Nelson<br><br>Defendant; Counter-Plaintiff PRO-Se. | **DOCKET NO.:     5:22-CV-04008-JWB-TJJ**<br>**CIVIL ACTION**<br><br>**<u>EXHIBITS</u>**<br>**<u>Motion in Opposition regarding Plaintiff's</u>**<br>**<u>Motion in Document 445</u>**<br>**<u>w/ Motion for Deposition by Remote Means</u>**<br>**<u>pursuant with FRCP Rule 1 & 26(c)</u>**<br><br>**[Jury Trial Demanded]** |

# <u>EXHIBIT</u>

# <u>"C"</u>

# <u>To Follow . . .</u>

# EXHIBIT "1"

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:11-cv-1598-ORL-31KRS

SIMON PROPERTY GROUP, INC., a
Delaware corporation,

      Plaintiff,

v.

LYNETTE LAURIA, individually and
d/b/a Marketing Resource Network, XLM
Marketing, Excell Services, XLM Excell
and PR Works, et al.,

      Defendants.

* * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF:     THOMAS BRIGNOLO

DATE TAKEN:      July 12, 2013

TIME:      10:08 a.m. - 12:52 p.m.

PLACE:      Nejame, Lafay, Jancha, et al.
      189 South Orange Avenue
      Suite 1800
      Orlando, Florida 32801

REPORTED BY:     Jean Rohrer, Registered
      Professional Reporter, Certified
      Realtime Reporter, Notary
      Public, State of Florida at
      Large

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

```
                                                    Page 2

 1   A P P E A R A N C E S:

 2   ANTHONY GREEN, ESQUIRE
     OF:  Winget, Spadafora, Schwartzberg, LLP
 3        45 Broadway, 19th Floor
          New York, NY 10006
 4

 5        APPEARING ON BEHALF OF THE PLAINTIFF

 6
     CRAIG A. BRAND, ESQUIRE
 7   OF:  The Brand Law Firm, P.A.
          Grove Forest Plaza
 8        2937 S. W. 27th Avenue, Suite 101
          Miami, Florida 33133
 9

10           APPEARING ON BEHALF OF THE DEFENDANTS

11

12   ALSO PRESENT:  Ryan Deming

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 3

1                        C O N T E N T S

2

3    TESTIMONY OF THOMAS BRIGNOLO

4              Direct Examination by Mr. Brand...........5

5              Cross-Examination by Mr. Green...........93

6              Redirect Examination by Mr. Brand.......102

7    CERTIFICATE OF OATH..............................109

8    CERTIFICATE OF REPORTER..........................110

9

10                        EXHIBITS

11   Defendants' Exhibit 1..............................10

12   (Notice of Deposition)

13   Defendants' Exhibit 2..............................12

14   (Subpoena)

15   Defendants' Exhibit 3..............................19

16   (Handwritten note from Lynnette)

17   Defendants' Exhibit 4..............................24

18   (Tax Return)

19   Defendants' Exhibit 5..............................51

20   (Letter from Craig Brand)

21   Defendants' Exhibit 6..............................52

22   (Electronic Articles)

23

24   EXHIBITS CONTINUED ON NEXT PAGE

25

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)

2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                                         Page  4
  1   EXHIBITS CONTINUED

  2

  3   Defendants' Exhibit 7...............................61

  4   (Photograph)

  5   Defendants' Exhibit 8...............................92

  6   (Judgment)

  7   Plaintiff's Exhibit 1...............................98

  8   (Email)

  9

 10                         - - - - -

 11

 12              S T I P U L A T I O N S

 13        It is hereby agreed and so stipulated by and

 14   between the parties hereto, through their respective

 15   counsel, that the reading and signing of the transcript

 16   are expressly waived by the Deponent.

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 5

1              P R O C E E D I N G S

2                    * * * * * * * *

3         THE REPORTER:  Do you swear or affirm that the

4      testimony you are about to give will be the truth,

5      the whole truth, and nothing but the truth?

6         THE WITNESS:  I do.

7                  THOMAS BRIGNOLO,

8  having been first duly sworn, testified under oath as

9  follows:

10                  DIRECT EXAMINATION

11  BY MR. BRAND:

12     Q    Tommy, for the record, can you please state

13  your full name and your address?

14     **A    Thomas Glenn Brignolo, 700 Mayfair Circle,**

15  **Orlando, Florida, 32803.**

16     Q    Okay.  It's my understanding that your -- is

17  that your house address or your office address?

18     **A    House.**

19     Q    Okay.  It's my understanding that you're going

20  to soon be relocating, is that correct?

21     **A    Correct.**

22     Q    All right.  And can you tell me a little bit

23  more about these relocation plans?

24     **A    Two weeks from today I'll be leaving to visit**

25  **my family in Connecticut, then from there the following**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 6

1      **Sunday the 28th, I'll be leaving from New York to**

2      **Edinburgh, Scotland, and then I'll be staying in**

3      **Glasgow.**

4          Q    And what are you going to be doing in

5      Scotland?

6          **A    Working.**

7          Q    Okay.

8          **A    Just relocating.**

9          Q    Okay.  I'm going to first make some

10     introductions, and then I'm going to ask you some

11     questions about that and continue with the deposition.

12     As you know, you and I have met before, correct?

13         **A    Mm-hmm.**

14         Q    So my name is Craig Brand, for the record, and

15     I'm going to read you -- even though you know that I

16     represent Dale and Ryan, I'm going to give you the

17     formal names of all the different companies that are

18     associated with them that I represent.

19                I represent, as you know, Ryan Deming,

20     individually, as Florida Tourism Distribution Services.

21     I represent Kids Eat Free Cards.  I represent Target

22     Distribution and TJI.  I represent Dale Takio,

23     individually, also d/b/a Kids Eat Free Cards.

24                I represent Image Marketing of Florida,

25     Inc., I represent Image Marketing Group, Inc., Event

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                          2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 7

1    Planners, USA, DT Printing Solutions, Hat Marketing,

2    LLC, which you know is Kevin Brett.  Pointe

3    Distribution, LLC, and Takitik, Inc.  So when I talk to

4    you and refer to my clients, it's all of those, even

5    though it probably boils down to Dale and Ryan.

6        **A    Okay.**

7        Q    Okay.  The deposition that we are doing today

8    is an informal process.  It's just us that are sitting

9    here around the table.  Any time you don't understand

10   something, just say, Craig, I don't get it.

11             If you have to use the restroom, if you

12   want to take some water, whatever it is, we will stop,

13   make life easy and comfortable for everybody concerned.

14   But if you give an answer to a question, then I'm going

15   to assume that you understood the question.

16       **A    Okay.**

17       Q    All right.  Also, to your right is the court

18   reporter.  She has to take down everything that

19   everybody is saying here, audibly, so she cannot take

20   down shakings of the head, nods, gestures.  That doesn't

21   come out on paper.  So, I'll need an audible response

22   from you.

23       **A    Okay.**

24       Q    Perfect.  Okay.  We were talking about

25   Scotland, and you're going to leave for the country

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 8

1  today.  So if I was to go meet you in Scotland next week

2  or in two weeks, where would you be?

3      A     Glasgow.

4      Q     Glasgow.  Are you -- do you have employment

5  there already?

6      A     **My partner stays outside of the city, so I'll**

7  **be staying with him and then looking for a flat in**

8  **Glasgow.**

9      Q     Okay.  Are you going to be competing with

10  Kevin?

11      A     **No.**

12      Q     What is it that you're going to be doing

13  there?

14      A     **Right now, still be managing Nolo Marketing**

15  **from abroad, doing my online stuff, accounting.  I can**

16  **do all that from home anyway.  And then eventually,**

17  **after establishing residency, then look for a job.**

18      Q     Okay.  So is your move to Scotland intended to

19  be permanent?

20      A     **Yes.**

21      Q     And when you say, residency, are you planning

22  on getting established as a resident of the country of

23  Scotland?

24      A     **Yes.**

25      Q     And who is your partner there?

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 9

1       **A      His name is Dean Robinson.**

2       Q      And is Dean Robinson from Scotland or from --

3       **A      From Scotland.**

4       Q      -- the states?

5       **A      Scotland.**

6       Q      Okay.  And the theoretical concept at least

7    right now is to establish a Nolo Marketing Europe, or is

8    it to run Nolo Marketing from Scotland but still have

9    its base roots here in Orlando?

10      **A      No.  Still be an Orlando business.**

11      Q      Okay.  And would you be looking to market to

12   Orlando clientele from Europeans or Scots?

13      **A      Possibility.  But that's not the main reason.**

14      Q      What is the main reason?

15      **A      For -- to be my partner.**

16      Q      Okay.  Is -- is Dean -- just so I understand,

17   because what's -- the first thing that's going through

18   my head, it's going to be difficult to pick up new

19   Orlando clients in Scotland unless you're able to

20   promise Scottish clientele to -- to the Orlando market.

21   Would I be correct in that premise?

22      **A      Right.  I'm not looking to expand.**

23      Q      Nolo?

24      **A      Nolo Marketing in Scotland.**

25      Q      So is Dean a business partner and a

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                              2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                                    Page 10
 1    relationship partner?

 2        A    Domestic partner.

 3        Q    Domestic partner?  Okay.  So that would be

 4    yes?

 5        A    Yes.  Domestic partner, not business partner.

 6        Q    Okay.  Now I understand.  And who is running

 7    Nolo Marketing in Orlando, if it's going to still be

 8    run?

 9        A    Her name is Carolyn Moncoda.

10        Q    Can you spell her last name?

11        A    M-o-n-c-o-d-a.

12        Q    Okay.  So, basically she is taking over the

13    operations for Nolo here?

14        A    Correct.

15        Q    Did you make her partner?

16        A    No.

17        Q    So, she is an employee of?

18        A    She is an independent contractor.

19        Q    Independent contractor running Nolo?

20        A    I'll still be running the everyday accounting

21    and books.  She will be doing the physical running

22    around here in Orlando.

23              MR. BRAND:  Okay.  Can I have this marked as

24        Number 1?

25              (Defendants' Exhibit 1 was marked for
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 11

1          identification)

2     BY MR. BRAND:

3          Q     Tommy, what I'm going to show you is your

4     notice of taking deposition for today and ask you if

5     you've seen this.  I have now marked this as Defense 1.

6          **A     Yep.  I received this a while back.**

7          Q     Okay.  Perfect.  Can I see it?

8          **A     I don't think all this part was in it, though.**

9          Q     That's Exhibit A.

10         **A     Mine is much smaller.  Mine doesn't have**

11    **all -- mine doesn't have all these numbers with**

12    **paragraphs.**

13         Q     What does yours have?  Can I see it?

14         **A     And part -- this is not correct.  Yeah.  I've**

15    **never seen --**

16         Q     There was a cover page to that.

17         **A     I didn't receive -- the Exhibit A on there**

18    **doesn't have all these documents and things to be**

19    **produced.**

20         Q     Actually --

21         **A     So this is -- if I had read this, I would have**

22    **had -- I see this one already -- I would not have agreed**

23    **to any of this.  And there is numbers in here, which I**

24    **have never seen.**

25         Q     Okay.  Let me see.  What I'm going to do is,

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                              2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 12

1    is, what happened was, I can't tell for sure.  What you

2    have here is what's the cover page to the process server

3    for this.  Can I use yours and mark this as number two?

4        **A     Sure.**

5            **(Defendants' Exhibit 2 was marked for**

6        **identification)**

7    BY MR. BRAND:

8        Q    Okay.  I'm going to be fair to you and we are

9    going to use -- go off -- work off of your -- what we

10   have now marked as Exhibit No. 2 to the subpoena.  And

11   the Exhibit A asks you to bring certain documents.

12       **A     Mm-hmm.**

13       Q    First -- first paragraph of Exhibit A states,

14   every document or a true copy of every document you

15   provided to plaintiff, Simon Property Group, its

16   employees, attorneys, agents and/or representatives

17   regarding each of the following defendants in this case.

18   First one is Dale Takio.  Do you have any documents

19   relating to Dale Takio?

20       **A     I forwarded me stuff I brought from the last**

21   **deposition.  That's all I have.  So, I think there was**

22   **just one e-mail concerning that.**

23       Q    I'll tell you what.  Maybe it's here.  Maybe

24   if you give me your folder.

25       **A     This is all stuff that was listed by the court**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 13

1   **reporter in the last --**

2       Q    Do you have copies of what -- what you have

3   here?

4       **A    These are copies.**

5       Q    These are copies?

6            MR. BRAND:  Okay.  Tell you what.  Let's mark

7       this, it will be easier.  We will mark this as

8       Defense Composite 3, and we will refer to this as

9       the documents that Mr. Brignolo has brought in

10      response to the Exhibit A attached to Exhibit 2,

11      Deposition Exhibit 2.

12           Let me just go off record for a second and

13      just review this.

14           (Discussion off the record)

15  BY MR. BRAND:

16      Q    Tommy, within the documents we have marked as

17  Composite 3, are there any documents that would show

18  correspondence, memoranda, telephone calls, text

19  messages, social media, and/or e-mail messages sent to

20  and/or received from Timothy Herman?

21      **A    There are text messages from Tim.**

22      Q    Okay.  Same question, however, concerning Dave

23  Donaway?

24      **A    There is an e-mail or two in there.**

25      Q    Okay.  Same question, but concerning anybody

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

```
                                                      Page 14
 1    from Simon Property Group.

 2         A    Just Dave.

 3         Q    Okay.  Same question, but pertaining to any

 4    attorney representing Simon Property Group.

 5         A    I don't believe so.

 6         Q    Okay.  Of those -- of those -- of that

 7    question, which is any and all records, correspondence,

 8    memoranda, telephone calls, text messages, social media

 9    and/or e-mails, are there such things that exist

10    between Simon Property Group, any lawyers from Simon

11    Property Group, Dave Donaway, anybody within that

12    corporation, to or from yourself, that are not in there?

13         A    No.

14         Q    Okay.  Did you bring any documents, electronic

15    or otherwise, concerning the formation of Nolo

16    Marketing, LLC, in the articles of incorporation?

17         A    I just brought the letter I brought back from

18    the IRS after applying for the company, just the

19    confirmation number.

20         Q    Can I see that?  Okay.  How do you know --

21    strike that.

22              When you said, just Dave, you're

23    referring to Mr. Donaway?

24         A    Yes.

25         Q    Head of Security for Simon Property Group, the
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 15

1    plaintiff in this case?

2         A    Yes.

3         Q    Okay.  How do you know Dave?

4         A    He sent me an e-mail that's in there, in that

5    package, a while back letting me know who he is and to

6    correspond with him.

7         Q    Okay.  Other than that e-mail, have you

8    corresponded with him?

9         A    No.

10        Q    Have you talked with him?

11        A    I've talked to him just, I think it was around

12   Christmastime, there was a deposition I apparently

13   didn't show up for that I didn't have any notice, and he

14   just called to make sure everything was all right.  And

15   I let him know I was never served the subpoena, so

16   that's why I didn't show up.

17        Q    Have you met with him or talked to him at any

18   time other than that?

19        A    Yes.  Just to sign an affidavit saying that I

20   didn't receive a subpoena.  Trying to think.  That's the

21   only time I've met her.

22        Q    Mr. Donaway seems to remember also having a

23   meeting with you at a restaurant or a bar.  Do you

24   remember that?  It was the Elephant Bar, which would be

25   a restaurant around the Millennia Mall area.

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 16

1      **A     I don't recall meeting with him at Millennia**

2   **or Elephant Bar.**

3      Q     Do you recall meeting him at another

4   restaurant?

5      **A     Just the StarBucks, just to sign the subpoena.**

6      Q     Okay.  Any other times?  Trying to figure out

7   why Mr. Donaway would be -- have in his notes that he

8   met with you at a restaurant.

9      **A     We met once -- there was another document I**

10  **signed, we had to have it notarized.  We went to my**

11  **bank, which was Chase Bank.**

12     Q     What did you notarize there?

13     **A     I'm trying to remember.  One was for the**

14  **subpoena.  It might have been the same reason.  I think**

15  **we did it twice, where I wasn't served a subpoena, so**

16  **needed my signature that I wasn't served.  And then I**

17  **think this past time was because we were served a**

18  **subpoena, and then that date didn't work out.**

19     Q     Okay.  Did you ever meet with him for any

20  other purpose?

21     **A     No.**

22     Q     What about any of the lawyers in this case?

23     **A     None.**

24     Q     Did you meet with Mr. Brian Blair?

25     **A     Just at the deposition last time.**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                                    Page 17
 1       Q    Did you ever meet him prior to that

 2  deposition?

 3       A    No.

 4       Q    Okay.  The deposition which Mr. Blair took of

 5  you was January 9, 2012.  Are you familiar with that?

 6       A    Yes.

 7       Q    And at that deposition was Mr. Blair on behalf

 8  of Simon Property Group, yourself, Mr. Kristopher

 9  Cruzada, on behalf of Lynnette Lauria.  You remember

10  him?

11       A    Mm-hmm.  Yes.

12       Q    And Dave Donaway?

13       A    Yes.

14       Q    Do you remember that?

15       A    Yes.

16       Q    Okay.  I, myself, was not there, correct?

17       A    Correct.

18       Q    My clients were not there, correct?

19       A    No.

20       Q    Okay.  Is it your understanding that my

21  clients were not part of that lawsuit at the time that

22  you gave the deposition?

23       A    Correct.

24       Q    Okay.  The deposition that you gave with

25  Mr. Blair kind of read like it was spoonfed to you.  So
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                                    Page 18
 1    I'm going to ask you some questions.

 2             MR. GREEN:  I object to that characterization.

 3    BY MR. BRAND:

 4        Q    Prior to that deposition, did anybody discuss

 5    the deposition with you, the facts, the questions?

 6        A    No.

 7        Q    Okay.  Did you have any knowledge going into

 8    the January 9, 2012 deposition, of what the issues were

 9    that you were going to be questioned on?

10        A    No.

11        Q    Okay.  How did they -- how -- who contacted

12    you for that deposition?

13        A    I believe it was the -- Mr. Blair, just a

14    regular subpoena.

15        Q    Okay.  Did he call you?

16        A    No.

17        Q    So you got served with the subpoena to come to

18    his office?

19        A    Yes.

20        Q    Okay.  Is that the first time you met

21    Mr. Blair?

22        A    Yes.

23        Q    Prior to the deposition, did you discuss this

24    matter with Dave Donaway?

25        A    No.
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 19

1        Q     Did you discuss this matter with anybody else

2     from Simon Property Group?

3        **A     No.**

4        Q     Did you discuss this matter with a Rex Homme,

5     H-o-m-m-e?

6        **A     Never heard of him.**

7        Q     Okay.  Is the expert witness that Simon

8     Property Group has hired, did you ever get contacted by

9     Mr. Homme?

10       **A     No.**

11       Q     His report has you all over it.  Tommy, when I

12    was trying to reach you for the taking of this

13    deposition, is there a reason why you didn't return my

14    phone calls or e-mails?

15       **A     It seemed as though yourself and the Simon**

16    **attorneys were not on the same page, and dates were**

17    **being made without contacting each other, and both**

18    **parties have to be present, and I kept getting e-mails**

19    **saying that those dates weren't cleared with them.  So I**

20    **just was waiting for an accurate date.**

21            **(Defendants' Exhibit 3 was marked for**

22            **identification.)**

23    BY MR. BRAND:

24       Q     Tommy, what has been marked as composite

25    number 3, are those the same records that you provided

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 20

1    to Mr. Blair during your first deposition?

2         **A    Yes.**

3         Q    Is there anything else given to Mr. Blair that

4    you have not brought with you here today?

5         **A    No.  It's the same exact file.**

6         Q    Going back to Exhibit A of the subpoena, are

7    there any other records that you may have, whether

8    they're at home or on a computer, on a cell phone, that

9    exists, but just are not part of this original package?

10        **A    No.**

11        Q    In reading over your January 9, 2012

12   deposition, obviously, I have a lot of comments.  So let

13   me start off by asking, have you, yourself, been able to

14   review your deposition?

15        **A    Yeah.  I reviewed it about a week or two**

16   **afterwards at the court reporter's office.**

17        Q    So that would be in January of 2012?

18        **A    Yes.**

19        Q    Have you reviewed it since?

20        **A    No.**

21        Q    Before we get into this actual deposition, we

22   have to kind of lay a ground work as to who everybody --

23   who all the players were.

24        **A    Mm-hmm.**

25        Q    So I want to start with that.  You worked for

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                              2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 21

1    a company called Image Marketing at the time, correct?

2        **A**    **Correct.**

3        Q    Which is a defendant in this case, correct?

4        **A**    **Yes.**

5        Q    Of which you were a part owner of?

6        **A**    **No.**

7        Q    Correct?

8        **A**    **That's not correct.**

9        Q    That's not correct?

10       **A**    **No.**

11       Q    Let me show you tax returns.  I know there is

12   more, but, I'm going to show you just the ones that I

13   have brought.  I brought 2009, 2010, tax returns to

14   Thomas Brignolo, and I'm going to show them to you.

15   Start off with number ten here.  Those are your tax

16   returns.  Have you seen those before?

17       **A**    **They look familiar.  They all kind of look the**

18   **same.**

19       Q    Your file tax returns.  Do you know an

20   accounting firm by the name of Mollica and Jenson?

21       **A**    **Yes.**

22       Q    And who are they?

23       **A**    **They are the accountants that Image Marketing**

24   **used.**

25       Q    Are they also your accountants?

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                        2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                               Page 22
 1        A    Yeah.  The whole office went there every year
 2    to do taxes.
 3        Q    Okay.  So when I ask you who they are, they're
 4    your accountants?
 5        A    They're not my accountants.
 6        Q    They filed this on your behalf.
 7        A    At the time the whole office went to
 8    Mr. Mollica, and they did our taxes.
 9        Q    Including your --
10        A    So, they did mine as well.
11        Q    Okay.  So let's not play with semantics.
12    Let's actually stick to the facts here.  So they were
13    your accountants?
14        A    They were -- the answer to your question is,
15    yes, they were my accountants, because that's where
16    everybody went.
17        Q    Okay.  Perfect.  Look at the front page,
18    please.  You'll see that on the tax schedule K-1 form,
19    there is an A through M on the first page.  You see
20    that?
21        A    Mm-hmm.
22        Q    Go to number B, and can you please read that
23    for me?
24        A    Partnership's name, address, city, state, zip
25    code, Image Marketing of Florida --
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                       2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 23

```
 1        Q     LLC?

 2        A     -- LLC.  PO Box 690573, Orlando, Florida,

 3   32869.

 4        Q     Can you please go to Line H and read that to

 5   me?  What box is checked off?

 6        A     Domestic partner.

 7        Q     Okay.  Can you please go to, F, and read the

 8   name as to who the domestic partner is?

 9        A     Is that the one that's blocked out here?

10        Q     No.  It's right here.

11        A     That would be myself, Thomas Brignolo.

12        Q     And what year is that Schedule K-1?

13        A     2010.

14        Q     Okay.  Let me show you another document which

15   is the previous year's tax return, and ask you to read

16   the date on that.

17        A     2009.

18        Q     Okay.  And ask you as well to look at letter

19   H -- I mean, letter F, and whose name appears there?

20        A     My name, Thomas Brignolo.

21        Q     And on letter H of that form?

22        A     Domestic.

23        Q     What box is checked off?

24        A     Domestic partner.

25        Q     Okay.  Domestic partner of Letter B says what?
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)

2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                              Page 24

 1        A     Image Marketing of Florida, LLC.

 2              MR. BRAND:  Please mark those as Defense

 3        Composite 4.

 4              (Defendants' Exhibit 4 was marked for

 5        identification.)

 6   BY MR. BRAND:

 7        Q    So, as a partner of Image Marketing, you had a

 8   fiduciary duty and responsibility to your partners, did

 9   you not?

10        A     I was not treated as a partner or an owner.

11        Q    Okay.  I didn't ask you if you were treated, I

12   asked you as a partner.

13        A     I --

14              MR. GREEN:  Objection, calls for a legal

15        conclusion.  He doesn't know what the law requires.

16              MR. BRAND:  Well, that's an assumption.

17              THE WITNESS:  Like I said, I was not treated

18        as a partner.  I didn't know I was a partner.

19        These taxes are prepared for me.  Never done taxes

20        in my life.  And still, to this day, when I own my

21        own business, I drop off my taxes because I don't

22        want to do them wrong.

23              So this is what I was given.  I wasn't -- not

24        under the knowledge that I was an owner of the

25        company.
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 25

```
 1   BY MR. BRAND:

 2        Q    You drop off your taxes so that the CPA can do

 3   them correctly, is that what you're saying?

 4        A    Yeah.  I don't do my own taxes.  I never want

 5   to mess up or anything.

 6        Q    That's why you rely on a CPA to do them

 7   correctly?

 8        A    Yes.

 9        Q    And then you sign off on your taxes, correct?

10        A    Correct.

11        Q    Just as you did for Exhibit 4?

12        A    This was done as a group with Image Marketing.

13        Q    It's 2013 now, so, should we -- are you saying

14   if we contacted the IRS and let them know that the tax

15   returns are incorrect, you're going to stand by that

16   with the IRS?  You were actually not -- are you trying

17   to disavow yourself as being a partner now?

18        A    I was never a partner.  So if the IRS wants to

19   redo my taxes, sobeit.

20        Q    You did sign those tax returns?

21        A    Yeah, I did.

22        Q    May I see those?  And, Tommy, you're aware

23   that Image Marketing of Florida, LLC, is a defendant in

24   this case?

25        A    Correct.
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                   2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 26

1      Q    Correct?

2            And have you reached an agreement with

3    Simon, that if Simon Property got a judgment against

4    Image Marketing of Florida, LLC, that they would not be

5    able to come back after you now?

6      A    **We don't have any such agreement.**

7      Q    Are you aware that Simon Property can do that?

8      A    **No.**

9      Q    Okay.  So are you aware that Simon Property,

10   by cozying up with you, and getting the information from

11   you, can actually now go against you at the same time?

12     A    **It's a risk.**

13     Q    Okay.  So you were telling me why all of a

14   sudden you stopped returning my telephone calls and my

15   e-mails, and you were saying that you were getting

16   e-mails that the dates were not being coordinated

17   between all the parties, correct?

18     A    **Yes.**

19     Q    Okay.  Who was sending you such e-mails?

20   Because I know I wasn't.

21     A    **Carlos from this law firm.**

22     Q    Carlos Mustelier?

23     A    **Yes.**

24     Q    What e-mails was he sending?

25     A    **Just letting me know that you hadn't**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 27

1   **corresponded with him on the dates of these subpoenas.**

2       Q    Why would he be sending you this -- why would

3   that be relevant to you?

4       **A    Well, he would need to be here.**

5       Q    Why was he sending you e-mails?

6       **A    I -- he contacted me first, I believe.  When I**

7   **said that I was leaving the country, he wanted to know**

8   **the dates to make sure that he was here for these**

9   **subpoenas, or for these depositions.**

10      Q    Tommy, one of the -- one of the documents I

11  asked you to bring was any and all e-mails from any

12  attorney representing Simon Property Group, the

13  plaintiff in this case.  And now you're telling me they

14  exist, but you didn't bring them.  Is there a reason?

15      **A    No.  I mean, they were just basic dates.  No**

16  **discussions on -- on the case or anything like that.**

17      Q    Okay.  Were there any other e-mails that you

18  may have?

19      **A    I suppose I have them, just a couple from**

20  **Carlos just discussing dates.**

21      Q    What about with Brian Blair just discussing

22  dates?

23      **A    No.  I never received anything from him.**

24      Q    So, again, it makes me suspicious, Tommy, as

25  to why Mr. Mustelier would be sending you e-mails

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                        2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 28

1    concerning issues or scheduling problems that he may

2    have been having with me.

3        A    He -- I asked a question afterwards.  You made

4    it seem, and made me feel under the impression, if I did

5    a deposition, that would relieve me of the trial.

6    Because I have contacted you, yes, for my contact

7    information for, I think it was July, or June 22, or

8    something like that, deposition we were going to have.

9    I let you know I would be leaving out of town.  You made

10   it seem like if I did this deposition I wouldn't have to

11   be at the trial, which was not true, I found out

12   afterwards.

13              So at that point that's when I decided

14   not to contact you anymore.  I felt you were trying to

15   dismiss me from the trial.  So that's when Mr. Carlos

16   let me know that he would be doing all the dates from

17   now on, or let me know that you had to contact him.

18       Q    Well --

19       A    Both parties had to be there.

20       Q    This is going to be interesting now, Tommy,

21   because now you're going to speak to something that I

22   have personal knowledge about.  So when did I ever tell

23   you that if I took your deposition, I would forego any

24   need of you in a trial?

25       A    I didn't say you said it, I said it made me

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 29

1    **feel under the impression of.**

2        Q    Well, how would I make you feel under the

3    impression that if I took your deposition, I was going

4    to somehow eliminate the need of you for trial?

5        **A    I let you know the dates I was leaving and I**

6    **believe the e-mail was asking if there was something we**

7    **could do to speed this up because I was looking to move**

8    **around the first of August, and you said that you would**

9    **do this deposition.   That, to me, made it sound like I**

10   **didn't have to do the trial.**

11       Q    But just to be clear, I never told you --

12       **A    Correct.**

13       Q    -- verbally or in writing that if I took your

14   deposition, you would be somehow excused or eliminated

15   for the need to be there at trial?

16       **A    Correct.   You didn't say that.   That was the**

17   **impression I got.**

18       Q    So that was -- because I moved to subpoena you

19   for deposition, you somehow understood that to mean that

20   if I took your deposition, you would not be needed at

21   trial?

22       **A    Yes.**

23       Q    Okay.   That was your belief?

24       **A    Yes.**

25       Q    Okay.   So, instead, you decided that you were

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 30

1   going to start speaking to Mr. Mustelier?

2       **A     Yes.**

3       Q     The plaintiff in this action?

4       **A     Yes.**

5       Q     Okay.  What did Mr. Mustelier tell you?

6       **A     That if I did a deposition, that doesn't**

7   **relieve me of being at the trial, and that he would set**

8   **up a new date for the deposition.**

9       Q     Okay.  And did Mr. Mustelier tell you that he

10  cannot control the date schedulings in this case?

11      **A     No, he didn't say anything like it was his**

12  **decision.**

13      Q     Okay.  In fact, I -- I was the one who served

14  you with a subpoena in this case, correct?

15      **A     Yes.**

16      Q     Okay.  With a date?

17      **A     Yes.**

18      Q     The same date that we are here on today?

19      **A     Correct.**

20      Q     Okay.  In the e-mail that you did send me,

21  it's dated June 26, 2013, and states -- it's from you to

22  me.  I'm not available to meet you.  I've been in

23  contact with SPG's -- that stands or Simon Property

24  Group? --

25      **A     Yes.**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                                    Page 31
    1        Q    -- attorney, and he'll be setting up for the

    2   contact for any depositions.  Thanks.  Also, my

    3   employee, Carolyn, will not be able to answer your

    4   calls.  Tommy Brignolo.

    5                Do you remember sending me that e-mail?

    6        A    Yes.

    7        Q    Okay.  Carolyn, is that the same Carolyn who

    8   is going to now be running Nolo Marketing?

    9        A    Yes.

   10        Q    Have you ever been convicted of a crime?

   11        A    Yes.

   12        Q    And which crime would that be?

   13        A    DUI.

   14        Q    What else?

   15        A    Battery, but that was dropped.

   16        Q    Okay.  Ever pled guilty to a criminal act?

   17        A    No.

   18        Q    No?

   19        A    I don't believe so.

   20        Q    Okay.  Have you ever presented false

   21   statements?

   22        A    In this case?

   23        Q    In any case.

   24        A    This is the only case I've ever been in.

   25        Q    Okay.  Have you ever been involved in any type
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                              Page 32
```

1    of litigation or lawsuit, whether in a criminal context,

2    administrative context, or civil context --

3         **A    No.**

4         Q    -- involving dishonesty?

5         **A    No.**

6         Q    Have you ever been involved in any type of

7    legal process, whether it's civil, administrative,

8    criminal, involving a business, whatever, involving

9    filing false reports?

10        **A    No.**

11        Q    Okay.  Have you ever pled guilty to any charge

12   of filing a false report?

13        **A    No.**

14        Q    Okay.  Is your date of birth 4/28/1983?

15        **A    Yes.**

16        Q    Tommy, who is Joseph Antanobi?

17        **A    I believe that's Tim Herman's partner.**

18        Q    When you say, partner, are we talking about

19   domestic partner, business partner?

20        **A    Boyfriend.**

21        Q    Boyfriend.  Okay.  And am I correct to say

22   that at one point in time you and Tim Herman, who is

23   also the defendant in this case, were domestic partners?

24        **A    Yes.**

25        Q    And after you and Tim Herman had dissolved

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 33

1    your personal relationship, is it your understanding

2    that Joseph Antinobi was Tim Herman's next boyfriend?

3        **A    Yes.**

4        Q    Okay.  And he would be coming -- he, too,

5    would be working with Tim Herman and coming into the

6    office, correct?

7        **A    Not while I was there.**

8        Q    Not while you were there?

9        **A    No.**

10       Q    Okay.  So we were talking about -- I'm sorry

11   for getting side tracked.  We were talking about who the

12   players are in this.  And now that we have, we mentioned

13   Tim Herman.  Tim Herman is who, as you understand it?

14       **A    The owner of Image Marketing.**

15       Q    Does Tim Herman also have other corporations?

16       **A    Yes.**

17       Q    Does he have -- does Tim Herman have side

18   ventures?

19       **A    Yes.**

20       Q    Does Tim Herman -- I'm going to use the term,

21   but I'm going to use the term so that you understand

22   where I'm going to go with it.  I'm going to use the

23   term, beat to his own drum, so to speak.  And by that I

24   mean, Tim Herman has the business ventures that he's

25   working on, whether co-owns or owns it, am I correct to

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                                    Page  34
  1    say that he's pretty much in charge of the business?

  2         A    Yes.

  3         Q    And he keeps things to himself?

  4         A    Absolutely.

  5         Q    Is it fair to say that not only for you, but

  6    for Ryan or for Dale, that if Tim Herman is involved

  7    with anybody, that doesn't mean that Tim Herman gives

  8    free reign to the other person or even candidness to the

  9    other person, whether it's his partner or not?

 10              MR. GREEN:  Objection.

 11    BY MR. BRAND:

 12         Q    Do you understand what I'm saying?

 13         A    No.

 14         Q    Is it fair to say that Tim Herman, both in his

 15    personal life and his professional life, has an air of

 16    secrecy to him?

 17         A    Absolutely.

 18              MR. GREEN:  Objection.

 19    BY MR. BRAND:

 20         Q    Is it fair to say that Tim Herman in his

 21    professional life, as you know it and as you understand

 22    it, keeps what he is doing secretive?

 23              MR. GREEN:  Objection.

 24    BY MR. BRAND:

 25         Q    You can answer.
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)

2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 35

1    **A     Yeah.**

2    Q    Are you aware of -- let's start with like, a

3    computer.   If Tim -- does Tim Herman have his own

4    computer?

5    **A     I'm sure he does.**

6    Q    At the time that you worked for Image

7    Marketing, did Tim Herman have his own computer?

8    **A     Yeah.**

9    Q    Is it -- am I correct in saying that Tim

10   Herman would keep that computer under password

11   protection, both with a fingerprint password as well as

12   a type-in password?

13   **A     Yes.   I remember -- I've never seen a computer**

14   **with a fingerprint, so I thought that was cool, so of**

15   **course I remember that.**

16   Q    Is it fair to say, as you understand it, Tim

17   Herman never shared his password with anybody?

18   **A     No, he couldn't because you also had to have a**

19   **fingerprint.**

20   Q    Is it fair to say that when Tim Herman was

21   dealing with somebody, such as Lynnette Lauria, he would

22   maintain -- as far as you know, he would maintain that

23   relationship under the strictest of confidence?

24   **A     Yes.**

25   Q    Is it fair to say, as you know it and

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                              Page 36
 1    understand it, that Tim Herman would even keep that type
 2    of relationship, such as with Lynnette Lauria,
 3    confidential, even from you?
 4         A    Yes.
 5         Q    Is it fair to say that, if he would keep that
 6    confidential from even you, the person who is -- had a
 7    domestic relationship with, that he would even keep that
 8    relationship secretive from Ryan Deming?
 9              MR. GREEN:  Objection.
10              THE WITNESS:  I don't know -- can you repeat
11         the question?
12    BY MR. BRAND:
13         Q    Yeah.  As far as you know, did Tim Herman ever
14    share his business relationship with Lynnette Lauria,
15    with Ryan Deming?
16              MR. GREEN:  Objection.
17              THE WITNESS:  I wouldn't know.
18    BY MR. BRAND:
19         Q    Okay.  Did you ever see Tim Herman invite Ryan
20    Deming into meetings with Lynnette Lauria that you were
21    not invited to?
22         A    Well, if I wasn't at the meeting I wouldn't
23    know if he was there.
24         Q    Well, you may have.  Did you ever see Tim
25    Herman and Lynnette Lauria all of a sudden call Ryan
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 37

1    Deming into an office?

2        **A    No.**

3        Q    Did you ever see Tim Herman with Lynnette

4    Lauria ever call Ryan Deming anywhere and not call you

5    into the same meeting?

6        **A    No.  I was never in any meetings with all of**

7    **them, including Ryan.**

8        Q    Did you ever know Ryan Deming to ever meet

9    with Lynnette Lauria, absent Tim Herman?

10       **A    No.**

11       Q    Okay.  Same questions, but now with Dale

12   Takio.  Did you ever see Dale Takio meet with Lynnette

13   Lauria?

14       **A    No.**

15       Q    So, not just that one answer, that's great.

16   I'm going to expand it out just a little bit.  Am I --

17   is it fair to say then, that you never saw Dale Takio in

18   a meeting with Lynnette Lauria or having any kind of

19   conversation with Lynnette Lauria?

20       **A    I've never seen them together.**

21       Q    Are you aware -- and now I'm asking you, it

22   can be pillow talk, it can be social talk, whatever --

23   did Tim Herman ever tell you, hey, Ryan Deming or Dale

24   Takio just had a meeting, or just had this conversation

25   with Lynnette Lauria?

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 38

1      **A     No.  I don't think Tim would want those two**
2  **people to -- or Ryan -- I'm sorry.  I don't think Tim**
3  **would ever want Ryan or Dale to meet with Lynnette, if**
4  **Tim wasn't there.**
5       Q    Thank you very much.  Now, let me ask, why?
6  Because I agree with you, Tim wouldn't.
7      **A     Tim and Lynnette's relationship was Tim had**
8  **Lynnette on a pedestal, I never seen her in the office.**
9  **They would just go out, have lunch meetings, happy hour**
10 **meetings.  He wouldn't want anyone to talk to her, ever.**
11      Q     Including Ryan Deming and Dale Takio?
12     **A     Right.**
13      Q    Okay.  Are you aware if Tim Herman and
14 Lynnette Lauria's business relationship was maintained
15 outside of the office context?
16     **A     Yeah.  They were friends as well.**
17      Q    Okay.  Are -- now, I believe you said that
18 Lynnette would never come to the office, is that
19 correct?
20     **A     Maybe in the -- was it five or six years I was**
21 **at Image, maybe I saw her in passing there once or**
22 **twice.**
23      Q    I want you to understand this.  I represent
24 Ryan, I represent Dale, as you know.  I do not represent
25 Tim.

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                                    Page 39
```

1      **A**    **Okay.**

2      Q    And I say that for purposes of, these are my

3    clients.  Is it fair to say, then, that if Tim wanted to

4    engage Lynnette Lauria in business, the two of them

5    would meet, and you would not be aware of Ryan Deming or

6    Dale Takio being involved in that meeting?

7           MR. GREEN:  Objection.

8    BY MR. BRAND:

9      Q    You can answer.

10     **A**    **Right.**

11     Q    Correct?  That's your understanding?

12     **A**    **Yes.**

13     Q    Did Tim -- since you had a domestic

14   relationship as well, did Tim ever tell you, socially,

15   casually, domestically, that Ryan Deming or Dale Takio

16   was involved with Lynnette Lauria on a one-on-one type

17   of business?

18     **A**    **If Ryan and Dale were?**

19     Q    Yes.

20     **A**    **No.**

21     Q    Did he ever mention it?

22     **A**    **No.**

23     Q    Did he ever mention himself engaged in

24   business with Lynnette Lauria?

25     **A**    **Yeah.  Several times.**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 40

1      Q     Okay.  You said they were friends as well

2   as --

3      **A     Friends.**

4      Q     Okay.  Did they go out socially together as

5   well?

6      **A     Yes.**

7      Q     Okay.  In your deposition, your January 9,

8   2012 deposition, you were -- you stated that it was your

9   belief or understanding that a kickback relationship

10   existed with Lynnette Lauria.  Do you remember that?

11      **A     Yes.**

12      Q     Okay.  It's unclear to me as to whom you

13   thought was involved in this kickback scheme.  Are you

14   saying that Ryan Deming was involved with Lynnette

15   Lauria in this kickback scheme, or did Tim Herman -- is

16   it your belief that Tim Herman had his own relationship

17   with Lynnette that would involve a kickback scheme?

18      **A     I was under the assumption it was Tim.   I**

19   **don't have the specifics or the accounting books or**

20   **credit card machine receipts or anything, so I don't**

21   **know the specifics.  But, to my knowledge, it was Tim.**

22      Q     Okay.  Would not be Ryan?

23      **A     Right.**

24      Q     Would not be Dale Takio?

25      **A     Right.  Ryan wasn't part of the company for**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 41

1    **the past two years that I was even there.**

2        Q    Okay.  Perfect.  I believe Ryan left in

3    October of 2010, correct?

4        **A    That date sounds right.**

5        Q    Okay.  And before that, Ryan was already

6    weeding himself out --

7        **A    Correct.**

8        Q    -- and was creating distance?

9        **A    Yes.**

10       Q    Yes?  Okay.  The context -- and I know

11   Mr. Blair took you through a long deposition.

12       **A    Mm-hmm.**

13       Q    Almost 200 pages.  The context of these 200

14   pages, almost, was that -- was it also your belief or

15   contention that there may have been false billings or

16   irregularities going on that you wanted to be

17   disassociated with, and that is why you came forward

18   with this information, correct?

19       **A    Yes.**

20       Q     In the 200 pages, it was pretty -- it was kept

21   general by Mr. Blair, and it was probably kept general

22   on purpose.

23           MR. GREEN:  Objection to the characterization.

24   BY MR. BRAND:

25       Q    So I'm going to ask you a little bit more

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 42

1    detail to that.  Do you have any proof or evidence that

2    if there was any big billing irregularities, or false

3    billing or billings for services not performed, that it

4    was -- that those billings were created by Ryan Deming?

5        A    No.  Just what's in that -- just those

6    documents there.  That's all I have.

7        Q    Okay.  Do you have any belief, evidence, or

8    contention, that any billing irregularities or false

9    billings or billing for services not performed, were

10   created by Dale Takio?

11       A    No.  Tim did all the billing.

12       Q    Did Tim do all the billing on his own personal

13   laptop?

14       A    I would assume so.

15       Q    Okay.  Is it your understanding, and based

16   upon your involvement at Image, that Simon Property's

17   billings were created by Tim Herman solely?

18       A    I believe it was Tim and Rachel Lauria, or --

19   I can't remember the two names of Lynnette's daughters.

20   One of them was Lynnette's daughter.

21       Q    Okay.

22       A    Sarah.

23       Q    Sarah Laggy?

24       A    Sarah Laggy and Tim did the accounting.

25       Q    Okay.  Your -- it is not your understanding,

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 43

1    am I correct, that Ryan Deming had any part of Simon's

2    billings?

3         **A     I don't believe so.**

4         Q     Did you ever see Ryan Deming partake in any of

5    Simon's billing?

6         **A     No.**

7         Q     Did you ever see Dale Takio partake in any of

8    Simon's billing?

9         **A     No.**

10        Q     Is it your understanding that any and all

11   bills submitted to Simon Properties was done so by Tim

12   Herman?

13        **A     Say that again?**

14        Q     Was it your understanding that any and all

15   billings submitted to Simon Property Group was done so

16   by Tim Herman?  And I read your deposition regarding

17   Sarah.  I think your testimony was, Sarah would e-mail

18   those?

19        **A     Right.**

20        Q     But those would actually then get submitted by

21   Tim?

22        **A     Correct.**

23        Q     That's still your understanding?

24        **A     Yes.**

25        Q     Okay.  Do you know if Tim was making money

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 44

1    from any of his companies, including companies that he

2    may have shared a partnership with with Ryan or Dale,

3    that Tim was making more than he should have?

4        **A    I don't know the specifics, but he was very**

5    **secretive of all his accounting anyway, so, I wouldn't**

6    **know profits and percentages.**

7        Q    Did -- did it come up in any type of scenario,

8    given your domestic relations, that you knew or saw Tim

9    maybe skimming or taking money that should have been

10   shared with Ryan or Dale?

11       **A    I know that, when I would check the PO Box, no**

12   **bank statements were able to be left in the office and**

13   **go directly to Tim.  So he just wanted everything to be**

14   **a secret, including the checkbook.**

15              **He didn't want them to know, or myself to**

16   **know, any numbers or profits or checking account, bank**

17   **accounts, nothing like that.**

18       Q    Okay.  So, am I fair to say that if Ryan

19   Deming stated that he did not have access to the bank

20   records for Image Marketing Company, that would be

21   correct, is that your understanding?

22       **A    That would be correct.**

23       Q    And if Dale said he couldn't see the numbers

24   because he couldn't access the bank statements, that

25   would be, as you just stated, because Tim would always

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 45

1    take those statements?

2         **A    Yes.**

3         Q    And are you aware of Tim ever freely or

4    voluntarily giving up that information?

5         **A    No.  Never.**

6         Q    Not even to yourself?

7         **A    No.**

8         Q    Okay.  Did you ever see Ryan Deming and/or

9    Dale Takio create an invoice and submit it to Simon

10   Property Group?

11        **A    No.**

12        Q    Okay.  We have now -- you got to, you,

13   yourself, so now, just got Tim in the office and now,

14   Ryan and Dale and anybody else.  But I believe you came

15   to work for Image Marketing in about 2003?

16        **A    Sounds right.**

17        Q    Okay.  And before that, you worked, I believe,

18   in a restaurant in Connecticut, correct?

19        **A    Yes.**

20        Q    All right.  When you came to Image Marketing,

21   what was your role?

22        **A    Distribution.**

23        Q    Distribution of what?

24        **A    Marketing materials to all the Orlando hotels.**

25        Q    And who brought you into the company?

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                                2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 46

1      A     Tim Herman.

2      Q     And for whom were you distributing marketing

3  material for at that time?

4      A     Just a couple restaurants.  I think the

5  Florida Mall was one of our clients by then.  Air boat

6  rides, tourist attractions.

7      Q     Were you distributing marketing information to

8  the hotels for Florida Mall?

9      A     Yeah.  Little referral cards.

10     Q     That's in 2003.  You did not continually work

11  for Image Marketing through 2011, correct?

12     A     There was a break of about six months, I

13  believe, I didn't work with them.

14     Q     I want to just put this back in perspective.

15  There was a time -- and I'm not trying to trap you here,

16  I'm trying to lay a timeline.  There was a time that you

17  went to work for, I believe, a car company, correct?

18     A     Correct.

19     Q     Do you remember that car company?

20     A     Advantage.

21     Q     Advantage car company.  And you were --

22  correct me if I'm wrong, but I believe you were let go

23  from Image Marketing at that time because of a DUI that

24  you told us about earlier?

25     A     Mm-hmm.

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                                    Page 47
 1        Q    And since your job involved driving and
 2   distribution of materials, Image Marketing could not
 3   have you employed at that particular time, given the
 4   DUI, correct?
 5        A    Yes.
 6        Q    Okay.  So you went to work for Advantage, and
 7   I believe it was, according to this, about -- about a
 8   year, you said, in that.  Does that sound about right?
 9        A    Probably just -- yeah.  Just under a year.
10        Q    Okay.  And then how did you get back to Image?
11   And I believe the year for that was around 2006, 2007?
12        A    Sounds right.
13        Q    Okay.
14        A    I had ran into Ryan, Dale and Tim, because the
15   car rental industry is hospitality, I think they were
16   getting rid of somebody, and asked if I wanted to come
17   back.
18        Q    Okay.
19             And at that time your license had been
20   cleared?
21        A    Yeah.
22        Q    So you were now able to drive again, correct?
23        A    Correct.
24        Q    And did they take you back for the purposes of
25   distribution of marketing material?
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)

2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 48

1        **A      Yeah.  Same.**

2        Q      Same?

3        **A      Mm-hmm.**

4        Q      What was your role in full at Image Marketing?

5        **A      In the beginning, just distribution.  Towards**

6        **the end, they had let go of a secretary, the office**

7        **manager.**

8        Q      Babette?

9        **A      Babette.  We had an intern for a while named**

10       **Michelle.  She was no longer an intern.  There was**

11       **somebody named Denise who was doing distribution as**

12       **well.**

13               **So basically -- and after Ryan left,**

14       **Image Marketing was pretty much down to me running**

15       **around, doing a little bit of office work.  That's about**

16       **it.**

17       Q      Okay.  While -- before Ryan left, and I

18       believe -- this is important, so I need you to really

19       think about these dates.  Ryan officially left Image

20       Marketing in October of 2011.

21               MR. DEMING:  (Indicating)

22       BY MR. BRAND:

23       Q      2010.  Sorry.  I believe that Ryan had

24       already, during the course of that year, going back six

25       to eight months before, already started to put some

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 49

1   distance between himself, Tim, and the company, is

2   that --

3       **A    Yes.**

4       Q    -- your recollection as well?

5       **A    Yes.**

6       Q    So Ryan at that point had very little

7   involvement with Image Marketing during, really, most of

8   2010?

9       **A    Yes.**

10      Q    Would you say that's fair?

11      **A    Correct.**

12      Q    I believe at one time, even, there was an

13  instance early in 2010 that Tim took it upon himself to

14  lock Ryan out of the office and change the locks.  Do

15  you remember that?

16      **A    Yes.**

17      Q    Okay.  So basically at that point Ryan doesn't

18  have anything to do -- neither Ryan nor Dale can even

19  get into the office at Image Marketing.  Do you remember

20  that?

21      **A    Yes.**

22      Q    Would it be fair to say that at that point

23  during this early part -- during late 2009, early 2010,

24  did Tim put more attention or focus on relying on you,

25  or was he still set off?

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                        2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 50

1       **A      Tim was never in the office.**

2       Q      Okay.

3       **A      He would come in to grab checks, run credit**

4       **cards, and then he would just be gone.**

5       Q      Okay.  So is it fair to say from -- for at

6       least late 2009 and most of 2010, then, really, the only

7       people in the office would either be yourself, Michelle,

8       Denise, Babette?

9       **A      Yes.**

10      Q      Okay.  Ryan was already pushing himself away

11      from Image, correct?

12      **A      Correct.**

13      Q      And if Ryan's pushed away, so is Dale,

14      correct?

15      **A      Right.**

16      Q      Okay.  In June of 2011, we didn't know each

17      other at that time?

18      **A      No.**

19      Q      But I sent you a cease and desist letter.  Do

20      you remember that?

21      **A      Yes.**

22      Q      That was a result of Tim Herman informing me

23      that about June 24, 2011, you had left Image Marketing,

24      and according to Tim, you had taken property belonging

25      to Image Marketing, or other companies associated with

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                              Page 51
 1   Tim Herman?

 2        A    That's what he blamed.

 3        Q    Okay.  And I -- I sent you this letter, cease

 4   and desist letter, and ask you to look at that.

 5        A    Yeah.  That looks familiar.  Yes.

 6             MR. BRAND:  Let's mark that as five.

 7             (Defendants' Exhibit 5 was marked for

 8        identification.)

 9   BY MR. BRAND:

10        Q    I sent this to you certified mail, do you

11   remember that?

12        A    Yeah.  One was -- I remember you sent two, one

13   was certified, one was regular mail.

14        Q    Okay.

15        A    I think it was the same exact letter,

16   basically.

17        Q    Just to be fair, you did not call me back or

18   write to me --

19        A    No.

20        Q    -- concerning this letter, correct?

21        A    Correct.

22        Q    Did you ever bring any documentation back to

23   Image Marketing?

24        A    No.

25        Q    Okay.  Did my nice letter go into the garbage
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 52

1    can?

2        **A    No.  I have it somewhere.**

3            **(Defendants' Exhibit 6 was marked for**

4        **identification.)**

5    BY MR. BRAND:

6        Q    I'm going to show you what's marked as

7    Exhibit 6 now.  And these are the articles of

8    incorporation for Nolo Marketing, LLC.  And I'm going to

9    show you Exhibit No. 6 and ask you if this looks

10   familiar?

11       **A    Yep.**

12       Q    Can you read the date that it was filed,

13   please?

14       **A    June 9, 2011.**

15       Q    Did you and Tim Herman -- at the time that you

16   formed Nolo Marketing, did Tim Herman know that you were

17   doing this?

18       **A    No.**

19       Q    Were you two already fighting?

20       **A    We weren't fighting.  He wasn't in the office**

21   **ever.  So I -- there was not a possibility to be**

22   **fighting.**

23       Q    You -- you were not seeing each other socially

24   at that time, correct?

25       **A    No.**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)

2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 53

1      Q     Were you even really talking at that time?

2      **A     No.**

3      Q     Okay.  So how did it come that you decided to

4  form Nolo?

5      **A     I knew I needed to leave Image Marketing.  No**

6  **one was working there, basically.**

7      Q     Ryan was already gone?

8      **A     Ryan was gone.**

9      Q     Dale?

10     **A     Dale was doing his own thing.  It just looked**

11 **doomed to close.  So this is what I know how to do.**

12 **I've been doing it for the past -- at that time for**

13 **about seven years, decided to do what I know how to do.**

14     Q     Okay.  So it was, sayonara Tim, basically?

15     **A     Yes.**

16     Q     And you decided to start your own business?

17     **A     Correct.**

18     Q     And your own business was going to do what?

19 Basically do what Image Marketing had done?

20     **A     Similar to what Image Marketing had done.  I**

21 **wanted to get into more of the group sale business, plan**

22 **conventions, and then support restaurants in my referral**

23 **program.**

24     Q     Okay.  And what was your referral program?

25 Was it the same thing?

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 54

1      **A      More than Image Marketing.  More -- offering**

2    **more social networking, e-blasts, contacting customers**

3    **in other ways.  But essentially providing those**

4    **restaurants with referral marketing.**

5            MR. BRAND:  Okay.  Going to take a five minute

6        break.

7            (A break was taken.)

8    BY MR. BRAND:

9      Q    Going back, is it fair to say that when you

10   reported this matter to Simon Property Group -- first,

11   just to set the tone, it was you who reported this

12   matter to Simon Property Group, right?

13     **A    Yes.**

14     Q    Is it fair to say at the time that you

15   reported it, you believed that the company that was

16   being reported at that point was really just Tim Herman?

17     **A    Yes.**

18     Q    You did not believe you were involving Ryan

19   Deming into this?

20     **A    Correct.**

21     Q    You did not believe you were involving Dale

22   Takio into this?

23     **A    Correct.**

24     Q    As a matter of fact, the documentation that

25   you reported, and the issues that you reported on in

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 55

1    your head, at least, you believe that to be related to

2    Tim, and Tim Herman, only?

3        **A    Yes.**

4        Q    Okay.  I'm just going through some of this

5    with you.  Some of this, meaning your January 9, 2012

6    depo.

7              And the purpose of what I'm going to do

8    is, is a lot of this, as I said, that's generalized.

9    And what I want is just to ask you whether or not you

10   believe it involved Ryan and Dale, or if they're

11   separated out from this and that this is a Tim Herman

12   issue.

13       **A    Okay.**

14       Q    When you gave your deposition back in 2012 and

15   it's referred to continuously within a deposition, you

16   made comments as, no one was there, the office was

17   empty, it was just you.  Are you, at that time that

18   you're talking about, at least in your head when you

19   gave the deposition, are you talking about post Ryan

20   Deming leaving Image Marketing?

21       **A    Yes.**

22       Q    You're not saying that Ryan Deming was never

23   at the office when he was actually working?

24       **A    Right.  That was towards the end of my**

25   **employment there.**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 56

1    Q    Okay.  When you talk about -- to continue with

2    those thoughts and now I'm going to be general.  But

3    when you were saying that no one was there, no one did

4    any work.  And I believe you did say in here that Tim

5    would come back to collect the checks.  Now I'm going to

6    ask you to go back a time.  There was a point in time in

7    which Ryan Deming was working diligently at Image

8    Marketing, correct?

9        **A    Yes.**

10    Q    And there was a point in time that you did see

11    Ryan Deming when he was working diligently at Image

12    Marketing, he would do whatever job tasks he was

13    responsible for, is that a fair statement?

14        **A    Yes.**

15    Q    When Ryan was putting -- when Ryan was working

16    at Image Marketing, is it fair to say that if

17    distributions were needed, if collateral needed --

18    collateral, meaning, marketing collateral, needed to be

19    distributed, or the concierge program needed to be

20    worked on, Ryan would do his task?

21        **A    Yes.**

22        MR. GREEN:  Objection.

23    BY MR. BRAND:

24    Q    Is it fair to say that when Mr. Rex Homme --

25    who is Simon's expert -- Mr. Homme tries to paraphrase

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)

2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 57

1    your testimony from this deposition into his expert

2    report, and one of the things that Mr. Homme states is

3    that no one from Image -- none of the partners from

4    Image Marketing ever did distribution of collateral for

5    Simon Properties, and, therefore, to paraphrase, his --

6    his report, it must all be a farce?

7           MR. GREEN:  Objection.

8    BY MR. BRAND:

9       Q    With that context, is it fair to say that when

10   Ryan Deming was working at Image Marketing, and

11   distribution was to be done regarding Simon Property,

12   Ryan Deming would do his responsibilities?

13          MR. GREEN:  Objection.

14          THE WITNESS:  It was rare.  Ryan was more

15       managerial side, so less distribution.

16   BY MR. BRAND:

17      Q    But if distribution was needed, would Ryan do

18   it?

19      **A    Yeah.**

20      Q    Are you aware that Ryan Deming would go --

21   when he did do distribution tasks, is it fair to say

22   that you had knowledge of him doing distribution in the

23   Orlando area?

24      **A    Yes.**

25      Q    So, is it also fair to say that he would make

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                          2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 58

1    trips all the way down to south Florida and even to

2    Naples to make distribution, if distribution needed to

3    be done that he could do?

4        **A    Yes.**

5        Q    Okay.  I know you get it.  They completely

6    don't get it.  Simon.  So let me ask you.

7            MR. GREEN:  Objection.

8    BY MR. BRAND:

9        Q    Concierge program, can you please, once and

10   for all, tell everybody what the concierge program was?

11       **A    Sure, concierge program.  Marketing company**

12   **goes out and talks to the concierge, promotes their**

13   **clients.  When a guest approaches the concierge and**

14   **says, what do I do, where do I go to eat, can you give**

15   **me get a tee time for golf, the concierge refers their**

16   **clients, they either give them the guest referral card**

17   **with their name on it, or they call in reservation and**

18   **give the guest name and tack along the concierge name so**

19   **then they get a credit, whether it be gift certificate,**

20   **or cash commission.  So it is a commission for sending**

21   **guests to clients within the referral program.**

22       Q    And was that a program that was created by

23   Mr. Deming, as you understand it?

24       **A    Yes.**

25       Q    And did Mr. Deming work diligently on

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                                    Page 59
 1   promotion and creation of the concierge program?

 2       A    Yes.

 3       Q    And did the concierge -- was the concierge

 4   program used to benefit Simon Properties as well?

 5       A    Yes.

 6       Q    By the way, thank you for that.  Because, for

 7   some reason, 200 pages --

 8       A    It's kind of easy.

 9       Q    Right?

10            Okay.  What's the name of that -- I'm

11   going to ask you if you're aware of this, instead of

12   asking you to explain everything.  Try to shortcut it a

13   bit.  Services provided by Image Marketing.  Okay.

14   Image Marketing provide -- Image marketing would create

15   custom packages for different kinds of clients, correct?

16       A    Correct.

17       Q    Not every client would want the same services,

18   correct?

19       A    Yes.

20       Q    And not every client would want to pay for

21   services that they didn't want to select, correct?

22       A    Yes.

23       Q    And it's fair to say that depending upon the

24   client, or depending upon the size of the client or

25   depending upon what types of services the client wants,
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 60

1    the prices that Image Marketing would charge to each

2    client would differ?

3         **A    Correct.**

4         Q    As part of the services that Image Marketing

5    would provide, are you aware of them providing referral

6    marketing services?

7         **A    Yes.**

8         Q    Redemption tracking services?

9         **A    Yeah.  That is part of the referral program.**

10        Q    Okay.  Trade show representation?

11        **A    Yes.**

12        Q    Hospitality event management?

13        **A    Yes.**

14        Q    Top Spot collateral racks?

15        **A    Yeah.  That's part of the referral program as**

16   **well.**

17        Q    Okay.  But it would still be Imaging Marketing

18   that would have its own top spot racks, correct?

19        **A    Yes.**

20        Q    As a matter of fact, just because they

21   couldn't get that in 200 pages, I need to show you a

22   picture.  This is you, I believe, in front of a top spot

23   rack?

24        **A    Yes.**

25        Q    That's an Image Marketing top spot rack?

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 61

1        **A      Yes.**

2        Q    As a matter of fact, you can read right here,

3   Florida Mall?

4        **A      Yeah.**

5             MR. BRAND:   Okay.  Just mark that.

6             (Defendants' Exhibit 7 was marked for

7        identification.)

8             THE WITNESS:   I was skinny there.

9   BY MR. BRAND:

10       Q    How old were you there?

11       **A      Twenty-five, maybe.**

12       Q    And the top spot racks, they were distributed

13   throughout Central Florida, correct?

14       **A      Yes.**

15       Q    Is it fair to say that Tim Herman would

16   establish other corporations under, maybe, the umbrella

17   of Image or the office setting, I should say, of Image,

18   that may have involved Ryan or Dale, but that there

19   would be other alternative companies there to kind of

20   separate out liabilities or responsibilities?

21       **A      Well, I wouldn't know about liabilities, but,**

22   **yeah, he had other companies.**

23       Q    Okay.  And he used companies for different

24   purposes?

25       **A      Yeah.**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 62

1        Q     So, for instance, like Event Planners, that

2    would be a company that could be used for promotion of

3    tickets to the attractions in Central Florida, so that

4    Image Marketing would have nothing to do with that?

5        **A     Right.**

6        Q     Tommy, you're making this easy.  I'm going

7    through this fast now.

8        **A     It's Friday.**

9        Q     Is it fair to say that Simon Property Group

10   was a large client of Image Marketing?

11       **A     Yes.**

12       Q     Is it fair to say that Simon Property was the

13   client, or the internal client, of Tim Herman?

14       **A     Yes.**

15       Q     Is it fair to say that it was Tim Herman who

16   basically controlled the aspects, or what Image

17   Marketing was to do, or any other Tim Herman related

18   companies was to do, with Simon Property?

19              MR. GREEN:   Objection.

20   BY MR. BRAND:

21       Q     Do you understand my question?

22       **A     Did he handle that client specifically?  Yes,**

23   **most of the time.**

24       Q     Okay.  For instance, Simon Property Group

25   was -- was not the client of Ryan Deming, correct?

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 63

1     **A     Simon would never contact any of us to do any**

2     **business, just him.**

3          Q     So if Lynnette Lauria was doing something with

4     Tim Herman or with Image Marketing or with any of the

5     related companies, it would -- is it your understanding

6     that Lynnette and Tim Herman would be working on that,

7     collectively, it would not be involving Ryan Deming or

8     Dale Takio?

9          **A     No.  It would just be Tim.**

10          Q     Did Simon Property Group take up about

11     100 percent of Tim Herman's time, or the majority of it?

12          **A     I don't recall him doing much for them at all.**

13          Q     Okay.  Did -- let me ask it a different way.

14     Are you aware of Tim Herman working on any other clients

15     of Image Marketing?

16          **A     Not really.**

17          Q     Okay.  When Ryan Deming was at Image

18     Marketing, and the other companies that may have -- he

19     may have had a partnership role with, Tim Herman, so

20     let's say pre-October of 2010, are you aware of Ryan

21     Deming working on other clients?

22          **A     Other clients, yes.**

23          Q     Okay.  Are you also aware that if Tim had

24     asked Ryan Deming to do something for Simon Property

25     Group, that Ryan would do -- do whatever he was asked to

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                          2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                              Page 64
 1    do?

 2         A     Sure.

 3         Q     Okay.  Is that the same for Dale Takio?

 4         A     Yes.

 5         Q     There was no way for Image Marketing to mass

 6    produce its own marketing material, is there?  In other

 7    words, they didn't have a large printer and photocopier

 8    in their office that they could do that?

 9         A     No.

10         Q     So that would all be stuff that had to get

11    sent out to other companies to produce for Image

12    Marketing, correct?

13         A     Yes.

14         Q     The trade shows and the networking events that

15    were hosted by Image Marketing, are you aware of Brian

16    Peters from Simon Properties Group would also attend

17    those?

18         A     Yes.  Once in a while.

19         Q     He would attend those on behalf of Simon

20    Properties for the Image Marketing event, correct?

21         A     Say that again?

22         Q     In other words, Image Marketing would host an

23    event?

24         A     Mm-hmm.

25         Q     And are you aware of Simon Properties would
```

Electronically signed by Jean Rohrer (401-292-166-3083)                          2f166a4c-ca8c-48da-b53d-272bdd2cbbc7
Electronically signed by Jean Rohrer (401-292-166-3083)

Thomas Brignolo - 7/12/2013

Page 65

1   always be a titled sponsor of that event?

2       **A**   **Yes.**

3       Q    So Simon Properties would then pay to become a

4   titled sponsor, correct?

5       **A**   **Yes.**

6       Q    Was it Brian Peters who showed up for these

7   events, or were there others that showed up from Simon

8   as well?

9       **A**   **There was others.  Usually the marketing**

10  **coordinator -- I mean, sometimes they even have the**

11  **guest service people have little kiosks in the mall come**

12  **once in a while.**

13      Q    The Mixer Mondays?

14      **A**   **Yes.**

15      Q    The Mixer Mondays were events hosted by Image

16  Marketing, correct?

17      **A**   **Yes.**

18      Q    And on the Mixer Mondays, the -- it's usually

19  Florida Mall, which is Simon Property, correct?

20      **A**   **Mm-hmm.**

21      Q    They would be a titled sponsor --

22      **A**   **Yes.**

23      Q    -- at the Mixer Mondays, correct?

24      **A**   **Yes.**

25      Q    So they would pay for their name or logo to be

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                              2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 66

1    at the Mixer Mondays, correct?

2         **A    Yes.**

3         Q    And then Brian Peters, or somebody else from

4    Simon Properties, would be there to help integrate or to

5    mix with the crowd that would come in for this event,

6    correct?

7         **A    Yes.**

8         Q    Were you at these events as well?

9         **A    Several.**

10        Q    The distribution material, or, I believe we

11   questioned somebody from Simon Property, and they said

12   that there would be times that they want their own

13   brochures, or they would create a certain -- certain

14   marketing piece, I guess, for a specific time period,

15   they would want that distributed.

16             Are you aware if they would bring that to

17   the office, the Image Marketing office, or were you sent

18   out to Simon to pick up those collateral pieces for

19   distribution?

20        **A    Usually to the warehouse, like the Florida**

21   **Mall, to pick them up.**

22        Q    So then you would pick them up in one of the

23   vans?

24        **A    Mm-hmm.**

25        Q    And then who would be assigned for

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                                    Page 67
 1    distribution for those?

 2          A     I, myself.

 3          Q     Yourself?

 4          A     Mm-hmm.

 5          Q     And where would they be distributed?

 6          A     The hotels.

 7          Q     All around Florida?

 8          A     No.   Just the Orlando hotels.

 9          Q     For the Florida Mall?

10          A     For the Florida Mall.

11          Q     What about, did Simon do the same thing for

12    other malls in different locations of Florida?

13          A     Yeah.   There was Naples, and then I believe

14    two or three properties in south Florida.

15          Q     So, would you be tasked with the

16    responsibility of -- of that distribution, or would it

17    be a shared responsibility?

18          A     Shared.

19          Q     Okay.   So that the burden wouldn't all be on

20    you to handle foreign places?

21          A     Right.

22          Q     Foreign, meaning --

23          A     I had to do it a couple times, and I am not

24    familiar with south Florida, so I let them know this

25    was -- I would need training.   Have to learn the area
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                                      2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 68

1    **first.**

2         Q    Okay.  So at that point you would send Ryan to

3    go do that work, or Dale?

4         **A    Ryan would do it.  Tim said he did it.  Don't**

5    **know that that happened.**

6         Q    He's just helping me get the words right.

7    So -- like I forgot, Mixer Monday, so he brought that

8    up.

9              All right.  So then it became -- if it

10   was something -- is it fair to say then outside of the

11   general Orlando market it became a -- distribution

12   became a shared task within the office?

13        **A    Yes.**

14        Q    Okay.  Are you aware of any collateral pieces

15   that you may have picked up from Simon Property that did

16   not get distributed?

17        **A    There was probably some leftover materials**

18   **that weren't all distributed, but if you go to south**

19   **Florida and pick something up from the mall, then it**

20   **went right to the hotels.**

21        Q    Okay.  But you're not alleging, even as it

22   relates to Tim at that point, but you're not alleging

23   that materials were picked up from Simon, not

24   distributed, but were billed as such?

25        **A    I wouldn't know.  On behalf of everybody else,**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)

2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 69

1   **I don't know.**

2       Q    Okay.

3       **A    I mean, if I picked something up, they would**

4   **know.**

5       Q    Okay.  But you're not aware of -- are you

6   aware of Ryan Deming saying that he delivered something,

7   but didn't?

8       **A    No.  He would never do that.**

9       Q    He would never do that?  Okay.  That was good.

10  That's what you said?

11      **A    Yeah.**

12      Q    Are you aware of Dale Takio ever -- ever

13  saying that he delivered something that he did not?

14      **A    No.  Dale wasn't ever doing distribution.**

15      Q    Okay.  Would Dale deliver his Kids Eat Free

16  cards?

17      **A    Yes.**

18      Q    But did Dale -- would Dale partake in the

19  distribution, if he was asked, of any type of rack

20  brochures or collateral marketing materials to the

21  hotels?

22      **A    Maybe once or twice.  I mean, that wasn't his**

23  **responsibilities.**

24      Q    Okay.  The -- since we are talking about

25  Dale -- the Kids Eat Free cards, those prominently

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

```
                                                    Page 70
 1    display within the Florida Mall, correct, Simon

 2    Property?

 3        A    Mm-hmm.

 4        Q    And, are you aware, that these are marketing

 5    pieces, correct?

 6        A    Yes.

 7        Q    The Kids Eat Free cards?

 8        A    Yes.

 9        Q    And let me just make sure we are on the same

10    page.  The Kids Eat Free cards, basically, is a tourist,

11    or an individual that purchases the card for a certain

12    fee, and they would purchase a meal, and their children

13    would be able to eat for free at that point, correct?

14        A    Yes.

15        Q    And there are certain restaurants that are

16    part of that program, correct?

17        A    Correct.

18        Q    And those restaurants would be identified on a

19    collateral piece with the card?

20        A    Yes.

21        Q    Correct?  And the Florida Mall restaurants

22    would be promoted within the collateral marketing piece,

23    correct?

24        A    Yep.

25        Q    So those restaurants would become part of the
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                          2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                                    Page 71
  1    program?

  2         A     Yes.

  3         Q     And, therefore, they would benefit from the

  4    program?

  5         A     Yes.

  6         Q     Dale would be tasked with delivering anything

  7    involving the Kids Eat Free cards?

  8         A     And getting more restaurants on the card.

  9         Q     And getting more restaurants on the card?

 10    Okay.  At the social events that were hosted by Image

 11    Marketing, are you aware of -- you may or may not be

 12    aware of what they charged each individual sponsor or --

 13         A     In the beginning it was $10, and then, towards

 14    the end, I think they reduced it to five.

 15         Q     That's for?

 16         A     The admission into the events, and usually a

 17    drink.

 18         Q     Okay.  Are you aware of how much they would

 19    charge -- excuse me -- people who advertise within the,

 20    within these trade shows or mixers?

 21         A     No.

 22         Q     Are you aware if they would charge a client

 23    like Boggy Creek differently than they would charge

 24    Simon Property Group?

 25         A     I don't think they ever had any other sponsors
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                                      Page 72
 1   for the Monday Mixer, other than the mall.

 2        Q    Other than Simon Property?

 3        A    Yeah.

 4        Q    Are you aware if they had an exclusive

 5   arrangement with Simon Property mall?  Meaning that they

 6   could not or would not advertise or market for any other

 7   mall other than Simon Property Group?

 8        A    I wasn't aware of that.

 9        Q    Did you ever see them market or take on as a

10   client any of Simon Property Group's competitors?

11        A    No.

12        Q    I'm going to show you from my own notes,

13   Tommy.  I'm going to come over to you.  Put something --

14   the trade shows, as I understand it, are different than

15   the Monday Mixers, correct?

16        A    Correct.

17        Q    Okay.  So, like, for instance, these are event

18   sponsors within the Image -- were you aware of these?

19        A    Yes.

20        Q    -- trade shows?

21        A    Mm-hmm.

22        Q    Yes?  So, for instance, the hospitality

23   appreciation trade show, that's an Image marketed,

24   sponsored, event, correct?

25        A    It was owned by GMF Consulting, and Image
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 73

1  **partnered with them.**

2      Q    Image partnered.  Okay.  So if you look at the

3  bottom here, we have a lot of sponsors?

4      **A    Correct.**

5      Q    Correct?  We have Wet N' Wild, we have -- your

6  eyes are better than mine.

7      **A    Sea World, Florida Mall, Travel Host, Pirates.**

8      Q    Okay.  Are you aware if everybody was charged

9  the same rate to be a -- a titled sponsor, or if --

10  different rates?

11     **A    I wouldn't know.  And those would have**

12  **probably gone to GMF Consulting.**

13     Q    Are you guessing, or you don't know?

14     **A    I would say about 90 percent sure, because the**

15  **guy's name is George, and it's George's trade show, not**

16  **Image Marketing's trade show.**

17     Q    Are you aware of -- and this is -- this is

18  reported because you did a lot of that in your January

19  deposition.  I don't want you to assume anything.  So is

20  it fair to say, whatever arrangement GMF Consulting had

21  with Image, you're not privy to that arrangement?

22     **A    Not at all.**

23     Q    Okay.  If Image Marketing had a relationship

24  with Kenney, or with Travel Host, is it fair to say you

25  were not privy to any of those contractual

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)        2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 74

1    relationships?

2         **A    No.**

3         Q    Is it fair to say that prior to Ryan leaving

4    Image, that the one who taught you the concierge

5    business was Ryan?  Did he bring you to the hotels?

6         **A    Yeah.  He brought me to the hotels.**

7         Q    Brought you to the concierges?  The -- the

8    Image -- Image Marketing had -- when Ryan left the

9    office, I believe at that particular point in time there

10   was a -- about 10,000 different contact sources,

11   potential clients, clients, referral sources of Image

12   Marketing.  Do you know if, after Ryan left Image

13   Marketing, what happened to that contact list?

14        **A    No.**

15        Q    Do you know if Tim sold that list to VS

16   Publishing?

17        **A    I wouldn't know.**

18        Q    Do you know anybody at VS Publishing?

19        **A    Not currently.**

20        Q    Did you?

21        **A    Yeah.  Of course.  We ran into them at all**

22   **these trade shows and hospitality events.**

23        Q    Did you ever hear on the buzz that, whether or

24   not Tim had distributed that list of VS Publishing?

25        **A    I had heard it through rumors, but I could**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)          2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 75

1   **never say for sure.**

2        Q    Okay.  In your deposition, there became this

3   great big discussion about -- I don't know if you can

4   remember this -- but about the marketing on the vans?

5        **A    Mm-hmm.**

6        Q    Logo placement on the vans.  Do you -- and

7   again, this was a lot of conversation, and it was the

8   most completely general.  Conversation was brought up

9   concerning Sun Cruise Casino and Advantage Rental Car,

10   that they, too, were advertising on the vans.  Question

11   for you is the following.  Do you know specifically the

12   terms of the business deal between Sun Cruise Casino and

13   Image Marketing?

14        **A    No.**

15        Q    Do you know specifically the arrangement, the

16   terms of the business deal, between Image Marketing and

17   Advantage Rental Car?

18        **A    No.**

19        Q    Okay.  So, counsel for Simon Property Group,

20   in your January 2012 deposition, kept bringing up that

21   Simon Property was paying, X, while these other

22   companies were paying, Y, and that there was a

23   difference.  Do you remember that?

24        **A    Mm-hmm.**

25        Q    And they seemed to think that, or want to give

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                                         2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Case 6:11-cv-01598-GAP-KRS   Document 406-1   Filed 04/01/14   Page 77 of 111 PageID 8125

Thomas Brignolo - 7/12/2013

```
                                                    Page 76
   1    an appearance that that was somehow unfair.  Do you

   2    remember -- do you remember that?

   3         A    Yeah.

   4         Q    Okay.  What wasn't discussed what we just

   5    talked about, which wasn't brought to light, and that

   6    is, whatever the terms were of the business deal with

   7    Sun Cruise Casino or Advantage Rental Car, those would

   8    be things that would not be known to you, correct?

   9         A    Correct.

  10         Q    So if they were being paid -- if Image

  11    Marketing was being paid through barter and some money,

  12    or for other types of work-out arrangements in order to

  13    bring the price down on advertising on the vehicles,

  14    that would not be something you would have knowledge of,

  15    correct?

  16         A    Correct.

  17         Q    At the time of your January 2012 deposition,

  18    had you ever leased to a company advertisements on any

  19    type of vehicle rack?

  20         A    No.

  21         Q    Did you ever look into what a vehicle rack

  22    cost would be?

  23         A    No.

  24         Q    Were you aware -- back up.  Did you ever see

  25    at the -- prior to giving your 2012 deposition, did you
```


Thomas Brignolo - 7/12/2013

```
                                              Page  77
 1    actually ever see an Image Marketing and Simon Property

 2    Group contract?

 3         A    No.

 4         Q    So you would not have any personal knowledge

 5    as to what types of services were to be provided as to

 6    any particular project or as -- any particular contract?

 7         A    No.

 8         Q    Are you aware of their ever being a time limit

 9    as far as the distribution of certain marketing material

10    for Simon Property Group?

11         A    No.

12         Q    Good point.

13              This -- let's go back to this.  Can you

14    please tell me how Simon Properties -- because Mr. Blair

15    didn't get it.  Can you please tell me how Simon

16    Properties benefits from the concierge program?

17         A    It would basically try to get tourists in the

18    Orlando area to go over to the Florida Mall, via talking

19    to the concierge and promoting the Florida Mall.  When

20    guests ask where to go shopping, the concierge would be

21    educated about the Florida Mall, and they could request

22    them to go there.

23         Q    So it was a means of driving traffic

24    specifically to the Florida Mall, correct?

25         A    Yes.
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)

2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 78

1      Q    Or other Simon related properties?

2      **A    Yes.**

3      Q    And this was a service that Image offered to

4  different Simon Properties throughout Florida, correct?

5      **A    Yes.**

6      Q    Are you aware -- did Ryan Deming ever share

7  with you the numbers that, the value added, the actual

8  physical numbers, of what the concierge program did for

9  Simon Properties?

10     **A    Yes.**

11     Q    Drove enormous amount of traffic to Simon

12  Properties, correct?

13          MR. GREEN:  Objection.

14          THE WITNESS:  Just in Orlando.

15  BY MR. BRAND:

16     Q    Just in Orlando, what?

17     **A    Meaning, they drove a lot of tourist business**

18  **to the Orlando property.  South Florida properties**

19  **weren't, I would say, the best.**

20     Q    But it -- did you find, or in your opinion,

21  was the concierge program cost effective in the Orlando

22  area?

23     **A    In the Orlando area, yes.**

24     Q    Did -- in your opinion, did Florida Mall

25  benefit from the concierge program established by Image

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 79

1    Marketing?

2         **A     Well, with owning a busines myself with a**

3    **return on investment, I would say, no, for the amount**

4    **they end up paying towards the end of employment.  But**

5    **if they had been charged like a regular client, then I**

6    **would say it would be a good return on the investment.**

7         Q    In your business with Nolo, do you charge each

8    client the same price, or do you charge clients

9    differently?

10        **A    Depending on services, very similar prices.**

11        Q    Did you ever attend any of the Image Marketing

12   posted -- Image Marketing hosted events with the Orlando

13   Magic?

14        **A    Yes.**

15        Q    Okay.  Am I correct to say that the Florida

16   Mall was one of the titled sponsors in all the Orlando

17   Magic events hosted by Image Marketing?

18        **A    Yes.**

19        Q    If event planners hosted certain functions, or

20   participated with Simon Property Group in certain

21   functions, would you have been privy to which cost Event

22   Planners had incurred, or would that be something, an

23   accounting piece, outside of your knowledge?

24        **A    Yeah.  I wouldn't go over prices.**

25        Q    Okay.  Is it your understanding that the

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)          2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                              Page 80
 1    Central Florida Distribution provided by Image Marketing
 2    included the territory from Daytona Beach to basically
 3    Tampa.  Like --
 4          A    No.
 5          Q    Daytona Beach to Tampa?
 6          A    No.  Just the tourism hotel area here in
 7    Orlando.
 8          Q    So you would say the I-4 corridor?
 9          A    Not the I-4 corridor.  Just Lake Buena Vista,
10    I-Drive, 192, airport area.
11          Q    Are you aware of distribution being conducted
12    by Image Marketing expanding further out, whether it's
13    east or west?
14          A    No.
15          Q    Do you have any knowledge as to any
16    distribution on the part of Lynnette Lauria or her
17    family or her related companies?
18          A    No.
19          Q    Okay.  And when I say, do you have any
20    knowledge, meaning, would you know whether or not they
21    made distributions of marketing material for Simon
22    Property Group or not?  That would be something outside
23    of your knowledge?
24          A    Wouldn't make sense, because they have --
25          Q    No.  No.  I'm not asking if it makes sense or
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 81

1    not, I'm asking, would you have knowledge if they did

2    it?

3         A    No.

4              MR. GREEN:  Objection.

5    BY MR. BRAND:

6         Q    Did you ever ask Lynnette Lauria or any of the

7    Laurias if they did any type of distribution on behalf

8    of Simon Property Group?

9         A    No.

10        Q    Did it ever come up in conversation, or did

11   the need ever come up in conversation between you and

12   any of the Laurias as to distribution as to Simon

13   Property Group?

14        A    No.

15        Q    Am I correct to state that Image Marketing

16   Group did not have a large photocopy machine in which to

17   run off volumes of marketing paraphernalia?

18        A    No.  Just had a regular, small printer.

19        Q    Small printer?

20        A    Mm-hmm.

21             MR. BRAND:  Take a five minute break.

22             (A break was taken.)

23   BY MR. BRAND:

24        Q    Tommy, I just want to make sure, you've had no

25   communication whatsoever with Simon's expert witness,

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 82

1    Homme, H-o-m-m-e, correct?

2         A    **Never.**

3         Q    You provided him no information?

4         A    **Never heard of him.**

5         Q    Never provided him any documents?

6         A    **No.**

7         Q    Never answered any questions that he may have

8    had?

9         A    **No.  Never heard of him.  Never contacted him.**

10        Q    Okay.  I'm reading part of Mr. Homme's report

11   here.  And so, again, this goes to clarification.  He's

12   referring to you in your January 2012 deposition.  And

13   he -- he states, again, that it's being alleged by you

14   that Image Marketing overcharges Simon and provides

15   kickbacks to Lynnette Lauria, Regional Marketing

16   Director for Simon.  Again, the context of your 2012

17   deposition, you do state that?

18        A    **Yes.**

19        Q    Okay.  It's general, general conversation.

20   When you made such a statement or context, were you

21   intending to include Ryan Deming and Dale Takio within

22   that?

23        A    **No.**

24        Q    Okay.  And when -- there is no timeframe in

25   here.  The timeframe that if you were alluding to that,

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 83

1   were you alluding to a timeframe of overcharges or

2   kickbacks, subsequent to Mr. Deming leaving the company?

3       **A     No.  It had nothing to do with Ryan.**

4       Q     Nothing to do with Ryan?

5       **A     No.**

6       Q     And if it did, it would have been afterwards?

7       **A     It wouldn't have involved him at all.**

8       Q     Okay.  Are you alleging that Ryan Deming or

9   Dale Takio had any knowledge whatsoever of kickbacks

10  going on between Image Marketing and Lynnette Lauria?

11      **A     I don't think they would stay working there if**

12  **they did.**

13      Q     Okay.  Are you aware of any knowledge on the

14  part of Ryan Deming or Dale Takio that they would have

15  had knowledge that Image Marketing was somehow falsely

16  billing Simon Properties?

17      **A     No.  Because that would be through Tim's**

18  **computer.**

19      Q     Okay.  And you've never saw Tim -- I mean, you

20  never saw Ryan Deming or Dale Takio on Tim's computer?

21      **A     No.**

22      Q     Are you aware if Tim Herman ever shared his

23  billing or invoicing with Ryan Deming or Dale Takio?

24      **A     No way.**

25      Q     Okay.  Rex Homme does not refer to the social

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 84

1   events hosted by Image Marketing, whether they were

2   gatherings, whether they were Monday Mixers, whether

3   they were regional or local events.  He does not take

4   into consideration the fact that Simon Property Group

5   was a sponsor at these -- at these particular groups.

6                  Is it your understanding that as to the

7   events hosted by Image Marketing, that Simon Properties

8   Group, whether Simon Properties Group or one of those

9   malls, was always a titled sponsor at one of these

10  events?

11      A    Yeah.  They were always a titled sponsor.

12      Q    Is it fair to say that Tim Herman cut you out

13  of the loop as to the Tim Herman ongoings, business

14  ongoings?

15      A    Yes.

16      Q    You were not Ryan Deming's boss, right?

17      A    No.

18      Q    You were not Dale Takio's boss?

19      A    No.

20      Q    So is it also fair to say that Dale Takio and

21  Ryan Deming, as it comes to what they were supposed to

22  do for their own job responsibilities, that would be

23  information that you were not privy to?

24      A    Correct.

25      Q    So if Ryan Deming or Dale Takio made

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                          2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

```
                                                    Page 85
 1    distributions or worked on Simon Property Group for a

 2    project to project, that's not something that they had

 3    to share -- that's not knowledge that they had to share

 4    with you, correct?

 5        A    Correct.

 6        Q    So is it -- if Ryan Deming or Dale Takio did

 7    perform functions, services, work, or even Kids Eat Free

 8    cards, to the benefit of Simon Property Group, that

 9    could have been information or work performed that they

10    didn't share with you?

11        A    Correct.

12        Q    Does Nolo Marketing do business with FPIC or

13    Kenney Communications?

14        A    No.

15        Q    The -- you were paid by both Image Marketing

16    and you received payments as well from Takitik, Inc.,

17    correct?

18        A    Yes.

19        Q    The services that you provided for Takitik

20    would have been services directed to you by Dale Takio,

21    not by Tim Herman, correct?

22        A    Correct.

23        Q    Different promotions by Image Marketing Group,

24    such as Orlando Magic that we talked about earlier,

25    Summer Bashes, Spring Concierge Services, the Florida
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 86

1   Mall, would be one of the titled sponsors to those

2   events as well, correct?

3       **A    Yes.**

4       Q    And the Florida Mall would be prominently

5   displayed within whatever promotional pieces were being

6   advertised by Image Marketing for those bashes or social

7   events by Image Marketing, correct?

8       **A    Yes.**

9       Q    You would have no knowledge, personal

10  knowledge, as to whether or not Brian Peters from Simon

11  Property Group ever signed off on or approved work or

12  performances by Image Marketing, correct?  Brian Peters

13  never had conversations with you regarding Image

14  Marketing Services?

15      **A    Never.**

16      Q    Did Lynnette Lauria ever have conversations

17  with you regarding what she approved or didn't approve

18  for Image Marketing to do?

19      **A    No.**

20      Q    So, if Rex Homme states that he found no

21  reason or that he could show no reason why Simon was to

22  ever pay Dale Takio, my question to you is the

23  following.  If Dale Takio or any of the Dale Takio

24  related companies were to provide services to Simon

25  Property, and were to be paid for the services provided,

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)

2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 87

1   that would not necessarily be something that you would

2   have privy to or knowledge about, correct?

3        **A    Correct.**

4        Q    So if Dale Takio or Takitik or Pointe

5   Distribution or DT did provide services, that's not

6   anything that Dale Takio had to say, hey, Tommy, I just

7   did this or I just did that.  Dale had no reason to

8   report to you, correct?

9        **A    Correct.**

10       Q    So if Dale did bill Simon Property, that could

11  be information -- that would be for services completely

12  outside your knowledge?

13       **A    Yes.**

14       Q    If Ryan Deming or Dale Takio provided

15  invoicing to Simon Property for whatever services

16  they're claiming to be provided, that could be for

17  services or billings that are outside of your knowledge

18  and control, correct?

19       **A    Correct.**

20       Q    You would not necessarily have knowledge as to

21  everything that Dale Takio or Ryan Deming did or may

22  have done for Simon Properties Group, correct?

23       **A    Correct.**

24       Q    The intern, Michelle --

25       **A    Mm-hmm.**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

```
                                                   Page 88
 1        Q      -- and Denise, did they also help with

 2     distribution at Image Marketing?

 3        A      Yes.

 4        Q      Were there other interns or employees at Image

 5     Marketing that did distribution?

 6        A      Yeah.  There was one named Liza, but she

 7     didn't last very log.

 8        Q      Minnelli?

 9        A      No.  Just as crazy.

10        Q      Okay.  Here in your deposition, your 2012

11     deposition, you affirmatively state that Tim did not

12     share his books or accounting or computer with you?

13        A      Correct.

14        Q      By the same token, you would have no knowledge

15     as to the billings or services or contracts that may

16     have been with Dale Takio, or Dale Takio related

17     companies and Simon Properties, correct?

18        A      Correct.

19        Q      Or any of the billings that Ryan Deming may

20     have personally done?

21        A      Correct.

22        Q      Do you have any knowledge whatsoever of any

23     type of false billing to Simon Properties Group or to

24     any other clients of Image Marketing that was done by

25     Ryan Deming or Dale Takio?
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 89

1      **A      Not that I know of.**

2      Q      Did you ever see any billings submitted to

3   Lynnette Lauria -- I take that back.  Meant it the other

4   way.  Did you ever see any billings that were created by

5   Lynnette Lauria that were sent to Image Marketing,

6   specifically to Tim Herman?

7      **A      No.**

8      Q      Do you have any knowledge concerning why Simon

9   Property Group in its insurance claim involved in this

10  case listed Westgate Properties as a source of fraud?

11     **A      Probably because her daughter works there.**

12     Q      Any other reason?

13     **A      I wouldn't assume so.  No.  Not Westgate.**

14     Q      Am I correct to say that, as it related to

15  Image Marketing, Image Marketing did have a price

16  distinction between Simon Property and some of its

17  smaller companies or clients like Vons?

18     **A      They were a lot different.**

19     Q      Okay.  Is it fair to say that the attention

20  that would have been given to Simon Properties was

21  different than that that was given to Vons?

22     **A      No, same amount.**

23     Q      Whose client was Vons?

24     **A      It wasn't anyone's client.  I mean, we didn't**

25  **really allocate, you take these clients, you take these**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                     2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 90

1    **clients.**

2        Q    Except for Simon Property?

3        **A    Well --**

4        Q    We already said that was Tim's?

5        **A    That was Tim's -- he would be the contact,**

6    **let's say that.**

7        Q    Okay.  Was it Tim who also delegated a lot of

8    responsibility or direction when it came to Simon

9    Property?

10       **A    Yes.**

11       Q    If during the deposition of Dale Takio, and

12   during the deposition of Ryan Deming in this case, they

13   affirmatively stated that they in fact were given

14   projects, were given responsibilities, and did provide

15   distribution services, and other types of services to

16   Simon Property Group, would you have any reason to doubt

17   Dale Takio or Ryan Deming?

18       **A    No.**

19       Q    Mr. Blair said that he was going to have your

20   iPhone forensically reviewed.  Did he ever take your

21   phone?  Was your phone ever given to him to be examined?

22       **A    Yes.**

23       Q    And can you tell me about that?

24       **A    He just called me in one day, the forensic**

25   **person was there, so we just signed over the phone to**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 91

1    **them.**

2        Q    So are they in possession of that phone?

3        **A    I would imagine they still have it, yeah.  I**

4    **don't have it.**

5        Q    And are there any communications involving

6    Simon Property that are not part of your composite

7    Exhibit 3 that were on that phone?

8        **A    I doubt it.  I don't believe so.**

9            MR. BRAND:  Anthony, just so you know, that

10           wasn't given to us in discovery.

11           MR. GREEN:  I don't know what happened before

12           we were involved.

13           MR. BRAND:  I know.

14   BY MR. BRAND:

15       Q    Here is where Mr. Donaway's Elephant Bar,

16   Maitland.  No recollection?

17       **A    He wanted to meet there.  I never met him**

18   **because I was under the assumption I wasn't supposed to**

19   **talk to him because of the false e-mails I received from**

20   **Tim.**

21       Q    Okay.

22       **A    Now I recollect that in the deposition, but I**

23   **never went because I thought I wasn't supposed to talk**

24   **to him.**

25       Q    Okay.  The June 24, 2011 date that Tim Herman

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                              Page 92
 1   gave me, in this letter --

 2        A    Mm-hmm.

 3        Q    -- was that -- does that sound right, the day

 4   that you officially left?

 5        A    Yeah.

 6        Q    And when I say, this letter, I mean Exhibit 5.

 7   That's the date, the June 24?

 8        A    Same letter.

 9        Q    Keith Dixon, he was not an employee of Image

10   Marketing, correct?

11        A    Correct.

12        Q    But he produced work on a contractor basis?

13        A    Yeah.  He did artwork.

14        Q    Artwork.  Artwork was outsourced to him?

15        A    Yes.

16        Q    And printing would get outsourced to them?

17        A    Yes.

18        Q    Was Allen Harris a partner in Nolo?

19        A    No.

20        Q    Are you still partners with Allen Harris in

21   Nolo?

22        A    No.

23        Q    I don't know who that is.  Is he a business

24   partner or was that personal?

25        A    Personal.
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 93

1                    (Defendants' Exhibit 8 was marked for

2          identification.)

3    BY MR. BRAND:

4         Q    Tommy, I'm going to show you what's been

5    marked as number eight and ask you if you can identify

6    this and what this was about.

7         A    Oh, yeah.  This was a long time ago.

8         Q    Do you recall what that was about, or no

9    recollection?

10        A    I remember now.

11        Q    What was that about?

12        A    False report to law officer concerning a car

13   crash.

14        Q    What did that involve?

15        A    I had crashed my car and left the scene, and I

16   didn't report it correctly, so an officer came over and

17   I gave a different report and then came clean.

18        Q    Okay.  In fact, the state filed this charge,

19   this case number 48-2008-MM-012892-zero, or, oh, against

20   you?

21        A    Mm-hmm.  Correct.

22        Q    And this was a charge that you pled guilty to?

23        A    Yes.

24             MR. BRAND:  I have nothing further.

25             MR. GREEN:  I'll just have some cross here.

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                              2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 94

1                    CROSS-EXAMINATION

2    BY MR. GREEN:

3         Q    I'm Anthony Green.  I'm here for Simon

4    Property.

5                    Last time you were deposed, you testified

6    that numerous services, that were charged to Simon, that

7    were either not provided or were charged in duplicate.

8    Are you changing any of that testimony today?

9         **A    No.**

10        Q    Okay.  Now, with this Top Spots, can you

11   explain to me what that is and how that relates, if it

12   relates to the concierge referral service?

13        **A    It's part of the referral program.  The**

14   **clients or restaurants or attractions use literally four**

15   **cards that the concierge gives the guests.  Those are**

16   **handled, or handed over to the concierge to the guest.**

17   **Some locations had a rack.  So the concierge put them on**

18   **the desk, or they put them on top of the desk in one of**

19   **those racks.**

20        Q    Now would that service normally be charged

21   separately from the concierge referral service?

22        **A    No.  It was part.**

23             MR. BRAND:  Objection, speculative for you to

24        know that.

25             THE WITNESS:  It's a part.  Because I was

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                                    Page 95
 1       doing distribution.

 2   BY MR. GREEN:

 3       Q    Okay.  Do you know whether it was normally

 4   charged separately from the concierge referral service?

 5           MR. BRAND:  Objection, speculative.

 6           THE WITNESS:  No, I wouldn't know, because

 7       some of the clients, with the restaurants or

 8       whatever, if I got them into the program, I was

 9       there to be signing them up with the prices, how

10       much they're charged.

11   BY MR. GREEN:

12       Q    Okay.  But the Top Spot Service, that didn't

13   include putting brochures in racks, did it?

14       A    They're not rack cards.

15       Q    Okay.  And you were asked the question, and I

16   understand this could have been as, just as a

17   hypothetical, but it included -- mentioned Event

18   Planners.  Last time you testified that that was never

19   operational.  Are you changing that testimony today?

20   Did Event Planners actually become operational at some

21   point?

22       A    Not to my knowledge.  They didn't never do

23   anything.

24       Q    Okay.  You also testified that the charges to

25   Simon for the vehicle rack were different from the
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                              2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 96

1   charges to Sun Cruise Casino and Advantage Rental Car,

2   is that correct?

3        **A      Correct.**

4        Q     How do you know -- how the charges were --

5        **A     I couldn't say for sure.  The amounts -- I**

6   **just recall hearing that Sun Cruise got charged X**

7   **amount, where the Advantage Car got charged less.**

8        Q     Do you know whether anyone but Simon, were

9   there any client but Simon paid for the representation

10  at Mixer Mondays?

11       **A     I don't believe there was any other client**

12  **besides Simon advertised with them.**

13       Q     Okay.  Let me clarify that.  No other client

14  was advertising at Mixer Mondays, or no other client was

15  paying?

16       **A     Both.  Essentially.**

17       Q     Okay.  All right.  So no other client was even

18  involved at the Mixer Mondays?

19       **A     I think Travel Host Magazine was at first, but**

20  **I think they backed off, then it just became Simon.**

21       Q     Okay.  You said it wouldn't make sense for the

22  Laurias to perform distribution services for Simon.  Why

23  wouldn't that make sense?

24            MR. BRAND:  Objection, speculation.

25            THE WITNESS:  Because they had Image Marketing

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)
2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 97

1        doing that, they had FPIS or Kenney Communications

2        doing it.  They had distribution companies, rack

3        service companies, doing all that kind of

4        distribution for them.

5    BY MR. GREEN:

6        Q    Okay.  And you were asked whether you know,

7    you know, absolutely whether Dale Takio ever provided

8    services to Simon, and you said that, no, you don't know

9    for certain.  But do you -- are you aware of any

10   services that Dale Takio provided to Simon Property?

11       **A    No.  I'm not aware of either.**

12       Q    Are you aware of any services that Takitik

13   provided to Simon Property?

14       **A    No.  Just the involvement on that card which**

15   **we just talked about.**

16       Q    Are you aware of any services that Pointe

17   Distribution provided to Simon Property?

18       **A    No.**

19       Q    And this was in the Composite 3, the documents

20   you brought today.  This is an e-mail between Lynnette

21   Lauria and Dale Takio dated June 22, 2010.  Take a look

22   at it.

23       **A    Mm-hmm.**

24       Q    Now, you earlier testified that only Tim

25   Herman dealt with Simon Property, but you have this

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                          2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 98

1    e-mail.  Do you want to clarify why this email would

2    exist?

3            MR. BRAND:  Let me first object.  And also I

4        would object because no predicate has been laid

5        whether or not Mr. Brignolo even has any personal

6        knowledge as to that e-mail, or what that's even

7        talking about.  Document would speak for itself.

8            MR. GREEN:  Well, he brought it in his

9        documents, response to the -- so let's find out.

10       Yeah.

11           THE WITNESS:  Like I said, this e-mail doesn't

12       make sense why funds would be going to Pointe or

13       Takitik, unless it was for the referral -- for the

14       Kids Eat Free card.  But I don't believe that was

15       part of Pointe Distribution.

16           MR. BRAND:  Can I see that?  Actually, you

17       mind if you mark this?

18           MR. GREEN:  I mean, it's in composite

19       Exhibit 3.  If you want to mark it separately --

20           MR. BRAND:  Could we mark this as Plaintiff's

21       1 or something?

22           (Plaintiff's Exhibit 1 was marked for

23       identification.)

24  BY MR. GREEN:

25       Q    And you also testified today that you don't

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 99

1    think Dale Takio had any knowledge as to any of, you

2    know, false billings of Simon Property.  But in your

3    last deposition, I'm just going to read it straight out.

4    It starts on page 92 and line 22.  To your knowledge --

5    you're asked, to your knowledge, did Dale Takio have

6    any, I guess, knowledge as to what was going on with

7    these services and billing for services that didn't take

8    place?

9              Your answer was the question, with which

10   company?

11             The followup question was, any of them.

12   I mean, did he -- if I just say, do you think Dale knew

13   what was going on, would your answer be yes, and, if so,

14   why?

15             Your answer was, yes, because he was

16   partners with -- business partners with Tim Herman.

17             Now it seems in your prior deposition

18   you're saying that Dale Takio, you believe Dale Takio

19   did know what was happening and now you're saying

20   that --

21        MR. BRAND:  That's not what he's saying.

22   BY MR. GREEN:

23        Q    -- that he had no knowledge, can you

24   explain --

25        A    Maybe the way the question was asked, if I

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 100

1    know for sure, 100 percent sure.  That's maybe the way

2    it sounded as of today, his question was.  That's

3    different than, do you think.  Are you 100 percent sure,

4    and, do you think, are, maybe that's where the

5    questioning kind of gets confusing.

6         Q    Okay.  You said there was also distribution

7    that you were not involved in that Image did in south

8    Florida, correct?

9         A    Correct.

10        Q    Who, to your knowledge, did that distribution?

11        A    Initially, Ryan started it, but after he left,

12   that became Tim's responsibility.

13        Q    Okay.  You also testified that Tim Herman

14   changed the locks to Image Marketing's offices.  Do you

15   know when that happened exactly?

16        A    No.  Let's see.  If I left -- probably before

17   Ryan left in 2010, so probably a little while before

18   that.

19        Q    Okay.  But at this time did Image Marketing

20   share offices with Takitik?

21        A    Yes.

22        Q    And Takitik was Dale Takio's company, correct?

23        A    Correct.

24        Q    Or he was a part of it.  Did Tim Herman

25   eventually, or at any time give Dale Takio a key to

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 101

1    these new locks for the office?

2        **A    Yes, he must have because Dale would have to**

3    **go in to get to his office.**

4        Q    Did you see Dale Takio come back into the

5    office at some point after the locks were changed?

6        **A    Yeah.**

7        Q    Did you see Ryan Deming coming into the office

8    at any time after the locks had been changed?

9        **A    Yes.**

10       Q    Okay.  So, do you know for certain whether

11   Ryan Deming or Dale Takio ever met or spoke to Lynnette

12   Lauria when Tim Herman was not involved?

13       **A    I can't be for certain, but -- so, I wouldn't**

14   **know.**

15       Q    But can you say for certain that Dale Takio

16   and Lynnette Lauria did have e-mail communications

17   together?

18       **A    That happened, yeah.**

19       Q    Okay.  I may be done.

20            With the concierge referral service, it was

21       cards that you would bring to the hotels?

22       **A    Yes.  Like business size cards.**

23       Q    Where did you get the cards from?

24       **A    The mall.**

25       Q    So did the mall print out all these cards and

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                                  2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 102

1     gave them to you, or --

2          **A     Image Marketing would collaborate with the**

3     **printer, so the printer would come drop them off.**

4          Q     Okay.  What printer?

5          **A     There was several.  I think one was called**

6     **International Minute Press, and then one is called DP**

7     **Printing, I believe.**

8          Q     Okay.  In your previous deposition you

9     testified that Sarah Laggy created invoices for Image

10    Marketing at some point during her employment.  Is that

11    true?

12         **A     Yes.**

13         Q     Do you know how she would know what to put on

14    the invoices?

15         **A     Tim would have told her.**

16         Q     Tim would have told her.  Did you ever witness

17    Tim and Sarah discussing what to put on the invoices?

18         **A     No.**

19         Q     Did Sarah ever come into the offices, the

20    Image offices?

21         **A     I don't believe so.**

22         MR. GREEN:  All right.  That's all I have.

23         MR. BRAND:  Tom, I just have a few response

24    questions.

25                    REDIRECT EXAMINATION

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)

2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 103

1    BY MR. BRAND:

2        Q    Looking at Plaintiff's Exhibit No. 1, which is

3    that June 22, 2010 e-mail from Lynnette Lauria to Dale

4    Takio, do you have any personal knowledge as to what

5    this e-mail is about?

6        **A    Just looks like payment to those two companies**

7    **listed.**

8        Q    Do you have any -- again, do you have any

9    personal knowledge as to what this involved?

10       **A    No.**

11       Q    Do you know what services were provided?

12       **A    No.**

13       Q    Can you speak to the content of this e-mail at

14   all?

15       **A    No.  Just look -- if I can see it?  Just**

16   **saying Lynnette -- or Lynnette is telling Dale Takio at**

17   **Comcast.net to run two different amounts.**

18       Q    You would have no idea why, would you?

19       **A    No.**

20       Q    And you couldn't tell me if this was for

21   distribution services or for tickets to the Orlando

22   Magic?

23       **A    Correct.**

24       Q    Other than picking up this piece of paper, or

25   this e-mail communication, making a copy of it, that's

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 104

1    the only knowledge you have concerning this June 22,

2    2010 e-mail in its entirety, correct?

3         **A    Correct.**

4         Q    The -- you have no personal knowledge

5    concerning what Image Marketing charged Simon Properties

6    for Top Spot's distribution, do you?

7         **A    Just in the -- the original documents from the**

8    **first deposition, there is printed out invoices.**

9         Q    Okay.  But as to the terms of how much money

10   Top Spot's been charging individual clients, the line

11   item that broke things down, that was not something that

12   you were responsible for, was it?

13        **A    No.**

14        Q    And you wouldn't be privy to that information,

15   would you?

16        **A    No.**

17        Q    And if a client that was -- had agreed and was

18   paying for Top Spot's distribution, that's between Image

19   Marketing and the client, correct?

20        **A    Correct.**

21        Q    Counsel for Simon Property asked about Event

22   Planners, and whether or not services were provided by

23   Event Planners.  And you stated, quote, not to your

24   knowledge.  That's -- not to your knowledge, is

25   different than not being performed at all, correct?

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)          2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 105

1       **A      Correct.**

2       Q    So, just because you don't have knowledge of

3   it, doesn't mean Event Planners didn't do anything for

4   its services, correct?

5       **A      Correct.**

6       Q    Events such as Monday Mixers, am I correct to

7   say there was only one titled sponsor?

8       **A      Yes.**

9       Q    And that one titled sponsor was held by

10  Florida Mall, which is a Simon Property mall, correct?

11      **A      Correct.**

12      Q    Am I also correct to say that you do not have

13  personal knowledge as to Dale Takio's, or Dale Takio

14  related company's billings?

15      **A      Correct.**

16      Q    In other words, you're not privy to his

17  contracts with his clients?

18      **A      Correct.**

19      Q    You're not privy to how he would line item a

20  client?

21      **A      Correct.**

22      Q    You're not privy to any agreement that he may

23  have with the client as to amounts charged or how to

24  charge them?

25      **A      Correct.**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Page 106

1      Q    Also, when counsel asked you about whether or

2   not -- I mean, I remember this event when we spoke

3   earlier when Tim changed the locks and locked out -- in

4   early 2010, locked out Dale and Ryan from the office,

5   counsel asked you if -- if Tim gave Dale or Ryan the

6   keys, and your answer was, must have, because they were

7   there afterwards.  Just because they were there

8   afterwards doesn't mean that they actually got the keys

9   back?

10      **A    They may have not have had the keys -- I think**

11   **his question was whether I had seen him there, yeah.**

12      Q    But you don't know if Tim actually gave the

13   keys back, do you?

14      **A    He must have gave Dale a key, because Dale**

15   **stayed around a couple more years.**

16      Q    Do you know if Tim gave Dale or Ryan

17   possession of the books and records of Image Marketing

18   or any of those related companies?

19      **A    I highly doubt it.**

20      Q    Do you know if Tim brought his laptop computer

21   home at night?

22      **A    Probably.**

23      Q    Okay.  In late 2009, Ryan and Tim were already

24   on the outs together, correct?

25      **A    Yes.**

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 107

1        Q    I mean, there was already infighting, there

2    was already animosity between the two of them, correct?

3        **A    Correct.**

4        Q    Is it fair to say based upon your knowledge

5    with Tim and your personal relationship with Tim, that

6    under that type of scenario where there is animosity

7    between two people, Tim is going to be even more

8    secretive than normal?

9        **A    Yes.**

10       Q    Is it also fair to say, based upon your

11   personal knowledge, that Tim was no longer sharing

12   information late 2009 through 2010 with Ryan Deming?

13            MR. GREEN:  Objection.

14            THE WITNESS:  Yeah.

15            MR. BRAND:  Okay.  I have nothing further.

16            MR. GREEN:  Okay.

17            THE REPORTER:  Do you need it typed up?

18            MR. BRAND:  I do.

19            THE REPORTER:  Would you like a copy?

20            MR. GREEN:  Yeah.  We will also take one.

21            Do you want to read or waive?

22            THE WITNESS:  I might as well just waive,

23        because I don't know when it will be ready, if I'm

24        going to be here.

25                (Signature waived.)

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                    2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

```
                                                    Page 108
 1                    (Deposition concluded at 12:51 p.m.)

 2                              -  -  -  -  -

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 109

1                    CERTIFICATE OF REPORTER

2
     STATE OF FLORIDA
3
     COUNTY OF ORANGE
4

5           I, JEAN ROHRER, RPR, CRR, Court Reporter and

6    Notary Public, certify that I was authorized to and did

7    stenographically report the deposition of THOMAS

8    BRIGNOLO, that a review of the transcript was not

9    requested; and that the foregoing transcript, pages 1

10   through 105, is a true and accurate record of my

11   stenographic notes.

12          I FURTHER CERTIFY that I am not a relative,

13   employee, attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorneys or counsel connected with the action, nor am I

16   financially interested in the action.

17          Dated this 16th day of July, 2013.

18

19

20

21          _____

22          JEAN ROHRER, RPR, CRR
            COURT REPORTER
23

24

25

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)          2f166a4c-ca8c-48da-b53d-272bdd2cbbc7

Thomas Brignolo - 7/12/2013

Page 110

```
 1                  CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA  )

 4   COUNTY OF ORANGE  )

 5

 6          I, JEAN ROHRER, Registered Professional

 7   Reporter, Certified Realtime Reporter, Notary Public,

 8   State of Florida, certify that the witness, THOMAS

 9   BRIGNOLO personally appeared before me on the 12th day

10   of July, 2013, and was duly sworn.

11                  WITNESS my hand and official seal

12   this 16th day of July, 2013.

13

14

15

16

17

18   _____

19   JEAN ROHRER
     Notary Public
20   State of Florida
     My Commission No.: DD 951518
21   My Commission Expires:  02/06/2014

22

23

24

25
```

Electronically signed by Jean Rohrer (401-292-166-3083)
Electronically signed by Jean Rohrer (401-292-166-3083)                2f166a4c-ca8c-48da-b53d-272bdd2cbbc7